FILED
2024 Aug-21  PM 03:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **HEATH BERRY, JADE BAKER, SHAWN WILBERT, ERIC BRIGGS, and DANIEL ANDERSON, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**WILLIAM C. BAILEY, ROBERT E. (Bud) CRAMER, JIM SCANLON, JED DEASON, JIM POSS, CAROL TEVEPAUGH, JOHN F. THOMPSON, ARGENT FINANCIAL GROUP, INC., ARGENT TRUST COMPANY, and STEPHEN A. MARTIN,**<br><br>**Defendants.** | **CIVIL ACTION NO.:<br>5:24-CV-00522-HNJ** |

## SECOND AMENDED AND RESTATED VERIFIED COMPLAINT

COMES NOW, Plaintiffs Heath Berry ("Berry"), Jade Baker ("Baker"), Shawn Wilbert ("Wilbert"), Eric Briggs ("Briggs"), and Daniel Anderson ("Anderson") each individually and derivatively on behalf of Radiance Technology, Inc. ("Radiance") and its "Shareholders", and individually and derivatively on behalf of the Radiance Technologies, Inc. Employee Stock Ownership Plan (the "ESOP") and the Shareholders, and individually and derivatively on behalf of themselves and

1

the present and former owners or holders of Stock Appreciation Rights ("SARs"), vested or unvested, and state their direct and derivative claims against William C. Bailey ("Bailey"), Robert E. (Bud) Cramer ("Cramer"), Jim Scanlon ("Scanlon"), Jed Deason ("Deason"), Jim Poss ("Poss"), Carol Tevepaugh ("Tevepaugh"), John F. Thompson ("Thompson"), Argent Financial Group, Inc. ("Argent Financial"), Argent Trust Company ("Argent Trust" together with Argent Financial, "Argent"), and Stephen A. Martin ("Martin", collectively "Defendants") as follows:

## PARTIES

1.    Berry, Baker, Wilbert, Briggs, and Anderson are over 21 years of age and some or all are residents of Madison County, Alabama. They are former employees of Radiance and each of them is a "Shareholder" of Radiance.

2.    Bailey is over 21 years of age and a resident of Marshall County, Alabama. Bailey, at all times relevant to this Complaint, was the Chief Executive Officer (CEO) of Radiance, as well as a member of the Radiance's Board of Directors ("BOD" or the "Board"). Bailey, as the CEO of Radiance and as described below, maintains control over Radiance, the BOD, and the ESOP.

3.    Radiance is an Alabama corporation doing business in Madison County, Alabama, as a defense contractor. Radiance has an ESOP. The ESOP holds the stock of each employee/participant in trust for those Shareholders who own ESOP shares. By virtue of the ESOP, the BOD, the ESOP Trustee, and the officers

of Radiance owe fiduciary duties to the ESOP and its beneficiaries, as well as to all Shareholders, *i.e.*, the Plaintiffs and the Class Members. All these fiduciary duties are intertwined.

4.    Argent Financial is, upon information and belief, a Louisiana corporation, and at all relevant times for purposes of this case was doing business in Madison County, Alabama. Argent Financial performed some or all the duties of Argent Trust under the ESOP.

5.    Argent Trust is, upon information and belief, a Tennessee corporation, and at all relevant times for purposes of this case was doing business in Madison County, Alabama. Argent Trust was designated as the "ESOP Trustee" under the ESOP documents.

6.    Martin is, based on information and belief, an adult resident of Georgia. Martin at all relevant times related to this case was an employee, agent, and officer of Argent Financial and Argent Trust, namely each of those entities' Senior Vice President and Senior Fiduciary Consultant. In his employment capacity, Martin, like Argent, owed fiduciary duties to the employees of Radiance who were Shareholders, whether through the trust or ESOP or otherwise.

7.    The BOD has legal and fiduciary duties which require each Board Member to act in the best interests of Radiance. The BOD consists of two groups: members who are regularly employed by Radiance, and members who are not so

employed. Notwithstanding their fiduciary duties, the members of the BOD have been and are controlled by Bailey because of, among other things, his threats and actions towards former Radiance employees such as revenge lawsuits and terminations that have occurred over the years – including one lawsuit brought against Plaintiff Berry. In essence, the regularly employed members fear for their jobs because of Bailey's erratic history, so they do not challenge Bailey's recommendations and decision-making as Board Members. As for the members who are not so employed, they have pecuniary interests in Radiance, receive benefits from Radiance, and are otherwise beholden to Bailey as CEO of Radiance. With Bailey, the regularly employed members comprise a majority of the BOD.

8.     The BOD members who are Defendants in this action are as follows:

a.     Cramer who is an adult resident of Madison County, Alabama;

b.     Bailey who is an adult resident of Marshall County, Alabama, and as described above is the CEO and an employee of Radiance;

c.     Scanlon who is an adult resident of Madison County, Alabama, and an employee of Radiance;

d.     Deason who is an adult resident of Madison County, Alabama, and is an officer and employee of Radiance;

e.     Poss who, based on information and belief, is an adult resident of Mississippi;

f.     Tevepaugh who is an adult resident of Madison County, Alabama, and an employee of Radiance; and

g.     John F. Thompson is, based on information and belief, an adult resident of California.

9.     All the individuals listed in paragraph 4(a)-(g) above were Board Members at times relevant to this First Amended Verified Complaint and will be referred to herein collectively as either BOD, the Board, or the "Board Members".

## JURISDICTION AND VENUE

10.     Jurisdiction and venue are proper in Madison County, Alabama, and in the United States District Court for the Northern District of Alabama, Northeastern Division, because at all times some or all of Plaintiffs are residents of Madison County, Alabama; Plaintiffs' financial injuries occurred in Madison County, Alabama; and Defendants are located in and doing business in Madison County, Alabama.

11.     The Board Members conduct business in Madison County, Alabama, and regularly attend BOD meetings in Madison County, Alabama.

12.     In addition, all acts complained of in this Complaint occurred in Madison County, Alabama, and/or caused injuries to Plaintiffs in Madison County, Alabama.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

13.     At Bailey's direction and with the (at least tacit) approval of the BOD, Radiance has repeatedly brought lawsuits against Berry and other former Radiance employees. These lawsuits are part of a pattern of intimidation in which Bailey, as CEO of Radiance, authorizes attorneys to file lawsuits against former employees

who dare to leave Radiance. Bailey has made statements in public settings that while he understands Radiance will not win certain lawsuits, he wants to put the former employees through the legal process to require them to spend money and time defending the claims, thus sending a message to current employees of Radiance that they cannot leave without a fight. Despite these public statements and the costs of the various lawsuits, the BOD has allowed Bailey to assume unchecked control and dominance over Radiance. This is just one of many actions taken by Bailey that are breaches of his fiduciary duties over which the BOD has failed or refused to regulate.

14.     The Board Members regularly do not properly do their jobs and have abrogated their fiduciary responsibilities to Radiance and its Shareholders because of their own self-interests. Specifically, the Board Members are paid for their service, and some are provided with benefits. Most owe their Board positions to Bailey. As a result, Bailey has historically controlled the BOD's actions through manipulation, misinformation, and his ultimate ability to replace Board Members. This Complaint highlights some of the self-dealing of which Bailey is guilty and the BOD's failure to regulate Bailey's actions.

15.     Plaintiffs are former employees of Radiance. Plaintiffs are Shareholders of Radiance with their shares held in its ESOP. Under the ESOP, the shares of employees like Plaintiffs are held by the ESOP Trustee in trust for their respective benefit. As Shareholders, Plaintiffs are currently equitable owners of

Radiance and were equitable Shareholders at the time of the events referenced in this First Amended Verified Complaint. Plaintiffs, therefore, have standing to maintain the direct and derivative claims stated below.

16.     The ESOP is an employee welfare benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1101, *et seq.* Radiance is the ESOP plan sponsor and employer and, therefore, is a fiduciary party under ERISA. Additionally, Argent is the ESOP plan Trustee, and therefore is also a fiduciary party under ERISA.

17.     Certain Plaintiffs also own or owned SARs. SARs are contractual rights, under which holders receive cash payouts in the event of certain eventualities, including certain valuation thresholds or buyouts of Radiance. Thus, if Radiance had sold pursuant to the offers (discussed in detail below), SARs holders would have received a SARs buyout from Radiance. Pursuant to any sale of Radiance, the buyout of the SARs would be treated like debt and paid first, off the top of the sales proceeds received. The remaining sales price would then be paid to the ESOP, and ultimately the Shareholders, including those within the ESOP like Plaintiffs.

18.     In early 2023, Bailey began looking at the possibility of selling Radiance because, among other things, Bailey was losing the trust of his management team and Radiance employees because of his erratic and sometimes abusive behavior. Bailey himself had terminated the past two Presidents of the

Radiance in addition to multiple executives and engineers in a relatively short timeframe, and many of the management and staff were concerned about Bailey's autocratic management style. Bailey, on many occasions, used graphic and threatening language such as telling employees he would "shoot them in the head" or "shoot them in the face" if they did not do what he asked. Members of the BOD were aware of Bailey's actions in this regard. On one occasion before Berry officially resigned, Bailey fired Berry abruptly and without merit and then later apologized and said he was just stressed because his son had been arrested and fired.

19.    In the beginning, Bailey kept his plan to sell Radiance to himself and began having clandestine communications with potential buyers. Shortly after these planned meetings, Radiance received what everyone, other than Bailey, believed to be an unsolicited offer from Axient (Sagewind) for the purchase of Radiance. Bailey's plan was to have Axient purchase Radiance with one main caveat: Bailey would remain the CEO. Bailey's covert plan to maintain power was not disclosed to the Shareholders or the BOD.

20.    In the summer of 2023, Radiance received a second "unsolicited" offer from Blue Halo. The BOD became aware of these offers, after which the BOD spent Radiance's money to retain an expert investment banking firm, Jefferies Financial Group, Inc. ("Jefferies"), to value Radiance. The result was a wrench thrown into Bailey's clandestine plan because Jefferies recommended that Radiance be offered

to a "limited" market, as opposed to one of Bailey's handpicked companies that would retain him as CEO, to determine the market value of Radiance and maximize its value.

21.    In the end, Radiance received approximately 14 offers, and these offers were then further culled down to the five "best" offers. All five offers were in a range of two times (2X) the ESOP's last appraised value for Radiance. Upon information and belief, as well as a mathematical calculation, these "culled" offers were all in the range of approximately two hundred fifty million dollars ($250,000,000).

22.    The Shareholders are not fully aware of the offers, because the BOD and Bailey did not disclose either the existence or the value of the offers. In fact, Bailey required individuals who did have knowledge of the offers, including the BOD members, to sign non-disclosure agreements. In the end however, a sale would have resulted in the Shareholders receiving approximately two times the value of the last stock valuation. In addition, some Shareholders also had SARs, which meant the SARs holders would also be paid for their SARs from the sale's proceeds. This obviously was a very lucrative offer for the Shareholders.

23.    For Bailey, these offers meant that, in all likelihood, he would not be allowed to maintain his position as the CEO, and thus his control over Radiance. It would also mean less money for Bailey, because he lacked any SARs rights. In addition, Bailey's loss of control over Radiance would result in, among other things,

Bailey not being able to utilize Radiance's resources to bolster Bailey's son's company, Minerva Defense Inc. ("Minerva"). This was important to Bailey, as Bailey had required Radiance's senior executives, leadership, and technical subject matter experts, including Berry, to leverage their customer contacts and technical abilities to write proposals on behalf of Minerva, a small government contracting company in which Radiance had no direct or beneficial ownership. Requiring Radiance employees to write these proposals was not only an act of self-dealing but also created possible conflicts of interest, as Radiance had the potential to work on these very projects for the benefit of Radiance. Nonetheless, once Bailey understood it was unlikely he would remain CEO upon a sale and that the SARs value would come off the top of any sale price, meaning less money for him, he began to backtrack on selling the company and started taking actions to torpedo the sale.

24.    By mid to late 2023, the due diligence for a sale of Radiance was in process and the five potential buyers were receiving "briefings" on items such as Radiance's programs, contracts, proposals, and business pipelines. During the due diligence process, Radiance's then President, Tim Tinsley ("Tinsley"), was the main point of contact for potential buyers and involved in frequent discussions with them.

25.    Despite Tinsley's involvement in the due diligence and Bailey's past commitment to Tinsley as the future CEO of the company, Bailey unilaterally terminated Tinsley (just as he had the past two Presidents) in the middle of due

diligence and without any legitimate business justification. Bailey's primary reason for terminating Tinsley was to derail the sale of Radiance. Simply put, to terminate the President of the target company in the middle of due diligence, when the President is running the due diligence, is not in the best interest of Radiance and would signal to any potential buyer that there was proverbial trouble in the C-suite.

26.    In addition, Bailey began having discussions with various Board Members, which culminated in a BOD meeting in or around October 2023. At this BOD meeting, Bailey provided the Board Members with false and or misleading financial information. Bailey (who has no expertise in business valuation) manipulated Radiance's financial information available to create his own valuation despite a defined market value. Baily did this in spite of the fact that the BOD had retained Jeffries for the specific purpose of valuing Radiance. The result was that Bailey developed his own personal valuation based on unrealistic and false financial information and projections. Nonetheless, this information was provided to the BOD as a true value and indicated that Radiance was worth substantially more than the five offers Radiance received in the open market.

27.    In addition, Bailey informed the BOD that because of certain programs of which Jeffries was not aware, Radiance would eventually have new product(s) which could ultimately result in a higher valuation. The problem was that these product(s) and programs did not even exist. They were not funded and were

otherwise proverbial "moon shots." Even if these product(s) or programs were potentially viable, these product(s) were not under production and were years away from any form of profitability. The timeline, the costs, significant risks, and unknown possibility of the success of these products were not explained to the BOD. Yet, the BOD asked no questions of Bailey, did not follow up with Jeffries on these matters, and took no action to perform any independent investigation or even due diligence as to whether what Bailey was representing was true.

28.    In sum, to torpedo the sale of Radiance, Bailey (a) fired the existing President who was dealing with the potential acquiring companies, (b) manipulated the financials of Radiance, (c) misrepresented to the BOD that Radiance was worth substantially more than the well-above-market offers "on the table," (d) misrepresented to the BOD that Radiance had products as part of its sales portfolio even though those products were not even funded, and (e) failed to report his own behind the scenes self-dealing and other stated reasons for not wanting to sell.

29.    Worse, the BOD members asked no questions, and, despite having retained valuation experts who brought the offers and thought them in Radiance's best interest, blindly accepted Bailey's representations, performing no independent verification of its own.

30.    As a result of Bailey's representations, the BOD voted to table the sale. In violation of their duties to the Shareholders, the BOD members did not even

disclose the potential for sale to the Shareholders, and thus did not allow the Shareholders to vote on whether to proceed with the sale. Members of the BOD have privately stated that they did not present the potential sale to the Shareholders because, if the Shareholders had been provided the right to vote, they would have undoubtedly approved the sale. So, Bailey and the BOD did what was in each of their respective best interests, not what was in the interest of the Shareholders or the SARs holders. In fact, in an open meeting, Bailey, in response to a question about the sale, made the outlandish statement that he would not sell Radiance at *any* price. Bailey intended to maintain control of Radiance despite what was in the best interest of the Shareholders.

31.    The BOD did no due diligence to determine if what Bailey had represented regarding Radiance's valuation was in fact true. Nor did the BOD listen to Jeffries, which the BOD itself had retained to advise it on valuation. Had they done even minimal diligence, as is their duty as Board Members, they would have easily determined that Bailey's representations were false and reckless. These failures constitute repeated and costly breaches of fiduciary duty to the Shareholders and to the holders of SARs.

32.    As Trustee for the ESOP, moreover, Martin and Argent owed duties to the Shareholders whose shares are reposed in the ESOP, as well as to the holders of SARs. Martin and Argent were aware of the offers to purchase Radiance and, as

trustee of the ESOP, they knew these offers were substantially in excess of the last valuation of Radiance (which under the ESOP Plan document is performed annually). Like the BOD, however, Martin and Argent also failed or refused to conduct any due diligence to investigate Bailey's claims that Radiance was worth more money, thus breaching their duties to the ESOP's beneficial owners (the Shareholders and the SARs holders). Similar to the motive of Bailey, Martin and Argent were driven by their desire to maintain the ESOP and the fees flowing to Argent therefrom, which would have likely been eliminated in a sale of Radiance to any third party.

33.    Shortly after it was announced that Radiance would not be sold, the "brain drain" of Radiance began: approximately ten (10) senior executives soon resigned from Radiance. These ten (10) included the Chief Financial Officer (CFO), Chief Growth Officer (CGO), Chief Capabilities Officer (CCO), a former President/Executive Vice President, and five (5) other Senior Vice Presidents. Beyond the C-suite, critical operations personnel also resigned, as numerous other senior engineers with substantial experience left. In a shocking development, and to illustrate the level of employee frustration, in the midst of these departures Radiance's Human Resources updated the company's policy banning firearms in the workplace to apply to Bailey as a result of multiple employees' voicing concerns for their own personal safety about Bailey. The resignations occurred because

Radiance's employees and senior leadership lost faith in Bailey's ability to lead Radiance, and it had become clear to all that the BOD was simply Bailey's puppet and would not exercise any independent oversight of him. Employees and former employees discussed these specific concerns with Board Members, yet the BOD did nothing.

34.    As this "brain drain" began, Shareholders and SARs holders began to ask questions. Berry, for example, communicated with both Martin and Board Members and asked why the sale did not go through. The Board Members and Martin explained that it was based **_solely_** on Bailey's presentation of the value which, as described above, was based on false financial information – which neither the Board Members nor Argent ever verified or even questioned. In fact, the Board Members and Martin admitted they were completely unaware of Bailey's misrepresentations and clandestine activity and further admitted they were unaware of Bailey's breach of fiduciary duties to Radiance (including Radiance's funding part of Bailey's son's business, Minerva). The Board Members and Martin were also unaware of Bailey's desire to torpedo the sale to maintain his position as CEO. Had the Board Members and Martin conducted any due diligence, Bailey's deceit would have been uncovered.

35.    The members of the BOD completely abrogated their fiduciary obligations to Bailey and allowed him to maintain his total control of Radiance

despite their obligation to check Bailey's power as CEO and to maintain ultimate decisional control over Radiance. And Argent completely failed to protect the interests of the Shareholders and the SARs holders, and thus failed to maximize Shareholder value, in allowing Bailey to torpedo a sale of Radiance, a sale which would have resulted in substantial returns to the Shareholders and SARs holders. The result was that the Shareholders were not even given the opportunity to vote on a potential sale that would have more than doubled their "ownership value" despite the recognition that the Shareholders would have approved the sale.

## RELEVANT PLAN PROVISIONS

36.     The ESOP Plan document contains several provisions establishing the fiduciary responsibilities of Radiance as Plan Sponsor and Administrator. Among them are the following:

a.     Section 2.4(a) of the ESOP imposes upon the Plan Administrator (Radiance) the responsibility "to administer the Plan *for the exclusive benefit of the Participants and their Beneficiaries*, subject to the terms of the Plan." (emphasis added).

b.     Similarly, Section 2.1(a) of the ESOP confers upon Radiance the power to remove the Trustee (Argent) in order to "ensure that the Plan is being operated *for the exclusive benefit of the Participants and their Beneficiaries*." (emphasis added).

c.    Section 2.6 confers on Radiance and Argent the power to appoint advisers and specialists as they deem necessary for, among other things, the providing of "investment information to the Plan's investment Fiduciaries and to Participants." This of course would include the providing of valuation materials and opinions from Jeffries or other financial experts concerning the valuation of Radiance and, upon Radiance's and Argent's providing of such "investment information to the Plan's …Participants[,]" to allow Participants to make intelligent assessments of the advisability of accepting any offer of sale presented to Radiance.

d.    Section 5.2(f) of the Plan provides that "all sales of Company Stock shall be made at a price which, in the judgment of the Administrator, is not less than the fair market value thereof. ***The valuation rules set forth in Article VI shall be applicable***." (emphasis added). Thus, the "judgment of the Administrator" as to a potential sale of Company Stock is to be exercised pursuant to the valuation principles of Article VI of the Plan.

e.    Article VI of the Plan, in turn, specifically Section 6.1 thereof, requires the Administrator to direct the Trustee to determine the net worth of the Assets on an annual "Valuation Date" at their fair market. Section 6.2 requires valuations to "be made in good faith and based on all relevant factors for determining the fair market value of securities."

f.      Pursuant to Section 7.10 of the Plan, Participants and Participant Beneficiaries have the right to sell their shares in Radiance to a third party, provided they give a 14-day right of first refusal to Radiance. In the event Radiance does not exercise its right, "Selling Participant shall have the right, following the expiration of such 14-day period, to dispose of the Offered Shares to the Third Party."

g.      Pursuant to Section 10.10 of the Plan, the "named Fiduciaries" of the Plan are Radiance and Argent. But Argent, as Trustee, "shall have the role responsibility of management of the assets held under the Trust…." However, "each named Fiduciary may rely upon any such direction, information or action of another named Fiduciary as being proper under the Plan, and is not required under the Plan to inquire into the propriety of any such direction, information or action."

**RELEVANT PROVISIONS OF THE TRUST AGREEMENT**

37.    The Trust Agreement also contains several relevant provisions as to the duties of Argent. Among them are the following:

a.      Section 2.3(d) of the Trust provides that Argent has certain defined power to vote the shares held in the Trust. Generally speaking, however, Plan Participants retain their individual power to vote shares held in the Plan under Section 3.3(b) thereof.

b.      Section 2.3(n) of the Trust empowers Argent to "invest and reinvest the assets of the Trust, such as cash that is not already invested in Company

stock, in personal property of any kind…." However, "[t]he Trustee shall follow the directions of the Administrator, shall have no duty to review the assets from time to time so acquired, nor to make any recommendations with respect to the investment, reinvestment or retention thereof…." Thus, ultimate investment authority appears to remain with Radiance.

c.  Section 2.5(a) requires Argent "to discharge its duties hereunder solely in the interest of Participants and other persons entitled to benefits under the Plan…."

d.  Section 2.5(b) of the Trust requires Argent to perform its duties "with the skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]"

e.  Under Section 3.3(c), Argent has specific duties in the event of a tender offer or other offer to sell Radiance: "[i]n the event of a tender offer or other offer to purchase shares of Company Stock held by the Trust, the Trustee shall, ***in its discretion and subject to its fiduciary duties under ERISA and the requirements of this Section 3.3***, tender and sell or not tender and sell such shares." (emphasis added).

## FUTILITY OF DEMAND ON RADIANCE BOARD

38.    To the extent claims stated herein are derivative in nature, Plaintiffs, as well as other Shareholders of Radiance, discussed the specific actions referenced above with numerous members of the BOD, yet the BOD has taken no action. To the contrary, instead of taking any actions relating to the sale or Bailey's wrongful actions, the BOD has instead communicated the complaints back to Bailey, the source of the misconduct. As a result, it would be futile to ask the BOD to pursue the derivative claims against Bailey for his breaches of fiduciary duty to Radiance and against the BOD members for their breaches of fiduciary duty in their abject failure to supervise Bailey and for their failure to allow a Shareholder vote on the potential sale of Radiance, for the following reasons, among others: (1) communications between the Shareholders and Board Members described above have been funneled back to Bailey, which indicates the BOD is aligned with Bailey and has no intention of investigating Bailey's precipitating misconduct or the missed sale opportunity; (2) the claims stated in this First Amended Verified Complaint are against both Bailey (the CEO) and the BOD for their respective but intertwined roles in the missed sale opportunity, so there are no independent Board Members who can make an independent evaluation of same; (3) Bailey (the CEO) and Board Members, are named Defendants and alleged wrongdoers, so it is not reasonable to assume they would agree to file a lawsuit against themselves; (4) Bailey (the CEO) and the BOD

have not only committed the acts alleged and have been made fully aware of the acts via conversations with Shareholders, yet they have taken no action concerning these claims; and (5) the interests of Bailey (the CEO) and the BOD are antagonistic to all of the Shareholders' interests, the SARs holders' interests, and Radiance's interests with regard to the claims stated herein.

### INAPPLICABILITY OF ADMINISTRATATIVE REMEDIES AND DEMAND ON ESOP PLAN SPONSOR AND ADMINISTRATOR (RADIANCE) AND ESOP TRUSTEE (ARGENT AND MARTIN)

39.    The ESOP contains a non-mandatory claims procedure which is applicable only to "claims for benefits under the Plan." (ESOP at § 2.8). That claims procedure is not applicable to the claims brought in this case because, among other things: (a) the claims brought in this action are not claims for benefits under the Plan, but rather are claims for equitable and other relief against ERISA Plan fiduciaries for their respective breaches of fiduciary duty under the Plan, which have caused Plan assets to be substantially compromised in value; (b) the claims procedure under the Plan is clearly optional, providing that claims for benefits "may" be filed in writing with the Administrator; and (c) even if the claims procedure in this case were mandatory (which it is not) and applied to the claims asserted herein (which it is not), any claim brought to the Administrator (which is Radiance) would be futile, for the reasons discussed above regarding the futility of demand on the Radiance BOD.

## CLASS CLAIMS

40.     Plaintiffs bring this action on behalf of themselves and all persons similarly situated, defined as follows:

- ***The Shareholder Class***. All participants in the Plan who own or owned Shares in Radiance which were held in the ESOP Plan from January 1, 2023, to the date of final judgment in this action; and

- ***The SARs Class***. All individuals who have or had SARs in or related to Radiance, whether vested or unvested, from January 1, 2023, to the date of final judgment in this action.

41.     The elements of Rule 23(a) are satisfied for the Classes in that (1) the number of persons in such class are too numerous for individual joinder to be practicable; (2) there are common issues to the claims of all class members – specifically the actions and inactions of Bailey and the BOD, as well as Argent, which breached their fiduciary duties and caused all Shareholders and SARs holders to lose substantial value as a result of the terminated sales negotiations; (3) the respective class representatives' claims are typical of the claims of absent class members because all of the Shareholders and SARs holders are similarly situated and lost substantial value as a result of the breaches of fiduciary duties by Bailey and the BOD and Argent; and (4) the class representatives and their counsel are adequate representatives for the absent class members.

42.     The elements of Rule 23(b)(1)(A) and Rule 23(b)(2) are satisfied with respect to Count VIII of this First Amended Verified Complaint. As set forth in that

Count, one form of relief needed in this case is for the Shareholders to be able to consider and either accept or reject potential offers of sale of Radiance. At this point, the BOD and Argent have actively interfered with the Shareholders' due exercise of their rights, in failing to disclose to the Shareholders the existence and terms of tender offers and other offers for the purchase of Radiance. Shareholders need a fulsome and accurate disclosure of these offers, so that they can decide for themselves whether a sale of Radiance is in their best interest. If some Shareholders wish to sell their shares, then they have that right, subject to Radiance's right of first refusal. And if current market conditions have altered the terms of third-party offers to purchase Radiance's shares, a sufficient number of Shareholders may still wish to sell their shares (again, subject to Radiance's right of first refusal) – in which event the damages for the breaches of fiduciary duty set out herein will be liquidated.

43.     The elements of Rule 23(b)(3) are also satisfied. The common issues relate to the breaches of fiduciary duties by Bailey, the BOD, and Argent, and those issues predominate over any individual issues, and the class-action mechanism is the superior procedural vehicle for resolving and adjudicating all claims of class members who are Shareholders and/or who have SARs in Radiance. In addition, there are currently no other pending actions directly relating to the claims stated herein.

<u>COUNT I</u>
<u>DIRECT BREACH OF FIDUCIARY DUTY AGAINST BAILEY</u>

44.    Plaintiffs readopt and reallege the allegations of the above paragraphs as if set out in their entirety for purposes of this count.

45.    Bailey, acting as an employee and agent of Radiance, the CEO of Radiance, and a member of the BOD of Radiance, owed Plaintiffs, and all Shareholders, fiduciary duties arising under Alabama state law. These duties are based on Alabama state law concerning agency and fiduciary duties of Bailey to the Shareholders as an employee, Officer, and/or Board Member of Radiance. These fiduciary duties are not based on any obligations or duties under the ESOP Plan.

46.    Bailey's actions individually and as an agent for Radiance which include but are not limited to self-dealing, misrepresentations, deceit, and other actions described above, breached his fiduciary duties to Plaintiffs and the other Shareholders. As a result of Bailey's actions, Plaintiffs were unable to receive the value, over and above the current stock valuation, that the sale would have generated. As such this is not a claim for compensatory relief akin to that available under 29 U.S.C. § 1132.

47.    Bailey's breaches resulted in substantial losses to the named Plaintiffs and to the Class members.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, individually and directly, and for themselves and the members of the respective classes, request this

Court to enter a judgment in their favor and against Bailey for compensatory and punitive damages, as well as any other relief the Court deems warranted. The total amount of the judgment shall be determined by the jury.

## COUNT II
## DIRECT BREACH OF FIDUCIARY DUTY AGAINST BOARD MEMBERS

48.    Plaintiffs readopt and reallege the allegations of the above paragraphs as if set out in their entirety for purposes of this count.

49.    The BOD owes a common law fiduciary duty to the Shareholders. This duty is grounded by Alabama state law and not related to any obligations the BOD has under the ESOP Plan.

50.    That duty includes the obligation to not abrogate their own judgment and/or fiduciary duties, but rather to do their own review, investigations, and due diligence before voting. Had the Board conducted even a minimal investigation of Bailey's representations, such as asking the Radiance CFO or other key employees for information, analysis and opinions, it would have been evident that Bailey's representations were demonstrably false and not in the best interests of Radiance and the Shareholders.

51.    The BOD's failure to exercise its own independent judgment and its grossly negligent and self-dealing actions to protect their own self-dealing interest, such as the receipt of compensation and benefits as a Board Member, and other

grossly negligent actions, precludes the BOD from the protection of the business judgment rule.

52.    The Board's grossly negligent actions and/or inactions and failure to conduct a proper review and investigation of the true conditions of a possible sale and Bailey's representations concerning the same has caused Plaintiffs to suffer substantial financial damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, individually and directly, and for themselves and the members of the respective classes, request this Court to enter a judgment in their favor and against the Board for compensatory and punitive damages, as well as any other relief the Court deems warranted. The total amount of the judgment shall be determined by the jury.

## COUNT III
## DERIVATIVE BREACH OF FIDUCIARY DUTY AGAINST BAILEY

53.    Plaintiffs readopt and reallege the allegations of the above paragraphs as if set out in their entirety for purposes of this count.

54.    Bailey, acting as an employee and agent of Radiance, the CEO of Radiance, and a Board Member of Radiance, owed Radiance common law fiduciary duties. These duties are based on Alabama state law regarding fiduciary duties, including but not limited to, the duties of care and loyalty. Bailey's fiduciary duties to Radiance arose from his position(s) as an employee, officer, and or director of Radiance, and are not based on any obligations under the ESOP Plan.

55.    Bailey breached his duties by self-dealing, as described above, as well as his gross negligence and misrepresentations to the BOD relating to the sale of Radiance.

56.    Radiance and its Shareholders have lost substantial value due to Bailey's actions and inactions which led to the termination of sale talks that were well underway. These acts and inactions not only caused the loss of the sale but also the lost money, time, and efforts by Radiance and its employees who worked on the due diligence and the sales process even though Bailey decided to torpedo the sale once he realized he would most likely not stay on as the CEO.

57.    The loss of value will continue, and Radiance and its Shareholders will continue to suffer financial loss because of Bailey's gross negligence, breach of his duty of care and loyalty, and other fiduciary duties.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, derivatively on behalf of Radiance, and for themselves and the members of the respective classes, request this Court to enter a judgment in their favor and against Bailey for compensatory and punitive damages, as well as any other relief the Court deems warranted. The total amount of the judgment shall be determined by the jury.

**COUNT IV**
**DERIVATIVE BREACH OF FIDUCIARY DUTY**
**AGAINST BOARD MEMBERS**

58.    Plaintiffs readopt and reallege the allegations of the above paragraphs as if set out in their entirety for purposes of this count.

59.    The BOD owes Alabama state law fiduciary duties to Radiance. These duties are based on state law and not related to any obligations the BOD has under the ESOP Plan.

60.    The BOD's duties include the obligation to not abrogate their own judgment and/or fiduciary duties but rather to do their own review, investigations, and due diligence before voting. Unfortunately, the BOD has historically acquiesced to Bailey's demands or requests because of his unchecked control over the BOD. Had the BOD conducted even a minimal investigation of Bailey's representations, such as asking the Radiance CFO or other key employees for information, analysis and opinions, it would have been evident that Bailey's representations were demonstrably false and not in the best interests of Radiance and the Shareholders.

61.    The BOD's failure to exercise its own independent judgment and its grossly negligent and self-dealing actions to protect their own self-dealing pecuniary interest, the receipt of compensation and benefits as a Board Member, and other grossly negligent actions, precludes the BOD from the protection of the business judgment rule.

62.    The Board's grossly negligent actions and/or inactions and failure to conduct a proper review, investigation, and due diligence of the true conditions of a possible sale and Bailey's representations concerning the same has caused Radiance to suffer substantial financial damages. These acts and inactions not only caused the loss of the sale but also the lost money, time, and efforts by Radiance and its employees who worked on the due diligence and the sales process even though Bailey decided to torpedo the sale once he realized he would most likely not stay on as the CEO.

63.    The loss of value will continue, and Radiance and its Shareholders will continue to suffer financial loss because of Bailey's gross negligence and breach of his duties of care, loyalty, and other fiduciary duties.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, derivatively on behalf of Radiance, and for themselves and the members of the respective classes, request this Court to enter a judgment in their favor and against the named members of the BOD for compensatory and punitive damages, as well as any other relief the Court deems warranted. The total amount of the judgment shall be determined by the jury.

## COUNT V
## DIRECT BREACH OF FIDUCIARY DUTY AGAINST
## ARGENT AND MARTIN

64.    Plaintiffs readopt and reallege the allegations of the above paragraphs as if set out in their entirety for purposes of this count.

65.    Argent and Martin owe a common law fiduciary duty to the Shareholders. This duty is grounded by Alabama state law and not related to any obligations the Trustee has under the ESOP Plan.

66.    That duty includes the obligation to not abrogate their own judgment and/or fiduciary duties, but rather to do their own review, investigations, and due diligence. Had Argent and Martin conducted even a minimal investigation of Bailey's representations, such as asking the Radiance CFO or other key employees for information, analysis and opinions, it would have been evident that Bailey's representations were demonstrably false and not in the best interests of Radiance and the Shareholders.

67.    Argent's and Martin's failure to exercise their own independent judgment and their grossly negligent and self-dealing actions to protect their own self-dealing interest, such as the receipt of fees and compensation, and other grossly negligent actions, precludes Argent and Martin from the protection of the business judgment rule or any similar protection.

68.    Argent's and Martin's grossly negligent actions and/or inactions and failure to conduct a proper review and investigation of the true conditions of a possible sale and Bailey's representations concerning the same has caused Berry to suffer substantial financial damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, individually and directly, and for themselves and the members of the respective classes, request this Court to enter a judgment in their favor and against Argent and Martin for compensatory and punitive damages, as well as any other relief the Court deems warranted. The total amount of the judgment shall be determined by the jury.

## COUNT VI
## DERIVATIVE BREACH OF FIDUCIARY DUTY AGAINST ARGENT AND MARTIN

69.    Plaintiffs readopt and reallege the allegations of the above paragraphs as if set out in their entirety for purposes of this count.

70.    Argent and Martin owe Alabama state law fiduciary duties to Radiance. These duties are based on state law and not related to any obligations the Trustee has under the ESOP Plan.

71.    Argent's and Martin's duties include the obligation to not abrogate their own judgment and/or fiduciary duties but rather to do their own review, investigations, and due diligence. Unfortunately, Martin and Argent have historically acquiesced to Bailey's demands or requests as a result of his unchecked

control over Radiance. Had Argent and Martin conducted even a minimal investigation of Bailey's representations, such as asking the Radiance CFO or other key employees for information, analysis and opinions, it would have been evident that Bailey's representations were demonstrably false and not in the best interests of Radiance and the Shareholders.

72.    Argent's and Martin's failure to exercise their own independent judgment and their grossly negligent and self-dealing actions to protect their own self-dealing pecuniary interest, the receipt of fees and compensation, and other grossly negligent actions, precludes them from the protection of the business judgment rule or any similar protection.

73.    Argent's and Martin's grossly negligent actions and/or inactions and failure to conduct a proper review, investigation, and due diligence of the true conditions of a possible sale and Bailey's representations concerning the same have caused Radiance to suffer substantial financial damages. These acts and inactions not only caused the loss of the sale but also the lost money, time, and efforts by Radiance and its employees who worked on the due diligence and the sales process even though Bailey decided to torpedo the sale once he realized he would most likely not stay on as the CEO.

74.     The loss of value will continue, and Radiance and its Shareholders will continue to suffer financial loss because of Bailey's gross negligence and breach of his duties of care, loyalty, and other fiduciary duties.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, derivatively on behalf of Radiance, and for themselves and the members of the respective classes, request this Court to enter a judgment in their favor and against Argent and Martin for compensatory and punitive damages, as well as any other relief the Court deems warranted. The total amount of the judgment shall be determined by the jury.

## COUNT VII
## ERISA - BREACH OF FIDUCIARY DUTY
## (AGAINST ALL DEFENDANTS)

75.     Plaintiffs readopt and reallege the allegations of the above paragraphs as if set out in their entirety for purposes of this count.

76.     Radiance and Argent are the named fiduciaries of the Plan and, as such, must act in accordance with their duties imposed under 29 U.S.C. § 1104(a) and other relevant provisions of ERISA.

77.     Among those duties, Radiance and Argent had affirmative duties to discharge their duties with respect to a Plan solely in the interest of the participants and beneficiaries and—for the exclusive purpose of providing benefits to participants and their beneficiaries.

78.    Radiance, through the actions of Bailey and the BOD, and Argent, through the actions of Martin, breached their respective fiduciary duties to Plan participant Shareholders and SARs rights holders by (a) failing to disclose to Shareholders the existence of multiple tender offers to purchase Radiance at multiple times in excess of the then-existing valuation of Radiance; and (b) failing to effect a sale of Radiance pursuant to these multiple offers to sell at multiple times in excess of the then-existing valuation of Radiance.

79.    Pursuant to 29 U.S.C. § 1109(a), Radiance, the BOD members, Argent, and Martin are "personally" liable for the breaches herein above alleged and are, therefore, personally obligated "to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary[.]"

WHEREFORE, Plaintiffs, for themselves and the members of the respective classes, pray that the Court enter judgment in their favor and against the Defendants for such compensatory damages or restitutionary relief, equitable relief, costs, attorneys' fees, and such further relief as may be just and equitable.

## COUNT VIII
## ERISA – ACTION TO ENJOIN BREACHES
## AND TO MANDATORILY ENJOIN DEFENDANTS TO ALLOW
## PARTICIPANTS TO EXERCISE THEIR PLAN RIGHTS
## (AGAINST ALL DEFENDANTS)

80.     Plaintiffs reallege and adopt by reference the allegations in all prior paragraphs of the First Amended Verified Complaint, as if set forth fully herein.

81.     As set forth earlier in this First Amended Verified Complaint, all Defendants have breached their fiduciary duties owed to the Shareholders and the SARs holders by not disclosing the terms of offers to purchase Radiance by third parties at substantially above-market prices.

82.     Although there may be no current outstanding offers to purchase, it is undoubtedly the case that prior offering parties likely maintain an interest in purchasing Radiance.

83.     From the allegations set out above, it is just as clear that these Defendants will not allow Shareholders to evaluate offers to purchase Radiance, nor will they allow these Defendants access to any information which the Shareholders could use to strike their own deals with third parties to sell their respective shares pursuant to the terms of the Plan.

84.     Plaintiffs are ERISA Participants and Beneficiaries under the Plan.

85.    Under ERISA (29 U.S.C. § 1132(a)(3)), the Court is empowered to enjoin any act or practice violating ERISA or the terms of the Plan, or to provide for appropriate equitable relief to redress such violations.

86.    Based on the allegations of this First Amended Verified Complaint, Shareholders are in need of information as to the existence and terms of any offers of sale or purchase of Radiance shares, so that they might exercise their rights under the Plan either to vote for a sale of Radiance entirely, or to sell their respective shares to a third party subject to Radiance's right of first refusal.

WHEREFORE, Plaintiffs, for themselves and the members of the Shareholder Class, pray that the Court enter judgment in their favor and against the Defendants; that the Court mandatorily enjoin Defendants to make fulsome disclosures to the Shareholders as to the existence and terms of any offers of sale or purchase of Radiance shares, so that they might exercise their rights under the Plan either to vote for a sale of Radiance entirely, or to sell their respective shares to a third party subject to Radiance's right of first refusal; and that the Court provide for such further equitable relief, costs, attorneys' fees, and such further relief as may be just and equitable.

## **JURY DEMAND**

Plaintiffs hereby demand trial by struck jury on all issues so triable.

Respectfully submitted,

*s/ G. Bartley Loftin, III*

G. Bartley Loftin, III

**OF COUNSEL:**

Douglas B. Hargett

Amanda J. Turnage

Jordan E. Loftin

Loftin Holt Hall & Hargett LLP

200 Clinton Ave. W, Ste. 405

Huntsville, AL 35801

Telephone: (256) 929-7997

bartley@loftinholt.com

douglas@loftinholt.com

amanda@loftinholt.com

jordan@loftinholt.com

*Counsel for Plaintiffs*

**OF COUNSEL:**

Wilson F. Green

Wilson F. Green LLC

301 19th Street North, Ste. 525

Birmingham, AL 35203

2620 6th Street, Ste. 200

Tuscaloosa, AL 35401

P.O. Box 2536, Tuscaloosa, AL 35403

Telephone: (205) 722-1018

wilson@wilsongreenlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a copy has been electronically filed with the Clerk of the Court

on August 21, 2024, using the CM/ECF system, which will notify the following:

W. Brad English
Emily J. Chancey
La Keisha W. Butler
Robert G. Jones
Taylor R. Holt
Maynard Nexsen PC
655 Gallatin Street
Huntsville, Alabama 35801
*Attorneys for Defendants Robert E. (Bud) Crame, Jim Scanlon, Jed Deason, Jim Poss, Carol Tevephaugh, and John F. Thompson*

J. Ethan McDaniel
Thomas J. Butler
Grace R. Murphy
Thomas W.H. Buck, Jr.
S. Reeves Jordan
Maynard Nexsen PC
1901 6th Avenue North, Suite 1799
Birmingham, AL 35201
*Attorneys for Defendants Robert E. (Bud) Crame, Jim Scanlon, Jed Deason, Jim Poss, Carol Tevephaugh, and John F. Thompson*

David J. Hodge
Morris King & Hodge PC
200 Pratt Avenue
Huntsville, AL 35801
*Attorney for Defendant William C. Bailey*

*s/ G. Bartley Loftin, III*
G. Bartley Loftin, III

## SERVE BY CERTIFIED MAIL:

Argent Financial Group, Inc.
D. Kyle McDonald. President
500 E. Reynolds Drive
Ruston, LA 7127