FILED
2024 Sep-04  PM 03:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1



AlaFile E-Notice

47-CV-2024-900092.00

To: W. BRAD ENGLISH
   benglish@maynardnexsen.com

---

# NOTICE OF ELECTRONIC FILING

---

IN THE CIRCUIT COURT OF MADISON COUNTY, ALABAMA

RADIANCE TECHNOLOGIES, INC V. HEATH BERRY
47-CV-2024-900092.00

The following complaint was FILED on 6/15/2024 3:37:18 PM

Notice Date:    6/15/2024 3:37:18 PM

DEBRA KIZER
CIRCUIT COURT CLERK
MADISON COUNTY, ALABAMA
MADISON COUNTY, ALABAMA
100 NORTHSIDE SQUARE
HUNTSVILLE, AL, 35801

256-532-3390

ELECTRONICALLY FILED
6/15/2024 3:37 PM
47-CV-2024-900092.00
CIRCUIT COURT OF
MADISON COUNTY, ALABAMA
DEBRA KIZER, CLERK

# IN THE CIRCUIT COURT OF MADISON COUNTY, ALABAMA

RADIANCE TECHNOLOGIES, INC.,

     *Plaintiff,*

v.

HEATH BERRY,

     *Defendant.*

Civil Action No. CV-2024-900092

## FIRST AMENDED AND RESTATED COMPLAINT

Plaintiff Radiance Technologies, Inc., for its amended and restated complaint against Defendant Heath Berry, shows the Court as follows:

### Introduction

Radiance develops innovative solutions for its defense, intelligence, and civilian customers. Part of Radiance's business focuses on cutting edge technologies in the directed energy, hypersonic, space, aviation, test and evaluation, intelligence, microelectronics, cyber, and critical infrastructure markets. In these markets, Radiance plays a critical role in the defense of the United States and its men and women in uniform.

In delivering its products and services, Radiance relies on the relationships it builds with its employees, vendors, and customers. Radiance expects its employees to protect these relationships as they agreed to do. Radiance also expects its officers to discharge the fiduciary and other legal duties they owe to Radiance (and its employees/owners). At times relevant to this Amended Complaint, Berry was Radiance's senior vice president. Berry violated these duties by, among other things, approaching customers and other employees about diverting

valuable business relationships and/or contracts from Radiance to PeopleTec, Inc. In hatching

and executing his plan, Berry violated his duties to Radiance and did so intending to damage

Radiance. The Court should enter judgment for Radiance.

## The Parties

1.      Radiance is an Alabama corporation. Its principal place of business is in

Huntsville, Alabama.

2.      Berry is an Alabama citizen and former Radiance employee.

## Jurisdiction and Venue

3.      The Court has subject matter jurisdiction over this action pursuant to Ala. Code §

12-11-30(1) because the amount in controversy, exclusive of interest and costs, exceeds

$20,000.00.

4.      The Court has personal jurisdiction over Berry because he is an Alabama citizen.

5.      Venue is appropriate in this district under Ala. Code § 6-3-2 because Berry, upon

information and belief, resides in Madison County, Alabama.

## FACTUAL ALLEGATIONS

## Background

6.      Radiance is a 100% employee-owned company that has faithfully served its

customers and the Huntsville community since 1999.

7.      Radiance treated Berry well, providing a high salary and tuition assistance for Berry's PhD in engineering from Louisiana Tech University.

8.      Berry was responsible for one of Radiance's business units – the Electronic Systems and Cyber Technology/National Security Management Division.

9.      Berry's business unit had an ongoing business relationship with Honeywell.  In late 2023, the Electronic Systems and Cyber Technology Group/National Security Management Division was deep in negotiations with Honeywell on a new, very lucrative contractual opportunity.

10.     The contract with Honeywell would have provided $6,500,000 in revenue in 2024, and $40,000,000 to $50,000,000 in revenue over the life of the contract.

11.     Berry was heavily involved in the negotiations of the Honeywell contract while employed by Radiance.

**Berry hatches his scheme to divert work from Radiance**

12.     While still employed by Radiance, Berry developed a plan to divert contracts, including the new Honeywell opportunity, away from Radiance to a new employer (PeopleTec).

13.     Berry knew how crucial key employees in his group were to the Honeywell relationship.  So, while still employed by Radiance, Berry recruited these employees to agree to leave Radiance and go to work for PeopleTec.

14.     Berry knew that losing critical personnel would hamper Radiance's ability to perform the Looking Glass work and it would give him a chance to divert that work to

PeopleTec. So, Berry resigned first and went to PeopleTec. Then, along came other employees

from Radiance's Electronic Systems and Cyber Technology Group/National Security

Management Division.

15.    Berry expected and intended that recruiting these other employees to follow him

to PeopleTec would result in PeopleTec getting Honeywell's work.

16.    Just as planned, shortly after Berry and his followers left, Honeywell informed

Radiance that it would no longer be negotiating a contract with Radiance given the departure of

the poached Radiance employees.

## Berry's Fiduciary Obligations

17.    While employed at Radiance, Berry owed fiduciary duties to Radiance, including

the duty of loyalty. Among other things, that duty prevented Berry from stealing Radiance's

corporate opportunities.

18.    While employed at Radiance, Berry was also subject to Radiance's Code of

Ethics and Business Conduct. This Code required, among other things, that employees "dealing

with customers, suppliers, contractors, competitors, or any person doing or seeking to do

business with the Company … to act in the best interest of the Company and [to] avoid even the

appearance of a conflict of interest." (Exhibit A, Code of Ethics and Business Policy.)

19.    Upon information and belief, Berry breached his duty to Radiance by working

with PeopleTec to move people and work from Radiance to PeopleTec.

20.    There was no good faith or legitimate business reason for Berry's actions.

21.     Berry's actions cost Radiance the Looking Glass contract and the $40 to $50 million in future revenue it will generate.

22.     Berry's wrongful acts directly and proximately damaged which lost, among other things, the Looking Glass contract and its associated profit and past performance, as well as good will.

### Count I - Breach of Fiduciary Duty

23.     Radiance adopts the allegations in the paragraphs above, as if set out in full.

24.     By virtue of his employment at Radiance, Berry owed Radiance fiduciary duties.

25.     Berry breached his duty to Radiance by seeking to undermine Radiance's negotiations with Honeywell and divert the Honeywell work to PeopleTec, all as discussed above.

26.     Berry's plan worked as he intended.  Radiance lost the Looking Glass work, while Berry and his former Radiance coworkers are performing it at PeopleTec.

27.     Berry obviously breached his fiduciary duties to Radiance.

28.     Berry's actions were so wanton and reckless, and displayed such a disregard for Radiance's rights, as to warrant punitive damages.

29.     Radiance suffered damages as a direct and proximate result of Berry's breaches, including lost profits, lost indirect cost recovery and damage to its business reputation.

WHEREFORE, Radiance demands judgment against Berry in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish Berry, and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

### Count II – Tortious Interference with a Business Relationship

30.     Radiance adopts the allegations in the paragraphs above, as if set out in full.

31.     Because of his work at Radiance, Berry knew about Radiance's relationship with Honeywell, including the Looking Glass work Radiance was performing while negotiating a subcontract with Honeywell.

32.     PeopleTec was not involved in the Honeywell negotiations.  But, after leaving Radiance and removing himself from Radiance's Honeywell relationship, Berry interfered with Radiance's negotiations and ongoing work on Looking Glass.  That destroyed Radiance's Looking Glass relationship with Honeywell.

33.     Berry had no justified reason for interfering with Radiance's relationship with Honeywell once he became a stranger to it.

34.     Berry intentionally and maliciously interfered with Radiance's business relationship by convincing Honeywell to work with PeopleTec, not Radiance.

35.     Berry's actions damaged Radiance.  As a result of Berry's actions, Radiance lost the Looking Glass work, as well as the profit, indirect cost recovery and the economic growth

that came with it.  Berry's actions were so wanton and reckless, and displayed such a disregard for Radiance's rights, as to warrant punitive damages.

WHEREFORE, Radiance demands judgment against Berry in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish Berry, and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

## Count III – Civil Conspiracy

36.    Radiance adopts the allegations in the paragraphs above, as if set out in full.

37.    Upon information and belief, Berry knowingly conspired with non-Radiance employees at PeopleTec and elsewhere, to divert the Honeywell contract from Radiance to PeopleTec.   Berry took the affirmative steps described above in furtherance of that conspiracy.

38.    Berry and his co-conspirators intended to harm Radiance, not just act in his own self-interest.  Berry's conduct, in furtherance of the conspiracy, caused Radiance injury and damages as discussed above.  Berry's actions were so wanton and reckless, and displayed such a disregard for Radiance's rights, as to warrant punitive damages.

WHEREFORE, Radiance demands judgment against Berry in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish them and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

**Jury Demand**

Radiance demands a jury trial on all claims so triable.

Respectfully submitted,

/s/ W. Brad English                             /s/ David B. Block
W. Brad English                                 David B. Block
Emily J. Chancey                                 Reave W. Shewmake
Robert G. Jones
Benjamin L. McArthur
Thomas J. Butler
Stephen C. Jackson
La Keisha Butler
Taylor R. Holt

MAYNARD NEXSEN PC                                BUTLER SNOW LLP
655 Gallatin Street                              200 West Side Square, Suite 100
Huntsville, Alabama 35801                        Huntsville, Alabama 35801
(256) 512-5705                                   (256) 936-5650
benglish@MaynardNexsen.com                       david.block@butlersnow.com
echancey@MaynardNexsen.com                       reave.shewmake@butlersnow.com
rjones@MaynardNexsen.com
bmcarthur@MaynardNexsen.com
tbutler@MaynardNexsen.com
steve.jackson@MaynardNexsen.com
lbutler@MaynardNexsen.com
taholt@MaynardNexsen.com

*Counsel for Plaintiff Radiance Technologies, Inc.*

**Certificate of Service**

I hereby certify that a copy of this document has been served on all counsel of record by filing it through the Alabama Trial Court System's online filing portal (www.alafile.com), on the June 15, 2024, which will serve the individuals below.

C. Gregory Burgess, Esq.
L. Franklin Corley IV, Esq.
LANIER FORD SHAVER & PAYNE P.C.
2101 Clinton Avenue W.
Huntsville, Alabama 35805

*Counsel for Defendant Heath Berry*

/s/ W. Brad English
Of Counsel

ELECTRONICALLY FILED
6/15/2024 3:37 PM
47-CV-2024-900092.00
CIRCUIT COURT OF
MADISON COUNTY, ALABAMA
DEBRA KIZER, CLERK

# EXHIBIT A



| Title: | | No. | 001 |
|---|---|---|---|
| Code of Ethics and Business Conduct | | | Page 1 of 10 |
| Approval: | | Rev: | 10 |
| CEO | | Date: | 12/1/2023 |

*Radiance will conduct all business affairs, both internally and externally, with uncompromising integrity and ethical behavior.*

## 1.0    STATEMENT OF POLICY – AN INTRODUCTION FROM THE PRESIDENT

The success of our business is dependent on the trust and confidence we earn from our customers and fellow employees.  We gain credibility by adhering to our commitments, displaying honesty and integrity, and reaching company goals solely through honorable and moral conduct. We promise to always do the right thing.

We all deserve to work in an environment where we are treated with dignity and respect. Radiance is committed to creating such an environment because it brings out the full potential in each of us, which, in turn, contributes directly to our business success.

At Radiance, everyone should feel comfortable to speak his or her mind, particularly with respect to ethics concerns. Managers have a responsibility to create an open and supportive environment where employees feel comfortable raising such questions. We all benefit tremendously when employees exercise their power to prevent mistakes or wrongdoing by asking the right questions at the right times. Management has the added responsibility of demonstrating, through their actions, the importance of this code.  To make this code work, managers must promptly address ethical questions or concerns raised by employees and take the appropriate steps to deal with such issues.

Radiance will investigate all reported instances of questionable or unethical behavior.  In every instance where improper behavior is found to have occurred, the company will take appropriate action including disciplinary action up to and including termination. In addition, we will not tolerate retaliation against employees who raise genuine ethics concerns in good faith.

## 2.0    SCOPE

This policy applies to all Radiance employees and Directors.

## 3.0    STANDARDS

All Radiance employees and Directors will conduct themselves with the highest ethical standards and integrity in all business transactions with customers, suppliers, employees, and other parties.  Concurrently, the Company will operate strictly within the bounds of the laws, rules, and regulations that affect the conduct of our business.  The following standards are essential areas to ensuring appropriate business integrity and conduct.

### 3.1 Respect for Others

Radiance Technologies is committed to providing a workplace that is free of discrimination of all types and from abusive, offensive, or harassing behavior.  Any employee who feels harassed or discriminated against should report the incident to their manager or to a Human Resources Representative.

All employees are also expected to support an inclusive workplace by adhering to the following conduct standards:



| Title: | No. | 001 |
|---|---|---|
| Code of Ethics and Business Conduct | | Page 2 of 10 |
| Approval: | Rev: | 10 |
| CEO | Date: | 12/1/2023 |

- Treat others with dignity and respect at all times.
- Address and report inappropriate behavior and comments that are discriminatory, harassing, abusive, offensive or are otherwise unwelcome.
- Foster teamwork and employee participating, encouraging the representation of different employee perspectives.
- Seek out insights from employees with different experiences, perspectives, and backgrounds.
- Support work arrangements for co-workers with different needs, abilities, and/or obligations
- Be open-minded and listen when given constructive feedback regarding others' perception of your conduct.

Radiance Technologies will not tolerate discrimination, harassment, or any behavior or language that is abusive, offensive, or otherwise unwelcome.

3.2 Conflicts of Interest

A "conflict of interest" exists any time an employee faces a choice between his/her personal interests (financial or otherwise) and the interests of the Company. Employees dealing with customers, suppliers, contractors, competitors, or any person doing or seeking to do business with the Company are to act in the best interest of the Company and shall avoid even the appearance of a conflict of interest. Such conflicts include but are not limited to:

- Employment by a competitor or potential competitor, regardless of the nature of the employment, while employed by Radiance. Refer to Radiance Policy No. 007, Outside Employment.
- Acceptance of gifts, payment or services from those seeking to do business with Radiance unless equally available to all Radiance employees.
- Placement of business with a firm owned or controlled by a Radiance employee or his/her family.
- Ownership of, or substantial interest in, a company that is a competitor or a supplier.

- Acting as a consultant to a Radiance customer or supplier.
- Having a personal interest or potential for gain in any Company transaction.

Organizational Conflicts of Interest (OCI) Radiance and its employees must ensure that no OCI either exists or is created or can be perceived as a result of Radiance personnel performing direct support activities for US Government organizations while pursuing or conducting technology development or production roles within this customer base. Radiance Policy No. 036, Organizational Conflict of Interest (OCI), addresses this issue in detail. In addition, all applicants as employees or consultants who are former Government employees must complete the Radiance Procurement Integrity Questionnaire to ensure potential procurement integrity issues are avoided prior to engagement.

3.3 Financial Record Keeping

Radiance will apply the highest ethical standards in its financial and non-financial record keeping and reporting. This includes fully and fairly disclosing the financial condition of the Company in compliance with the applicable accounting principles, laws, rules, and regulations. Accurate and honest recording and reporting of information is critical to our ability to make responsible business decisions. Additionally, the Company will require that:

| Title: Code of Ethics and Business Conduct | No.    001    Page 3 of 10 |
|---|---|
| Approval: CEO | Rev:   10    Date:   12/1/2023 |

- All Company accounting records, as well as reports produced from those records, are kept and presented in accordance with the laws of each applicable jurisdiction.
- All records accurately and fairly reflect the transaction or occurrences to which they relate.
- All records accurately and fairly reflect in reasonable detail the Company's asset, liabilities, revenues and expenses.
- The Company's accounting records do not contain any intentionally false or misleading entries.
- No transactions are intentionally misclassified as to accounts, departments, or accounting periods.
- All transactions are supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period.
- All Company accounting financial reports are prepared in accordance with generally accepted accounting principles; and
- The Company's system of internal accounting controls is always followed.

3.4 Security

To ensure a safe and secure working environment, remain competitive in the marketplace, and enhance our reputation as a government contractor, Radiance employees must effectively protect information, property, and personnel. Employees are responsible for reporting to management and security personnel any security violations or situations that could affect the security of Radiance personnel, facilities, and/or contracts. Employees working on Government classified contracts are also responsible for following established procedures for safeguarding Government classified information (including electronic systems) in accordance with the DOD 5220.22-M National Industrial Security Program Operating Manual (NISPOM) and/or other Government security regulations. Refer to Radiance Security Standard Practice and Procedures Manuals.

3.5 Timekeeping

As a government contractor, Radiance is required to follow the guidelines established in the Federal Acquisition Regulations (FAR) concerning the recording and accountability of labor charges for government contracts. Timesheets are to be prepared accurately and timely (daily) and all employees must adhere to the procedures regarding the recording and accountability of labor charges. Falsifying a timesheet is grounds for immediate disciplinary action up to and including dismissal from employment. As a matter of criminal fraud, falsification is also possible grounds for criminal prosecution. Refer to Radiance Timesheet Control Policy No. 004.

3.6 Proprietary and Confidential Information

Proprietary and confidential information is information that must be protected by company employees from unauthorized disclosure or use. The company and its employees must safeguard not only proprietary information of the company but also the proprietary and confidential information belonging to others which has been entrusted to the company. This duty of protection survives the termination of employment. All employees must sign an Employee Confidentiality and Ownership Agreement upon hiring and adhere to its principles.

3.7 Procurement Ethics

As a government contractor, it is particularly important that we protect the integrity of all procurement of goods and services and enforce the concept of fair and open competition. Radiance is committed to competing solely on the merit of our products and services. We should avoid any actions that create a perception that favorable treatment of outside entities by Radiance was sought, received or given in exchange for personal business courtesies. Business courtesies include gifts, gratuities, meals, refreshments, entertainment or other benefits from persons or companies with whom Radiance does or may do business. We will neither give nor accept business courtesies that constitute, or could reasonably be perceived as constituting, unfair business inducements that would violate law, regulation or polices of Radiance or customers, or would cause embarrassment or reflect negatively on Radiance's reputation.

3.7.1 Gifts, Gratuities and Business Courtesies

It is Radiance policy that employees do not solicit or accept for themselves compensation or money of any amount from persons or companies with whom Radiance does or may do business without a legitimate business purpose.

Unsolicited advertising, promotional "novelty" items, perishable items, or other small dollar gifts and common business courtesies associated with customary business practices are acceptable if the items are not excessive.

3.7.2 Meals, Refreshments and Entertainment

Radiance employees may accept for themselves common courtesies such as meals, refreshments, and entertainment usually associated with customary business practices if they are not excessive.

When suppliers visit our facilities or when supplier's personnel are located within Radiance facilities, Radiance may provide the visitor's meals or refreshments provided the meal/refreshments are provided to all attendees.

3.7.3 Authorized Acceptance of Business Courtesies

Most business courtesies offered to us in the course of our employment are offered because of the employee's positions at Radiance. Employees should not feel any entitlement to accept and keep a business courtesy. Employees may not use their position at Radiance to obtain business courtesies and must never ask for them.

Employees may accept unsolicited business courtesies associated with customary business practices from suppliers or potential suppliers, which are not excessive.

Employees who award contracts or who can influence the allocation of business, who create specifications that result in the placement of business or who participate in negotiations of contracts must be particularly careful to avoid actions that create the appearance of favoritism or that may adversely affect the company's reputation for impartiality and fair dealing. The prudent course is to refuse a courtesy from a supplier when Radiance is involved in choosing



| Title: | No. | 001 |
|--------|-----|-----|
| Code of Ethics and Business Conduct | | Page 5 of 10 |
| Approval: | Rev: | 10 |
| CEO | Date: | 12/1/2023 |

or reconfirming a supplier or under circumstances that would create an impression that offering courtesies is the way to obtain Radiance business.

### 3.7.4 Transportation

Radiance policy is that we do not permit suppliers or their personnel or other representatives to pay for or provide employee transportation. As exceptions, local transportation may be accepted (1) where it is incidental to the purpose of a visit to a supplier or the customer's facility, (2) where the parties share a vehicle for the sake of economy of savings, (3) or where commercial transportation to or from a supplier or customer's facility is clearly impractical.

### 3.7.5 Procurement for Personal Use

Purchases of items that are for the personal use by Radiance employees are not authorized, except for management-approved programs (e.g., the employee personal computer discount program or the tuition reimbursement program, etc.).

## 3.8 Hiring/Appointing Officers and Directors

Radiance will not hire or appoint as an officer or nominate as a director of the corporation any individual who previously engaged in conduct that conflicts with this policy. Radiance will identify an individual's suitability for serving as an officer or Director by verifying their government security clearance and/or performing background checks, as appropriate.

## 3.9 Export Control

Radiance complies with the International Traffic in Arms Regulations (ITAR) governing the export of military hardware, software, and technical data; the Export Administration Regulations (EAR), regulating the export of dual-use hardware, software, and technical data; and all other applicable U.S. Government export regulations. These regulations restrict the transfer of export-controlled items abroad and to foreign persons, including employees, without first obtaining a license or applicable license exemption.

## 3.10 Information Technology

Radiance Information Technology (IT) systems, including but not limited to servers, desktop and laptop computers, networks, PDAs, telephones, cellphones, printers, storage devices, and all related software, should predominately be used for official Radiance business. Digital messaging, such as email, instant messaging, and internet access, must not contain any material that may reasonably be considered offensive, disruptive, defamatory, or disparaging towards any Radiance employee, the company, or third parties. The use of unlicensed or illegally copied software at Radiance is strictly forbidden. Good judgment, personal awareness, and appropriate physical and logical security measures must be used in the protection of all data and information, particularly proprietary and export-controlled information. All usage of IT resources, whether company owned or not, to process or communicate Radiance business or information must be conducted with the company's reputation in mind. Refer to Radiance Computer Policy No. 031.



| Title: Code of Ethics and Business Conduct | No.    001<br>Page 6 of 10 |
|---|---|
| Approval: CEO | Rev:    10<br>Date:   12/1/2023 |

## 4.0    APPLICABLE LAWS AND REGULATIONS

This section provides a partial list of the laws and regulations that are applicable to our business conduct and practices.

### 4.1 Antitrust Laws

Antitrust is a blanket term for laws that protect the free enterprise system and promote open and fair competition. These laws deal with agreements and practices such as price fixing and boycotting suppliers or customers. They also bar pricing schemes intended to run a competitor out of business; disparaging, misrepresenting, or harassing a competitor; stealing trade secrets; bribery; and kickbacks.

Violations of Antitrust laws may result in severe penalties such as forced sales of parts of businesses and significant fines against the Company. There may also be sanctions against individual employees, including substantial fines and prison sentences. These laws also apply to international operations and transactions related to imports and exports.

### 4.2 Foreign Corrupt Practices Act (FCPA)

The FCPA is a United States law that prohibits corruptly giving, offering or promising anything of value to foreign officials or foreign political parties, officials or candidates, for the purpose of influencing them to misuse their official capacity to obtain, keep or direct business or to gain any improper advantage. In addition, the FCPA prohibits knowingly falsifying a company's books and records or knowingly circumventing or failing to implement accounting controls.

### 4.3  International Traffic in Arms Regulations (ITAR)

ITAR is a United States law that regulates the international transfers of equipment or technology that may contain prior approval, licensing, and reporting requirements.

### 4.4  Anti-Kickback Enforcement Act

The federal anti-kickback statute prohibits individuals or entities from knowingly and willfully offering, paying, soliciting or receiving remuneration to induce referrals of items or services covered by Medicare, Medicaid or any other federally funded program. Procurement shall incorporate the prescribed standard Anti-Kickback clause in non-commercial purchase orders/subcontracts issued under a federal prime contract in accordance with the Anti-Kickback Enforcement Act of 1986 (PL 99-634).

### 4.5  Whistleblower Law

A Whistleblower is an employee who reports (usually to a Government agency) the illegal activities of the employer or of another employee. The law provides maximum protection for the Whistleblower when the report is made to a Government agency, especially if the report is made to



| Title: | | No. | 001 |
| Code of Ethics and Business Conduct | | | Page 7 of 10 |
| Approval: | | Rev: | 10 |
| CEO | | Date: | 12/1/2023 |

the agency that has some jurisdiction over the illegal activity. Assuming a Whistleblower law applies, the employer will be barred from retaliating against the employee who made the report.

4.6  False Claims Act

The False Claims Act is a federal law which allows people who are not affiliated with the Government to file actions against federal contractors claiming fraud against the government. The act of filing such actions is informally called "whistleblowing." The Act provides a legal tool to counteract fraudulent billings turned in to the Federal Government.

4.7  Truth in Negotiations Act

The purpose of the Truth in Negotiations Act (TINA) is to give the Government effective means of negotiating a fair and reasonable price. It requires disclosure of cost or pricing data to the contracting officer (or designated representative) and certification that such data provided is accurate, complete, and current for negotiated procurements requiring TINA certification as of a mutually agreed-to-date. The TINA compliance requirement applies whether Radiance is a prime contractor or subcontractor under a Government contract subject to TINA.

4.8  Federal Acquisition Regulation (FAR)

The Federal Acquisition Regulation (FAR) is the principal set of rules in the Federal Acquisition Regulation System. This system consists of sets of regulations issued by agencies of the Federal Government of the United States to govern the "acquisition process," which is the process through which the Government purchases ("acquires") goods and services. That process consists of three phases: (1) need recognition and acquisition planning, (2) contract formation, and (3) contract administration. The FAR System regulates the activities of Government personnel in carrying out that process.

Of particular importance to this policy are FAR 52.203-13, Contractor Code of Business Ethics and Conduct, 52.203-14, Display of Hotline Poster(s), and 52.222-50, Combating Trafficking in Persons. FAR 52.203-13 requires a comprehensive ethics program for Government contractors. The clauses will be included in our subcontracts and other agreements, as required.

4.9  Combating Trafficking in Persons (FAR 52.222-50)

The United States Government has adopted a policy prohibiting trafficking in persons including the trafficking and related activities. Contractors, subcontractors, and their employees shall not:

- Engage in severe forms of trafficking in persons during the period of performance of the contract;
- Procure commercial sex acts during the period of performance of the contract;
- Use forced labor in the performance of the contract;
- Destroy or possess any employee(s) passport or other identity or immigration documents with the intentions to prevent an employee's liberty to travel;

| Title: | | No. | 001 |
| Code of Ethics and Business Conduct | | | Page 8 of 10 |
| Approval: | | Rev: | 10 |
| CEO | | Date: | 12/1/2023 |

- Use misleading or fraudulent practices during the recruitment of employees or offering of employment;
- Charge employees recruitment fees;
- Fail to provide return transportation or pay for the cost of return transportation upon the end of employment;
  - For an employee who is not a national of the country in which the work is taking place and who was brought into that country for the purpose of working on a U.S. Government contract or subcontract (for portions of the contracts performed outside the US); or
  - For an employee who is not a US national and who was brought into the US for the purpose of working on a US Government contract or subcontract (see FAR 52.222-50 for complete clause)
- Provide or arrange housing that does not meet the host country housing and safety standards (Note: as a general rule, Radiance does not provide or arrange for housing);
- Provide an employment contract, recruitment agreement, or other required work document in a written language the employee does not understand.

To ensure adherence to these requirements, Radiance will have a zero tolerance policy regarding trafficking in persons. Employees, officers, directors, subcontractors, and agents of Radiance will be subject to removal from the contract, reduction in benefits and disciplinary action up to and including termination of employment for non-compliance of the government's anti-trafficking policy.

4.10 Copyright or Licensed Materials

It is both illegal and unethical to engage in practices that violate copyright laws or licensing agreements. It is Radiance policy that all employees respect the rights conferred by such laws and agreements and refrain from making or purchasing unauthorized copies of protected materials, including printed matter and computer software.

4.11 Radiance Technologies Policies and Procedures

Radiance policies and procedures that may apply include, but are not limited to:
- Safety and Health, Policy No. 002
- Alcohol and Drug Free Workplace, Policy No. 006
- Equal Employment Opportunity, Policy No. 008
- Non-Harassment, Non-Discrimination, Non-Retaliation, Policy No. 010
- Building and Property, Policy No. 023
- Tabacco and Vape Free Workplace, Policy No. 024
- Personnel Files and Privacy, Policy No. 035
- HIPAA, Policy No. 038

**5.0    RESPONSIBILITIES**

All managers and employees are responsible for observing the basic code of ethical conduct. Managers have additional responsibilities to set an example in their behavior and to ensure that every employee under their



| Title: | | No. | 001 |
|---|---|---|---|
| Code of Ethics and Business Conduct | | | Page 9 of 10 |
| Approval: | | Rev: | 10 |
| CEO | | Date: | 12/1/2023 |

supervision understands the standards of conduct expected and consequences for violating these standards. The Vice President, Director of Human Resources is the corporate official responsible for carrying out the ethics program at Radiance with support from Human Resources. Their responsibilities include:

- Awareness     Maintaining, updating, and distributing this policy to all employees and Directors.
- Training     Provide training to all employees and Directors with acknowledgment.
- Compliance     Ensuring the company complies with the wide range of Government laws and regulations. Also, performing periodic reviews of company practices and internal controls to ensure compliance with this policy.
- Reporting     Providing employees appropriate and numerous channels to report suspected violations of this policy, including channels that provide anonymity and confidentiality. Also, supporting the investigation of complaints under this policy, as appropriate.

Additionally, the Radiance In-House Counsel is the Ethics Officer with the duty to lead or assist complaint investigations, provide legal advice on the policy, and support the ethics program.

## 6.0    DUTY TO REPORT VIOLATIONS

Each employee, officer and director is responsible for promptly reporting to the company any circumstances that such person believes in good faith may constitute a violation of this policy. Suspected policy violations should be reported through one of the following channels:

1. Talk to your supervisor or someone in your management chain.
2. Contact the In-House Counsel.
3. Contact the Director of Human Resources.
4. Contact the President.
5. Call the Ethics Hotline (anonymously and confidentially) at (866) 849-1379.
6. Write a letter to the Board of Directors at:
   c/o Corporate Secretary
   Radiance Technologies, Inc.
   310 Bob Heath Drive
   Huntsville, AL 35806
7. Call the appropriate Government Office of Inspector General (OIG). Contact information is listed on the Radiance Inside site.

No retribution against any individual who reports violations of this policy in good faith will be tolerated. The Company will investigate all reports of violations in a timely manner and will take any appropriate corrective action. The Company will also report to the appropriate Government officials, including appropriate contracting officers, any credible evidence of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity, or a violation of the civil False Claims Act in connection with Government contracts. The Company will cooperate with any Government agencies responsible for audits, investigations, or corrective actions.



| Title: | | No. | 001 |
| Code of Ethics and Business Conduct | | | Page 10 of |
| Approval: | | 10 | |
| CEO | | Rev: | 10 |
| | | Date: | 12/1/2023 |

## 7.0 VIOLATIONS OF POLICY

Violations of any of the foregoing provisions, including failure to report a violation, may expose the Company and the individual involved to lawsuits and possible criminal action. Employees who violate this policy are subject to appropriate disciplinary action, up to and including termination.

## 8.0 TRAINING AND AWARENESS

Radiance believes in being proactive and is committed to upholding the integrity of all our employees. It is our policy to provide periodic ethics training. Employees must formally acknowledge receipt of this policy and training. Training may include our agents and subcontractors, as appropriate.

A copy of this policy is provided to employees during new hire orientation and a copy is also available on the Radiance Inside web site for all employees. The Ethics Policy is reviewed annually by the Board of Directors.

# EXHIBIT 2

FILED

2024 Jun-17 PM 05:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

**RADIANCE TECHNOLOGIES, INC.,**

       *Plaintiff,*

v.

    Civil Action No. _____

**JADE BAKER,**

       *Defendant.*

## COMPLAINT

Plaintiff Radiance Technologies, Inc., for its complaint against Defendant Jade Baker, shows the Court as follows:

### Introduction

This is a blatant case of trade secret theft. As the paragraphs below explain, on his way out of Radiance, Baker downloaded dozens of proprietary documents from Radiance's servers to his Radiance-issued laptop. This included proposal documents, pricing documents, pictures of Radiance's proprietary technology, plus-up strategies and the like. Then, on his way to Radiance's competitor, PeopleTec, Baker transferred those files to a different device and deleted them from Radiance's laptop to cover his tracks. Now, Baker is with his former Radiance colleagues at PeopleTec, performing work they diverted from Radiance,

using Radiance's proprietary data.  For the reasons discussed below, the Court

should enter judgment for Radiance.

## The Parties

1.     Radiance is an Alabama corporation.  Its principal place of business is

in Huntsville, Alabama.

2.     Baker is an Alabama citizen and a former Radiance employee.

## Jurisdiction and Venue

3.     The Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1331 because its Defend Trade Secrets claims, count one, arises under

the laws of the United States.  The Court has supplemental jurisdiction over

Radiance's remaining claims under 28 U.S.C. § 1367 because all the claims arise

out of a common nucleus of operative facts, forming the same case or controversy.

Additionally, the Court should exercise supplemental jurisdiction for convenience

and judicial efficiency since the claims are expected to be tried together.

4.     The Court has personal jurisdiction over Baker because he is an

Alabama citizen.

5.    Venue is appropriate in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Radiance's claims occurred in this district.

## FACTUAL ALLEGATIONS

### Radiance's secured microelectronics work

6.    Radiance is a government contractor providing, among other things, microelectronics and cyber technology services to the U.S. government under various prime contracts and subcontracts.

7.    Radiance hired Baker as chief scientist in 2018.  By 2021, Baker was Radiance's assistant vice president.  In that role, Baker worked as part of Radiance's Electronic Systems and Cyber Technology group, led by then-senior vice president Heath Berry.  Baker was essentially Mr. Berry's second-in-command.

8.    Radiance's Electronic Systems and Cyber Technology group's work on federal government contracts focuses on anti-tamper microelectronics, a collection of countermeasures that protect security chips, like microchips, from being monitored or affected.

9.    In August of 2022, President Biden signed the Creating Helpful

Incentives to Produce Semiconductors ("CHIPS") and Science Act into law. The CHIPS Act is designed to attract microchip manufacturing back to the United States after decades of companies offshoring the technology. Radiance is doing just that. In fact, Radiance is working to build a facility in Louisiana to produce microelectronics CHIPS packages.

10. Radiance's research and development work allows it to produce the microelectronics CHIPS packages through various federal contracts, such as the Agile Cyber Technology 3 ("ACT3") indefinite-delivery, indefinite-quantity ("IDIQ") contract vehicle.[1] Radiance protects the information about its ACT3 contract, and others, by using secured internal networks, marking documents as proprietary, requiring some of the work to be performed only in classified areas, and with non-disclosure agreements.

11. Baker was heavily involved in several of Radiance's microchip business relationships, including with Honeywell International. In 2023, Baker was part of the Radiance team that negotiated a subcontract with Honeywell to

---

[1] The government uses IDIQ contracts to winnow down potential suppliers to a pre-vetted group of eligible contractors, or sometimes a single contractor. The IDIQ does not order work but establishes a framework under which the government can place future orders. This allows the government to streamline competitions for future orders by limiting competition to the pre-vetted group of suppliers holding the IDIQ contract. An IDIQ contract is often called a "license to hunt" because it allows a company to bid on work in the future.

perform work on a contract called "Looking Glass." Baker was even listed as key personnel for this program, which involved anti-tamper work for microchips on classified programs.

12.     The Looking Glass subcontract would have guaranteed Radiance $6.5 million in revenue in 2024 and would have provided another $40 to $50 million over the life of the contract. Radiance's prospects of landing this subcontract were so strong that Honeywell even let Radiance began performing some Looking Glass work, with preliminary funding, while subcontract negotiations were ongoing.

13.     Tim Tinsley was Radiance's president until Radiance fired him in September of 2023. After that, Mr. Tinsley and others loyal to him, instead of Radiance, began recruiting critical employees to leave Radiance. Even if not successful in convincing employees to leave, Mr. Tinsley and his loyalists wanted to undermine Radiance's relationship with them.

14.     One of Mr. Tinsley's loyalists was Mr. Chris Wright, the senior vice president of Radiance's Emerging and Disruptive Technologies group. Mr. Wright laid out their plan in a document entitled "Fiduciary." It said, "[s]enior leaders will be first order effect." It continued, "[n]ext level staff will get nervous and many will leave[,]" and then "[c]ustomers will lose confidence." And, finally, the

"[s]hip will sink." Their plan was not limited to Radiance's directed energies group.

15.     To expand their plan to Radiance's other groups, Mr. Wright and Mr. Tinsley sought Mr. Berry's help. Mr. Tinsley met Mr. Berry for lunch on September 14, 2023.

16.     Around this same time, Mr. Tinsley told Baker that he was only a "strategic hire" to Radiance. That was not true but, understandably, upset Baker, who began looking for employment elsewhere.

17.     Baker expressed interest in PeopleTec, a Radiance competitor. On September 18, Mr. Berry met with Baker and another then-Radiance employee, John Brady. Mr. Brady was the Microelectronics Solutions Division Manager in Mr. Berry's group. On information and belief, during the September 18 meeting, Mr. Brady, Mr. Berry and Baker all discussed joining PeopleTec and Mr. Tinsley's plan as Mr. Wright laid it out.

18.     On September 18, Baker emailed Wes Hawkins, a PeopleTec employee, and said "Heath and I noticed an absence of a [non-disclosure agreement/teaming agreement] from PeopleTec … ☺ [.]" This was significant to Baker because Radiance had an existing teaming relationship with PeopleTec. As

Baker interpreted them, the agreements between Radiance and PeopleTec did not prevent PeopleTec from poaching its teaming partner's workforce. Baker ran multiple Google searches for "People Tec" on September 18 and 19.

19.  Once Baker, Mr. Berry, and Mr. Brady knew where they wanted to go—PeopleTec—it was time to coordinate with Mr. Wright. On September 22, Mr. Wright called Berry and they talked for 13 minutes. That is not all—on October 9, Mr. Berry exchanged twenty texts with Mr. Wright, and then left Mr. Wright a voicemail. The two texted three times the morning of October 10 and again on October 11, before talking on the phone again in the afternoon on October 12.

20.  Although Mr. Berry, Mr. Brady, and Baker were prepared to leave Radiance, they had no intention of working on different projects. To ensure that they could continue their work elsewhere, on November 1, Baker began downloading Radiance's proprietary documents.

21.  On November 1, 2023 at 10:17AM, Baker downloaded "20230718_102522(1)(1).jpg", "20200218_155647 (1).jpg", and "20200908_132803(1).jpg" from Radiance's server to the local drive on his Radiance-issued computer. He also downloaded a document entitled "Experimental_Slice_Interfacing_Released.pdf" from "Shared

Documents/General/from_APL." These documents contain proprietary information about Radiance's work in microelectronics, specifically pertaining to the Looking Glass work.

22.     On November 2 at 1:37PM, Baker created two zip files: "103123-BCT1" and "103123-BCT2," which he added to the local drive on his Radiance laptop. A few hours later, at around 6:30PM, Baker took **61** different screenshots of Radiance's CHIP technology from "Shared Documents/General/Parts_Initial_Inspection/103123-BCT1[.]" At the same time, he downloaded the following picture files of Radiance's CHIP technology:

> 20231102_121234.jpg
>
> 20231102_121904.jpg
>
> 20231102_121414.jpg
>
> 20231102_121857.jpg
>
> 20231102_121500.jpg
>
> 20231102_122103.jpg
>
> 20231102_122224.jpg
>
> 20231102_122200.jpg

23.     The next day, November 3, Mr. Wright met with Baker. After the meeting, Baker searched Google for "Kratos" at 4:08PM before asking Mr. Brady about it at 5:14PM.

24.     Baker's work at Radiance had no connection to Kratos.  Cahaba

Federal Solutions is currently doing work previously performed by Radiance as a

subcontractor to Kratos.  Mr. Tinsley owns Cahaba, and it employs Mr. Wright and

other former Radiance employees.

25.     At about 9AM on November 6, Baker checked in with Mr. Brady

about the progress of their plan to hijack Radiance's proprietary information.

26.     Baker became impatient because he was eager to leave Radiance.  On

November 7, Baker sent Mr. Berry a message that says: "Do you know, **not that it

is technically any of Radiance's business**, what contract vehicle the COINS subs

are currently using, what the PoP is, and the anticipated burn out?"

27.     Cyber Operation INSCOM Network Strategies, otherwise known as

"COINS," is work on a task order under the ACT3 contract.  Again, Radiance has

an ACT3 contract.  PeopleTec is a subcontractor to Radiance for this work.

Baker's curiosity was to see if he could divert the work to PeopleTec without

Radiance as a middleman.

28.     On November 8, Baker downloaded

"LOOKING_GLASS_AO4B_Technical-Volume.docx" to his local drive at

2:21PM.  He also created a zip file called "boe_material.zip[.]"  These documents

are the technical solution and pricing documents for Radiance's effort to get work

on the Looking Glass contract with Honeywell.  But it does not stop there, at

8:21PM, Baker downloaded **19** files associated with the "Looking Glass" proposal

technical volume, and then downloaded the following documents also related to

that work:

> Attachment_8_MJC_2023-03-14.xlsx
>
> LOOKING_GLASS_AO4B_BOE_Methodology-no-template.docx
>
> Quote_RadianceTech_TA230324-6.pdf
>
> D9650 Quotation 020123 spec.pdf
>
> Radiance Technologies Inc. 323012 SM-16-8200.pdf
>
> 22US04264_v3.pdf
>
> IMVAP1000756-4 Radiance Technologies M120.pdf
>
> Radiance Technologies_82333-2_EHS-222MD_3206.pdf
>
> hast_options.xlsx
>
> QUOTE-RADIANCE-TECH-IR3100 8007-0586 120VAC
> Quotation.pdf
>
> Nordson_Bondtest_4000PLUS.pdf
>
> Hentec Odyssey 1325 – Radiance Tech AL – T230213C.pdf
>
> Hentec Photon Budgetary – Radiance Tech AL – T2302138.pdf
>
> ZT-7-MIL-120_Website.pdf
>
> QD44996 Radiance Techonologies, Inc.pdf
>
> 264015 Radiance Radiance Stemi 508 208 Fiber Optic RL.pdf
>
> steam-ager_options.xlsx

Fishman_vendor_ROM_email.pdf

Cole-Parmer OVF-400-16-120 Gravity Convection Oven 16 L 120 VAC from Cole-Parmer.pdf

Cole-Parmer OVF-400-27-120 Gravity Convection Oven 16 L 120 VAC from Cole-Parmer.pdf

ZT-3-MIL.pdf

ABS Premier Freestanding Undercounter Freezer (-40°C), 4 Cu.Ft.pdf

R2023.002.pdf

delidding-apparatus-estimate.pdf

ip-verification-pwa-estimate.xlsx

PRRT2102 Quote Letter.pdf

advanced_5829815.pdf

proof-of-life-pwas-estimate.xlsx

advanced_5754896.pdf

1660MC040621A-REVA-TPJ-Dedicated Socket and Lid for 1156 BGA.pdf

PO 21P-1120 (9143) 1660MC040621A 1156 BGA Socket and Lid.pdf

Q-000172 Bright-CT TLS Kanga SOW Mar 2023.pdf

cole-parmer_vacuum-pump.pdf

Radiance Technologies_SQTE11573_F4303 Rev2 (003).pdf

1_desco.pdf

11_static-clean.pdf

10_BenchDepot.pdf

12_gel-pak.pdf

3_pac.pdf

4_grainger.pdf

13_protekive-pak.pdf

2_uline.pdf

5_corstat.pdf

8_bomir.pdf

7_lehigh-outfitters.pdf

6_digi-key.pdf

9_cleantech.pdf

139576-1-Radiance Technologies, Inc.pdf

LOOKING_GLASS_A04B_BOE_Methodology.docx

materials_for_matt_2023-03-14.xlsx

3_newark_solder_consumables.pdf

1_digi-key_thermal-interface-material.pdf

2_mouser_lid-attach-adhesive.pdf

Quotation_12675546_Radiance Technologies Inc.pdf

29.    On November 9, Baker downloaded "20231109_122959" from Radiance's server to his local drive.  This file is associated with Radiance's microchip technology and the Looking Glass work.

30.    On November 14, Mr. Berry looked up directions from Radiance's headquarters to "Another Broken Egg" on Google Maps.  Another Broken Egg is a

consistent meeting spot for Mr. Wright. On information and belief, Mr. Berry met with Mr. Wright at Another Broken Egg and they decided it was time to start staggering their resignations from Radiance.

31.     The following day, on November 15, Mr. Berry sent a "Final Sign Off" email to Radiance employees in the microelectronics group announcing his upcoming resignation.

32.     On November 16, Baker informed Karl Walli, the executive vice president of Radiance's national security sector, that his last day would be November 30.

33.     On November 19, Baker sent a message to Mr. Berry saying: "Testing to see if my accounts are still live." They were, so Baker resumed his efforts to steal Radiance's proprietary data. On information and belief, he did so the next day when he removed a device called "Realtek USB GbE Family Controller #4" from his Radiance-issued laptop.

34.     On November 21, 2023, Baker confirmed his resignation, listing his last day as December 4. But then PeopleTec sent him an offer letter and he moved up his resignation to December 1.

35. Not knowing the depths of Baker's and others malfeasance, Radiance offered Baker significant incentives to stay. But he chose to leave and, on November 24, confirmed his resignation.

36. Interestingly, on November 27, Baker signed his PeopleTec job application. But that was six days **after** he signed the offer letter. Clearly, this was done to create a false paper trail.

37. Knowing Baker's last day at Radiance was approaching, on November 28, Mr. Wright sent Baker his contact information using his g-mail account.

38. Also on November 28, Baker again started downloading Radiance's files. That day, he downloaded and saved "Quad Secure Microelectronic Interposer Technology FY24.pptx" to his local drive from Radiance's server after downloading "FY23 Congressional Add Quad_Full Spectrum Protective Technologies for Cyber Mission Assurance_SED Submission_6February2023.pptx[.]" These powerpoints contain proprietary information about Radiance's process for obtaining and executing funding for contracts.

39. Immediately after these downloads, Baker deleted messages from his deleted items folder in his email account. He also moved more messages to his

deleted items folder before purging those messages at 9:56AM.  Baker repeated this purging with more files at 11:47AM.

40.     On November 29, Baker added "phase1b_boe.xlsx" and "LG-AO4B_tool_lead_times.xlsx" to his local drive from Radiance's server before moving messages to his deleted items folder.  Less than an hour later, Baker downloaded the same excel sheets and moved more messages to his deleted items folders.  Baker then deleted messages from his deleted items folder.

41.     Aside from the deletions, as crunch time approached, Baker again used an external device to take Radiance's data.  After his final download, Baker plugs in a device called "Realtek USB GbE Family Controller #3[.]"  He removed this device from his Radiance-issued computer less than two hours before his final out-processing meeting on December 1.

42.     Baker is now at PeopleTec with Mr. Berry and Mr. Brady.  Shortly after Baker left Radiance, Honeywell sent Radiance a stop work order on the work they were already performing for the Looking Glass effort and the subcontract negotiations ended.  In January 10, 2024, Berry attended a meeting with the government customer and Honeywell representatives, on behalf of PeopleTec, for the Looking Glass work.  The purpose of this meeting was to discuss future work between PeopleTec and Honeywell.  This work would have (and should have)

belonged to Radiance.  Baker and PeopleTec used Radiance's proprietary

information to obtain that work and to perform it.  Unless this Court stops him,

Baker will continue to use Radiance's proprietary information against it in

competitive procurements.

<div align="center">

**Count I – Misappropriation of Trade Secrets**
**Under the Defend Trade Secrets Act 18 U.S.C. § 1836**

</div>

43.     Radiance adopts the allegations in the paragraphs above, as if set out

in full.

44.     Radiance owns all the documents that Baker accessed, downloaded

and transferred in November 2023.  These documents contain Radiance's

confidential, proprietary and trade secret information.

45.     As mentioned above, the documents that Baker accessed, downloaded

and transferred contained information about Radiance's microchip technology and

proprietary proposal information.  The people, purchases and communications

involved in that work all implicate interstate commerce.  Those documents are

marked as competition sensitive.

46.     Radiance is currently pursuing secure microchip technology work.  In

fact, as mentioned above, Radiance is working to build a registered facility in

Louisiana to produce secure microelectronic CHIPS packages.  Upon information

and belief, Baker and PeopleTec are using Radiance's proprietary data about this technology to pursue work in competition with Radiance.

47.     Radiance's CHIPS technology and other proposal information is not publicly known, or even generally known in the microelectronics industries.  It cannot be reasonably ascertained or derived from publicly available information. Radiance took reasonable measures to ensure that this information was kept secret including, among other things, limiting access to the information.  In fact, only (approximately) 5-10 of Radiance's 1,050 employees had access to those files, and each of them had job responsibilities necessitating that access.  Furthermore, these documents are marked as proprietary/competition sensitive and some of the work can only be performed in classified areas.

48.     Not only did Radiance mark its proposal documents competition sensitive, but Baker was subject to the confidentiality provision in Radiance's handbook, which provides:

> 3.5 Proprietary and Confidential Information
>
> Proprietary and confidential information is information that must be protected by company employees from unauthorized disclosure or use. The company and its employees must safeguard not only proprietary information of the company but also the proprietary and confidential information belonging to others which has been entrusted to the company. This duty of protection survives the termination of employment. All

employees must sign an Employee Confidentiality and
Ownership Agreement upon hiring and adhere to its principles.

The confidentiality agreement mentioned above requires Radiance employees to

> [A]gree, at all times during the term of [their] employment and
> thereafter to hold in strictest confidence, and not to use, except
> for the benefit of the Company, or to disclose to any person, firm
> or corporation without written authorization of the Company …
> Radiance trade secrets, confidential knowledge, data or other
> proprietary information relating to products, processes, know-
> how, designs, formulas, developmental or experimental work,
> computer programs, data bases, other original works of
> authorship, business plans, financial information or other subject
> matter pertaining to any business of the Company or any of its
> clients, consultants, or licensees.

49.     The proposals and other information that Baker took from Radiance
for PeopleTec have independent economic value particularly as it relates to
Radiance's microelectronics programs.  The secrecy of Radiance's proposals and
microchip information gives it independent economic value, as it supplies
Radiance a confidential, competitive advantage in pursuing this work.  Therefore,
the information Baker took from Radiance for PeopleTec is trade secret
information under 18 U.S.C. § 1839(3).

50.     As evidenced by the Radiance handbook and confidentiality
agreement, Baker had a duty to protect and maintain the secrecy of Radiance's
trade secrets.  He breached that duty by downloading Radiance's trade secrets and

18

taking them with him to PeopleTec where he works on programs directly competitive to Radiance's efforts. Therefore, Baker misappropriated Radiance's trade secrets by improper means.

51. Upon information and belief, Baker has used or disclosed Radiance's trade secrets while working for and in preparation to work for PeopleTec, without Radiance's express or implied consent. Further, Baker attempted to conceal his misdeeds by using an external device or now-deleted emails to transfer the documents and information he misappropriated. Alternatively and/or additionally, Baker will inevitably use or disclose Radiance's trade secrets (without Radiance's express or implied consent) because his position with PeopleTec is substantially similar to his previous position with Radiance. The circumstances of Baker's departure and misappropriation show a concrete intent to use or disclose Radiance's trade secrets.

52. Radiance has suffered injury and damage as a proximate result of Baker's actual and threatened misappropriation and will be irreparably harmed without injunctive or other equitable relief to prevent further use or disclosure of its trade secrets.

WHEREFORE, Radiance demands judgment against Baker awarding

(a)    injunctive relief

19

(i)     enjoining Baker, and anyone in active concert with him, from disclosing any of Radiance's trade secrets in any way, to include distributing, transferring, disclosing, selling, publishing or describing them to any person or entity;

(ii)    prohibiting Baker, and anyone in active concert with him, from obtaining any additional Radiance trade secrets, or using them in any way, including copying, printing, modifying, opening or viewing them in any format or medium;

(iii)   allowing an inspection of Baker's systems, servers and devices to identify any Radiance trade secret in their possession;

(iv)    requiring Baker and anyone in active concert with him to remove and return all of Radiance's trade secrets in their possession (to include any copies and, only upon entry of a final judgment or specific direction from the Court, deletion of any remaining copies or versions of the trade secrets); and

(v)     allowing Baker to remain employed by PeopleTec, but restraining him from working, directly or indirectly, on any competitive microchips program, for at least two years;

(b)     compensatory damages consistent with 18 U.S.C. § 1836(b)(3)(B);

(c)     exemplary damages consistent with 18 U.S.C. § 1836(b)(3)(C); and

(d)     such other and further relief, at law or equity, that the Court deems just and proper, including a reasonable attorneys' fee.

## Count II - Breach of Fiduciary Duty

53.     Radiance adopts the allegations in the paragraphs above, as if set out in full.

54.     As a Radiance employee, Baker had a fiduciary duty to act in Radiance's best interests, with the utmost good faith and loyalty.

55.     Baker breached his fiduciary duty by, among other things, while still employed at Radiance, transmitting trade secrets and other proprietary information for later use at PeopleTec.

56.     These breaches undoubtedly damaged Radiance. Namely, PeopleTec's use and access to Radiance's proprietary and trade secret information diminishes Radiance's competitive advantage in upcoming competitive acquisitions. This stands to cost Radiance federal contracts and millions in revenue.

WHEREFORE, Radiance demands judgment against Baker in an amount sufficient to compensate it for its injuries and damages, along with punitive

damages in an amount sufficient to punish Baker, and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

## Count III– Civil Conspiracy

57.     Radiance adopts the allegations in the paragraphs above, as if set out in full.

58.     Baker conspired with Mr. Tinsley and potentially PeopleTec and others to misappropriate Radiance's trade secrets and breach his fiduciary duties. Baker took the affirmative steps described above in furtherance of that conspiracy.

59.     Baker and his co-conspirators intended to harm Radiance, not just to act in their own self-interest.  Baker's actions in furtherance of the conspiracy caused Radiance injury and damages.

WHEREFORE, Radiance demands judgment against Baker in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish him and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

## Count IV- Violation of the Alabama Digital Crime Act
### Ala. Code § 13A-8-110, *et seq.*

60.     Radiance adopts the allegations in the paragraphs above, as if set out

in full.

61.     Radiance's computer system is a "Computer," "Computer Network" or "Computer System" as defined by the Alabama Digital Crimes Act ("ADCA"). *See* Ala. Code §§ 13A-8-111(2), (3), (8).  The laptop Radiance issued to Baker is a "Computer" as defined by the ADCA.

62.     Radiance granted Baker access and privileges to its proprietary CHIP information, documents and materials on its network, to be used only for Radiance's legitimate business purposes.

63.     Baker knew or should have known that the documents he accessed and subsequently emailed or retrieved from Radiance's network contained its trade secret and proprietary information.  Baker also knew or should have known that he had no authority to disclose Radiance's trade secret and proprietary data to PeopleTec or use it on PeopleTec's behalf.

64.     Baker was not authorized to alter, delete, damage or destroy the data stored on Radiance's network or devices.  But he knowingly and intentionally did just that when he deleted emails containing Radiance's proprietary information and then purging his inbox.  Baker did this to hide his activities.  This caused harm to Radiance.

23

65.     Radiance has expended more than $2,500.00 because of Baker's misconduct and will likely spend more than $100,000.00 to redress his wrongdoing.

66.     Because Baker's actions caused damage to Radiance's data, breached his fiduciary duty (discussed above) and otherwise violated Radiance's property rights, Radiance can bring this claim against him.  *See* Ala. Code § 6-5-70 (1975); *Sunil Gupta, M.D., LLC v. Franklin,* No. CV 17-00335-N, 2017 WL 5196392, at *8-9 (S.D. Ala. Nov. 9, 2017); *Pixsys Techs., Inc. v. Agemni, L.L.C.*, No. 2:13-CV-1929-SLB, 2013 WL 5739027, at *4 (N.D. Ala. Oct. 22, 2013).

WHEREFORE, Radiance demands judgment against Baker in an amount sufficient to compensate it for its injuries and damages, along with punitive damages in an amount sufficient to punish Baker and deter future misconduct, and such other and further relief, at law or equity, that the Court deems just and proper.

## Jury Demand

Radiance demands a jury trial on all claims so triable.

Respectfully submitted,

/s/ W. Brad English                          /s/ Thomas J. Butler
W. Brad English                              Thomas J. Butler
Emily J. Chancey                             Stephen C. Jackson
Robert G. Jones
Benjamin L. McArthur
La Keisha Butler
Taylor R. Holt

**Of Counsel:**                              **Of Counsel:**
MAYNARD NEXSEN PC                            MAYNARD NEXSEN PC
655 Gallatin Street                          1901 Sixth Avenue North, Suite 1700
Huntsville, Alabama 35801                    Birmingham, Alabama 35203
Telephone: (256) 512-5705                    Telephone: (256) 254-1037
benglish@MaynardNexsen.com                   tbutler@MaynardNexsen.com
echancey@MaynardNexsen.com                   steve.jackson@MaynardNexsen.com
rjones@MaynardNexsen.com
bmcarthur@MaynardNexsen.com
lbutler@MaynardNexsen.com
taholt@MaynardNexsen.com

# EXHIBIT 3

# David (Shawn) Wilbert, Ph.D

Electrical Engineer

Huntsville, Alabama, United States

## Contact

www.linkedin.com/in/david-shawn-
wilbert-ph-d-28745051 (LinkedIn)
www.researchgate.net/profile/
David-Wilbert (Other)

## Top Skills

AFM

Labview

Characterization

## Publications

Equivalent-Circuit Interpretation
of the Polarization Insensitive
Performance of THz Metamaterial
Absorbers

Terahertz metamaterial absorbers

Atom probe tomography of zinc
oxide nanowires

High sensitivity and high selectivity
terahertz biomedical imaging

Observation of Hydrofluoric Acid
Burns on Osseous Tissues by
Means of Terahertz Spectroscopic
Imaging

## Experience

**PeopleTec, Inc.**
Principal Electrical Engineer
December 2023 - Present (9 months)

**Radiance Technologies**
4 years 7 months

Microelectronics Applied Technologies Division Manager
October 2023 - December 2023 (3 months)

Semiconductor Fabrication SME
June 2019 - September 2023 (4 years 4 months)

**USPTO**
Patent Examiner
January 2015 - May 2019 (4 years 5 months)

**The University of Alabama**
5 years 4 months

Course Instructor
May 2014 - August 2014 (4 months)

ECE-333: Electronics II

Graduate Research Assistant
May 2009 - August 2014 (5 years 4 months)

Laboratory Instructor
August 2013 - May 2014 (10 months)

ECE-332: Electronics I

**United States Marine Corps**
Sergeant
November 2001 - November 2005 (4 years 1 month)

—————

## Education

### University of Alabama
Doctor of Philosophy, Electrical Engineering · (2010 - 2014)

### University of Alabama
Master of Science, Electrical Engineering · (2009 - 2010)

### University of Alabama
Bachelor of Science, Electrical Engineering/Physics Double Major · (2006 - 2009)

# EXHIBIT 4

## ALABAMA SJIS CASE DETAIL

PREPARED FOR: REEVES JORDAN
9/4/2024 1:29:16 PM



County: **47**    Case Number: **CV-2024-900092.00**    Court Action:
Style: **RADIANCE TECHNOLOGIES, INC V. HEATH BERRY**



### Case Action Summary

| Date: | Time | Code | Comments | Operator |
|---|---|---|---|---|
| 1/19/2024 | 3:16 PM | ECOMP | COMPLAINT E-FILED. | SHE135 |
| 1/19/2024 | 3:16 PM | FILE | FILED THIS DATE: 01/19/2024          (AV01) | AJA |
| 1/19/2024 | 3:16 PM | EORD | E-ORDER FLAG SET TO "Y"          (AV01) | AJA |
| 1/19/2024 | 3:16 PM | ASSJ | ASSIGNED TO JUDGE: D. ALAN MANN          (AV01) | AJA |
| 1/19/2024 | 3:16 PM | SCAN | CASE SCANNED STATUS SET TO: N          (AV01) | AJA |
| 1/19/2024 | 3:16 PM | TDMJ | JURY TRIAL REQUESTED          (AV01) | AJA |
| 1/19/2024 | 3:16 PM | STAT | CASE ASSIGNED STATUS OF: ACTIVE          (AV01) | AJA |
| 1/19/2024 | 3:16 PM | ORIG | ORIGIN: INITIAL FILING          (AV01) | AJA |
| 1/19/2024 | 3:16 PM | C001 | C001 PARTY ADDED: RADIANCE TECHNOLOGIES, INC(AV02) | AJA |
| 1/19/2024 | 3:16 PM | C001 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 1/19/2024 | 3:16 PM | C001 | LISTED AS ATTORNEY FOR C001: SHEWMAKE REAVE WILSO | AJA |
| 1/19/2024 | 3:16 PM | C001 | C001 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 1/19/2024 | 3:16 PM | D001 | D001 PARTY ADDED: BERRY HEATH          (AV02) | AJA |
| 1/19/2024 | 3:16 PM | D001 | INDIGENT FLAG SET TO: N          (AV02) | AJA |
| 1/19/2024 | 3:16 PM | D001 | LISTED AS ATTORNEY FOR D001: PRO SE          (AV02) | AJA |
| 1/19/2024 | 3:16 PM | D001 | CERT MAIL-FIL ISSUED: 01/19/2024 TO D001   (AV02) | AJA |
| 1/19/2024 | 3:16 PM | D001 | D001 E-ORDER FLAG SET TO "Y"          (AV02) | AJA |
| 1/23/2024 | 11:26 AM | EVNT | S/A          (AV25) | ALW |
| 1/23/2024 | 11:26 AM | EVDT | ABOVE EVENT SCHEDULED FOR: 05/20/2024          (AV25) | ALW |
| 2/27/2024 | 4:50 PM | EMOT | D001-EXTENSION OF TIME FILED. | COR050 |
| 2/27/2024 | 4:51 PM | D001 | LISTED AS ATTORNEY FOR D001: CORLEY LUTHER FRANKL | AJA |
| 2/27/2024 | 4:52 PM | EMOT | D001-EXTENSION OF TIME /DOCKETED | MAM |
| 2/28/2024 | 3:17 PM | JEORDE | ORDER GENERATED FOR EXTENSION OF TIME - RENDERED & ENTERED: 2/28/2024 3:17:38 PM - ORDER | |
| 2/28/2024 | 4:54 PM | ENOTA | NOTICE OF APPEARANCE E-FILED | BUR103 |
| 2/28/2024 | 4:54 PM | D001 | LISTED AS ATTORNEY FOR D001: BURGESS CHARLES GREG | AJA |
| 2/29/2024 | 10:29 AM | EDISC | NOTICE OF DISCOVERY E-FILED. | SHE135 |
| 2/29/2024 | 10:41 AM | EDISC | NOTICE OF DISCOVERY E-FILED. | SHE135 |
| 3/1/2024 | 2:08 PM | ESUBP | SUBPOENA FOR PEOPLETEC, INC. C/O TERRY JENNINGS E-FILED BY C001 - RADIANCE TECHNOLOGIES, INC | SHE135 |
| 3/1/2024 | 2:08 PM | W001 | ADDED: PEOPLETEC, INC. C/O TERRY JE          (AW21) | AJA |
| 3/1/2024 | 2:08 PM | W001 | ISSUED: 03012024 - CERTIFIED MAIL; PEOPLETEC, INC. | AJA |
| 3/1/2024 | 2:36 PM | ESCAN | SCAN - FILED 3/1/2024 - SUBPOENA ISSUED | MAM |
| 3/12/2024 | 1:40 PM | ESCAN | SCAN - FILED 3/1/2024 - SUBPOENA SERVED | KAC |
| 3/19/2024 | 4:33 PM | D001 | ANSWER OF UNKNOWN ON 03/19/2024 FOR D001   (AV02) | AJA |
| 3/19/2024 | 4:33 PM | EANSW | D001 - UNKNOWN E-FILED. | COR050 |
| 3/25/2024 | 11:06 PM | DAT1 | FOR: TRIAL - JURY ON 12/16/2024 @ 0900A    (AV01) | AJA |
| 3/25/2024 | 11:06 PM | JESET | TRIAL - JURY /SET FOR 12/16/2024 9:00 AM | |
| 4/1/2024 | 2:52 PM | C001 | LISTED AS ATTORNEY FOR C001: ENGLISH WALTER BRAD | AJA |
| 4/1/2024 | 2:52 PM | ENOTA | NOTICE OF APPEARANCE E-FILED | ENG015 |
| 4/1/2024 | 4:23 PM | EDISC | NOTICE OF DISCOVERY E-FILED. | COR050 |
| 4/11/2024 | 4:32 PM | ENOTA | NOTICE OF APPEARANCE E-FILED | BUT028 |
| 4/11/2024 | 4:32 PM | C001 | LISTED AS ATTORNEY FOR C001: BUTLER THOMAS JULIAN | AJA |

| 6/7/2024 | 2:45 PM | ENOTA | NOTICE OF APPEARANCE E-FILED | JAC040 |
|---|---|---|---|---|
| 6/7/2024 | 2:45 PM | C001 | LISTED AS ATTORNEY FOR C001: JACKSON STEPHEN CLAR | AJA |
| 6/15/2024 | 3:37 PM | EAMEN | AMENDED COMPLAINT E-FILED. | ENG015 |
| 8/9/2024 | 9:46 AM | EMOT | C001-WITHDRAW FILED. | SHE135 |
| 8/9/2024 | 9:50 AM | EMOT | C001-WITHDRAW /DOCKETED | KIC |
| 8/9/2024 | 10:03 AM | JEORDE | ORDER GENERATED FOR WITHDRAW - RENDERED & ENTERED: 8/9/2024 10:03:15 AM - ORDER | |
| 8/9/2024 | 10:27 AM | TEXT | EFILED ORDER - MOTION TO W/D FILED BY REAVE WILSON | SHH |
| 8/9/2024 | 10:27 AM | TEXT | SHEWMAKE GRANTED | SHH |
| 8/12/2024 | 8:24 PM | DOCK | NOTICE SENT: 08/12/2024 ENGLISH WALTER BRAD | ALW |
| 8/12/2024 | 8:24 PM | DOCK | NOTICE SENT: 08/12/2024 BUTLER THOMAS JULIAN | ALW |
| 8/12/2024 | 8:24 PM | DOCK | NOTICE SENT: 08/12/2024 JACKSON STEPHEN CLARK | ALW |
| 8/12/2024 | 8:24 PM | DOCK | NOTICE SENT: 08/12/2024 CORLEY LUTHER FRANKLIN IV | ALW |
| 8/12/2024 | 8:24 PM | DOCK | NOTICE SENT: 08/12/2024 BURGESS CHARLES GREGORY | ALW |

 *END OF THE REPORT*

# EXHIBIT 5

**U.S. District Court**
**Northern District of Alabama (Northeastern)**
**CIVIL DOCKET FOR CASE #: 5:24-cv-00794-LCB**


Radiance Technologies Inc v. Baker
Assigned to: Judge Liles C Burke
Cause: 28:1331 Fed. Question: Breach of Contract

Date Filed: 06/15/2024
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Radiance Technologies Inc**                    represented by    **Benjamin L McArthur**
MAYNARD NEXSEN
655 Gallatin Street
PO Box 18668
Huntsville, AL 35804-8668
256-551-0171
Fax: 256-512-0119
Email: bmcarthur@maynardnexsen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emily Jones Chancey**
MAYNARD NEXSEN PC
655 Gallatin Street
Huntsville, AL 35811
256-512-0108
Fax: 256-512-0119
Email: echancey@maynardnexsen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**La Keisha W. Butler**
MAYNARD NEXSEN, PC
655 Gallatin Street SW
Huntsville, AL 35801
256-512-5745
Email: lbutler@maynardcooper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G Jones**
MAYNARD NEXSEN PC
655 Gallatin Street SW
Huntsville, AL 35801
256-551-0171
Email: rjones@maynardnexsen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen C Jackson**
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400

Birmingham, AL 35203-2618
205-254-1000
Fax: 205-254-1999
Email: sjackson@maynardcooper.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Taylor Reign Holt**
MAYNARD NEXSEN
655 Gallatin Street
PO Box 18668
Huntsville, AL 35804-8668
256-682-0710
Email: taholt@maynardnexsen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas J Butler**
MAYNARD NEXSEN, PC
1901 Sixth Avenue North, Suite 2400
Suite 1700
Birmingham, AL 35203
205-254-1063
Fax: 205-254-1999
Email: tbutler@maynardnexsen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**W Brad English**
MAYNARD NEXSEN PC
655 Gallatin Street
Huntsville, AL 35801
256-551-0171
Email: benglish@maynardnexsen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Jade Baker**                          represented by **L Franklin Corley , IV**
LANIER, FORD, SHAVER & PAYNE, P.C.
P.O. Box 2087
2101 West Clinton Avenue, Ste. 102
Huntsville, AL 35805
256-535-1100
Fax: 256-533-9322
Email: LFC@lanierford.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**C Gregory Burgess**
LANIER FORD SHAVER & PAYNE, P.C.

2101 West Clinton Avenue, Suite 102
P O Box 2087
Huntsville, AL 35805
256-535-1100
Fax: 256-533-9322
Email: cgb@LanierFord.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/15/2024 | 1 | COMPLAINT against Jade Baker, filed by Radiance Technologies Inc. (Attachments: # 1 Civil Cover Sheet)(KAM) (Entered: 06/17/2024) |
| 06/15/2024 | 2 | NOTICE of Corporate Disclosure by Radiance Technologies Inc (KAM) (Entered: 06/17/2024) |
| 06/18/2024 | 3 | NOTICE of assignment of case to a United States Magistrate Judge for trial. (LCB) (Entered: 06/18/2024) |
| 06/18/2024 | | Filing Fee: Filing fee $ 405, receipt_number AALNDC-4617206 (B-12108). related document 1 COMPLAINT against Jade Baker, filed by Radiance Technologies Inc. (Attachments: # 1 Civil Cover Sheet)(KAM). (English, W) (Entered: 06/18/2024) |
| 06/26/2024 | 4 | Summons Issued by the Clerk as to Jade Baker and delivered to Plaintiff for service. (LCB) (Entered: 06/26/2024) |
| 07/11/2024 | 5 | ANSWER to 1 Complaint by Jade Baker.(Corley, L) (Entered: 07/11/2024) |
| 07/12/2024 | 6 | ORDER: Regarding compliance with Rule 26(f). Signed by Magistrate Judge Herman N Johnson, Jr on 7/12/2024. (LCB) (Entered: 07/12/2024) |
| 07/12/2024 | 7 | ORDER: The Court **SETS** a Telephone Status Conference for **8/12/2024 at 10:00 AM** before Magistrate Judge Herman N Johnson Jr. Call-in information will be provided to the parties by email. Signed by Magistrate Judge Herman N Johnson, Jr on 7/12/2024. (LCB) (Entered: 07/12/2024) |
| 07/12/2024 | 8 | ORDER: That the parties are required to enter an election regarding the exercise of jurisdiction by a magistrate judge no later than **August 26, 2024**; in the absence of consent by all parties, the Clerk is directed to reassign the case to a randomly drawn district judge without further order after **August 26, 2024**. Signed by Magistrate Judge Herman N Johnson, Jr on 7/12/2024. (LCB) (Entered: 07/12/2024) |
| 07/12/2024 | 9 | NOTICE of Appearance by C Gregory Burgess on behalf of Jade Baker (Burgess, C) (Entered: 07/12/2024) |
| 08/12/2024 | | Minute Entry for proceedings held before Magistrate Judge Herman N Johnson, Jr: Telephone Status Conference held on 8/12/2024. (Court Reporter None) (SHB) (Entered: 08/20/2024) |
| 08/27/2024 | 10 | **NOTICE OF REASSIGNMENT**: The parties having not unanimously consented to the dispositive jurisdiction by a Magistrate Judge, this action has been randomly reassigned to the **Honorable Liles C. Burke**. Please use case number **5:24-cv-00794-LCB** on all subsequent pleadings. Magistrate Judge Herman N. Johnson, Jr is no longer assigned to this case. (LCB) (Entered: 08/27/2024) |
| 08/27/2024 | 11 | **INITIAL ORDER GOVERNING ALL FURTHER PROCEEDINGS** - with appendices attached. Signed by Judge Liles C Burke on 8/27/2024. (AHI) (Entered: 08/27/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/04/2024 13:30:43 | | | |
| **PACER Login:** | reevesjordan | **Client Code:** | 999999.00058 |
| **Description:** | Docket Report | **Search Criteria:** | 5:24-cv-00794-LCB |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT 6

# Daniel J. Anderson

Sr. Capture Director @ COLSA | Driving Value through Relationships
Huntsville, Alabama, United States

## Contact

www.linkedin.com/in/daniel-anderson-pmp (LinkedIn)

## Top Skills

UAS

Software Solution Development

Hiring

## Patents

System for the in-situ detection of plant exposure to trichloroethelyne

## Summary

My hands-on experience with operational leadership, strategic decision making, the capture process, and proposal management are key elements to my success in navigating the competitive landscape of the defense and intelligence sectors. Collaborating closely with COLSA's growth team, we maintain a sharp focus on new markets and innovative solutions, ensuring our offerings meet the evolving needs of our clients. I am currently focused on developing and executing strategies for securing contracts and promoting growth initiatives in our Uncrewed Systems market.

My recent role as Vice President at Radiance Technologies afforded me deep understanding of key concepts such as strategy, market analysis, resourcing, customer satisfaction, and sustainable growth. I also maintain a high degree of interest and acumen in the technology sectors where we operate, including UAS, ISR, and especially geospatial technologies. I recently began serving on the board of GEOHuntsville, a non-profit collaborative focused on economic development in the geospatial sciences.

---

## Experience

### COLSA

Sr. Capture Director
June 2024 - Present (3 months)
Huntsville, Alabama, United States

Identify business opportunities that align to corporate capabilities and strategic direction. Collaborate to maintain awareness of new customers, markets, or contract opportunities of strategic interest. Develop and execute strategies to increase the company's position for competitively solicited contracts or to secure direct business. Support proposal activities. Promote growth initiatives.

### Radiance Technologies

15 years 5 months

### Vice President of Strategy, Geospatial and Intelligence Programs
January 2024 - May 2024 (5 months)
Huntsville, Alabama, United States

Develop, communicate, and execute the company's strategic plan for growth within the Military Service Intelligence Centers and the National Intelligence Agencies. Leverage the company's considerable geospatial technology capabilities in new business pursuits. Successfully led and assisted in capture and proposal development activities.  Based on my prior experience, I mentor and develop emerging Group (P&L) and Operations Managers to cultivate leadership talent within the organization. I also oversaw the firm's GEOINT conference and trade show strategy to enhance brand visibility and market presence.

### Vice President - Aviation, Sensors, and Geospatial Group
January 2022 - January 2024 (2 years 1 month)
Huntsville, Alabama, United States

Direct a profit and loss business unit with a diverse portfolio of projects that deliver innovative and cutting-edge solutions for the defense and intelligence communities. I focus on remote sensing technology, test and evaluation, and machine learning and software development in support of Intelligence operations. Charged with business development in key Intelligence Community sector. I developed and maintain Radiance's corporate geospatial technology and Intelligence analysis strategy and engage with other business units to successfully implement that strategy.

### Assistant Vice President, Stennis Operations
October 2018 - January 2022 (3 years 4 months)
NASA John C. Stennis Space Center

### Director of Stennis Business Operations
October 2014 - October 2018 (4 years 1 month)
NASA John C. Stennis Space Center

Responsible for the identification and development of business opportunities, personnel and staffing management including professional development, management of a portfolio of programs focused on geospatial software development, intelligence analysis, workflow management, and specialized algorithm development. Ensure customer satisfaction for Stennis based clients, including NASA and the US Navy, and remote support to other DoD and IC agencies.  Oversaw a 50% increase in revenues on key U.S. Navy contracts. Developed and sustained an R&D program focusing on geospatial OSINT exploitation techniques and software systems.

### Geospatial Programs Manager
January 2009 - September 2014 (5 years 9 months)
NASA John C. Stennis Space Center

Management of all aspects of multiple projects focusing on the development and dissemination of analytical products with a geospatial emphasis. Responsibilities included ensuring technical, cost, and schedule performance, risk mitigation, staffing, and overall execution.  Individual projects ranged from, software development, enhancement, and sustainment, to  R&D efforts, to long-term production sustainment programs.  Program revenues exceeded $4M annually.

### INSTITUTE FOR TECHNOLOGY DEVELOPMENT
Project Manager
January 2006 - December 2008 (3 years)
NASA John C. Stennis Space Center

Technical performance and oversight of hyper-spectral imagery projects with NASA and the USDA.   Projects generally covered environmental remote sensing technique development and the creation of software-based decision support systems.

### SAIC
Project Manager
February 2000 - January 2006 (6 years)

Project management of the ADRG/CADRG production program and Image City Map (ICM) projects.  Oversaw the production of standardized digital raster products for the National Geospatial-Intelligence Agency (NGA).  Program revenues exceeded $4M annually.  Oversaw a staff of 25+ and helped to plan the migration from government owned software to an enterprise solution.

------

# Education

### Auburn University
Master of Business Administration - MBA  · (August 2020 - May 2023)

### University of Southern Mississippi
BS, Geography · (1994 - 1999)

# EXHIBIT 7

**C COLSA**

Company Capabilities Careers Employees

**Contact Us**



CULTURE

# COLSA Welcomes New Director of Joint Venture Operations

BY Carly Alcala  ·  FEBRUARY 26, 2024

COLSA recently welcomed Eric Briggs as the new Director of Joint Venture Operations. His background includes operations and technical leadership with a keen focus on business strategy and growth. Eric brings a wealth of knowledge in captures and proposals


Shares

 in





and a demonstrated track record in program execution.

"I'm excited to get to know COLSA as a company and how each individual organization operates within the company," Eric told us. As the Director of Joint Venture Operations, Eric's goal is to develop a JV strategy that ultimately increases COLSA's ROI. He's excited to use his experience and capabilities to add value to what he says is "an already excellent company."

## Best piece of advice for someone new in their career:

## "Be patient with your career and remember it is mostly about relationships."

Eric told us something that stands out to him is that COLSA is so customer and employee focused. He says he's thankful for the infrastructure that COLSA has implemented for its employees with virtual desktops, which allows him to easily manage work/home life.

Outside of work, you can find Eric spending time with his family and

 

expressing his creativity through woodworking

**More Insights**

TAGS:   # culture     # employee spotlight
# talent acquisition

---

◁  PREVIOUS POST
COLSA Attains Pres…



NEXT POST
COLSA's Colorado S…  ▷

# Latest Updates



**COLSA's Director of Data Science Helps Develop New CompTIA DataX Certification**

AUGUST 8, 2024



**Veteran & Travel Enthusiast, Sam Viray, Excels at COLSA**

AUGUST 5, 2024



**2024 Interns: Spotlighting Our Trailblazers & Their Summer at COLSA**

JULY 24, 2024


Shares

 in





COLSA strives to maintain a fully accessible site. If you have questions or need help with the job application process, please contact assistance@colsa.com

**COLSA is a family of professionals focused on customer satisfaction above all else.**

Request Assistance

 COLSA





### ABOUT

About COLSA

Privacy Policy

### CURRENT EMPLOYEES

Portal

### FUTURE EMPLOYEES

Latest Jobs

**COLSA CORPORATION**
6728 Odyssey Drive
Huntsville, AL 35806
256-964-5555

  

© COLSA CORPORATION ALL RIGHTS RESERVED | COLSA CORPORATION IS AN EQUAL OPPORTUNITY EMPLOYER


Shares







# EXHIBIT 8

RADIANCE TECHNOLOGIES, INC.

EMPLOYEE STOCK OWNERSHIP PLAN

TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS

ARTICLE II
ADMINISTRATION

2.1   POWERS AND RESPONSIBILITIES OF THE EMPLOYER ................................... 14

2.2   DESIGNATION OF ADMINISTRATIVE AUTHORITY ......................................... 15

2.3   ALLOCATION AND DELEGATION OF RESPONSIBILITIES ............................. 15

2.4   POWERS AND DUTIES OF THE ADMINISTRATOR ........................................... 15

2.5   RECORDS AND REPORTS ........................................................................................ 17

2.6   APPOINTMENT OF ADVISERS ............................................................................... 17

2.7   PAYMENT OF EXPENSES ........................................................................................ 17

2.8   CLAIMS PROCEDURE .............................................................................................. 17

2.9   CLAIMS REVIEW PROCEDURE ............................................................................. 18

ARTICLE III
ELIGIBILITY

3.1   CONDITIONS OF ELIGIBILITY ............................................................................... 18

3.2   EFFECTIVE DATE OF PARTICIPATION ................................................................ 18

3.3   DETERMINATION OF ELIGIBILITY ...................................................................... 19

3.4   TERMINATION OF ELIGIBILITY ........................................................................... 19

3.5   REHIRED EMPLOYEES AND BREAKS IN SERVICE ........................................... 19

3.6   ELECTION NOT TO PARTICIPATE ........................................................................ 20

ARTICLE IV
CONTRIBUTION AND ALLOCATION

4.1   FORMULA FOR DETERMINING EMPLOYER CONTRIBUTION ........................ 20

4.2   TIME OF PAYMENT OF EMPLOYER CONTRIBUTION ....................................... 21

i

4.3     ALLOCATION OF CONTRIBUTION, FORFEITURES AND EARNINGS ........... 21

4.4     MAXIMUM ANNUAL ADDITIONS ........................................................................ 26

4.5     DIVERSIFICATION ................................................................................................. 28

4.6     QUALIFIED MILITARY SERVICE ........................................................................ 30

4.7     PROHIBITED ALLOCATION OF COMPANY STOCK .......................................... 30

ARTICLE V
FUNDING AND INVESTMENT POLICY

5.1     INVESTMENT POLICY ........................................................................................... 35

5.2     APPLICATION OF CASH AND INACTIVE PARTICIPANTS ............................... 35

5.3     TRANSACTIONS INVOLVING COMPANY STOCK ............................................. 36

5.4     LOANS TO THE TRUST ......................................................................................... 38

ARTICLE VI
VALUATIONS

6.1     VALUATION OF THE TRUST FUND ...................................................................... 39

6.2     METHOD OF VALUATION ..................................................................................... 39

ARTICLE VII
DETERMINATION AND DISTRIBUTION OF BENEFITS

7.1     DETERMINATION OF BENEFITS UPON RETIREMENT .................................... 39

7.2     DETERMINATION OF BENEFITS UPON DEATH ................................................. 40

7.3     DETERMINATION OF BENEFITS IN EVENT OF DISABILITY .......................... 41

7.4     DETERMINATION OF BENEFITS UPON TERMINATION .................................. 42

7.5     DISTRIBUTION OF BENEFITS .............................................................................. 43

7.6     HOW AND WHEN PLAN BENEFITS WILL BE DISTRIBUTED .......................... 45

7.7     REQUIRED MINIMUM DISTRIBUTIONS ............................................................. 47

7.8     DISTRIBUTION FOR MINOR OR INCOMPETENT INDIVIDUAL ..................... 52

7.9     LOCATION OF PARTICIPANT OR BENEFICIARY UNKNOWN ........................ 52

7.10    RIGHT OF FIRST REFUSALS ................................................................................ 52

7.11    STOCK CERTIFICATE LEGEND ........................................................................... 53

7.12    PUT OPTION ................................................................................... 54

7.13    NONTERMINABLE PROTECTIONS AND RIGHTS ............................................. 55

7.14    QUALIFIED DOMESTIC RELATIONS ORDER DISTRIBUTION ........................ 55

7.15    DIRECT ROLLOVER ................................................................................. 56

7.16    CORRECTIVE DISTRIBUTIONS ................................................................. 57

7.17    DIVERSIFICATION AND TRANSFER RIGHTS ............................................... 58

ARTICLE VIII
AMENDMENT, TERMINATION AND MERGERS

8.1    AMENDMENT ........................................................................................ 60

8.2    TERMINATION ...................................................................................... 60

8.3    MERGER, CONSOLIDATION OR TRANSFER OF ASSETS ............................... 61

ARTICLE IX
TOP HEAVY

9.1    TOP HEAVY PLAN REQUIREMENTS .......................................................... 61

9.2    DETERMINATION OF TOP HEAVY STATUS ................................................. 61

ARTICLE X
MISCELLANEOUS

10.1    PARTICIPANT'S RIGHTS .......................................................................... 64

10.2    ALIENATION ......................................................................................... 64

10.3    CONSTRUCTION OF PLAN ...................................................................... 65

10.4    GENDER AND NUMBER .......................................................................... 65

10.5    LEGAL ACTION ..................................................................................... 65

10.6    PROHIBITION AGAINST DIVERSION OF FUNDS ......................................... 65

10.7    EMPLOYER'S AND TRUSTEE'S PROTECTIVE CLAUSE ................................. 66

10.8    RECEIPT AND RELEASE FOR PAYMENTS .................................................. 66

10.9    ACTION BY THE EMPLOYER .................................................................. 66

10.10    NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY .............. 66

10.11    HEADINGS ......................................................................................... 67

iii

10.12    ELECTRONIC MEDIA................................................................................. 67

10.13    PLAN CORRECTION................................................................................. 67

10.14    APPROVAL BY INTERNAL REVENUE SERVICE........................................... 67

10.15    UNIFORMITY ....................................................................................... 68

10.16    SECURITIES AND EXCHANGE COMMISSION APPROVAL ......................... 68

ARTICLE XI
PARTICIPATING EMPLOYERS

11.1    ADOPTION BY OTHER EMPLOYERS .................................................... 68

11.2    REQUIREMENTS OF PARTICIPATING EMPLOYERS....................................... 68

11.3    DESIGNATION OF AGENT ...................................................................... 69

11.4    EMPLOYEE TRANSFERS......................................................................... 69

11.5    PARTICIPATING EMPLOYER CONTRIBUTION AND FORFEITURES.............. 69

11.6    AMENDMENT....................................................................................... 69

11.7    DISCONTINUANCE OF PARTICIPATION ................................................ 69

11.8    ADMINISTRATOR'S AUTHORITY ......................................................... 70

RADIANCE TECHNOLOGIES, INC. EMPLOYEE STOCK OWNERSHIP PLAN

The Radiance Technologies, Inc. Employee Stock Ownership Plan (herein referred to as the "Plan") is hereby amended and restated as of January 1, 2021 by Radiance Technologies, Inc. (herein referred to as the "Employer").

W I T N E S S E T H:

WHEREAS, the Employer heretofore established the Plan effective January 1, 2008, in recognition of the contribution made to its successful operation by its employees and for the exclusive benefit of its eligible employees and such Plan was amended and restated effective January 1, 2014, and January 1, 2015; and

WHEREAS, under the terms of the Plan, the Employer has reserved the right to amend the Plan; and

WHEREAS, contributions to the Plan will be made by the Employer and such contributions made to the Trust will be invested primarily in the capital stock of the Employer;

NOW, THEREFORE, effective January 1, 2021, except as otherwise provided, the Employer in accordance with the provisions of the Plan pertaining to amendments thereof, hereby amends the Plan in its entirety and restates the Plan to provide as follows:

ARTICLE I
DEFINITIONS

1.1     "Account" means the account established and maintained by the Administrator for each Participant with respect to such Participant's total interest in the Plan and Trust resulting from the Employer contributions, and, including but not limited to, such Participant's Transfer Account.

1.2     "Act" means the Employee Retirement Income Security Act of 1974, as it may be amended from time to time.

1.3     "Administrator" means the Employer unless another person or entity has been designated by the Employer pursuant to Section 2.2 to administer the Plan on behalf of the Employer.

1.4     "Affiliated Employer" means any corporation which is a member of a controlled group of corporations (as defined in Code Section 414(b)) which includes the Employer; any trade or business (whether or not incorporated) which is under common control (as defined in Code Section 414(c)) with the Employer; any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Code Section 414(m)) which includes the Employer; and any other entity required to be aggregated with the Employer pursuant to Regulations under Code Section 414(o).

1.5    "Aggregate Account" means, with respect to each Participant, the value of all accounts maintained on behalf of a Participant, whether attributable to Employer or Employee contributions, subject to the provisions of Section 9.2.

1.6    "Anniversary Date" means the last day of the Plan Year.

1.7    "Beneficiary" means the person (or entity) to whom the share of a deceased Participant's interest in the Plan is payable.

1.8    "Code" means the Internal Revenue Code of 1986, as amended or replaced from time to time.

1.9    "Company Stock" means common stock issued by the Employer (or by a corporation which is a member of the controlled group of corporations of which the Employer is a member) which is readily tradable on an established securities market. If there is no common stock which meets the foregoing requirement, the term "Company Stock" means common stock issued by the Employer (or by a corporation which is a member of the same controlled group) having a combination of voting power and dividend rights equal to or in excess of: (A) that class of common stock of the Employer (or of any other such corporation) having the greatest voting power, and (B) that class of common stock of the Employer (or of any other such corporation) having the greatest dividend rights. Noncallable preferred stock shall be deemed to be "Company Stock" if such stock is convertible at any time into stock which constitutes "Company Stock" hereunder and if such conversion is at a conversion price which (as of the date of the acquisition by the Trust) is reasonable. For purposes of the preceding sentence, pursuant to Regulations, preferred stock shall be treated as noncallable if after the call there will be a reasonable opportunity for a conversion which meets the requirements of the preceding sentence.

1.10    "Company Stock Account" means the account of a Participant which is credited with the shares of Company Stock purchased and paid for by the Trust Fund or contributed to the Trust Fund.

A separate accounting shall be maintained with respect to that portion of the Company Stock Account attributable to a Participant's or the Participant's Beneficiary's election pursuant to Section 7.5(c)(3) to reinvest cash dividends in Company Stock. Any such Company Stock allocated to the Company Stock Account shall be fully Vested at all times and shall not be subject to Forfeiture for any reason.

1.11    "Compensation" means, with respect to any Participant and except as otherwise provided herein, such Participant's wages for the Plan Year (the "determination period") within the meaning of Code Section 3401(a) (for the purposes of income tax withholding at the source) but determined without regard to any rules that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401(a)(2)) (wages subject to Federal income tax withholding).

2

Except as provided herein, Compensation for a specified period is the Compensation actually paid or made available (or if earlier, includible in gross income) during such period.

Compensation for a Plan Year shall also include Compensation paid by the later of $2^1/_2$ months after an Employee's severance from employment with the Employer maintaining the Plan or the end of the Plan Year that includes the date of the Employee's severance from employment with the Employer maintaining the Plan, if the payment is (i) regular Compensation for services during the Employee's regular working hours, or Compensation for services outside the Employee's regular working hours (such as shift differential), commissions, or other similar payments, and, absent a severance from employment, the payments would have been paid to the Employee while the Employee continued in employment with the Employer; (ii) effective as of January 1, 2022, for "unused leave" (i.e., unused accrued bona fide sick, vacation, or other leave, but only if the Employee would have been able to use the leave if employment had continued); or (iii), effective as of January 1, 2022, received by a Participant pursuant to a nonqualified unfunded deferred compensation plan, but only if the payment would have been paid to the Participant at the same time if the Participant had not severed employment and only to the extent that the payment is includible in the Participant's gross income.

Any payments not described above shall not be considered Compensation if paid after severance from employment, even if they are paid by the later of $2^1/_2$ months after the date of severance from employment or the end of the Plan Year that includes the dates of severance from employment. Additionally, any payments described above shall not be considered Compensation if subject to any other exclusion stated herein, such as the exclusions for overtime and bonuses.

Back pay, within the meaning of section 1.415(c)-2(g)(8) of the Regulations, shall be treated as Compensation for the Plan Year to which the back pay relates to the extent the back pay represents wages and compensation that would otherwise be included in this definition.

For purposes of this Section, the determination of Compensation shall be made by:

(a)     excluding bonuses, overtime, and post and cost of living allowances in accordance with Department of State standardized regulations;

(b)     excluding, effective as of March 1, 2021, reimbursements or other expense allowances, fringe benefits (cash and noncash), moving expenses, deferred compensation, and welfare benefits;

(c)     excluding, effective of as of January 1, 2022, amounts paid to, or on behalf of, the Employee to reduce or offset student loan repayment obligations;

(d)     excluding, for periods prior to January 1, 2022, group term life insurance and amounts realized from the exercise, sale, exchange, settlement or other disposition of any restricted stock, vested stock unit, stock option, or any "synthetic equity" (as such term is defined in Section 4.7(c)(5));

(e)    including amounts which are contributed by the Employer pursuant to a salary reduction agreement and which are not includible in the gross income of the Participant under Code Sections 125, 132(f)(4), 402(e)(3), 402(h)(1)(B), 403(b) or 457(b), and, effective as of January 1, 2022, Employee contributions described in Code Section 414(h)(2) that are treated as Employer contributions. For this purpose, effective as of January 1, 2022, amounts not includible in gross income under Code Section 125 shall be deemed to include any amounts not available to a Participant in cash in lieu of group health coverage because the Participant is unable to certify that the Participant has other health coverage, provided the Employer does not request or collect information regarding the Participant's other health coverage as part of the enrollment process for the health plan; and

(f)    including Military Differential Pay.

Compensation in excess of $200,000 (or such other amount provided in the Code) shall be disregarded. Such amount shall be adjusted for increases in the cost of living in accordance with Code Section 401(a)(17)(B), except that the dollar increase in effect on January 1 of any calendar year shall be effective for the Plan Year beginning with or within such calendar year. For any "determination period" of less than twelve (12) months, the Compensation limit shall be an amount equal to the Compensation limit for the calendar year in which the "determination period" begins multiplied by the ratio obtained by dividing the number of full months in the short "determination period" by twelve (12). A "determination period" is not less than twelve (12) months solely because a Participant's Compensation does not include Compensation paid during a determination period while the Participant was not a Participant in the Plan (or a component of the Plan).

If any Employees are excluded from the Plan (or from any component of the Plan), then Compensation for any such Employees who become eligible or cease to be eligible to participate in the Plan (or in the component of the Plan) during a Plan Year shall only include Compensation while such Employees are Eligible Employees of the Plan (or of such component of the Plan).

For purposes of this Section, if the Plan is a plan described in Code Section 413(c) or 414(f) (a plan maintained by more than one Employer), the limitation applies separately with respect to the Compensation of any Participant from each Employer maintaining the Plan.

If, in connection with the adoption of any amendment, the definition of Compensation has been modified, then, except as otherwise provided herein, for Plan Years prior to the Plan Year which includes the adoption date of such amendment, Compensation means compensation determined pursuant to the terms of the Plan then in effect.

1.12    "Contract" means any life insurance policy, retirement income policy or annuity policy (group or individual) issued pursuant to the terms of the Plan. In the event of any conflict between the terms of this Plan and the terms of any contract purchased hereunder, the Plan provisions shall control.

1.13    "Current Obligations" means Trust obligations arising from extension of credit to the Trust and payable in cash within (1) year from the date an Employer contribution is due.

1.14    "Eligible Employee" means any Employee, except as provided below. The following Employees shall not be eligible to participate in this Plan:

(a)    Employees of Affiliated Employers, unless such Affiliated Employers have specifically adopted this Plan in writing.

(b)    Individuals who are not reported on the payroll records of the Employer as common law employees. In particular, it is expressly intended that individuals who are not treated as common law employees by the Employer on its payroll records, or partners or other self-employed individuals who are treated as independent contractors, are not Eligible Employees and are excluded from Plan participation even if a court or administrative agency determines that such individuals are common law employees and not independent contractors.

(c)    Employees whose employment is governed by the terms of a collective bargaining agreement between Employee representatives (within the meaning of Code Section 7701(a)(46)) and the Employer under which retirement benefits were the subject of good faith bargaining between the parties, unless such agreement expressly provides for coverage in this Plan.

(d)    Employees who are nonresident aliens (within the meaning of Code Section 7701(b)(1)(B)) and who receive no earned income (within the meaning of Code Section 911(d)(2)) from the Employer which constitutes income from sources within the United States (within the meaning of Code Section 861(a)(3)).

(e)    Leased Employees.

1.15    "Employee" means any person who is employed by the Employer or Affiliated Employer. Employee shall include Leased Employees within the meaning of Code Sections 414(n)(2) and 414(o)(2) unless such Leased Employees are covered by a plan described in Code Section 414(n)(5) and such Leased Employees do not constitute more than 20% of the recipient's non-highly compensated work force.

1.16    "Employer" means Radiance Technologies, Inc., any successor that shall maintain this Plan, and any predecessor that has maintained this Plan. The Employer has elected "S" corporation status under Code Section 1362(a). In addition, where appropriate, the term Employer shall include any Participating Employer (as defined in Section 11.1) which shall adopt this Plan.

1.17    "ESOP" means an employee stock ownership plan that meets the requirements of Code Section 4975(e)(7) and Regulation 54.4975-11.

1.18    "Exempt Loan" means a loan made to the Plan by a disqualified person or a loan to the Plan which is guaranteed by a disqualified person and which satisfies the requirements of Section 5.4 hereof. Any Exempt Loan must be primarily for the benefit of the Participants.

5

1.19    "Fiduciary" means any person who (a) exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets, (b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan or has any authority or responsibility to do so, or (c) has any discretionary authority or discretionary responsibility in the administration of the Plan.

1.20    "Forfeiture" means that portion of a Participant's Account that is not Vested, and occurs on the earlier of:

(a)    the distribution of the entire Vested portion of the Participant's Account of a Former Participant who has severed employment with the Employer. For purposes of this provision, if the Former Participant has a Vested benefit of zero, then such Former Participant shall be deemed to have received a distribution of such Vested benefit as of the year in which the severance of employment occurs, or

(b)    the last day of the Plan Year in which a Former Participant who has severed employment with the Employer incurs five (5) consecutive 1-Year Breaks in Service.

Regardless of the preceding provisions, if a Former Participant is eligible to share in the allocation of Employer contributions or Forfeitures in the year in which the Forfeiture would otherwise occur, then the Forfeiture will not occur until the end of the first Plan Year for which the Former Participant is not eligible to share in the allocation of Employer contributions or Forfeitures. Furthermore, the term "Forfeiture" shall also include amounts deemed to be Forfeitures pursuant to any other provision of this Plan.

1.21    "Former Participant" means a person who has been a Participant, but who has ceased to be a Participant for any reason.

1.22    "415 Compensation" with respect to any Participant means such Participant's wages for the Plan Year within the meaning of Code Section 3401(a) (for the purposes of income tax withholding at the source) but determined without regard to any rules that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401(a)(2)), plus amounts that would have been treated as wages for withholding purposes but for an election under Code Section 125(a), 132(f)(4), 402(e)(3), 402(h)(1)(B), 402(k), or 457(b), plus Military Differential Pay.

Notwithstanding the above, the determination of 415 Compensation shall be made by:

(a)    including amounts not includible in gross income under Code Section 125 shall be deemed to include any amounts not available to a Participant in cash in lieu of group health coverage because the Participant is unable to certify that the Participant has other health coverage, provided the Employer does not request or collect information regarding the Participant's other health coverage as part of the enrollment process for the health plan.

(b)     effective for Limitation Years beginning on and after July 1, 2007, making the following adjustments for amounts that are paid after the Participant's severance from employment with the Employer. Any other payment of compensation paid after severance of employment that is not described in the following types of compensation is not considered compensation within the meaning of Code Section 415(c)(3), even if payment is made within the time period specified above.

(1)     415 Compensation shall include regular pay after severance of employment if:

(i)     The payment is regular compensation for services during the Participant's regular working hours, or compensation for services outside the Participant's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments; and

(ii)     The payment would have been paid to the Participant prior to a severance from employment if the Participant had continued in employment with the Employer, and

(iii)     The payment is made by the later of 2 1/2 months after a Participant's severance from employment with the Employer or the end of the Limitation Year that includes the date of the Participant's severance from employment with the Employer.

(2)     Leave cash-outs shall be included in 415 Compensation if those amounts would have been included in the definition of 415 Compensation if they were paid prior to the Participant's severance from employment with the Employer and the amounts are for unused accrued bona fide sick, vacation, or other leave, but only if the Participant would have been able to use the leave if employment had continued, and such amounts are paid by the later of 2 1/2 months after a Participant's severance from employment with the Employer or the end of the Limitation Year that includes the date of the Participant's severance from employment with the Employer, and represents.

(3)     Deferred compensation shall be included in 415 Compensation if those amounts would have been included in the definition of 415 Compensation if they were paid prior to the Participant's severance from employment with the Employer maintaining the Plan and the amounts are received pursuant to a nonqualified unfunded deferred compensation plan, but only if the payment would have been paid if the Participant had continued in employment with the Employer and only to the extent that the payment is includible in the Participant's gross income, and such payment is made by the later of 2 1/2 months after a Participant's severance from employment with the Employer or the end of the Limitation Year that includes the date of the Participant's severance from employment with the Employer.

Notwithstanding the above, amounts earned but not paid during a Limitation Year solely because of the timing of pay periods and pay dates, shall be included in 415 Compensation

7

for the Limitation Year in which such amounts were earned provided the amounts are paid during the first few weeks of the next Limitation Year, the amounts are included on a uniform and consistent basis with respect to all similarly situated Participants, and no Compensation is included in more than one Limitation Year.

1.23   "Highly Compensated Employee" means an Employee described in Code Section 414(q) and the Regulations thereunder, and generally means any Employee who:

(a)     was a "five percent owner" as defined in the definition for "Key Employee" at any time during the "determination year" or the "look-back year"; or

(b)     for the "look-back year" had "415 Compensation" from the Employer in excess of $80,000. The $80,000 amount is adjusted at the same time and in the same manner as under Code Section 415(d), except that the base period is the calendar quarter ending September 30, 1996.

The "determination year" means the Plan Year for which testing is being performed, and the "look-back year" means the immediately preceding twelve (12) month period.

A highly compensated former Employee is based on the rules applicable to determining Highly Compensated Employee status as in effect for the "determination year," in accordance with Regulation 1.414(q)-1T, A-4 and IRS Notice 97-45 (or any superseding guidance).

In determining who is a Highly Compensated Employee, Employees who are non-resident aliens and who received no earned income (within the meaning of Code Section 911(d)(2)) from the Employer constituting United States source income within the meaning of Code Section 861(a)(3) shall not be treated as Employees. If a nonresident alien Employee has U.S. source income, that Employee is treated as satisfying this definition if all of such Employee's U.S. source income from the Employer is exempt from U.S. income tax under an applicable income tax treaty. Additionally, all Affiliated Employers shall be taken into account as a single employer and Leased Employees within the meaning of Code Sections 414(n)(2) and 414(o)(2) shall be considered Employees unless such Leased Employees are covered by a plan described in Code Section 414(n)(5) and are not covered in any qualified plan maintained by the Employer. The exclusion of Leased Employees for this purpose shall be applied on a uniform and consistent basis for all of the Employer's retirement plans. Highly Compensated former Employees shall be treated as Highly Compensated Employees without regard to whether they performed services during the "determination year."

1.24   "Highly Compensated Participant" means any Highly Compensated Employee who is eligible to participate in the component of the Plan being tested.

1.25   "Hour of Service" means (1) each hour for which an Employee is directly or indirectly compensated or entitled to compensation by the Employer for the performance of duties (these hours will be credited to the Employee for the computation period in which the duties are performed); (2) each hour for which an Employee is directly or indirectly compensated or entitled to compensation by the Employer (irrespective of whether the employment relationship has

8

terminated) for reasons other than performance of duties (such as vacation, holidays, sickness, jury duty, disability, lay-off, military duty or leave of absence) during the applicable computation period (these hours will be calculated and credited pursuant to Department of Labor regulation 2530.200b-2 which is incorporated herein by reference); (3) each hour for which back pay is awarded or agreed to by the Employer without regard to mitigation of damages (these hours will be credited to the Employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made). The same Hours of Service shall not be credited both under (1) or (2), as the case may be, and under (3).

Notwithstanding (2) above, (i) no more than 501 Hours of Service are required to be credited to an Employee on account of any single continuous period during which the Employee performs no duties (whether or not such period occurs in a single computation period); (ii) an hour for which an Employee is directly or indirectly paid, or entitled to payment, on account of a period during which no duties are performed is not required to be credited to the Employee if such payment is made or due under a plan maintained solely for the purpose of complying with applicable worker's compensation, or unemployment compensation or disability insurance laws; and (iii) Hours of Service are not required to be credited for a payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee.

For purposes of (2) above, a payment shall be deemed to be made by or due from the Employer regardless of whether such payment is made by or due from the Employer directly, or indirectly through, among others, a trust fund, or insurer, to which the Employer contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer, or other entity are for the benefit of particular Employees or are on behalf of a group of Employees in the aggregate.

For purposes of this Section, Hours of Service will be credited for employment with other Affiliated Employers. The provisions of Department of Labor regulations 2530.200b-2(b) and (c) are incorporated herein by reference.

1.26    "Investment Manager" means any Fiduciary described in Act Section 3(38).

1.27    "Key Employee" means an Employee as defined in Code Section 416(i) and the Regulations thereunder. Generally, any Employee or former Employee (as well as each of the Employee's or former Employee's Beneficiaries) is considered a Key Employee if the Employee's or former Employee's, at any time during the Plan Year that contains the "determination date" (within the meaning of Section 9.2) has been included in one of the following categories:

(a)    an officer of the Employer (as that term is defined within the meaning of the Regulations under Code Section 416) having annual "415 Compensation" greater than $130,000 (as adjusted under Code Section 416(i)(1)).

(b)      a "five percent owner" of the Employer. "Five percent owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than five percent (5%) of the outstanding stock of the Employer or stock possessing more than five percent (5%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business, any person who owns more than five percent (5%) of the capital or profits interest in the Employer.

(c)      a "one percent owner" of the Employer having an annual "415 Compensation" from the Employer of more than $150,000. "One percent owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than one percent (1%) of the outstanding stock of the Employer or stock possessing more than one percent (1%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business, any person who owns more than one percent (1%) of the capital or profits interest in the Employer.

For purposes of this Section, the determination of "415 Compensation" shall be made by including amounts which are contributed by the Employer pursuant to a salary reduction agreement and which are not includible in the gross income of the Participant under Code Sections 125, 132(f)(4), 402(e)(3), 402(h)(1)(B), 403(b) or 457(b), and Employee contributions described in Code Section 414(h)(2) that are treated as Employer contributions.

In determining percentage ownership hereunder, employers that would otherwise be aggregated under Code Sections 414(b), (c), (m) and (o) shall be treated as separate employers. In determining whether an individual has 415 Compensation of more than $150,000 or $130,000 as adjusted, 415 Compensation from each employer required to be aggregated under Code Sections 414(b), (c), (m) and (o) shall be taken into account.

1.28    "Late Retirement Date" means a Participant's actual Retirement Date after having reached Normal Retirement Date.

1.29    "Leased Employee" means any person (other than an Employee of the recipient Employer) who pursuant to an agreement between the recipient Employer and any other person or entity ("leasing organization") has performed services for the recipient (or for the recipient and related persons determined in accordance with Code Section 414(n)(6)) on a substantially full time basis for a period of at least one year, and such services are performed under primary direction or control by the recipient Employer. Contributions or benefits provided a Leased Employee by the leasing organization which are attributable to services performed for the recipient Employer shall be treated as provided by the recipient Employer. Furthermore, Compensation for a Leased Employee shall only include Compensation from the leasing organization that is attributable to services performed for the recipient Employer. A Leased Employee shall not be considered an Employee of the recipient Employer:

(a)      if such employee is covered by a money purchase pension plan providing:

10

(1)     a nonintegrated employer contribution rate of at least 10% of compensation, as defined in Code Section 415(c)(3);

(2)     immediate participation;

(3)     full and immediate vesting; and

(b)     if Leased Employees do not constitute more than 20% of the recipient Employer's nonhighly compensated work force.

1.30     "Limitation Year"  means the Plan Year.

1.31     "Military Differential Pay" means any differential wage payments made to an individual that represents an amount which, when added to the individual's military pay, approximates the amount of compensation that was paid to the individual while working for the Employer. An individual receiving a differential wage payment, as defined by Code Section 3401(h)(2), is treated as an Employee of the Employer making the payment, and the differential wage payment is treated as 415 Compensation.

The Plan is not treated as failing to meet the requirements of any provision described in Code Section 414(u)(1)(C) (or corresponding Plan provisions) by reason of any contribution or benefit which is based on the differential wage payment. The preceding sentence applies only if all Employees of the Employer performing service in the uniformed services described in Code Section 3401(h)(2)(A) are entitled to receive differential wage payments (as defined in Code Section 3401(h)(2)) on reasonably equivalent terms and, if eligible to participate in a retirement plan maintained by the Employer, to make contributions based on the payments on reasonably equivalent terms (taking into account Code Sections 410(b)(3), (4), and (5)).

1.32     "Non-Highly Compensated Participant" means any Participant who is not a Highly Compensated Employee.

A Participant is a Non-Highly Compensated Participant for a particular Plan Year if such Participant does not meet the definition of a Highly Compensated Employee in effect for that Plan Year.

1.33     "Non-Key Employee" means any Employee or former Employee (and such Employee's or former Employee's Beneficiaries) who is not a Key Employee.

1.34     "Normal Retirement Age" means the Participant's 65th birthday. A Participant shall become fully Vested in the Participant's Account upon attaining Normal Retirement Age (if the Participant is an Employee on or after such date).

1.35     "Normal Retirement Date" means the Participant's Normal Retirement Age.

1.36    "1-Year Break in Service" means the applicable computation period during which an Employee has not completed more than 500 Hours of Service with the Employer. Further, solely for the purpose of determining whether a Participant has incurred a 1-Year Break in Service, Hours of Service shall be recognized for "authorized leaves of absence" and "maternity and paternity leaves of absence." Years of Service and 1-Year Breaks in Service shall be measured on the same computation period.

"Authorized leave of absence" means an unpaid, temporary cessation from active employment with the Employer pursuant to an established nondiscriminatory policy, whether occasioned by illness, military service, or any other reason.

A "maternity or paternity leave of absence" means an absence from work for any period by reason of the Employee's pregnancy, birth of the Employee's child, placement of a child with the Employee in connection with the adoption of such child, or any absence for the purpose of caring for such child for a period immediately following such birth or placement. For this purpose, Hours of Service shall be credited for the computation period in which the absence from work begins, only if credit therefore is necessary to prevent the Employee from incurring a 1-Year Break in Service, or, in any other case, in the immediately following computation period. The Hours of Service credited for a "maternity or paternity leave of absence" shall be those which would normally have been credited but for such absence, or, in any case in which the Administrator is unable to determine such hours normally credited, eight (8) Hours of Service per day. The total Hours of Service required to be credited for a "maternity or paternity leave of absence" shall not exceed the number of Hours of Service needed to prevent the Employee from incurring a 1-Year Break in Service.

1.37    "Other Investments Account" means the account of a Participant which is credited with such Participant's share of the net gain (or loss) of the Plan and Employer contributions in other than Company Stock and which is debited with payments made to pay for Company Stock.

1.38    "Participant" means any Eligible Employee who participates in the Plan and has not for any reason become ineligible to participate further in the Plan.

1.39    "Plan" means this instrument, including all amendments thereto.

1.40    "Plan Year" means the Plan's accounting year of twelve (12) months commencing on January 1 of each year and ending the following December 31.

1.41    "Radiance 401(k) Plan" means the Radiance Technologies, Inc. 401(k) Profit Sharing Plan.

1.42    "Regulation" means the income tax regulations as promulgated by the Secretary of the Treasury or a delegate of the Secretary of the Treasury, and as amended from time to time.

1.43    "Retirement" means a Participant's separation from service on or after attaining Normal Retirement Age.

1.44    "Retirement Date" means the date as of which a Participant retires for reasons other than Total and Permanent Disability, whether such retirement occurs on a Participant's Normal Retirement Date or Late Retirement Date (see Section 7.1).

1.45    "Terminated Participant" means a person who has been a Participant, but whose employment has been terminated other than by death, Total and Permanent Disability or Retirement.

1.46    "Top Heavy Plan" means a plan described in Section 9.2(a).

1.47    "Top Heavy Plan Year" means a Plan Year during which the Plan is a Top Heavy Plan.

1.48    "Total and Permanent Disability" means a physical or mental condition of a Participant resulting from bodily injury, disease, or mental disorder which renders such Participant incapable of continuing any gainful occupation and which condition constitutes total disability under the federal Social Security Acts or the Participant being determined by the insurance carrier for a long-term disability plan maintained by the Employer to be eligible for benefits under such plan.

1.49    "Transfer Account" means the account established and maintained by the Administrator for each Participant with respect to the Participant's interest in the Plan resulting from amounts transferred to this Plan pursuant to the direct plan-to-plan transfer from the Radiance 401(k) Plan described in Section 7.17.

1.50    "Trust" means the trust created by the Trust Agreement.

1.51    "Trustee" means the person(s) or entity named as trustee herein or in any separate trust forming a part of this Plan, and any successors.

1.52    "Trust Agreement" means the agreement between the Employer and the Trustee or any successor Trustee establishing the Trust and specifying the duties of the Trustee.

1.53    "Trust Fund" means the assets of the Plan and Trust as the same shall exist from time to time.

1.54    "Unallocated Company Stock Suspense Account" means an account containing Company Stock acquired with the proceeds of an Exempt Loan and which has not been released from such account and allocated to the Participants' Company Stock Accounts.

1.55    "Valuation Date" means the Anniversary Date and may include any other date or dates deemed necessary or appropriate by the Administrator for the valuation of the Participant's Account during the Plan Year, which may include any day that the Trustee, any transfer agent appointed by the Trustee or the Employer or any stock exchange used by such agent, are open for business.

13

1.56    "Vested" means the nonforfeitable portion of any account maintained on behalf of a Participant.

1.57    "Year of Service" means the computation period of twelve (12) consecutive months, herein set forth, during which an Employee has at least 1000 Hours of Service.

For vesting purposes, the computation periods shall be the Plan Year, excluding periods prior to the effective date of the Plan.

The computation period for all other purposes shall be the Plan Year if not otherwise set forth herein.

Notwithstanding the foregoing, for any short Plan Year, the determination of whether an Employee has completed a Year of Service shall be made in accordance with Department of Labor regulation 2530.203-2(c). However, in determining whether an Employee has completed a Year of Service for benefit accrual purposes in the short Plan Year, the number of the Hours of Service required shall be proportionately reduced based on the number of full months in the short Plan Year.

Years of Service with any Affiliated Employer shall be recognized.

ARTICLE II
ADMINISTRATION

2.1    POWERS AND RESPONSIBILITIES OF THE EMPLOYER

(a)    In addition to the general powers and responsibilities otherwise provided for in this Plan, the Employer shall be empowered to appoint and remove the Trustee and the Administrator from time to time as it deems necessary for the proper administration of the Plan to ensure that the Plan is being operated for the exclusive benefit of the Participants and their Beneficiaries in accordance with the terms of the Plan, the Code, and the Act. The Employer may appoint counsel, specialists, advisers, agents (including any nonfiduciary agent) and other persons as the Employer deems necessary or desirable in connection with the exercise of its fiduciary duties under this Plan. The Employer may compensate such agents or advisers from the assets of the Plan as fiduciary expenses (but not including any business (settlor) expenses of the Employer), to the extent not paid by the Employer.

(b)    The Employer may, by written agreement or designation, appoint at its option an Investment Manager (qualified under the Investment Company Act of 1940 as amended), investment adviser, or other agent to provide direction to the Trustee with respect to any or all of the Plan assets. Such appointment shall be given by the Employer in writing in a form acceptable to the Trustee and shall specifically identify the Plan assets with respect to which the Investment Manager or other agent shall have authority to direct the investment.

(c)    The Employer shall establish a "funding policy and method," i.e., it shall determine

14

whether the Plan has a short run need for liquidity (e.g., to pay benefits) or whether liquidity is a long run goal and investment growth (and stability of same) is a more current need, or shall appoint a qualified person to do so. The Employer or its delegate shall communicate such needs and goals to the Trustee, who shall coordinate such Plan needs with its investment policy. The communication of such a "funding policy and method" shall not, however, constitute a directive to the Trustee as to the investment of the Trust Funds. Such "funding policy and method" shall be consistent with the objectives of this Plan and with the requirements of Title I of the Act.

(d)     The Employer shall periodically review the performance of any Fiduciary or other person to whom duties have been delegated or allocated by it under the provisions of this Plan or pursuant to procedures established hereunder. This requirement may be satisfied by formal periodic review by the Employer or by a qualified person specifically designated by the Employer, through day-to-day conduct and evaluation, or through other appropriate ways.

(e)     The Employer will furnish Fiduciaries and Participants with notices and information statements when voting rights must be exercised.

## 2.2     DESIGNATION OF ADMINISTRATIVE AUTHORITY

The Employer shall be the Administrator. The Employer may appoint any person, including, but not limited to, the Employees of the Employer, to perform the duties of the Administrator. Any person so appointed shall signify acceptance by filing written acceptance with the Employer. Upon the resignation or removal of any individual performing the duties of the Administrator, the Employer may designate a successor.

## 2.3     ALLOCATION AND DELEGATION OF RESPONSIBILITIES

If more than one person is appointed as Administrator, the responsibilities of each Administrator may be specified by the Employer and accepted in writing by each Administrator. In the event that no such delegation is made by the Employer, the Administrators may allocate the responsibilities among themselves, in which event the Administrators shall notify the Employer and the Trustee in writing of such action and specify the responsibilities of each Administrator. The Trustee thereafter shall accept and rely upon any documents executed by the appropriate Administrator until such time as the Employer or the Administrators file with the Trustee a written revocation of such designation.

## 2.4     POWERS AND DUTIES OF THE ADMINISTRATOR

The primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan. The Administrator shall administer the Plan in accordance with its terms and shall have the power and discretion to construe the terms of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan. Any such determination by the Administrator shall be conclusive and binding upon all persons. The Administrator may establish procedures, correct any defect, supply any information, or reconcile any inconsistency in such

manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Plan; provided, however, that any procedure, discretionary act, interpretation or construction shall be done in a nondiscriminatory manner based upon uniform principles consistently applied and shall be consistent with the intent that the Plan shall continue to be deemed a qualified plan under the terms of Code Section 401(a), and shall comply with the terms of the Act and all regulations issued pursuant thereto. The Administrator shall have all powers necessary or appropriate to accomplish the Administrator's duties under the Plan.

The Administrator shall be charged with the duties of the general administration of the Plan as set forth under the terms of the Plan, including, but not limited to, the following:

(a)     the discretion to determine all questions relating to the eligibility of Employees to participate or remain a Participant hereunder and to receive benefits under the Plan;

(b)     to compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any Participant shall be entitled hereunder;

(c)     to authorize and direct the Trustee with respect to all nondiscretionary or otherwise directed disbursements from the Trust;

(d)     to maintain all necessary records for the administration of the Plan;

(e)     to interpret the provisions of the Plan and to make and publish such rules for regulation of the Plan as are consistent with the terms hereof;

(f)     to determine the size and type of any Contract to be purchased from any insurer, and to designate the insurer from which such Contract shall be purchased;

(g)     to compute and certify to the Employer and to the Trustee from time to time the sums of money necessary or desirable to be contributed to the Plan;

(h)     to consult with the Employer and the Trustee regarding the short and long-term liquidity needs of the Plan in order that the Trustee can exercise any investment discretion in a manner designed to accomplish specific objectives;

(i)     to establish and communicate to Participants a procedure for satisfying the diversification requirements under Code Section 401(a)(28);

(j)     to establish and communicate to Participants a procedure and method to insure that each Participant will vote Company Stock allocated to such Participant's Company Stock Account pursuant;

(k)     to determine the validity of, and take appropriate action with respect to, any qualified domestic relations order received by it;

16

(l)      to assist any Participant regarding the Participant's rights, benefits, or elections available under the Plan; and

(m)     to establish and maintain a distribution policy to interpret the distribution provisions of the Plan and provide for methods for benefit distributions from the Plan.

2.5      RECORDS AND REPORTS

The Administrator shall keep a record of all actions taken and shall keep all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law.

2.6      APPOINTMENT OF ADVISERS

The Administrator, or the Trustee with the consent of the Administrator, may appoint counsel, specialists, advisers, agents (including nonfiduciary agents) and other persons as the Administrator or the Trustee deems necessary or desirable in connection with the administration of this Plan, including but not limited to agents and advisers to assist with the administration and management of the Plan, and thereby to provide, among such other duties as the Administrator may appoint, assistance with maintaining Plan records and the providing of investment information to the Plan's investment Fiduciaries and to Participants.

2.7      PAYMENT OF EXPENSES

All expenses of administration may be paid out of the Trust Fund unless paid by the Employer. Such expenses shall include any expenses incident to the functioning of the Administrator, or any person or persons retained or appointed by any named Fiduciary incident to the exercise of their duties under the Plan, including, but not limited to, fees of accountants, counsel, Investment Managers, agents (including nonfiduciary agents) appointed for the purpose of assisting the Administrator or the Trustee in carrying out the instructions of Participants as to the directed investment of their Accounts and other specialists and their agents, the costs of any bonds required pursuant to Act Section 412, and other costs of administering the Plan. Until paid, the expenses shall constitute a liability of the Trust Fund.

2.8      CLAIMS PROCEDURE

Claims for benefits under the Plan may be filed in writing with the Administrator. Written or electronic notice of the disposition of a claim shall be furnished to the claimant within 90 days after the application is filed, or such period as is required by applicable law or Department of Labor regulation. In the event the claim is denied, the reasons for the denial shall be specifically set forth in the notice in language calculated to be understood by the claimant, pertinent provisions of the Plan shall be cited, and, where appropriate, an explanation as to how the claimant can perfect the claim will be provided. In addition, the claimant shall be furnished with an explanation of the Plan's claims review procedure.

17

2.9    CLAIMS REVIEW PROCEDURE

Any Employee, former Employee, or Beneficiary of either, who has been denied a benefit by a decision of the Administrator pursuant to Section 2.8 shall be entitled to request the Administrator to give further consideration to a claim by filing with the Administrator a written request for a hearing. Such request, together with a written statement of the reasons why the claimant believes the claim should be allowed, shall be filed with the Administrator no later than 60 days after receipt of the written or electronic notification provided for in Section 2.8. The Administrator shall then conduct a hearing within the next 60 days, at which the claimant may be represented by an attorney or any other representative of such claimant's choosing and expense and at which the claimant shall have an opportunity to submit written and oral evidence and arguments in support of the claim. At the hearing the claimant or the claimant's representative shall have an opportunity to review all documents in the possession of the Administrator which are pertinent to the claim at issue and its disallowance. Either the claimant or the Administrator may cause a court reporter to attend the hearing and record the proceedings. In such event, a complete written transcript of the proceedings shall be furnished to both parties by the court reporter. The full expense of any such court reporter and such transcripts shall be borne by the party causing the court reporter to attend the hearing. A final decision as to the allowance of the claim shall be made by the Administrator within 60 days of receipt of the appeal (unless there has been an extension of 60 days due to special circumstances, provided the delay and the special circumstances occasioning it are communicated to the claimant within the 60 day period). Such communication shall be written in a manner calculated to be understood by the claimant and shall include specific reasons for the decision and specific references to the pertinent Plan provisions on which the decision is based.

ARTICLE III
ELIGIBILITY

3.1    CONDITIONS OF ELIGIBILITY

Any Eligible Employee who has attained age 21 shall be eligible to participate hereunder as of the date such Employee has satisfied such requirements, provided that no age requirement shall apply effective as of January 1, 2022. However, any Employee who was a Participant in the Plan prior to the effective date of this amendment and restatement shall continue to participate in the Plan, subject to the eligibility terms as amended from time to time.

3.2    EFFECTIVE DATE OF PARTICIPATION

An Eligible Employee shall become a Participant effective as of the date on which he satisfies the eligibility requirements of Section 3.1.

If an Employee, who has satisfied the Plan's eligibility requirements and would otherwise have become a Participant, shall go from a classification of a noneligible Employee to an Eligible Employee, such Employee shall become a Participant on the date such Employee becomes an

18

Eligible Employee or, if later, the date that the Employee would have otherwise entered the Plan had the Employee always been an Eligible Employee.

If an Employee, who has satisfied the Plan's eligibility requirements and would otherwise become a Participant, shall go from a classification of an Eligible Employee to a noneligible class of Employees, such Employee shall become a Participant in the Plan on the date such Employee again becomes an Eligible Employee, or, if later, the date that the Employee would have otherwise entered the Plan had the Employee always been an Eligible Employee. However, if such Employee incurs a 1-Year Break in Service, eligibility will be determined under the break in service rules set forth in Section 3.5.

### 3.3    DETERMINATION OF ELIGIBILITY

The Administrator shall determine the eligibility of each Employee for participation in the Plan based upon information furnished by the Employer. Such determination shall be conclusive and binding upon all persons, as long as the same is made pursuant to the Plan and the Act. Such determination shall be subject to review pursuant to Section 2.9.

### 3.4    TERMINATION OF ELIGIBILITY

In the event a Participant shall go from a classification of an Eligible Employee to an ineligible Employee, such Former Participant shall continue to vest in the Plan for each Year of Service completed while a noneligible Employee, until such time as the Participant's Account shall be forfeited or distributed pursuant to the terms of the Plan. Additionally, the Former Participant's interest in the Plan shall continue to share in the earnings of the Trust Fund.

### 3.5    REHIRED EMPLOYEES AND BREAKS IN SERVICE

(a)    If any Employee becomes a former Employee due to severance from employment with the Employer and is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service occur, then the former Employee's prior service shall count in the same manner as if severance from employment with the Employer had not occurred. If any Participant ceases to be a Participant due to severance from employment with the Employer and is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service occur, then the Participant shall resume participation (as if severance from employment with the Employer had not occurred) on the reemployment date.

(b)    After a Former Participant who has severed employment with the Employer incurs five (5) consecutive 1-Year Breaks in Service, the Vested portion of such Former Participant's Account attributable to pre-break service shall not be increased as a result of post-break service. In such case, separate accounts will be maintained as follows:

(1)    one account for nonforfeitable benefits attributable to pre-break service; and

19

(2)     one account representing the Participant's Employer derived account balance in the Plan attributable to post-break service.

(c)     If any Participant becomes a Former Participant due to severance of employment with the Employer and is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service, and such Former Participant had received a distribution of the entire Vested interest prior to reemployment, then the forfeited account shall be reinstated only if the Former Participant repays the full amount which had been distributed. Such repayment must be made before the earlier of five (5) years after the first date on which the Participant is subsequently reemployed by the Employer or the close of the first period of five (5) consecutive 1-Year Breaks in Service commencing after the distribution. If a distribution occurs for any reason other than a severance of employment, the time for repayment may not end earlier than five (5) years after the date of distribution. In the event the Former Participant does repay the full amount distributed, the undistributed forfeited portion of the Participant's Account must be restored in full, unadjusted by any gains or losses occurring subsequent to the Valuation Date preceding the distribution. The source for such reinstatement may be Forfeitures occurring during the Plan Year. If such source is insufficient, then the Employer will contribute an amount which is sufficient to restore any such forfeited Accounts; provided, however, that if a discretionary contribution is made for such year pursuant to Section 4.1, such contribution shall first be applied to restore any such Accounts and the remainder shall be allocated in accordance with Section 4.3.

If a non-Vested Former Participant was deemed to have received a distribution and such Former Participant is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service, then such Participant will be deemed to have repaid the deemed distribution as of the date of reemployment.

3.6     ELECTION NOT TO PARTICIPATE

An Employee may, subject to the approval of the Employer, elect voluntarily and irrevocably not to participate in the Plan. The election not to participate must be communicated to the Employer, in writing, within a reasonable period of time before the beginning of the first Plan Year to which such waiver shall apply.

ARTICLE IV
CONTRIBUTION AND ALLOCATION

4.1     FORMULA FOR DETERMINING EMPLOYER CONTRIBUTION

(a)     For each Plan Year, the Employer shall contribute to the Plan such amount as shall be determined by the Employer.

(b)     The Employer shall contribute to the Plan the amount necessary to provide the top heavy minimum contribution. All contributions by the Employer shall be made in cash or, if there is no prohibited transaction within the meaning of Labor regulation 2509.94-3, in such property as is acceptable to the Trustee.

4.2    TIME OF PAYMENT OF EMPLOYER CONTRIBUTION

The Employer may make its contribution to the Plan for a particular Plan Year at such time as the Employer, in its sole discretion, determines. If the Employer makes a contribution for a particular Plan Year after the close of that Plan Year, the Employer will designate to the Trustee the Plan Year for which the Employer is making its contribution.

4.3    ALLOCATION OF CONTRIBUTION, FORFEITURES AND EARNINGS

(a)    The Administrator shall establish and maintain an Account in the name of each Participant to which the Administrator shall credit as of each Anniversary Date, or other Valuation Date, all amounts allocated to each such Participant as set forth herein.

(b)    The Employer shall provide the Administrator with all information required by the Administrator to make a proper allocation of the Employer contribution for each Plan Year. Within a reasonable period of time after the date of receipt by the Administrator of such information, the Administrator shall allocate such contribution to each Participant's Account in accordance with written directions to the Trustee and such contributions shall be allocated to each Participant's Account in the same proportion that each such Participant's Compensation for the year bears to the total Compensation of all Participants for such year.

Only Participants who have completed a Year of Service during the Plan Year and are actively employed on the last day of the Plan Year shall be eligible to share in the discretionary contribution for the year.

(c)    The Company Stock Account of each Participant shall be credited as of each Anniversary Date with the Participant's allocable share of Company Stock (including fractional shares) purchased and paid for by the Plan or contributed in kind by the Employer. Stock dividends on Company Stock held in the Participant's Company Stock Account shall be credited to the Participant's Company Stock Account when paid to the Plan. Cash dividends on Company Stock held in the Participant's Company Stock Account shall, in the sole discretion of the Administrator, either be credited to the Participant's Other Investments Account when paid to the Plan or be used to repay an Exempt Loan; provided, however, that when cash dividends are used to repay an Exempt Loan, Company Stock shall be released from the Unallocated Company Stock Suspense Account and allocated to the Participant's Company Stock Account pursuant to Section 4.3(e) and, provided further, that Company Stock allocated to the Participant's Company Stock Account shall have a fair market value not less than the amount of cash dividends which would have been allocated to such Participant's Other Investments Account for the year.

Notwithstanding the above, if the Employer elected to be an S corporation under Code Section 1362(a) and a distribution under Code Section 1368(a) is made, then the Administrator shall direct that such distribution on S corporation Company Stock held in the Participant's Company Stock Account shall, in the sole discretion of the Administrator, either be credited to the Participant's Other Investment Account when paid to the Plan or be used to repay an Exempt Loan;

21

provided, however, that when such distribution is used to repay an Exempt Loan, Company Stock shall be released from the Unallocated Company Stock Suspense Account and allocated to the Participant's Company Stock Account pursuant to Section 4.3(e) and, provided further, that Company Stock allocated to the Participant's Company Stock Account shall have a fair market value not less than the amount of the distribution that would have been allocated to such Participant's Other Investment Account for the year.

Company Stock acquired by the Plan with the proceeds of an Exempt Loan shall only be allocated to each Participant's Company Stock Account upon release from the Unallocated Company Stock Suspense Account as provided in Section 4.3(e) herein. Company Stock acquired with the proceeds of an Exempt Loan shall be an asset of the Trust Fund and maintained in the Unallocated Company Stock Suspense Account.

(d)     Except as provided above with respect to stock dividends on Company Stock, as of each Valuation Date, after allocation of Employer contributions, any earnings or losses (net appreciation or net depreciation) of the Trust Fund shall be allocated in the same proportion that each Participant's and Former Participant's nonsegregated accounts (other than each Participant's Company Stock Account) bear to the total of all Participants' and Former Participants' nonsegregated accounts (other than each Participant's Company Stock Account) as of such date.

Earnings or losses do not include the interest paid under any installment contract for the purchase of Company Stock by the Trust Fund or on any loan used by the Trust Fund to purchase Company Stock, nor does it include income received by the Trust Fund with respect to Company Stock acquired with the proceeds of an Exempt Loan; all income received by the Trust Fund from Company Stock acquired with the proceeds of an Exempt Loan may, at the discretion of the Administrator, be used to repay such loan.

(e)     All Company Stock acquired by the Plan with the proceeds of an Exempt Loan must be added to and maintained in the Unallocated Company Stock Suspense Account. Such Company Stock shall be released and withdrawn from that account as if all Company Stock in that account were encumbered. For each Plan Year during the duration of the loan, the number of shares of Company Stock released shall equal the number of encumbered shares held immediately before release for the current Plan Year multiplied by a fraction, the numerator of which is the amount of principal and interest paid for the Plan Year and the denominator of which is the sum of the numerator plus the principal and interest to be paid for all future Plan Years; provided however, at the discretion of the Administrator, the number of shares of Company Stock released and withdrawn from the Unallocated Company Stock Suspense Account may be determined solely with reference to the principal payment of the Exempt Loan if the following three conditions are met: (i) the Exempt Loan provides for annual payments of principal and interest at a cumulative rate that is not less rapid at any time than level annual payments of such amounts for ten years; (ii) the interest portion of any payment is disregarded for purposes of determining the number of shares released only to the extent it would be treated as interest under standard loan amortization tables; and (iii) if the Exempt Loan is renewed, extended or refinanced, the sum of the expired duration of the Exempt Loan and the renewal period, the extension period or the duration of a new Exempt

22

Loan does not exceed ten years. As of each Anniversary Date, the Plan must consistently allocate to each Participant's Account, in the same manner as Employer discretionary contributions pursuant to Section 4.1(a) are allocated, non-monetary units (shares and fractional shares of Company Stock) representing each Participant's interest in Company Stock withdrawn from the Unallocated Company Stock Suspense Account. In addition, Company Stock released from the Unallocated Company Stock Suspense Account with cash dividends pursuant to Section 4.3(c) shall be allocated to each Participant's Company Stock Account in the same manner as Employer discretionary contributions pursuant to Section 4.1(a) are allocated. Income earned with respect to Company Stock in the Unallocated Company Stock Suspense Account shall be used, at the discretion of the Administrator, to repay the Exempt Loan used to purchase such Company Stock. Company Stock released from the Unallocated Company Stock Suspense Account with such income, and any income which is not so used, shall be allocated as of each Anniversary Date in the same proportion that each Participant's and Former Participant's nonsegregated accounts after the allocation of any earnings or losses pursuant to the Employer discretionary contribution described in Section 4.1(a) bear to the total of all Participants' and Former Participants' nonsegregated account after the allocation of any earnings or losses pursuant to Section 4.3(d).

Notwithstanding the above, if the Employer elected to be an S corporation under Code Section 1362(a), Company Stock released from the Unallocated Company Stock Suspense Account with a distribution under Code Section 1368(a) on S corporation Company Stock pursuant to Section 4.3(c) shall be allocated to each Participant's Company Stock Account in the same proportion that each Participant's number of shares of Company Stock sharing in such distribution bears to the total number of shares of all Participant's Company Stock sharing in such distribution.

It is intended that the provisions of this section be applied and construed in a manner consistent with the requirements and provisions of Treas. Reg. section 54.4975-7(b)(8) and any successor Regulations thereto.

(f)      On or before each Anniversary Date any amounts that became Forfeitures since the last Anniversary Date may be made available to reinstate previously forfeited account balances, if any, of Former Participants in accordance with Section 3.5, reduce any Employer contributions, satisfy any contributions that may be required pursuant to Section 7.9, and/or pay administrative expenses of the Plan. The remaining Forfeitures, if any, shall be allocated among the Participant's Account in the same manner as Employer discretionary contributions pursuant to Section 4.1(a) are allocated. Provided, however, that in the event the allocation of Forfeitures provided herein shall cause the "annual addition" (as defined in Section 4.4) to any Participant's Account to exceed the amount allowable by the Code, the excess shall be reallocated in accordance with Section 4.4.

(g)      For any Top Heavy Plan Year, Non-Key Employees not otherwise eligible to share in the allocation of contributions as provided above, shall receive the minimum allocation provided for in Section 4.3(i) if eligible pursuant to the provisions of Section 4.3(k).

(h)      Notwithstanding the foregoing, Participants who are not actively employed on the last day of the Plan Year due to Retirement, Total and Permanent Disability or death shall share in

the allocation of contributions for that Plan Year regardless of whether such Participants completed a Year of Service during such Plan Year.

(i)    Minimum Allocations Required for Top Heavy Plan Years: Notwithstanding the foregoing, for any Top Heavy Plan Year, the sum of the Employer contributions allocated to the Participant's Account of each Non-Key Employee shall be equal to at least three percent (3%) of such Non-Key Employee's "415 Compensation" (reduced by contributions and forfeitures, if any, allocated to each Non-Key Employee in any defined contribution plan included with this Plan in a Required Aggregation Group). However, if (1) the sum of the Employer contributions allocated to the Participant's Account of each Key Employee for such Top Heavy Plan Year is less than three percent (3%) of each Key Employee's "415 Compensation" and (2) this Plan is not required to be included in an Aggregation Group to enable a defined benefit plan to meet the requirements of Code Section 401(a)(4) or 410, then the sum of the Employer contributions allocated to the Participant's Account of each Non-Key Employee shall be equal to the largest percentage allocated to the Participant's Account of any Key Employee.

However, no such minimum allocation shall be required in this Plan for any Non-Key Employee who participates in another defined contribution plan subject to Code Section 412 included with this Plan in a Required Aggregation Group where the other plan provides the minimum allocation.

(j)    For purposes of the minimum allocations set forth above, the percentage allocated to the Participant's Account of any Key Employee shall be equal to the ratio of the sum of the Employer contributions allocated on behalf of such Key Employee divided by the "415 Compensation" for such Key Employee.

(k)    For any Top Heavy Plan Year, the minimum allocations set forth above shall be allocated to the Participant's Account of all Non-Key Employees who are Participants and who are employed by the Employer on the last day of the Plan Year, including Non-Key Employees who have (1) failed to complete a Year of Service; (2) failed to receive an allocation of Employer contributions merely because the Participant's Compensation was less than a stated amount, or (3) declined to make mandatory contributions (if required) to the Plan.

(l)    For the purposes of this Section, "415 Compensation" in excess of $150,000 (or such other amount provided in the Code) shall be disregarded. Such amount shall be adjusted for increases in the cost of living in accordance with Code Section 401(a)(17)(B), except that the dollar increase in effect on January 1 of any calendar year shall be effective for the Plan Year beginning with or within such calendar year. If "415 Compensation" for any prior determination period is taken into account in determining a Participant's minimum benefit for the current Plan Year, the "415 Compensation" for such determination period is subject to the applicable annual "415 Compensation" limit in effect for that prior period. For this purpose, in determining the minimum benefit in Plan Years beginning on or after January 1, 1989, the annual "415 Compensation" limit in effect for determination periods beginning before that date is $200,000 (or such other amount as adjusted for increases in the cost of living in accordance with Code Section 415(d) for

24

determination periods beginning on or after January 1, 1989, and in accordance with Code Section 401(a)(17)(B) for determination periods beginning on or after January 1, 1994). For determination periods beginning prior to January 1, 1989, the $200,000 limit shall apply only for Top Heavy Plan Years and shall not be adjusted. For any short Plan Year the "415 Compensation" limit shall be an amount equal to the "415 Compensation" limit for the calendar year in which the Plan Year begins multiplied by the ratio obtained by dividing the number of full months in the short Plan Year by twelve (12).

(m)     Notwithstanding anything in this Section to the contrary, all information necessary to properly reflect a given transaction may not be available until after the date specified herein for processing such transaction, in which case the transaction will be reflected when such information is received and processed. Subject to express limits that may be imposed under the Code, the processing of any contribution, distribution or other transaction may be delayed for any legitimate business reason (including, but not limited to, failure of systems or computer programs, failure of the means of the transmission of data, force majeure, the failure of a service provider to timely receive values or prices, and the correction for errors or omissions or the errors or omissions of any service provider). The processing date of a transaction will be binding for all purposes of the Plan.

(n)     410(b) ratio percentage fail-safe provisions. Notwithstanding anything in the Plan to the contrary, if the Plan would otherwise fail to meet the requirements of Code Section 410(b)(1)(B) and the Regulations thereunder because the Employer discretionary contributions described in Section 4.1(a) would not be allocated to a sufficient number or percentage of Participants for a Plan Year, then the following rules may apply as determined by the Administrator (except as otherwise provided for herein):

(1)     The group of Participants eligible to share in the Employer discretionary contributions for the Plan Year will be expanded to include the minimum number of Participants who would not otherwise be eligible as are necessary to satisfy the applicable test specified above. The specific Participants who become eligible under the terms of this paragraph will be those who have not separated from service prior to the last day of the Plan Year and have completed the greatest number of Hours of Service in the Plan Year. In the event that more Participants than the "minimum necessary" become entitled to an allocation because they all have the same number of Hours of Service (and at least one of that group is required to receive an allocation in order for the test to be satisfied), then all such Participants shall be deemed to constitute the minimum necessary to pass the test.

(2)     If after application of paragraph (1) above, the applicable test is still not satisfied, then the group of Participants eligible to share in the Employer discretionary contributions for the Plan Year shall be further expanded to include the minimum number of Participants who have separated from service prior to the last day of the Plan Year as are necessary to satisfy the applicable test. The specific Participants who become eligible to share shall be those Participants who have completed the greatest number of Hours of Service in the Plan Year before terminating employment. In the event that more Participants than the "minimum necessary"

become entitled to an allocation because they all have the same number of Hours of Service (and at least one of that group is required to receive an allocation in order for the test to be satisfied), then all such Participants shall be deemed to constitute the minimum necessary to pass the test.

(3)     Nothing in this Section 4.3(n) will permit the reduction of a Participant's accrued benefit. Therefore, any amounts that have previously been allocated to Participants may not be reallocated to satisfy these requirements. In such event, the Employer shall make an additional contribution equal to the amount such affected Participants would have received had they been included in the allocations, even if it exceeds the amount that would be deductible under Code Section 404. Any adjustment to the allocations pursuant to this paragraph will be considered a retroactive amendment adopted by the last day of the Plan Year.

Notwithstanding the foregoing, if the Plan fails to meet the requirements of Code Section 410(b)(1)(B) and the Regulations thereunder because the Employer discretionary contributions would not be allocated to a sufficient number or percentage of Participants for a Plan Year, the Administrator may use any other correction method permitted under the Code and Regulations thereunder and the foregoing will not limit the right of the Employer to amend the Plan to address such failure in a manner consistent with the requirements of the Code and Regulations thereunder.

## 4.4     MAXIMUM ANNUAL ADDITIONS

(a)     Notwithstanding the foregoing, the maximum "annual additions" credited to a Participant's accounts for any "limitation year" shall equal the lesser of: (1) $40,000 adjusted annually as provided in Code Section 415(d) pursuant to the Regulations, or (2) one-hundred percent (100%) of the Participant's "415 Compensation" for such "limitation year." If the Employer contribution that would otherwise be contributed or allocated to the Participant's accounts would cause the "annual additions" for the "limitation year" to exceed the maximum "annual additions," the amount contributed or allocated will be reduced so that the "annual additions" for the "limitation year" will equal the maximum "annual additions," and any amount in excess of the maximum "annual additions," which would have been allocated to such Participant may be allocated to other Participants. For any short "limitation year," the dollar limitation in (1) above shall be reduced by a fraction, the numerator of which is the number of full months in the short "limitation year" and the denominator of which is twelve (12).

(b)     For purposes of applying the limitations of Code Section 415, "annual additions" means the sum credited to a Participant's accounts for any "limitation year" of (1) Employer contributions, (2) Employee contributions, (3) forfeitures, (4) amounts allocated, after March 31, 1984, to an individual medical account, as defined in Code Section 415(l)(2) which is part of a pension or annuity plan maintained by the Employer, (5) amounts derived from contributions paid or accrued after December 31, 1985, in taxable years ending after such date, which are attributable to post-retirement medical benefits allocated to the separate account of a key employee (as defined in Code Section 419A(d)(3)) under a welfare benefit plan (as defined in Code Section 419(e)) maintained by the Employer and (6) allocations under a simplified employee pension plan. Except,

26

however, the "415 Compensation" percentage limitation referred to in paragraph (a)(2) above shall not apply to: (A) any contribution for medical benefits after separation from service (within the meaning of Code Sections 401(h) or 419A(f)(2)) which is otherwise treated as an "annual addition," or (B) any amount otherwise treated as an "annual addition" under Code Section 415(l)(1). The annual additions under Section 4.4(b) with respect to Company Stock released from the Unallocated Company Stock Suspense Account (by reason of contributions used for payments on an Exempt Loan and allocated to Participants' Company Stock Accounts) shall be based upon the lesser of (Y) the amount of such contributions, or (Z) the fair market value of such Company Stock as of the allocation date. Annual additions shall not include any allocation attributable to proceeds from the sale of Company Stock by the Trust or to appreciation (realized or unrealized) in the fair market value of Company Stock.

(c)     For purposes of applying the limitations of Code Section 415, the following are not "annual additions": (1) the transfer of funds from one qualified plan to another and (2) provided the Employer has not elected to be an S corporation under Code Section 1362(a) and provided no more than one-third of the Employer contributions for the year are allocated to Highly Compensated Participants, Forfeitures of Company Stock purchased with the proceeds of an Exempt Loan and Employer contributions applied to the payment of interest on an Exempt Loan. In addition, the following are not Employee contributions for the purposes of Section 4.4(b): (A) rollover contributions (as defined in Code Sections 402(c), 403(a)(4), 403(b)(8), 408(d)(3) and 457(e)(16)); (B) repayments of loans made to a Participant from the Plan; (C) repayments of distributions received by an Employee pursuant to Code Section 411(a)(7)(B) (cash-outs); (D) repayments of distributions received by an Employee pursuant to Code Section 411(a)(3)(D) (mandatory contributions); and (E) Employee contributions to a simplified employee pension excludable from gross income under Code Section 408(k)(6).

(d)     For purposes of applying the limitations of Code Section 415, the "limitation year" shall be the Plan Year.

(e)     For the purpose of this Section, all qualified defined contribution plans (whether terminated or not) ever maintained by the Employer shall be treated as one defined contribution plan.

(f)     For the purpose of this Section, if the Employer is a member of a controlled group of corporations, trades or businesses under common control (as defined by Code Section 1563(a) or Code Section 414(b) and (c) as modified by Code Section 415(h)), is a member of an affiliated service group (as defined by Code Section 414(m)), or is a member of a group of entities required to be aggregated pursuant to Regulations under Code Section 414(o), all Employees of such Employers shall be considered to be employed by a single Employer.

(g)     If this is a plan described in Code Section 413(c) (other than a plan described in Code Section 414(f)), then all of the benefits or contributions attributable to a Participant from all of the Employers maintaining this Plan shall be taken into account in applying the limits of this Section with respect to such Participant. Furthermore, in applying the limitations of this Section

with respect to such a Participant, the total "415 Compensation" received by the Participant from all of the Employers maintaining the Plan shall be taken into account.

(h)    (1)    If a Participant participates in more than one defined contribution plan maintained by the Employer which have different Anniversary Dates, the maximum "annual additions" under this Plan shall equal the maximum "annual additions" for the "limitation year" minus any "annual additions" previously credited to such Participant's accounts during the "limitation year."

(2)    If a Participant participates in both a defined contribution plan subject to Code Section 412 and a defined contribution plan not subject to Code Section 412 maintained by the Employer which have the same Anniversary Date, "annual additions" will be credited to the Participant's accounts under the defined contribution plan subject to Code Section 412 prior to crediting "annual additions" to the Participant's accounts under the defined contribution plan not subject to Code Section 412.

(3)    If a Participant participates in more than one defined contribution plan not subject to Code Section 412 maintained by the Employer which have the same Anniversary Date, the maximum "annual additions" under this Plan shall equal the product of (A) the maximum "annual additions" for the "limitation year" minus any "annual additions" previously credited under subparagraphs (1) or (2) above, multiplied by (B) a fraction (i) the numerator of which is the "annual additions" which would be credited to such Participant's accounts under this Plan without regard to the limitations of Code Section 415 and (ii) the denominator of which is such "annual additions" for all plans described in this subparagraph.

(i)    Notwithstanding anything contained in this Section to the contrary, the limitations, adjustments and other requirements prescribed in this Section shall at all times comply with the provisions of Code Section 415 and the Regulations thereunder.

4.5    DIVERSIFICATION

(a)    During each Annual Election Period in the Qualified Election Period, a Qualified Participant may elect to direct the Plan as to the investment of up to 25 percent of the Qualified Participant's Company Stock Account in the Plan to the extent such portion exceeds the amount to which a prior election under this subsection applies. In the year in which the Qualified Participant can make his or her last election, "50 percent" is substituted for "25 percent" in the preceding sentence.

The Administrator shall offer at least three investment options to each Qualified Participant who makes an election under this subsection; each investment option will be diversified and have materially different risk and return characteristics. In lieu of offering such investment options, the Administrator may direct that all amounts subject to Participant elections under this subsection be (i) distributed to Qualified Participants in cash, (ii) distributed to Qualified Participants in Company Stock, subject to the immediate put obligation, or (iii) liquidated and transferred to the

28

Radiance 401(k) Plan or another qualified plan of the Employer that accepts such transfers, provided that such plan permits participant-directed investments, such plan offers at least three investment options (each of which must be diversified and have materially different risk and return characteristics), such plan does not invest in employer securities to a substantial degree, and the transfer complies with all applicable qualification requirements including Code Sections 414(l), 411(d)(6), and 401(a)(11). Such investment, distribution, or transfer shall be made within ninety (90) days after the close of the Annual Election Period.

Notwithstanding the foregoing, no diversification shall be permitted with respect to the Company Stock Accounts of Participants to which Company Stock with a fair market value of less than $500 has been allocated. For this purpose, fair market value is determined as of the Valuation Date immediately preceding the first day on which a Qualified Participant is eligible to make the diversification election under this Subsection.

(b)      Beginning with the 2024 Plan Year and for each Plan Year thereafter, a Participant, subject to any Participant direction procedures established by the Administrator, may elect within an election period determined annually by the Administrator and communicated to Participants to direct the Trustee to diversify a maximum of 10% of his or her Transfer Account (determined as of the most recent Valuation Date preceding the election period). If the Participant so elects, such direction to the Trustee shall be effective no later than the final day of the Plan Year in which the election is made and shall be based on the most recent Valuation Date preceding the election period. If the Employer does not hold sufficient cash as determined by the Board of Directors of the Employer to satisfy all pending diversifications requests or if such requests are restricted by the terms of a third-party loan agreement or other similar arrangement involving the Employer's creditors, the Administrator shall first reduce the elections made pursuant to this Section 4.5(b), beginning with highest percentage elections and continuing with the next highest percentage elections, as necessary to effect the same highest possible percentage election for all Participants. Next, the elections will be effected on a pro rata basis at such highest possible percentage election and will be effected fully at all lower percentage election levels. Amounts diversified pursuant to this Section 4.5(b) shall be (i) if elected by the Participants, distributed to Participants in cash or distributed to Participants in Company Stock, subject to the immediate put obligation, or (ii) liquidated and transferred to the Radiance 401(k) Plan. The diversification rights described in this Section 4.5(b) are available to all Participants with a Transfer Account balance and not just those Participants who are Qualified Participants.

(c)      If a Qualified Participant is entitled to diversify a portion of his Transfer Account in accordance with Section 4.5(b), such Qualified Participant may elect to diversify the greater of: (i) the amount described in Section 4.5(a) or (ii) the amount described in Section 4.5(b).

(d)      For the purposes of this Section the following definitions shall apply:

(1)      "Annual Election Period" means the period that begins the day after the end of each Plan Year in the Qualified Election Period and ends 90 days after the date that the value of the shares subject to the diversification election is provided to the Qualified Participant.

(2)    "Qualified Participant" means any Employee who has completed ten (10) Years of Service as a Participant and has attained age 55.

(3)    "Qualified Election Period" means the six (6) Plan Year period beginning with the first Plan Year in which the Participant first became a "Qualified Participant."

### 4.6    QUALIFIED MILITARY SERVICE

Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service will be provided in accordance with Code Section 414(u).

### 4.7    PROHIBITED ALLOCATION OF COMPANY STOCK

(a)    No portion of the Trust Fund attributable to (or allocable in lieu of) Company Stock in an S corporation may, during a "nonallocation year," accrue (or be allocated directly or indirectly under any plan maintained by the Employer meeting the requirements of Code Section 401(a)) for the benefit of any "disqualified person."

(b)    For purposes of this Section:

(1)    The term "nonallocation year" means any Plan Year if, at any time during such Plan Year,

(i)    the Plan holds Company Stock consisting of stock in an S corporation, and

(ii)    "disqualified persons" own at least fifty percent (50%) of the number of shares of stock in the S corporation.

(2)    Attribution rules. For purposes of subsection (b)(1),

(i)    the rules of Code Section 318(a) shall apply for purposes of determining ownership, except that:

(A)    in applying paragraph (1) thereof, the members of an individual's family shall include members of the family described in subsection (c)(4), and

(B)    paragraph (4) thereof shall not apply.

(ii)    Deemed-owned shares. Notwithstanding the employee trust exception in Code Section 318(a)(2)(B)(i), an individual shall be treated as owning "deemed-owned shares" of the individual.

Solely for purposes of applying subsection (c)(5), this subsection (b)(2) shall be applied after the attribution rules of subsection (c)(5) have been applied.

(c)        For purposes of this Section:

(1)        The term "disqualified person" means any person if,

(i)        the aggregate number of "deemed-owned shares" of such person and the members of such person's family is at least twenty percent (20%) of the number of "deemed-owned shares" of stock in the S corporation, or

(ii)        in the case of a person not described in subsection (c)(1)(i), the number of "deemed-owned shares" of such person is at least ten percent (10%) of the number of "deemed-owned shares" of stock in such corporation.

(2)        Treatment of family members. In the case of a "disqualified person" under subsection (c)(1)(i), any member of such person's family with "deemed-owned shares" shall be treated as a "disqualified person" if not otherwise treated as a "disqualified person" under subsection (c)(1).

(3)        Deemed-owned shares:

(i)        The term "deemed-owned shares" means, with respect to any person,

(A)        the stock in the S corporation constituting Company Stock which is allocated to such person, and

(B)        such person's share of the stock in such corporation which is held by the Plan but which is not allocated under the Plan to Participants.

(ii)        Person's share of unallocated stock. For purposes of subsection (c)(3)(i)(B), a person's share of unallocated S corporation stock held by the Plan is the amount of the unallocated stock which would be allocated to such person if the unallocated stock were allocated to all Participants in the same proportions as the shares released and allocated from a suspense account, as described in Treasury Regulations Section 54.4975-11(c), under the Plan for the most recently ended Plan Year for which there were shares released and allocated from such a suspense account, or if there has been no such prior release and allocation from such a suspense account, then determined in proportion to a reasonable estimate of the shares that would be released and allocated in the first year of a loan payment.

(4)        Member of family. For purposes of this subsection (c), the term member of the family means, with respect to any individual,

(i)        the spouse of the individual,

(ii)        an ancestor or lineal descendent of the individual or the individual's spouse,

        (iii)    a brother or sister of the individual or the individual's spouse and any lineal descendent of the brother or sister, and

        (iv)    the spouse of any individual described in subsection (c)(4)(ii) or (iii).

        A spouse of an individual who is legally separated from such individual under a decree of divorce or separate maintenance shall not be treated as such individual's spouse for purposes of this subsection (c)(4).

        (5)    Treatment of synthetic equity. For purposes of subsections (b) and (c), in the case of a person who owns "synthetic equity" in the S corporation, except to the extent provided in Regulations, the shares of stock in such corporation on which such "synthetic equity" is based shall be treated as outstanding stock in such corporation and "deemed-owned shares" of such person if such treatment of "synthetic equity" of one (1) or more such persons results in,

        (i)    the treatment of any person as a "disqualified person," or

        (ii)    the treatment of any year as a "nonallocation year."

        For purposes of this subsection (c)(5), "synthetic equity" shall be treated as owned by a person in the same manner as stock is treated as owned by a person under the rules of paragraphs (2) and (3) of Code Section 318(a). If, without regard to this subsection (c)(5), a person is treated as a "disqualified person" or a year is treated as a "nonallocation year," this subsection (c)(5) shall not be construed to result in the person or year not being so treated. The term "synthetic equity" means, any stock option, warrant, restricted stock, deferred insurance stock right, nonqualified deferred compensation, or similar interest or right that gives the holder the right to acquire or receive stock of the S corporation in the future. Except to the extent provided in Regulations, "synthetic equity" also includes a stock appreciation right, phantom stock unit, or similar right to a future cash payment based on the value of such stock or appreciation in such value.

        (d)    For purposes of this Section and Code Section 409(p) and the Regulations thereunder, a prohibited allocation means an "impermissible accrual" or an "impermissible allocation."

        (1)    "Impermissible accrual" means the extent that employer securities consisting of stock in an S corporation owned by the Plan and any assets attributable thereto are held under the Plan for the benefit of a "disqualified person" during a "nonallocation year." For this purpose, assets attributable to stock in an S corporation owned by the Plan include any distributions, within the meaning of Code Section 1368, made on S corporation stock held in a "disqualified person's" account in the Plan (including earnings thereon), plus any proceeds from the sale of S corporation securities held for a "disqualified person's" account in the Plan (including any earnings thereon).

(2)    "Impermissible allocation" means with respect to a "nonallocation year," the extent that a contribution or other annual addition (within the meaning of Code Section 415(c)(2)) is made with respect to the account of a "disqualified person," or the "disqualified person" otherwise accrues additional benefits, directly or indirectly under the Plan or any other plan of the Employer qualified under Code Section 401(a) (including a release and allocation of assets from a suspense account, as described at Regulations Section 54.4975-11(c) and (d)) that, for the "nonallocation year," would have been added to the account of the "disqualified person" under the Plan and invested in Company Stock owned by the Plan but for a provision in the Plan that precludes such addition to the account of the "disqualified person," and investment in Company Stock during a "nonallocation year."

(e)    The Administrator may use the following provisions to effect Code Section 409(p) transfers.

(1)    <u>Non-ESOP Portion.</u> Assets held under the Plan in accordance with this Section are held under a portion of the Plan that is not an employee stock ownership plan (ESOP), within the meaning of Code Section 4975(e)(7). Amounts held in the portion of the Plan that is not an ESOP (the Non-ESOP portion) shall be held in accounts that are separate from the accounts for the amounts held in the remainder of the Plan (the ESOP portion). The statements provided to Participants and Beneficiaries to show their interest in the Plan shall separately identify the amounts held in each such portion. Except as specifically set forth in this Section, all of the terms of the Plan apply to any amount held under the Non-ESOP portion of the Plan in the same manner and to the same extent as to any other amount held under the Plan.

(2)    <u>Transfers from ESOP to Non-ESOP Portion of Plan.</u>

(i)    In the case of any event that the Administrator determines would cause a "nonallocation year" (referred herein as a "nonallocation event"), shares of Company Stock held under the Plan before the date of the "nonallocation event," shall be transferred from the ESOP portion of the Plan to the Non-ESOP portion of the Plan as provided in this subsection (2)(i). Actions that may cause a "nonallocation event," include, but are not limited to, a contribution to the Plan in the form of shares of Company Stock, a distribution from the Plan in the form of shares of Company Stock, a change of investment within a Plan account of a "disqualified person" that alters the number of shares of Company Stock held in the account of the "disqualified person," or the issuance by the Employer of "synthetic equity" as defined by Code Section 409(p)(6)(C) and Regulations Section 1.409(p)-1(f). A "nonallocation event" occurs only if (y) the total number of "deemed-owned" shares held by the ESOP account of those Participants who are or who would be "disqualified persons" after taking into account the Participant's "synthetic equity" and the "nonallocation event," exceeds (z) 50% of the total number of shares of Company Stock outstanding after taking the "nonallocation event" into account. No transfer under this Section shall be greater than the amount the Administrator reasonably determines or estimates to be the excess, if any, of (y) over (z). Before the "nonallocation event" occurs, the Administrator shall determine the extent to which a transfer is required to be made and shall take steps to ensure

33

that all action necessary to implement the transfer are taken before the "nonallocation event" occurs.

   (ii) Except as provided for in subsection (2)(iii), at the date of the transfer, the total number of shares transferred, as provided for in subsection (2)(i), shall be charged against the accounts of Participants who are "disqualified persons" (y) by first reducing the ESOP account of the Participant who is a "disqualified person" whose account has the largest number of shares (with the addition of "synthetic equity" shares) and (z) thereafter by reducing the ESOP accounts of each succeeding Participant who is a "disqualified person" who has the largest number of shares in his or her their account (with the addition of "synthetic equity" shares). Immediately following the transfer, the number of transferred shares charged against any Participant's account in the ESOP portion of the Plan shall be credited to an account established for that Participant in the Non-ESOP portion of the Plan.

   (iii) Notwithstanding subsection (2)(ii), the number of shares transferred shall be charged against the accounts of Participants who are "disqualified persons" by first reducing the account of the Participant with the fewest shares (including "synthetic equity") who is a "disqualified person" and who is a Highly Compensated Employee to cause the Participant not to be a "disqualified person," and thereafter reducing the account of each other Participant who is a "disqualified person" and a Highly Compensated Employee, in order of who has the fewest ESOP shares (including "synthetic equity"). A transfer under this subsection (2)(iii) only applies to the extent that the transfer results in fewer shares being transferred than in a transfer under (2)(ii).

   (iv) For purposes of subsections (2)(ii) and (2)(iii), "disqualified person" includes any person who would become a "disqualified person" at the time of the "nonallocation event" if such transfer did not occur.

   (v) If two or more Participants described in subsections (2)(ii) and (2)(iii) above have the same number of shares, the account of the Participant with the longest service shall be reduced first. Furthermore, Beneficiaries are treated as Participants for purposes of this Section.

   (3) <u>Income Taxes.</u> If the Trust owes income taxes as a result of unrelated business taxable income under Code Section 512(e) with respect to shares of Company Stock held in the Non-ESOP portion of the Plan, the income tax payments made by the Trustee shall be charged against the accounts of each Participant or Beneficiary who has an account in the Non-ESOP portion of the Plan in proportion to the ratio of the shares of Company Stock in such Participant's or Beneficiary's account in the non-ESOP portion of the Plan to the total shares of Company Stock in the non-ESOP portion of the Plan. The Employer may purchase shares of Company Stock from the Trustee with cash (based on the fair market value of the shares so purchased) from each such account to the extent necessary for the Trustee to make the income tax payments.

<div align="center">ARTICLE V</div>

FUNDING AND INVESTMENT POLICY

5.1    INVESTMENT POLICY

(a)    The Plan is designed to invest primarily in Company Stock.

(b)    With due regard to subparagraph (a) above, the Administrator may also direct the Trustee to invest funds under the Plan in other property described in the Trust or in life insurance policies to the extent permitted by subparagraph (c) below, or the Trustee may hold such funds in cash or cash equivalents.

(c)    With due regard to subparagraph (a) above, the Administrator may also direct the Trustee to invest funds under the Plan not attributable to proceeds from an Exempt Loan in insurance policies on the life of any "keyman" Employee. The proceeds of a "keyman" insurance policy may not be used for the repayment of any indebtedness owed by the Plan which is secured by Company Stock. In the event any "keyman" insurance is purchased by the Trustee, the premiums paid thereon during any Plan Year, net of any policy dividends and increases in cash surrender values, shall be treated as the cost of Plan investment and any death benefit or cash surrender value received shall be treated as proceeds from an investment of the Plan.

(d)    The Plan may not obligate itself to acquire Company Stock from a particular holder thereof at an indefinite time determined upon the happening of an event such as the death of the holder.

(e)    The Plan may not obligate itself to acquire Company Stock under a put option binding upon the Plan. However, at the time a put option is exercised, the Plan may be given an option to assume the rights and obligations of the Employer under a put option binding upon the Employer.

(f)    All purchases of Company Stock shall be made at a price which, in the judgment of the Administrator, does not exceed the fair market value thereof. All sales of Company Stock shall be made at a price which, in the judgment of the Administrator, is not less than the fair market value thereof. The valuation rules set forth in Article VI shall be applicable.

5.2    APPLICATION OF CASH AND INACTIVE PARTICIPANTS

(a)    Employer contributions in cash, and any earnings on such contributions, shall first be applied to pay any Current Obligations of the Trust Fund.

(b)    If a Participant (or Beneficiary) becomes entitled to a distribution from his or her Vested Account pursuant to Article VII and such Participant (or Beneficiary) does not apply to receive the distribution in accordance with Article VII, such Participant (or Beneficiary) will be considered an "inactive participant" and the Employer, on a uniform and nondiscriminatory basis, may elect to redeem all or a portion of the distributable shares of the Company Stock held in the inactive participant's Company Stock Account (Vested and unvested) based on the appraised fair

35

market value of such Company Stock on the date of the redemption. In the event the Employer does not elect to redeem such inactive participant's distributable Company Stock Account, then the Plan may, on a uniform and nondiscriminatory basis, purchase all or a portion of such shares of Company Stock based on the most recent appraised fair market value. The proceeds of the shares of Company Stock redeemed or purchased from an inactive participant's Company Stock Account shall be held in a special "liquidated company stock account" on behalf of the inactive participant and shall, as soon as administratively practicable thereafter, be transferred in a trustee-to-trustee transfer to the Radiance 401(k) Plan. In addition, simultaneous with the trustee-to-trustee transfer of the Participant's special "liquidated company stock account," the inactive participant's Other Investments Account (Vested and unvested) shall also be transferred in a trustee-to-trustee transfer to the Radiance 401(k) Plan. The trustee-to-trustee transfer described in this Section 5.2(b) shall be subject to the following terms and conditions:

(1)     Only those inactive participants whose Account balances exceed the threshold set forth in Section 7.5(b) shall have their distributable Account balances transferred.

(2)     Immediately after the transfer, such Participant shall have a balance in the Radiance 401(k) Plan equal to the amount of his Account balance transferred from this Plan.

(3)     Any such transferred amounts shall assume the same characteristics of a Discretionary Contribution (as defined in the Radiance 401(k) Plan) under the Radiance 401(k) Plan and shall be eligible for in-service withdrawals and loans according to the provisions of the Radiance 401(k) Plan; provided, however, that such transferred amounts shall continue to be subject to the vesting schedule described in Section 7.4(b).

(4)     Any such transferred amount shall be subject to the distribution provisions of the Radiance 401(k) Plan; provided, however, that such transfer shall not eliminate any benefits provided under this Plan which are protected by Section 411(d)(6) of the Code.

(5)     Such transferred amount shall be invested in the Radiance 401(k) Plan's investment options pursuant to the Participant's investment direction currently on file with the Radiance 401(k) Plan or in the then-current default investment option for the Radiance 401(k) Plan.

5.3     TRANSACTIONS INVOLVING COMPANY STOCK

(a)     No portion of the Trust Fund attributable to (or allocable in lieu of) Company Stock acquired by the Plan in a sale to which Code Section 1042 applies may accrue or be allocated directly or indirectly under any plan maintained by the Employer meeting the requirements of Code Section 401(a):

(1)     during the "Nonallocation Period," for the benefit of

(i)     any taxpayer who makes an election under Code Section 1042(a) with respect to Company Stock,

36

(ii)        any individual who is related to the taxpayer (within the meaning of Code Section 267(b)), or

(2)        for the benefit of any other person who owns (after application of Code Section 318(a) applied without regard to the employee trust exception in Code Section 318(a)(2)(B)(i)) more than 25 percent of

(i)        any class of outstanding stock of the Employer or Affiliated Employer which issued such Company Stock, or

(ii)        the total value of any class of outstanding stock of the Employer or Affiliated Employer.

(b)        Except, however, subparagraph (a)(1)(ii) above shall not apply to lineal descendants of the taxpayer, provided that the aggregate amount allocated to the benefit of all such lineal descendants during the "Nonallocation Period" does not exceed more than five (5) percent of the Company Stock (or amounts allocated in lieu thereof) held by the Plan which are attributable to a sale to the Plan by any person related to such descendants (within the meaning of Code Section 267(c)(4)) in a transaction to which Code Section 1042 is applied.

(c)        person shall be treated as failing to meet the stock ownership limitation under paragraph (a)(2) above if such person fails such limitation:

(1)        at any time during the one (1) year period ending on the date of sale of Company Stock to the Plan, or

(2)        on the date as of which Company Stock is allocated to Participants in the Plan.

(d)        For purposes of this Section, "Nonallocation Period" means the period beginning on the date of the sale of the Company Stock and ending on the later of:

(1)        the date which is ten (10) years after the date of sale, or

(2)        the date of the Plan allocation attributable to the final payment of the Exempt Loan incurred in connection with such sale.

(e)        Notwithstanding any provision of this Section to the contrary, a sale to which Code Section 1042 applies shall not be made during the period in which the Employer has elected to be an S corporation under Code Section 1362(a).

5.4    LOANS TO THE TRUST

(a)    The Plan may borrow money for any lawful purpose, provided the proceeds of an Exempt Loan are used within a reasonable time after receipt only for any or all of the following purposes:

(1)    To acquire Company Stock.

(2)    To repay such loan.

(3)    To repay a prior Exempt Loan.

(b)    All loans to the Trust which are made or guaranteed by a disqualified person must satisfy all requirements applicable to Exempt Loans including but not limited to the following:

(1)    The loan must be at a reasonable rate of interest;

(2)    The interest rate and price of the stock to be acquired with loan proceeds should not be such that the Plan assets may be drained off;

(3)    Any collateral pledged to the creditor by the Plan shall consist only of the Company Stock purchased with the borrowed funds;

(4)    Under the terms of the loan, any pledge of Company Stock shall provide for the release of shares so pledged on a pro-rata basis pursuant to Section 4.3(e);

(5)    Under the terms of the loan, the creditor shall have no recourse against the Plan except with respect to such collateral, earnings attributable to such collateral, Employer contributions (other than contributions of Company Stock) that are made to meet Current Obligations and earnings attributable to such contributions;

(6)    The loan must be for a specific term and may not be payable at the demand of any person, except in the case of default;

(7)    In the event of default upon an Exempt Loan, the value of the Trust Fund transferred in satisfaction of the Exempt Loan shall not exceed the amount of default. If the lender is a disqualified person, an Exempt Loan shall provide for a transfer of Trust Funds upon default only upon and to the extent of the failure of the Plan to meet the payment schedule of the Exempt Loan;

(8)    Exempt Loan payments during a Plan Year must not exceed an amount equal to: (A) the sum, overall Plan Years, of all contributions and cash dividends paid by the Employer to the Plan with respect to such Exempt Loan and earnings on such Employer contributions and cash dividends, less (B) the sum of the Exempt Loan payments in all preceding

Plan Years. A separate accounting shall be maintained for such Employer contributions, cash dividends and earnings until the Exempt Loan is repaid.

(c)     For purposes of this Section, the term "disqualified person" means a person who is a Fiduciary, a person providing services to the Plan, an Employer any of whose Employees are covered by the Plan, an employee organization any of whose members are covered by the Plan, an owner, direct or indirect, of 50% or more of the total combined voting power of all classes of voting stock or of the total value of all classes of the stock, or an officer, director, 10% or more shareholder, or a Highly Compensated Employee.

## ARTICLE VI
## VALUATIONS

### 6.1     VALUATION OF THE TRUST FUND

The Administrator shall direct the Trustee, as of each Valuation Date, to determine the net worth of the assets comprising the Trust Fund as it exists on the Valuation Date. In determining such net worth, the Trustee shall value the assets comprising the Trust Fund at their fair market (or their contractual value in the case of a Contract) value as of the Valuation Date and shall deduct all expenses for which the Trustee has not yet obtained reimbursement from the Employer or the Trust Fund.

### 6.2     METHOD OF VALUATION

Valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities. In the case of a transaction between a Plan and a disqualified person, value must be determined as of the date of the transaction. For all other Plan purposes, value must be determined as of the most recent Valuation Date under the Plan. An independent appraisal will not in itself be a good faith determination of value in the case of a transaction between the Plan and a disqualified person. However, in other cases, a determination of fair market value based on at least an annual appraisal independently arrived at by a person who customarily makes such appraisals and who is independent of any party to the transaction will be deemed to be a good faith determination of value. Company Stock not readily tradeable on an established securities market shall be valued by an independent appraiser meeting requirements similar to the requirements of the Regulations prescribed under Code Section 170(a)(1).

## ARTICLE VII
## DETERMINATION AND DISTRIBUTION OF BENEFITS

### 7.1     DETERMINATION OF BENEFITS UPON RETIREMENT

Every Participant may terminate employment with the Employer and retire for the purposes hereof on the Participant's Normal Retirement Date. However, a Participant may postpone the termination of employment with the Employer to a later date, in which event the participation of such Participant in the Plan, including the right to receive allocations pursuant to Section 4.3, shall

39

continue until such Participant's Late Retirement Date. The Trustee shall distribute, at the election of the retired Participant, all amounts credited to such Participant's Account in accordance with Sections 7.5 and 7.6.

     7.2    DETERMINATION OF BENEFITS UPON DEATH

(a)    Upon the death of a Participant before the Participant's Retirement Date or other termination of employment, all amounts credited to such Participant's Account shall become fully Vested. The Trustee shall distribute, at the election of the Beneficiary, all amounts credited to such deceased Participant's Account in accordance with Sections 7.5 and 7.6.

(b)    Upon the death of a Former Participant, the Administrator shall direct the Trustee, in accordance with the provisions of Sections 7.5 and 7.6, to distribute any remaining Vested amounts credited to the accounts of a deceased Former Participant to such Former Participant's Beneficiary.

(c)    The Administrator may require such proper proof of death and such evidence of the right of any person to receive payment of the value of the account of a deceased Participant or Former Participant as the Administrator may deem desirable. The Administrator's determination of death and of the right of any person to receive payment shall be conclusive.

(d)    The Beneficiary of the death benefit payable pursuant to this Section shall be the Participant's spouse. Except, however, the Participant may designate a Beneficiary other than the spouse if:

        (1)    the spouse has waived the right to be the Participant's Beneficiary, or

        (2)    the Participant is legally separated or has been abandoned (within the meaning of local law) and the Participant has a court order to such effect (and there is no "qualified domestic relations order" as defined in Code Section 414(p) which provides otherwise), or

        (3)    the Participant has no spouse, or

        (4)    the spouse cannot be located.

In such event, the designation of a Beneficiary shall be made on a form satisfactory to the Administrator. A Participant may at any time revoke a designation of a Beneficiary or change a Beneficiary by filing written (or in such other form as permitted by the Internal Revenue Service) notice of such revocation or change with the Administrator. However, the Participant's spouse must again consent in writing (or in such other form as permitted by the Internal Revenue Service) to any change in Beneficiary unless the original consent acknowledged that the spouse had the right to limit consent only to a specific Beneficiary and that the spouse voluntarily elected to relinquish such right.

(e)     In the event no valid designation of Beneficiary exists, or if the Beneficiary is not alive at the time of the Participant's death, the death benefit will be paid in the following order of priority to:

       (1)     the Participant's surviving spouse;

       (2)     the Participant's children, including adopted children, per stirpes;

       (3)     the Participant's surviving parents in equal shares; or

       (4)     the Participant's estate.

If the Beneficiary does not predecease the Participant, but dies prior to distribution of the death benefit, the death benefit will be paid to the Beneficiary's designated Beneficiary (or if there is no designated Beneficiary, to the Beneficiary's estate).

(f)     Notwithstanding anything in this Section to the contrary, if a Participant has designated the spouse as a Beneficiary, then a divorce decree or a legal separation that relates to such spouse shall revoke the Participant's designation of the spouse as a Beneficiary unless the decree or a qualified domestic relations order (within the meaning of Code Section 414(p)) provides otherwise.

(g)     Any consent by the Participant's spouse to waive any rights to the death benefit must be in writing (or in such other form as permitted by the Internal Revenue Service), must acknowledge the effect of such waiver, and be witnessed by a Plan representative or a notary public. Further, the spouse's consent must be irrevocable and must acknowledge the specific nonspouse Beneficiary.

(h)     If a Participant dies while performing qualified military service (as defined in Code Section 414(u)), the Participant's Beneficiary is entitled to any additional benefits (other than benefit accruals relating to the period of qualified military service) provided under the Plan as if the Participant had resumed employment and then terminated employment on account of death. Moreover, the Plan will credit the Participant's qualified military service as service for vesting purposes, as though the Participant had resumed employment under the Uniformed Services Employment and Reemployment Rights Act (USERRA) immediately prior to the Participant's death.

7.3     DETERMINATION OF BENEFITS IN EVENT OF DISABILITY

In the event of a Participant's Total and Permanent Disability prior to the Participant's Retirement Date or other termination of employment, all amounts credited to such Participant's Account shall become fully Vested. In the event of a Participant's Total and Permanent Disability, the Trustee shall distribute, in accordance with election of such Participant, all amounts credited to the Participant's Account in accordance with the provisions of Sections 7.5 and 7.6.

7.4     DETERMINATION OF BENEFITS UPON TERMINATION

(a)     If a Participant's employment with the Employer is terminated for any reason other than death, Total and Permanent Disability or Retirement, then such Participant shall be entitled to such benefits as are provided hereinafter pursuant to this Section 7.4.

If a portion of a Participant's Account is forfeited, Company Stock allocated to the Participant's Company Stock Account must be forfeited only after the Participant's Other Investments Account has been depleted. If interest in more than one class of Company Stock has been allocated to a Participant's Account, the Participant must be treated as forfeiting the same proportion of each such class.

For purposes of this Section 7.4, if the value of a Terminated Participant's Vested benefit is zero, the Terminated Participant shall be deemed to have received a distribution of such Vested benefit.

(b)     The Vested portion of the Participant's Account attributable to certain Employer contributions shall be a percentage of the total amount credited to the Participant's Account determined on the basis of the Participant's number of Years of Service.

The Vested portion of the Participant's Account attributable to Employer discretionary contributions made pursuant to Section 4.1(a) is determined according to the following schedule:

Vesting Schedule

Employer Discretionary Contributions

| Years of Service | Percentage |
|---|---|
| 1 Year of Service | 30 % |
| 2 Years of Service | 60 % |
| 3 Years of Service | 100 % |

Notwithstanding the foregoing, any Participant who first completes at least one Hour of Service on or before December 31, 2013, shall always be fully Vested in his Employer discretionary contributions.

(c)     Notwithstanding the above, Company Stock allocated to each Participant's Company Stock Account pursuant to Section 4.3(e) must be forfeited only after other assets.

(d)     Notwithstanding the vesting schedule above, the Vested percentage of a Participant's Account shall not be less than the Vested percentage attained as of the later of the effective date or adoption date of this amendment and restatement.

(e)     Notwithstanding the vesting schedule above, upon the complete discontinuance of the Employer contributions to the Plan or upon any full or partial termination of the Plan, all

amounts then credited to the account of any affected Participant shall become 100% Vested and shall not thereafter be subject to Forfeiture.

(f)     The computation of a Participant's nonforfeitable percentage of such Participant's interest in the Plan shall not be reduced as the result of any direct or indirect amendment to this Plan. In the event that the Plan is amended to change or modify any vesting schedule, or if the Plan is amended in any way that directly or indirectly affects the computation of the Participant's nonforfeitable percentage, or if the Plan is deemed amended by an automatic change to a top heavy vesting schedule, then each Participant with at least three (3) Years of Service as of the expiration date of the election period may elect to have such Participant's nonforfeitable percentage computed under the Plan without regard to such amendment or change. If a Participant fails to make such election, then such Participant shall be subject to the new vesting schedule. The Participant's election period shall commence on the adoption date of the amendment and shall end sixty (60) days after the latest of:

> (1)     the adoption date of the amendment,
>
> (2)     the effective date of the amendment, or
>
> (3)     the date the Participant receives written notice of the amendment from the Employer or Administrator.

(g)     In determining Years of Service for purposes of vesting under the Plan, Years of Service prior to the effective date of the Plan shall be excluded.

7.5     DISTRIBUTION OF BENEFITS

(a)     The Administrator, pursuant to the election of the Participant, shall direct the Trustee to distribute to a Participant or such Participant's Beneficiary any amount to which the Participant is entitled under the Plan.

(b)     Any distribution to a Participant who has a benefit which exceeds $1,000, shall require such Participant's written (or in such other form as permitted by the Internal Revenue Service) consent if such distribution is to occur prior to the time the benefit is "immediately distributable." A benefit is "immediately distributable" if any part of the benefit could be distributed to the Participant (or surviving spouse) before the Participant attains (or would have attained if not deceased) the later of the Participant's Normal Retirement Age or age 62. With regard to this required consent:

> (1)     The Participant must be informed of the right to defer receipt of the distribution and such notification must also include a description of how much larger benefits will be if the commencement of distributions is deferred. If a Participant fails to consent, it shall be deemed an election to defer the distribution of any benefit. However, any election to defer the receipt of benefits shall not apply with respect to distributions which are required under Section 7.7.

43

(2)      Notice of the rights specified under this paragraph shall be provided no less than thirty (30) days and no more than one hundred eighty (180) days before the date the distribution is made.

(3)      Written (or such other form as permitted by the Internal Revenue Service) consent of the Participant to the distribution must not be made before the Participant receives the notice and must not be made more than one hundred eighty (180) days before the date the distribution is made.

(4)      No consent shall be valid if a significant detriment is imposed under the Plan on any Participant who does not consent to the distribution.

Any such distribution may occur less than thirty (30) days after the notice required under Regulation 1.411(a)-11(c) is given, provided that: (1) the Administrator clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and (2) the Participant, after receiving the notice, affirmatively elects a distribution.

(c)      Notwithstanding anything herein to the contrary, the Administrator may direct that cash dividends on shares of Company Stock allocable to Participants' Company Stock Accounts be:

(1)      Paid by the Employer directly in cash to the Participants in the Plan or their Beneficiaries.

(2)      Paid to the Plan and distributed in cash to Participants in the Plan or their Beneficiaries no later than ninety (90) days after the close of the Plan Year in which paid.

(3)      At the election of Participants or their Beneficiaries, paid in accordance with paragraph (1) or (2) above, or paid to the Plan and reinvested in Company Stock; provided, however, that if cash dividends are reinvested in Company Stock, then Company Stock allocated to the Participant's Company Stock Account shall have a fair market value not less than the amount of cash dividends which would have been allocated to such Participant's Other Investment Account for the year. This paragraph (3) shall not apply while the Employer elected to be an S corporation under Code Section 1362(a).

(4)      Used to make payments on an Exempt Loan the proceeds of which were used to acquire Company Stock (whether or not allocated to Participants' Company Stock Accounts) with respect to which the cash dividend is paid.

(5)      Allocated to Participants' Other Investment Accounts.

44

Provided, however, that during the time the Employer has elected to be an S corporation under Code Section 1362(a), all S corporation dividends (if any) will be allocated pro rata based on the Participant's Company Stock Account balance.

(d)     Any part of a Participant's benefit which is retained in the Plan after the Anniversary Date on which the Participant's participation ends will continue to be treated as a Company Stock Account or as an Other Investments Account (subject to Sections 5.2(b) and 7.4(a)) as provided in Article IV. However, neither account will be credited with any further Employer contributions.

(e)     Required minimum distributions (Code Section 401(a)(9)). Notwithstanding any provision in the Plan to the contrary, the distribution of a Participant's benefits shall be made in accordance with the requirements of Section 7.7.

(f)     Except as limited by Sections 7.5 and 7.6, whenever the Trustee is to make a distribution, the distribution may be made on such date or as soon thereafter as is practicable. However, unless a Former Participant elects in writing to defer the receipt of benefits (such election may not result in a death benefit that is more than incidental), the payment of benefits shall occur not later than the sixtieth (60th) day after the close of the Plan Year in which the latest of the following events occurs:

(1)     the date on which the Participant attains the earlier of age 65 or the Normal Retirement Age specified herein;

(2)     the tenth (10th) anniversary of the year in which the Participant commenced participation in the Plan; or

(3)     the date the Participant terminates his service with the Employer.

(g)     If a distribution is made to a Participant who has not severed employment and who is not fully Vested in the Participant's Account and the Participant may increase the Vested percentage in such account, then, at any relevant time the Participant's Vested portion of the account will be equal to an amount ("X") determined by the formula:

X equals P(AB plus D) - D

For purposes of applying the formula: P is the Vested percentage at the relevant time, AB is the account balance at the relevant time, and D is the amount of distribution.

7.6     HOW AND WHEN PLAN BENEFITS WILL BE DISTRIBUTED

(a)     <u>Form of Distributions</u>.

(1)     <u>Company Stock Account</u>. Subject to the conditions set forth below, distribution of a Participant's benefit in the Company Stock Account will be made in shares of

45

Company Stock. However, if the Employer's charter or by-laws restrict the ownership of substantially all outstanding Company Stock to employees and the Trust, or if the Employer has elected to be taxed as an "S corporation," then a Participant's Company Stock Account will be distributed, at the Employer's election, in either (i) cash, or (ii) shares of Company Stock, provided that any such distributed shares of Company Stock shall be immediately resold to the Employer (or the Trust). Any shares purchased by the Employer (or the Trust) pursuant to this subsection shall be purchased at their fair market value. For purposes of this subsection, fair market value shall be based upon the appraised fair market value determined in accordance with Section 6.2 as of the Valuation Date coinciding with or immediately preceding the date such shares are purchased. Notwithstanding the foregoing, all such purchases of Company Stock by the Trustee shall be made at prices which, in the judgment of the Trustee, do not exceed the fair market value of such shares as of the date of the transaction. Such shares shall be purchased by notifying the Participant (or Beneficiary) in writing. The terms of payment for a purchase of such shares of stock will be set forth in a written statement delivered to the Participant (or Beneficiary).

(2)    Other Investments Account. Distribution of a Participant's benefit in the Other Investments Account shall be made in cash.

(b)    Timing of Distributions. Death, Disability, or Retirement. In the event of death, Disability, or Retirement, subject to Section 7.5(b), distribution of a Participant's Vested Account shall commence during the following Plan Year. Except as otherwise provided in any Plan distribution policy, the distribution will be made in annual installment payments over a period not longer than the greater of (i) 5 years, or (ii) in the case of a Participant with an account balance in excess of $1,165,000 (as adjusted), 5 years plus 1 additional year (but not more than 5 additional years) for such $230,000 (as adjusted) or fraction thereof by which such balance exceeds $1,165,000 (as adjusted). In the event a Participant is eligible to receive a distribution and does not elect to take such distribution, the distributable shares of Company Stock may be liquidated and transferred to the Radiance 401(k) Plan in accordance with Section 5.2(b).

(2)    Other Termination of Employment. In the event a Participant's employment terminates for reasons other than death, Disability, or Retirement, subject to Section 7.5(b), the distribution of the Participant's Vested Account shall commence no later than one year after the close of the Plan Year that is the fifth Plan Year following the Plan Year in which the Participant terminates employment. Except as provided in any Plan distribution policy, the distribution will be made in annual installment payments over a period not longer than the greater of (i) 5 years, or (ii) in the case of a Participant with an account balance in excess of $1,165,000 (as adjusted), 5 years plus 1 additional year (but not more than 5 additional years) for such $230,000 (as adjusted) or fraction thereof by which such balance exceeds $1,165,000 (as adjusted). In the event a Participant is eligible to receive a distribution and does not elect to take such distribution, the distributable shares of Company Stock may be liquidated and transferred to the Radiance 401(k) Plan in accordance with Section 5.2(b).

(c)    The Trustee will make distributions from the Trust only on instructions from the Administrator.

46

7.7    REQUIRED MINIMUM DISTRIBUTIONS

(a)    General Rules

(1)    Precedence. The requirements of this Section will take precedence over any inconsistent provisions of the Plan.

(2)    Requirements of Treasury Regulations Incorporated. All distributions required under this Section will be determined and made in accordance with the Regulations under Code Section 401(a)(9) notwithstanding any terms of the Plan to the contrary.

(3)    Required Beginning Date. The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's required beginning date.

(4)    Forms of Distribution. Unless the Participant's interest is distributed in a single sum on or before the required beginning date, as of the first distribution calendar year, distributions will be made in accordance with this Section.

(5)    TEFRA Section 242(b)(2) Elections. Notwithstanding the other provisions of this Section and the Plan, distributions may be made under a designation made before January 1, 1984, in accordance with Section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act (TEFRA) and the provisions of the Plan that relate to Section 242(b)(2) of TEFRA.

(b)    Required Minimum Distributions During Participant's Lifetime

(1)    Amount of Required Minimum Distribution For Each Distribution Calendar Year. During the Participant's lifetime, the minimum amount that will be distributed for each distribution calendar year is the lesser of:

(i)    the quotient obtained by dividing the Participant's account balance by the distribution period in the Uniform Lifetime Table set forth in Regulation Section 1.401(a)(9)-9, Q&A-2, using the Participant's age as of the Participant's birthday in the distribution calendar year; or

(ii)    if the Participant's sole designated beneficiary for the distribution calendar year is the Participant's spouse, the quotient obtained by dividing the Participant's account balance by the number in the Joint and Last Survivor Table set forth in Regulation Section 1.401(a)(9)-9, Q&A-3, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the distribution calendar year.

(2)    Lifetime Required Minimum Distributions Continue Through Year of Participant's Death. Required minimum distributions will be determined under this Section 7.7(b) beginning with the first distribution calendar year and up to and including the distribution calendar year that includes the Participant's date of death.

47

(c)     Required minimum distributions after Participant's death occurring prior to January 1, 2020

(1)     Death On or After Date Distributions Begin.

(i)     Participant survived by designated beneficiary. If the Participant dies on or after the date distributions begin and there is a designated beneficiary, the minimum amount that will be distributed for each distribution calendar year beginning with the calendar year after the calendar year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the longer of the remaining life expectancy of the Participant or the remaining life expectancy of the Participant's designated beneficiary, determined as follows:

(A)     The Participant's remaining life expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(B)     If the Participant's surviving spouse is the Participant's sole designated beneficiary, the remaining life expectancy of the surviving spouse is calculated for each distribution calendar year after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year. For distribution calendar years after the year of the surviving spouse's death, the remaining life expectancy of the surviving spouse is calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death, reduced by one for each subsequent calendar year.

(C)     If the Participant's surviving spouse is not the Participant's sole designated beneficiary, the designated beneficiary's remaining life expectancy is calculated using the age of the beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(ii)     No designated beneficiary. If the Participant dies on or after the date distributions begin and there is no designated beneficiary as of September 30th of the year after the year of the Participant's death, the minimum amount that will be distributed for each distribution calendar year after the year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the Participant's remaining life expectancy calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(2)     Death Before Date Distributions Begin.

(i)     Participant survived by designated beneficiary. If the Participant dies before the date distributions begin and there is a designated beneficiary, the minimum amount that will be distributed for each distribution calendar year beginning with the calendar year after the calendar year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the remaining life expectancy of the Participant's designated beneficiary, determined as provided in Section 7.7(c)(1)(i).

48

    (ii)  No designated beneficiary. If the Participant dies before the date distributions begin and there is no designated beneficiary as of September 30th of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31st of the calendar year containing the fifth anniversary of the Participant's death.

   (d)  Required minimum distributions after Participant's death occurring on or after January 1, 2020

    (1)  Participant survived by eligible designated beneficiary.

     (i)  Death Before Date Distributions Begin. If the Participant dies before the date distributions begin and there is an eligible designated beneficiary, the minimum amount that will be distributed for each distribution calendar year beginning with the calendar year after the calendar year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the remaining life expectancy of the Participant's eligible designated beneficiary, determined in the same manner as provided in Section 7.7(c)(1)(i).

     (ii)  Death On or After Date Distributions Begin. If the Participant dies on or after the date distributions begin and there is an eligible designated beneficiary, the minimum amount that will be distributed for each distribution calendar year beginning with the calendar year after the Participant's death is the quotient obtained by dividing the Participant's account balance by the longer of the remaining life expectancy of the Participant or the remaining life expectancy of the Participant's eligible designated beneficiary, determined as follows:

49

(A)     The Participant's remaining life expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(B)     If the Participant's surviving spouse is the Participant's sole designated beneficiary, the remaining life expectancy of the surviving spouse is calculated for each distribution calendar year after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year.

(C)     If the Participant's surviving spouse is not the Participant's sole designated beneficiary, the designated beneficiary's remaining life expectancy is calculated using the age of the beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

If an eligible designated beneficiary dies before receiving distribution of the beneficiary's entire interest in the Participant's account balance, distribution of the remaining interest will be completed by December 31st of the calendar year containing the tenth anniversary of the eligible designated beneficiary's death.

Notwithstanding the above, when a child of the Participant who is an eligible designated beneficiary reaches the age of majority, distribution of the child's entire interest will be completed by December 31st of the calendar year containing the tenth anniversary of the year the child reaches the age of majority.

(2)     Participant survived by designated beneficiary but no eligible designated beneficiary. If the Participant dies and there is a designated beneficiary but no eligible designated beneficiary as of September 30th of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31st of the calendar year containing the tenth anniversary of the Participant's death.

(3)     No designated beneficiary. If the Participant dies and there is no designated beneficiary as of September 30th of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31st of the calendar year containing the fifth anniversary of the Participant's death.

(e)     Definitions. For purposes of this Section, the following definitions apply:

(1)     "Designated beneficiary" means the individual who is designated as the Beneficiary under the Plan and is the designated beneficiary under Code Section 401(a)(9) and Regulation Section 1.401(a)(9)-1, Q&A-4.

(2)     "Distribution calendar year" means a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's "Required beginning date." For distributions beginning after the Participant's death, the first distribution calendar year is the calendar year in which distributions

50

are required to begin under Section 7.7(c) or (d). The required minimum distribution for the Participant's first distribution calendar year will be made on or before the Participant's "Required beginning date." The required minimum distribution for other distribution calendar years, including the required minimum distribution for the distribution calendar year in which the Participant's "Required beginning date" occurs, will be made on or before December 31st of that distribution calendar year.

(3)    "Eligible designated beneficiary" means Participant's designated beneficiary who qualifies as an eligible designated beneficiary under Code Section 401(a)(9)(E)(ii). Certain trusts may be treated as eligible designated beneficiaries pursuant to Code Section 401(a)(9)(H)(iv) and (v).

(4)    "Life expectancy" means the life expectancy as computed by use of the Single Life Table in Regulation Section 1.401(a)(9)-9.

(5)    "Participant's account balance" means the Participant's account balance as of the last valuation date in the calendar year immediately preceding the "Distribution calendar year" (valuation calendar year) increased by the amount of any contributions made and allocated or Forfeitures allocated to the account balance as of the dates in the valuation calendar year after the valuation date and decreased by distributions made in the valuation calendar year after the valuation date. The account balance for the valuation calendar year includes any amounts rolled over or transferred to the Plan either in the valuation calendar year or in the "Distribution calendar year" if distributed or transferred in the valuation calendar year.

(6)    "Required beginning date" means, with respect to a Participant who has attained age 70 1/2 before January 1, 2020, April 1st of the calendar year following the later of the calendar year in which the Participant attains age 70 1/2 or the calendar year in which the Participant retires, except that benefit distributions to a "5-percent owner" must commence by April 1st of the calendar year following the calendar year in which the Participant attains age 70 1/2. "Required beginning date" means, with respect to any other Participant, April 1st of the calendar year following the later of the calendar year in which the Participant attains age 72 or the calendar year in which the Participant retires, except that benefit distributions to a "5-percent owner" must commence by April 1st of the calendar year following the calendar year in which the Participant attains age 72.

(7)    "5-percent owner" means, with respect to a Participant who has attained age 70 1/2 before January 1, 2020, a Participant who is a 5-percent owner as defined in Code Section 416 at any time during the Plan Year ending with or within the calendar year in which such owner attains age 70 1/2. "5-percent owner" means, with respect to any other Participant, a Participant who is a 5-percent owner as defined in Code Section 416 at any time during the Plan Year ending with or within the calendar year in which such owner attains age 72. Once distributions have begun to a 5-percent owner under this Section they must continue to be distributed, even if the Participant ceases to be a 5-percent owner in a subsequent year.

51

7.8    DISTRIBUTION FOR MINOR OR INCOMPETENT INDIVIDUAL

In the event a distribution is to be made to a minor or incompetent individual, then the Administrator may direct that such distribution be paid to the court appointed legal guardian or any other person authorized under state law to receive such distribution, or if none, then in the case of a minor individual, to a parent of such individual, or to the custodian for such individual under the Uniform Gift to Minors Act or Gift to Minors Act, if such is permitted by the laws of the state in which said individual resides. Such a payment to the guardian, custodian or parent of a minor or incompetent individual shall fully discharge the Trustee (or insurer), Employer, and Plan from further liability on account thereof.

7.9    LOCATION OF PARTICIPANT OR BENEFICIARY UNKNOWN

In the event that all, or any portion, of the distribution payable to a Participant or Beneficiary hereunder shall, at the later of the Participant's attainment of age 62 or Normal Retirement Age, remain unpaid solely by reason of the inability of the Administrator, after sending a registered letter, return receipt requested, to the last known address, and after further diligent effort, to ascertain the whereabouts of such Participant or Beneficiary, the amount so distributable may either, at the discretion of the Administrator, be treated as a Forfeiture or paid directly to an individual retirement account described in Code Section 408(a) or individual retirement annuity described in Code Section 408(b) pursuant to the Plan. However, the foregoing shall also apply prior to the later of a Participant's attainment of age 62 or Normal Retirement Age if, pursuant to the terms of the Plan, a mandatory distribution may be made to the Participant without the Participant's consent and the amount of such distribution is not more than $1,000. In the event a Participant or Beneficiary is located subsequent to a Forfeiture, such benefit shall be restored, first from Forfeitures, if any, and then from an additional Employer contribution if necessary. However, regardless of the preceding, a benefit which is lost by reason of escheat under applicable state law is not treated as a Forfeiture for purposes of this Section nor as an impermissible forfeiture under the Code.

7.10    RIGHT OF FIRST REFUSALS

(a)    If any Participant, the Participant's Beneficiary or any other person to whom shares of Company Stock are distributed from the Plan (the "Selling Participant") shall, at any time, desire to sell some or all of such shares (the "Offered Shares") to a third party (the "Third Party"), the Selling Participant shall give written notice of such desire to the Employer and the Administrator, which notice shall contain the number of shares offered for sale, the proposed terms of the sale and the names and addresses of both the Selling Participant and Third Party. Both the Trust Fund and the Employer shall each have the right of first refusal for a period of fourteen (14) days from the date the Selling Participant gives such written notice to the Employer and the Administrator (such fourteen (14) day period to run concurrently against the Trust Fund and the Employer) to acquire the Offered Shares. As between the Trust Fund and the Employer, the Trust Fund shall have priority to acquire the shares pursuant to the right of first refusal. The selling price and terms shall be the same as offered by the Third Party.

(b)      If the Trust Fund and the Employer do not exercise their right of first refusal within the required fourteen (14) day period provided above, the

Selling Participant shall have the right, at any time following the expiration of such fourteen (14) day period, to dispose of the Offered Shares to the Third Party; provided, however, that (i) no disposition shall be made to the Third Party on terms more favorable to the Third Party than those set forth in the written notice delivered by the Selling Participant above, and (ii) if such disposition shall not be made to a third party on the terms offered to the Employer and the Trust Fund, the offered Shares shall again be subject to the right of first refusal set forth above.

(c)      The closing pursuant to the exercise of the right of first refusal under Section 7.10(a) above shall take place at such place agreed upon between the Administrator and the Selling Participant, but not later than ten (10) days after the Employer or the Trust Fund shall have notified the Selling Participant of the exercise of the right of first refusal. At such closing, the Selling Participant shall deliver certificates representing the Offered Shares duly endorsed in blank for transfer, or with stock powers attached duly executed in blank with all required transfer tax stamps attached or provided for, and the Employer or the Trust Fund shall deliver the purchase price, or an appropriate portion thereof, to the Selling Participant.

(d)      Except as provided in this paragraph (d), no Company Stock acquired with the proceeds of an Exempt Loan complying with the requirements of Section 5.4 hereof shall be subject to a right of first refusal. Company Stock acquired with the proceeds of an Exempt Loan, which is distributed to a Participant or Beneficiary, shall be subject to the right of first refusal provided for in paragraph (a) of this Section only so long as the Company Stock is not publicly traded. The term "publicly traded" refers to a securities exchange registered under Section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f) or that is quoted on a system sponsored by a national securities association registered under Section 15A(b) of the Securities Exchange Act (15 U.S.C. 780). In addition, in the case of Company Stock which was acquired with the proceeds of a loan described in Section 5.4, the selling price and other terms under the right must not be less favorable to the seller than the greater of the value of the security determined under Section 6.2, or the purchase price and other terms offered by a buyer (other than the Employer or the Trust Fund), making a good faith offer to purchase the security. The right of first refusal must lapse no later than fourteen (14) days after the security holder gives notice to the holder of the right that an offer by a third party to purchase the security has been made. The right of first refusal shall comply with the provisions of paragraphs (a), (b) and (c) of this Section, except to the extent those provisions may conflict with the provisions of this paragraph.

7.11     STOCK CERTIFICATE LEGEND

Certificates for shares distributed pursuant to the Plan shall contain the following legend:

"The shares represented by this certificate are transferable only upon compliance with the terms of Radiance Technologies, Inc. Employee Stock Ownership Plan, which grants to Radiance Technologies, Inc. a right of first refusal, a copy of said

Plan being on file in the office of the Company."

7.12    PUT OPTION

(a)      If Company Stock which was not acquired with the proceeds of an Exempt Loan is distributed to a Participant and such Company Stock is not readily tradeable on an established securities market (within the meaning of Code Section 409(h)(1)(B)), a Participant has a right to require the Employer to repurchase the Company Stock distributed to such Participant under a fair valuation formula. Such Company Stock shall be subject to the provisions of Section 7.12(c).

(b)      Company Stock which is acquired with the proceeds of an Exempt Loan and which is not publicly traded when distributed, or if it is subject to a trading limitation when distributed, must be subject to a put option. For purposes of this paragraph, a "trading limitation" on a Company Stock is a restriction under any Federal or State securities law or any regulation thereunder, or an agreement (not prohibited by Section 7.13) affecting the Company Stock which would make the Company Stock not as freely tradeable as stock not subject to such restriction.

(c)      The put option must be exercisable only by a Participant, by the Participant's donees, or by a person (including an estate or its distributee) to whom the Company Stock passes by reason of a Participant's death. (Under this paragraph Participant or Former Participant means a Participant or Former Participant and the Beneficiaries of the Participant or Former Participant under the Plan.) The put option must permit a Participant to put the Company Stock to the Employer. Under no circumstances may the put option bind the Plan. However, it shall grant the Plan an option to assume the rights and obligations of the Employer at the time that the put option is exercised. If it is known at the time a loan is made that Federal or State law will be violated by the Employer honoring such put option, the put option must permit the Company Stock to be put, in a manner consistent with such law, to a third party (e.g., an affiliate of the Employer or a shareholder other than the Plan) that has substantial net worth at the time the loan is made and whose net worth is reasonably expected to remain substantial.

The put option shall commence as of the day following the date the Company Stock is distributed to the Former Participant and end sixty (60) days thereafter and if not exercised within such sixty (60) day period, an additional sixty (60) day option shall commence on the first day of the fifth month of the Plan Year next following the date the stock was distributed to the Former Participant (or such other sixty (60) day period as provided in Regulations). However, in the case of Company Stock that is publicly traded without restrictions when distributed but ceases to be so traded within either of the sixty (60) day periods described herein after distribution, the Employer must notify each holder of such Company Stock in writing on or before the tenth day after the date the Company Stock ceases to be so traded that for the remainder of the applicable sixty (60) day period the Company Stock is subject to the put option. The number of days between the tenth day and the date on which notice is actually given, if later than the tenth day, must be added to the duration of the put option. The notice must inform distributees of the term of the put options that they are to hold. The terms must satisfy the requirements of this paragraph.

The put option is exercised by the holder notifying the Employer in writing that the put option is being exercised; the notice shall state the name and address of the holder and the number of shares to be sold. The period during which a put option is exercisable does not include any time when a distributee is unable to exercise it because the party bound by the put option is prohibited from honoring it by applicable Federal or State law. The price at which a put option must be exercisable is the value of the Company Stock determined in accordance with Section 6.2. Payment under the put option involving a "Total Distribution" shall be paid in substantially equal monthly, quarterly, semiannual or annual installments over a period certain beginning not later than thirty (30) days after the exercise of the put option and not extending beyond five (5) years. The deferral of payment is reasonable if adequate security and a reasonable interest rate on the unpaid amounts are provided. The amount to be paid under the put option involving installment distributions must be paid not later than thirty (30) days after the exercise of the put option. Payment under a put option must not be restricted by the provisions of a loan or any other arrangement, including the terms of the Employer articles of incorporation, unless so required by applicable state law.

For purposes of this Section, "Total Distribution" means a distribution to a Participant or the Participant's Beneficiary within one (1) taxable year of the entire Vested Account.

(d)     An arrangement involving the Plan that creates a put option must not provide for the issuance of put options other than as provided under this Section. The Plan (and the Trust Fund) must not otherwise obligate itself to acquire Company Stock from a particular holder thereof at an indefinite time determined upon the happening of an event such as the death of the holder.

7.13     NONTERMINABLE PROTECTIONS AND RIGHTS

No Company Stock, except as provided in Section 7.11 and Section 7.12(b), acquired with the proceeds of a loan described in Section 5.4 hereof may be subject to a put, call, or other option, or buy-sell or similar arrangement when held by and when distributed from the Trust Fund, whether or not the Plan is then an ESOP. The protections and rights granted in this Section are nonterminable, and such protections and rights shall continue to exist under the terms of this Plan so long as any Company Stock acquired with the proceeds of a loan described in Section 5.4 hereof is held by the Trust Fund or by any Participant or other person for whose benefit such protections and rights have been created, and neither the repayment of such loan nor the failure of the Plan to be an ESOP, nor an amendment of the Plan shall cause a termination of said protections and rights.

7.14     QUALIFIED DOMESTIC RELATIONS ORDER DISTRIBUTION

All rights and benefits, including elections, provided to a Participant in this Plan shall be subject to the rights afforded to any "alternate payee" under a "qualified domestic relations order." Furthermore, a distribution to an "alternate payee" shall be permitted if such distribution is authorized by a "qualified domestic relations order," even if the affected Participant has not separated from service and has not reached the "earliest retirement age" under the Plan. For the purposes of this Section, "alternate payee," "qualified domestic relations order" and "earliest retirement age" shall have the meaning set forth under Code Section 414(p).

A domestic relations order that otherwise satisfies the requirements for a qualified domestic relations order ("QDRO") will not fail to be a QDRO: (i) solely because the order is issued after, or revises, another domestic relations order or QDRO; or (ii) solely because of the time at which the order is issued, including issuance after the Participant's death. A domestic relations order described in this paragraph is subject to the same requirements and protections that apply to QDROs.

7.15    DIRECT ROLLOVER

(a)    Notwithstanding any provision of the Plan to the contrary that would otherwise limit a "distributee's" election under this Section, a "distributee" may elect, at the time and in the manner prescribed by the Administrator, to have any portion of an "eligible rollover distribution" that is equal to at least $500 paid directly to an "eligible retirement plan" specified by the "distributee" in a "direct rollover."

(b)    For purposes of this Section the following definitions shall apply:

(1)    An "eligible rollover distribution" means any distribution described in Code Section 402(c)(4) and generally includes any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the "distributee" or the joint lives (or joint life expectancies) of the "distributee" and the "distributee's" designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any other distribution(s) that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and any other distribution reasonably expected to total less than $200 during a year. Any amount that is distributed on account of hardship shall not be an eligible rollover distribution and the "distributee" may not elect to have any portion of such a distribution paid directly to an "eligible retirement plan."

(2)    An "eligible retirement plan" is an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b) (other than an endowment contract), a qualified trust (an employees' trust) described in Code Section 401(a) which is exempt from tax under Code Section 501(a) and which agrees to separately account for amounts transferred into such plan from this Plan, an annuity plan described in Code Section 403(a), an eligible deferred compensation plan described in Code Section 457(b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality thereof which agrees to separately account for amounts transferred into such plan from this Plan, and an annuity contract described in Code

Section 403(b) that accepts the distributee's eligible rollover distribution. However, in the case of an "eligible rollover" distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity. The definition of eligible retirement

plan shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relation order, as defined in Code Section 414(p).

In addition, a Participant may elect to directly roll over an "eligible rollover distribution" to a Roth IRA described in Code Section 408A(b).

(3)    A "distributee" includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code Section 414(p), are "distributees" with regard to the interest of the spouse or former spouse.

For distributions after December 31, 2009, a nonspouse beneficiary who is a "designated beneficiary" under Code Section 401(a)(9)(E) and the Regulations thereunder, by a direct trustee-to-trustee transfer ("direct rollover"), may roll over all or any portion of his or her distribution to an individual retirement account the beneficiary establishes for purposes of receiving the distribution. In order to be able to roll over the distribution, the distribution otherwise must be an "eligible rollover distribution." If the Participant's named beneficiary is a trust, the Plan may make a direct rollover to an individual retirement account on behalf of the trust, provided the trust satisfies the requirements to be a designated beneficiary within the meaning of Code Section 401(a)(9)(E). A nonspouse beneficiary may not roll over an amount which is a required minimum distribution, as determined under applicable Regulations and other Internal Revenue Service guidance. If the Participant dies before his or her required beginning date and the nonspouse Beneficiary rolls over to an IRA the maximum amount eligible for rollover, the beneficiary may elect to use either the 5-year rule or the life expectancy rule, pursuant to Regulations Section 1.401(a)(9)-3, A-4(c), in determining the required minimum distributions from the IRA that receives the non-spouse beneficiary's distribution.

(4)    A "direct rollover" is a payment by the Plan to the "eligible retirement plan" specified by the "distributee."

(c)    Participant Notice. A Participant entitled to an eligible rollover distribution must receive a written explanation of his/her right to a direct rollover, the tax consequences of not making a direct rollover, and, if applicable, any available special income tax elections. The notice must be provided within the same 30-to-180 day timeframe applicable to the Participant consent notice. The direct rollover notice must be provided to all Participants, unless the total amount the Participant will receive as a distribution during the calendar year is expected to be less than $200.

7.16    CORRECTIVE DISTRIBUTIONS

Nothing in this Article shall preclude the Administrator from making a distribution to a Participant to the extent such distribution is made to correct a qualification defect in accordance

with the correction procedures under the IRS's Employee Plans Compliance Resolution System or any other voluntary compliance programs.

    7.17    DIVERSIFICATION AND TRANSFER RIGHTS

    (a)    Subject to the provisions listed below in this Section and such other terms and conditions as the Trustee and Administrator may require, a Participant who is actively employed by Employer and who is a participant in the Radiance 401(k) Plan may, during a specified period (herein referred to as the "Election Period"), elect to transfer all or a portion of his Vested Account balance under the Radiance 401(k) Plan to this Plan.

    (1)    The Administrator shall provide reasonable notice of the Election Period to such Participants, including the projected dates of the Election Period and the per share valuation of Company Stock that will be purchased with the amount transferred from the Radiance 401(k) Plan.

    (2)    The Administrator shall maintain a Transfer Account in the name of each such Participant, to which such transferred amounts shall be credited. Each Participant's Transfer Account shall share in any earnings and losses (net appreciation or net depreciation) of the Trust Fund in the same manner provided in Section 4.3(d).

    (b)    The Transfer Account shall be adjusted as of each Valuation Date in accordance with Section 4.3(d). The Participant's interest in his Transfer Account shall be fully Vested and nonforfeitable at all times.

    (c)    Amounts in a Participant's Transfer Account shall be held by the Trustee pursuant to the provisions of this Plan and shall be subject to the distribution limitations provided for in Regulation 1.401(k)-1(d). Such amounts may not be withdrawn by, or distributed to the Participant, in whole or in part, except as provided in Section 7.14, Section 7.15, and paragraphs (d), (e), and (f) of this Section 7.17.

    (d)    At Normal Retirement Date, or such other date when the Participant or the Participant's Beneficiary shall be entitled to receive benefits, the Participant's Transfer Account shall be used to provide additional benefits to the Participant or the Participant's Beneficiary. Any distributions of amounts held in a Participant's Transfer Account shall be made in a manner which is consistent with and satisfies the provisions of Section 7.5, including, but not limited to, all notice and consent requirements of Code Section 411(a)(11) and the Regulations thereunder.

    (e)    At such time as a Participant shall have attained the age of $59^1/_2$, the Administrator, at the election of the Participant who has not severed employment with the Employer, may direct the Trustee to distribute all or a portion of the amount then credited to the Participant's Transfer Account maintained on behalf of the Participant. In the event that the Administrator makes such a distribution, the Participant shall continue to be eligible to participate in the Plan on the same basis as any other Employee. Any distribution made pursuant to this Section shall be made in a manner

58

consistent with Sections 7.5 and 7.6, including, but not limited to, all notice and consent requirements of Code Section 411(a)(11) and the Regulations thereunder.

Notwithstanding the above, pre-retirement distributions from a Participant's Transfer Account shall not be permitted prior to the Participant attaining age $59\frac{1}{2}$ except as otherwise permitted under the terms of the Plan.

(f)    The Administrator, at the election of the Participant, shall direct the Trustee to distribute to any Participant in any one Plan Year up to the lesser of 100% of the Participant's Transfer Account valued as of the last Valuation Date or the amount necessary to satisfy the immediate and heavy financial need of the Participant.

Withdrawal under this paragraph (f) shall be authorized if the distribution is on account of:

(1)    Expenses incurred or necessary for medical care that would be deductible under Code Section 213(a) (determined without regard to whether the expenses exceed the stated limit on adjusted gross income);

(2)    The purchase of (excluding mortgage payments) of a principal residence for the Participant;

(3)    Payment of tuition, related educational fees, and room and board expenses, for up to the next 12 months of post-secondary education for the Participant, his spouse, children, or dependents (as defined in Code Section 152 without regard to Code Sections 152(b)(1), (b)(2), and (d)(1)(B));

(4)    Payments necessary to prevent the eviction of the Participant from, or foreclosure on the mortgage of, the Participant's principal residence;

(5)    Payments for funeral or burial expenses for the Participant's deceased parent, spouse, child, or dependent (as defined in Code Section 152 without regard to Code Section 152(d)(1)(B));

(6)    Expenses to the repair damage to the Participant's principal residence that would qualify for a casualty loss deduction under Code Section 165 (determined without regard to whether the loss exceeds 10% of adjusted gross income); or

(7)    Any other distribution which is deemed by the Commissioner of Internal Revenue to be made on account of immediate and heavy financial need as provided in Regulations.

Notwithstanding the above, distributions from the Participant's Transfer Account pursuant to this paragraph (f) shall be limited solely to the Participant's Transfer Account as of the date of distribution, reduced by the amount of any previous distributions pursuant to this Section and Section 7.14 and shall only be made once the Administrator determines that the Participant has first received any available hardship distributions from the Radiance 401(k) Plan.

(g)     Notwithstanding the above, any sale of Company Stock held in the Participants' Transfer Accounts shall not occur unless such sale complies with or is otherwise exempt from federal or state securities law.

<div align="center">

ARTICLE VIII
AMENDMENT, TERMINATION AND MERGERS

</div>

8.1     AMENDMENT

(a)     The Employer shall have the right at any time to amend this Plan subject to the limitations of this Section. However, any amendment that affects the rights, duties or responsibilities of the Administrator may only be made with the Administrator's written consent. Any such amendment shall become effective as provided therein upon its execution.

(b)     No amendment to the Plan shall be effective if it authorizes or permits any part of the Trust Fund (other than such part as is required to pay taxes and administration expenses) to be used for or diverted to any purpose other than for the exclusive benefit of the Participants or their Beneficiaries or estates; or causes any reduction in the amount credited to the account of any Participant; or causes or permits any portion of the Trust Fund to revert to or become property of the Employer.

(c)     Except as permitted by Regulations (including Regulation 1.411(d)-4) or other IRS guidance, no Plan amendment or transaction having the effect of a Plan amendment (such as a merger, plan transfer or similar transaction) shall be effective if it eliminates or reduces any "Section 411(d)(6) protected benefit" or adds or modifies conditions relating to "Section 411(d)(6) protected benefits" which results in a further restriction on such benefit unless such "Section 411(d)(6) protected benefits" are preserved with respect to benefits accrued as of the later of the adoption date or effective date of the amendment. "Section 411(d)(6) protected benefits" are benefits described in Code Section 411(d)(6)(A), early retirement benefits and retirement-type subsidies, and optional forms of benefit.

8.2     TERMINATION

(a)     The Employer shall have the right at any time to terminate the Plan by delivering to the Trustee and Administrator written notice of such termination. Upon any full or partial termination, all amounts credited to the affected Participants' Accounts shall become 100% Vested as provided in Section 7.4 and shall not thereafter be subject to forfeiture, and all unallocated amounts (other than the Unallocated Company Stock Suspense Account), including Forfeitures, shall be allocated to the accounts of all Participants in accordance with the provisions hereof.

(b)     Upon the full termination of the Plan, the Employer shall direct the distribution of the assets of the Trust Fund to Participants in a manner which is consistent with and satisfies the provisions of Sections 7.5 and 7.6. Except as permitted by Regulations, the termination of the Plan shall not result in the reduction of "Section 411(d)(6) protected benefits" in accordance with Section 8.1(c).

8.3     MERGER, CONSOLIDATION OR TRANSFER OF ASSETS

This Plan and Trust may be merged or consolidated with, or its assets and/or liabilities may be transferred to any other plan and trust only if the benefits which would be received by a Participant of this Plan, in the event of a termination of the Plan immediately after such transfer, merger or consolidation, are at least equal to the benefits the Participant would have received if the Plan had terminated immediately before the transfer, merger or consolidation, and such transfer, merger or consolidation does not otherwise result in the elimination or reduction of any "Section 411(d)(6) protected benefits" in accordance with Section 8.1(c).

<div align="center">

ARTICLE IX
TOP HEAVY

</div>

9.1     TOP HEAVY PLAN REQUIREMENTS

For any Top Heavy Plan Year, the Plan shall provide the special vesting requirements of Code Section 416(b) pursuant to Section 7.4 of the Plan and the special minimum allocation requirements of Code Section 416(c) pursuant to Section 4.3 of the Plan.

9.2     DETERMINATION OF TOP HEAVY STATUS

(a)     This Plan shall be a Top Heavy Plan for any Plan Year in which, as of the "determination date," (1) the Present Value of Accrued Benefits of Key Employees and (2) the sum of the Aggregate Accounts of Key Employees under this Plan and all plans of an Aggregation Group, exceeds sixty percent (60%) of the Present Value of Accrued Benefits and the Aggregate Accounts of all Key Employees and Non-Key Employees under this Plan and all plans of an Aggregation Group.

If any Participant is a Non-Key Employee for any Plan Year, but such Participant was a Key Employee for any prior Plan Year, such Participant's Present Value of Accrued Benefit and/or Aggregate Account balance shall not be taken into account for purposes of determining whether this Plan is a Top Heavy Plan (or whether any Aggregation Group which includes this Plan is a Top Heavy Group). In addition, if a Participant or Former Participant has not performed any services for any Employer maintaining the Plan at any time during the one-year period ending on the "determination date," any accrued benefit for such Participant or Former Participant shall not be taken into account for the purposes of determining whether this Plan is a Top Heavy Plan.

(b)     Aggregate Account: A Participant's Aggregate Account as of the "determination date" is the sum of:

(1)     the Participant's Account balance as of the most recent valuation occurring within a twelve (12) month period ending on the "determination date." However, with respect to Employees not performing services for the Employer during the year ending on the "determination date," the Participant's Account balance as of the most recent valuation occurring within a twelve

<div align="center">61</div>

(12) month period ending on the "determination date" shall not be taken into account for purposes of this Section.

(2)     an adjustment for any contributions due as of the "determination date." Such adjustment shall be the amount of any contributions actually made after the Valuation Date but due on or before the "determination date," except for the first Plan Year when such adjustment shall also reflect the amount of any contributions made after the "determination date" that are allocated as of a date in that first Plan Year.

(3)     any Plan distributions made within the Plan Year that includes the "determination date" or, with respect to distributions made for a reason other than severance from employment, disability or death, within the five (5) preceding Plan Years. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Code Section 416(g)(2)(A)(i). In the case of distributions made after the Valuation Date and prior to the "determination date," such distributions are not included as distributions for top heavy purposes to the extent that such distributions are already included in the Participant's Aggregate Account balance as of the Valuation Date.

(4)     any Employee contributions, whether voluntary or mandatory. However, amounts attributable to tax deductible qualified voluntary employee contributions shall not be considered to be a part of the Participant's Aggregate Account balance.

(5)     with respect to unrelated rollovers and plan-to-plan transfers (ones which are both initiated by the Employee and made from a plan maintained by one employer to a plan maintained by another employer), if this Plan provides the rollovers or plan-to-plan transfers, it shall always consider such rollovers or plan-to-plan transfers as a distribution for the purposes of this Section. If this Plan is the plan accepting such rollovers or plan-to-plan transfers, it shall not consider such rollovers or plan-to-plan transfers as part of the Participant's Aggregate Account balance.

(6)     with respect to related rollovers and plan-to-plan transfers (ones either not initiated by the Employee or made to a plan maintained by the same employer), if this Plan provides the rollover or plan-to-plan transfer, it shall not be counted as a distribution for purposes of this Section. If this Plan is the plan accepting such rollover or plan-to-plan transfer, it shall consider such rollover or plan-to-plan transfer as part of the Participant's Aggregate Account balance, irrespective of the date on which such rollover or plan-to-plan transfer is accepted.

(7)     For the purposes of determining whether two employers are to be treated as the same employer in (5) and (6) above, all employers aggregated under Code Sections 414(b), (c), (m) and (o) are treated as the same employer.

(c)     "Aggregation Group" means either a Required Aggregation Group or a Permissive Aggregation Group as hereinafter determined.

(1)     Required Aggregation Group: In determining a Required Aggregation Group hereunder, each plan of the Employer in which a Key Employee is a participant in the Plan Year containing the Determination Date or any of the four preceding Plan Years, and each other plan of the Employer which enables any plan in which a Key Employee participates to meet the requirements of Code Sections 401(a)(4) or 410, will be required to be aggregated. Such group shall be known as a Required Aggregation Group.

In the case of a Required Aggregation Group, each plan in the group will be considered a Top Heavy Plan if the Required Aggregation Group is a Top Heavy Group. No plan in the Required Aggregation Group will be considered a Top Heavy Plan if the Required Aggregation Group is not a Top Heavy Group.

(2)     Permissive Aggregation Group: The Employer may also include any other plan not required to be included in the Required Aggregation Group, provided the resulting group, taken as a whole, would continue to satisfy the provisions of Code Sections 401(a)(4) and 410. Such group shall be known as a Permissive Aggregation Group.

In the case of a Permissive Aggregation Group, only a plan that is part of the Required Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is a Top Heavy Group. No plan in the Permissive Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is not a Top Heavy Group.

(3)     Only those plans of the Employer in which the Determination Dates fall within the same calendar year shall be aggregated in order to determine whether such plans are Top Heavy Plans.

(4)     An Aggregation Group shall include any terminated plan of the Employer if it was maintained within the last five (5) years ending on the Determination Date.

(d)     "Determination date" means (a) the last day of the preceding Plan Year, or (b) in the case of the first Plan Year, the last day of such Plan Year.

(e)     Present Value of Accrued Benefit: In the case of a defined benefit plan, the Present Value of Accrued Benefit for a Participant other than a Key Employee, shall be as determined using the single accrual method used for all plans of the Employer and Affiliated Employers, or if no such single method exists, using a method which results in benefits accruing not more rapidly than the slowest accrual rate permitted under Code Section 411(b)(1)(C). The determination of the Present Value of Accrued Benefit shall be determined as of the most recent valuation date that falls within or ends with the 12-month period ending on the Determination Date except as provided in Code Section 416 and the Regulations thereunder for the first and second plan years of a defined benefit plan.

(f)     "Top Heavy Group" means an Aggregation Group in which, as of the Determination Date, the sum of:

(1)    the Present Value of Accrued Benefits of Key Employees under all defined benefit plans included in the group, and

(2)    the Aggregate Accounts of Key Employees under all defined contribution plans included in the group, exceeds sixty percent (60%) of a similar sum determined for all Participants.

ARTICLE X
MISCELLANEOUS

10.1    PARTICIPANT'S RIGHTS

This Plan shall not be deemed to constitute a contract between the Employer and any Participant or to be a consideration or an inducement for the employment of any Participant or Employee. Nothing contained in this Plan shall be deemed to give any Participant or Employee the right to be retained in the service of the Employer or to interfere with the right of the Employer to discharge any Participant or Employee at any time regardless of the effect which such discharge shall have upon the Employee as a Participant of this Plan.

10.2    ALIENATION

(a)    Subject to the exceptions provided below, and as otherwise permitted by the Code and Act, no benefit which shall be payable out of the Trust Fund to any person (including a Participant or the Participant's Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any such person, nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Trustee, except to such extent as may be required by law.

(b)    Subsection (a) shall not apply to a "qualified domestic relations order" defined in Code Section 414(p), and those other domestic relations orders permitted to be so treated by the Administrator under the provisions of the Retirement Equity Act of 1984. The Administrator shall establish a written procedure to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Further, to the extent provided under a "qualified domestic relations order," a former spouse of a Participant shall be treated as the spouse or surviving spouse for all purposes under the Plan.

(c)    Subsection (a) shall not apply to an offset to a Participant's accrued benefit against an amount that the Participant is ordered or required to pay the Plan with respect to a judgment, order, or decree issued, or a settlement entered into in accordance with Code Sections 401(a)(13)(C) and (D).

64

10.3    CONSTRUCTION OF PLAN

This Plan and Trust shall be construed and enforced according to the Code, the Act and the laws of the State of Alabama, other than its laws respecting choice of law, to the extent not pre-empted by the Act.

10.4    GENDER AND NUMBER

Wherever any words are used herein in the masculine, feminine or neuter gender, they shall be construed as though they were also used in another gender in all cases where they would so apply, and whenever any words are used herein in the singular or plural form, they shall be construed as though they were also used in the other form in all cases where they would so apply.

10.5    LEGAL ACTION

In the event any claim, suit, or proceeding is brought regarding the Trust and/or Plan established hereunder to which the Trustee, the Employer or the Administrator may be a party, and such claim, suit, or proceeding is resolved in favor of the Trustee, the Employer or the Administrator, they shall be entitled to be reimbursed from the Trust Fund for any and all costs, attorney's fees, and other expenses pertaining thereto incurred by them for which they shall have become liable provided there has been no breach of fiduciary duty by the party seeking reimbursement.

10.6    PROHIBITION AGAINST DIVERSION OF FUNDS

(a)    Except as provided below and otherwise specifically permitted by law, it shall be impossible by operation of the Plan or of the Trust, by termination of either, by power of revocation or amendment, by the happening of any contingency, by collateral arrangement or by any other means, for any part of the corpus or income of any Trust Fund maintained pursuant to the Plan or any funds contributed thereto to be used for, or diverted to, purposes other than the exclusive benefit of Participants, Former Participants, or their Beneficiaries.

(b)    In the event the Employer shall make an excessive contribution under a mistake of fact pursuant to Act Section 403(c)(2)(A), the Employer may demand repayment of such excessive contribution at any time within one (1) year following the time of payment and the Trustees shall return such amount to the Employer within the one (1) year period. Earnings of the Plan attributable to the contributions may not be returned to the Employer but any losses attributable thereto must reduce the amount so returned.

(c)    Except for Section 4.1(b), any contribution by the Employer to the Trust Fund is conditioned upon the deductibility of the contribution by the Employer under the Code and, to the extent any such deduction is disallowed, the Employer may, within one (1) year following the final determination of the disallowance, whether by agreement with the Internal Revenue Service or by final decision of a competent jurisdiction, demand repayment of such disallowed contribution and the Trustee shall return such contribution within one (1) year following the disallowance. Earnings

of the Plan attributable to the contribution may not be returned to the Employer, but any losses attributable thereto must reduce the amount so returned.

### 10.7    EMPLOYER'S AND TRUSTEE'S PROTECTIVE CLAUSE

The Employer, Administrator and Trustee, and their successors, shall not be responsible for the validity of any Contract issued hereunder or for the failure on the part of the insurer to make payments provided by any such Contract, or for the action of any person which may delay payment or render a Contract null and void or unenforceable in whole or in part.

### 10.8    RECEIPT AND RELEASE FOR PAYMENTS

Any payment to any Participant, the Participant's legal representative, Beneficiary, or to any guardian or committee appointed for such Participant or Beneficiary in accordance with the provisions of the Plan, shall, to the extent thereof, be in full satisfaction of all claims hereunder against the Trustee and the Employer, either of whom may require such Participant, legal representative, Beneficiary, guardian or committee, as a condition precedent to such payment, to execute a receipt and release thereof in such form as shall be determined by the Trustee or Employer.

### 10.9    ACTION BY THE EMPLOYER

Whenever the Employer under the terms of the Plan is permitted or required to do or perform any act or matter or thing, it shall be done and performed by a person duly authorized by its legally constituted authority.

### 10.10    NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY

The "named Fiduciaries" of this Plan are (1) the Employer, (2) the Administrator and (3) the Trustee, and (4) any Investment Manager appointed hereunder. The named Fiduciaries shall have only those specific powers, duties, responsibilities, and obligations as are specifically given them under the Plan including, but not limited to, any agreement allocating or delegating their responsibilities, the terms of which are incorporated herein by reference. In general, the Employer shall have the sole responsibility for making the contributions provided for under Section 4.1; and shall have the authority to appoint and remove the Trustee and the Administrator; to formulate the Plan's "funding policy and method;" and to amend or terminate, in whole or in part, the Plan. The Administrator shall have the sole responsibility for the administration of the Plan, including, but not limited to, the items specified in Article II of the Plan, as the same may be allocated or delegated thereunder. The Trustee shall have the sole responsibility of management of the assets held under the Trust, except to the extent directed pursuant to Article II or with respect to those assets, the management of which has been assigned to an Investment Manager, who shall be solely responsible for the management of the assets assigned to it, all as specifically provided in the Plan. Each named Fiduciary warrants that any directions given, information furnished, or action taken by it shall be in accordance with the provisions of the Plan, authorizing or providing for such direction, information or action. Furthermore, each named Fiduciary may rely upon any such

direction, information or action of another named Fiduciary as being proper under the Plan, and is not required under the Plan to inquire into the propriety of any such direction, information or action. It is intended under the Plan that each named Fiduciary shall be responsible for the proper exercise of its own powers, duties, responsibilities and obligations under the Plan as specified or allocated herein. No named Fiduciary shall guarantee the Trust Fund in any manner against investment loss or depreciation in asset value. Any person or group may serve in more than one Fiduciary capacity.

### 10.11   HEADINGS

The headings and subheadings of this Plan have been inserted for convenience of reference and are to be ignored in any construction of the provisions hereof.

### 10.12   ELECTRONIC MEDIA

The Administrator may use telephonic or electronic media to satisfy any notice requirements required by this Plan, to the extent permissible under regulations (or other generally applicable guidance). In addition, a Participant's consent to an immediate distribution may be provided through telephonic or electronic means, to the extent permissible under regulations (or other generally applicable guidance). The Administrator also may use telephonic or electronic media to conduct plan transactions such as enrolling participants, making (and changing) deferral elections, electing (and changing) investment allocations, applying for Plan loans, and other transactions, to the extent permissible under regulations (or other generally applicable guidance).

### 10.13   PLAN CORRECTION

The Administrator in conjunction with the Employer may undertake such correction of Plan errors as the Administrator deems necessary, including correction to preserve tax qualification of the Plan under Code Section 401(a) or to correct a fiduciary breach under the Act. Without limiting the Administrator's authority under the prior sentence, the Administrator, as it determines to be reasonable and appropriate, may undertake correction of Plan document, operational, demographic and employer eligibility failures under a method described in the Plan or under the IRS Employee Plans Compliance Resolution System ("EPCRS") or any successor program to EPCRS. The Administrator, as it determines to be reasonable and appropriate, also may undertake or assist the appropriate Fiduciary or plan official in undertaking correction of a fiduciary breach, including correction under the DOL Voluntary Fiduciary Correction Program ("VFC") or any successor program to VFC.

### 10.14   APPROVAL BY INTERNAL REVENUE SERVICE

Notwithstanding anything herein to the contrary, if, pursuant to an application for qualification filed by or on behalf of the Plan by the time prescribed by law for filing the Employer's return for the taxable year in which the Plan is adopted, or such later date that the Secretary of the Treasury may prescribe, the Commissioner of Internal Revenue Service or the Commissioner's delegate should determine that the Plan does not initially qualify as a tax-exempt

plan under Code Sections 401 and 501, and such determination is not contested, or if contested, is finally upheld, then if the Plan is a new plan, it shall be void ab initio and all amounts contributed to the Plan by the Employer, less expenses paid, shall be returned within one (1) year and the Plan shall terminate, and the Trustee shall be discharged from all further obligations. If the disqualification relates to an amended plan, then the Plan shall operate as if it had not been amended.

### 10.15   UNIFORMITY

All provisions of this Plan shall be interpreted and applied in a uniform, nondiscriminatory manner. In the event of any conflict between the terms of this Plan and any Contract purchased hereunder, the Plan provisions shall control.

### 10.16   SECURITIES AND EXCHANGE COMMISSION APPROVAL

The Employer may request an interpretative letter from the Securities and Exchange Commission stating that the transfers of Company Stock contemplated hereunder do not involve transactions requiring a registration of such Company Stock under the Securities Act of 1933. In the event that a favorable interpretative letter is not obtained, the Employer reserves the right to amend the Plan and Trust retroactively to their effective dates in order to obtain a favorable interpretative letter or to terminate the Plan.

<div align="center">

ARTICLE XI
PARTICIPATING EMPLOYERS

</div>

### 11.1   ADOPTION BY OTHER EMPLOYERS

Notwithstanding anything herein to the contrary, with the consent of the Employer and Trustee, any other corporation or entity, whether an affiliate or subsidiary or not, may adopt this Plan and all of the provisions hereof, and participate herein and be known as a Participating Employer, by a properly executed document evidencing said intent and will of such Participating Employer.

### 11.2   REQUIREMENTS OF PARTICIPATING EMPLOYERS

(a)     Each such Participating Employer shall be required to use the same Trustee as provided in this Plan.

(b)     The Trustee may, but shall not be required to, commingle, hold and invest as one Trust Fund all contributions made by Participating Employers, as well as all increments thereof.

(c)     Any expenses of the Plan which are to be paid by the Employer or borne by the Trust Fund shall be paid by each Participating Employer in the same proportion that the total amount standing to the credit of all Participants employed by such Employer bears to the total standing to the credit of all Participants.

<div align="center">

68

</div>

11.3    DESIGNATION OF AGENT

Each Participating Employer shall be deemed to be a party to this Plan; provided, however, that with respect to all of its relations with the Trustee and Administrator for the purpose of this Plan, each Participating Employer shall be deemed to have designated irrevocably the Employer as its agent. Unless the context of the Plan clearly indicates the contrary, the word "Employer" shall be deemed to include each Participating Employer as related to its adoption of the Plan.

11.4    EMPLOYEE TRANSFERS

In the event an Employee is transferred between Participating Employers, accumulated service and eligibility shall be carried with the Employee involved. No such transfer shall effect a termination of employment hereunder, and the Participating Employer to which the Employee is transferred shall thereupon become obligated hereunder with respect to such Employee in the same manner as was the Participating Employer from whom the Employee was transferred.

11.5    PARTICIPATING EMPLOYER CONTRIBUTION AND FORFEITURES

Any contribution or Forfeiture subject to allocation during each Plan Year shall be determined and allocated separately by each Participating Employer, and shall be allocated only among the Participants eligible to share of the Employer or Participating Employer making the contribution or by which the forfeiting Participant was employed. On the basis of the information furnished by the Administrator, the Trustee shall keep separate books and records concerning the affairs of each Participating Employer hereunder and as to the accounts and credits of the Employees of each Participating Employer. The Trustee may, but need not, register Contracts so as to evidence that a particular Participating Employer is the interested Employer hereunder, but in the event of an Employee transfer from one Participating Employer to another, the employing Employer shall immediately notify the Trustee thereof.

11.6    AMENDMENT

Any Participating Employer that is an Affiliated Employer hereby authorizes the Employer to make amendments on its behalf, unless otherwise agreed among all affected parties. If a Participating Employer is not an Affiliated Employer, then amendment of this Plan by the Employer at any time when there shall be a Participating Employer shall, unless otherwise agreed to by the affected parties, only be by the written action of each and every Participating Employer and with the consent of the Trustee where such consent is necessary in accordance with the terms of this Plan.

11.7    DISCONTINUANCE OF PARTICIPATION

Any Participating Employer shall be permitted to discontinue or revoke its participation in the Plan at any time. At the time of any such discontinuance or revocation, satisfactory evidence thereof and of any applicable conditions imposed shall be delivered to the Trustee. The Trustee shall thereafter transfer, deliver and assign Contracts and other Trust Fund assets allocable to the

69

Participants of such Participating Employer to such new trustee as shall have been designated by such Participating Employer, in the event that it has established a separate qualified retirement plan for its Employees provided, however, that no such transfer shall be made if the result is the elimination or reduction of any "Section 411(d)(6) protected benefits" as described in Section 8.1(c). If no successor is designated, the Trustee shall retain such assets for the Employees of said Participating Employer pursuant to the provisions of Article VII hereof. In no such event shall any part of the corpus or income of the Trust as it relates to such Participating Employer be used for or diverted for purposes other than for the exclusive benefit of the Employees of such Participating Employer.

    11.8    ADMINISTRATOR'S AUTHORITY

The Administrator shall have authority to make any and all necessary rules or regulations, binding upon all Participating Employers and all Participants, to effectuate the purpose of this Article.

*[signature page follows]*

IN WITNESS WHEREOF, this Plan has been executed on the <u>22nd</u> day of December, 2021, effective as provided herein.

**RADIANCE TECHNOLOGIES, INC.**

By _____

Its ___CFO_____

71

# EXHIBIT 9



Employee Stock Ownership Plan

# ESOP

# Summary Plan Description

*Moving Forward Together*

**The 100% ESOP Solution**

www.radiancetech.com

**RADIANCE TECHNOLOGIES, INC. EMPLOYEE STOCK OWNERSHIP PLAN**

**SUMMARY PLAN DESCRIPTION**

**Effective January 1, 2021**

**TABLE OF CONTENTS**

INTRODUCTION TO THE ESOP                                                        1

ARTICLE I The Radiance ESOP and its Purpose                                      2

ARTICLE II Eligibility, Entry and Participation                                  2

ARTICLE III Contributions                                                        3

ARTICLE IV Prior Transfers Under the Terms of the 401(K) Transfer Election       5

ARTICLE V Diversification                                                        6

ARTICLE VI Voting                                                                7

ARTICLE VII Vesting                                                              7

ARTICLE VIII Disability and Death Benefits                                       9

ARTICLE IX Timing and Form of Distribution                                      10

ARTICLE X Tax Treatment of Distributions                                        11

ARTICLE XI Top-Heavy Rules                                                      12

ARTICLE XII Protected Benefits and Claims Procedures                            12

ARTICLE XIII ESOP Expenses                                                      15

ARTICLE XIV General Information About the Radiance ESOP                         16

**RADIANCE TECHNOLOGIES, INC. EMPLOYEE STOCK OWNERSHIP PLAN**

**SUMMARY PLAN DESCRIPTION (SPD)**

---

### INTRODUCTION TO THE ESOP

Radiance Technologies, Inc. Employee Stock Ownership Plan, or ESOP, has been adopted to provide you with additional income for retirement. This Summary Plan Description referred to as the SPD, contains valuable information regarding when you may become eligible to participate in the ESOP, your benefits, distribution options, and many other features of the Plan. You should take the time to read this SPD to get a better understanding of your rights and obligations under the ESOP.

Radiance Technologies, Inc., referred to in this document as Radiance, and the Company, has attempted to answer most of the questions you may have regarding your benefits according to the terms of the ESOP. If this SPD does not answer all your questions, please contact the Company, who serves as Administrator of the ESOP. You will find the contact data for the Company in ARTICLE XIV, *General Information About the Radiance ESOP*.

This SPD describes the ESOP's benefits and obligations as contained in the Plan document, which governs the operation of the ESOP. The Plan document is written in much more technical and precise language. If the non-technical language in this SPD and the technical language of the Plan document conflict, the Plan document always governs.

This SPD describes the current provisions of the ESOP, as designed to comply with applicable legal requirements. The ESOP is subject to federal laws, such as ERISA, which is the Employee Retirement Income Security Act of 1974, as amended, the Internal Revenue Code or IRC, and other federal and state laws which may affect your rights. The provisions of the ESOP are subject to revision due to a change in laws or due to pronouncements by the Internal Revenue Service, or IRS or the Department of Labor, referred to as the DOL. Radiance may also amend or terminate this ESOP. If the provisions of the ESOP that are described in this SPD change, the Company will notify you.

# ARTICLE I
## THE RADIANCE ESOP AND ITS PURPOSE

### What is the purpose of the ESOP and generally how does it work?

The ESOP is a retirement plan designed to invest primarily in the stock of the Company. The ESOP trustee holds the stock on your behalf in a tax-qualified trust.

The purpose of the ESOP is to enable you to participate in the growth and prosperity of the Company. Your efforts, added to the efforts of all other participants, contribute to the profitability and growth of the Company, which means when the value of company stock increases, your retirement benefit increases. If Radiance is successful, and does well, you will share in this success.

When your employment with Radiance ends, you will receive a distribution of the shares of company stock held in your ESOP account which will immediately be 'put' or sold to the Company at the then-current fair market value. Cash held in your ESOP account will be distributed in cash.

# ARTICLE II
## ELIGIBILITY, ENTRY AND PARTICIPATION

### Is the Plan Year for the ESOP the same as it is for the 401(k) Profit Sharing Plan?

Yes, the Plan Year for the ESOP begins January 1 and ends December 31, which is the same as the Radiance Technologies, Inc. 401(k) Profit Sharing Plan (the "401(k) Plan").

### When am I eligible to participate in the ESOP?

Prior to January 1, 2022, you are eligible to participate in the ESOP on your date of hire or age 21, if later, provided you are not an "Excluded Employee" (as defined below). Beginning as of January 1, 2022, you are eligible to participate in the ESOP on your date of hire, provided you are not an Excluded Employee.

### Who are Excluded Employees under the terms of the ESOP?

The following are Excluded Employees and are not eligible to participate in the ESOP:

- Represented by a bargaining unit that has bargained with us in good faith on the subject of retirement benefits
- A nonresident alien with no U.S. income or all such income is exempt from U.S. income tax
- A leased employee
- An individual who is considered an independent contractor or an employee of an independent contractor who is later determined by the IRS to be an employee of ours.

If you are an acquired employee, you may be excluded from the plan for a period of time, as determined by us and in accordance with requirements of the Internal Revenue Code. You are an acquired employee if we purchased the assets of a company (or any similar transaction), and you worked for that company before the purchase and were hired by us at the time we purchased such assets. This exclusion will only apply during the transition period (the period beginning on the date of the transaction and ending on the last day of the next plan year following the date of the transaction) or an earlier date as required by law or as elected by us.

**When do I get into the ESOP?**

You enter the plan on the day you meet the eligibility requirements described above.

**What happens if I was in the ESOP, left employment and am now rehired?**

You are eligible to participate in the ESOP on your rehire date, provided you are not an Excluded Employee. However, special rules may apply with respect to credit for vesting and the restoration of forfeitures. See ARTICLE VII, *Vesting*.

<div align="center">

**ARTICLE III**
**CONTRIBUTIONS**

</div>

**How much does Radiance contribute to the ESOP?**

Each year the Board of Directors approves the amount Radiance contributes to the ESOP, based on recommendations presented by the management team. The annual contribution amount is a discretionary contribution because it may vary, depending on the financial performance of the Company, in addition to other factors, such as the percent of pay the Company targets to deliver to participants in total between the ESOP and the 401(k) Plan.

**What requirements do I have to meet to receive the discretionary contribution?**

To receive the discretionary contribution, you are required to meet a service and employment requirement each Plan Year: (1) you must be credited with at least 1,000 Hours of Service, and (2) you must be employed on the last day of the Plan Year.

**What is an Hour of Service?**

An Hour of Service is generally an hour you are paid or entitled to be paid. You are credited with an Hour of Service for each hour that Radiance:

1. directly or indirectly compensates you for the performance of duties during the Plan Year;
2. compensates you directly or indirectly for reasons other than performance of duties (such as vacation, holidays, sickness, disability, lay-off, military duty, jury duty or leave of absence during the Plan Year); and
3. agrees to pay you for back pay or you are awarded to be paid.

The computation for crediting hour of service related to numbers 2 and 3 above are determined by the Department of Labor regulations and the terms of any award /or settlement agreement.

**Are there any exceptions to the requirements for receiving part of the company contribution to the ESOP?**

Yes. If your employment ended due to retirement on or after age 65, death, or permanent disability, you would be eligible to share in the contribution for the year your employment ended, without regard to whether you satisfied the 1,000 Hours of Service or last day requirements described above.

**How is my part of the contribution Radiance makes to the ESOP determined?**

The formula for allocating or dividing the ESOP contribution among all ESOP participants who meet the 1,000 Hours of Service and last day requirements is calculated based on your eligible compensation. The

contributions typically made by the Company are targeted to result in your share of the contribution equaling a specified percentage of your eligible compensation for the Plan Year.

In addition to the company contributions made to your account, your account will be credited annually with a share of the investment earnings or losses of the ESOP Trust.

Your ownership rights in these contributions will vest in accordance with the vesting schedule that is explained further in ARTICLE VII, *Vesting*.

**What happens if a dividend is payable on the company stock held in my account?**

Radiance will determine how cash dividends, if any, are paid on the shares of company stock held in your ESOP account. The Company will choose from the following alternatives:

a. The dividends paid to the ESOP are credited to your other investments cash account based on the number of shares of company stock held in your ESOP account as of the record date of the dividends. If the trustee reinvests the cash dividends in shares of company stock, the fair market value of the stock must not be less than the value of the cash dividend.

b. If the ESOP has an outstanding loan due to the purchase of additional shares of company stock, cash dividends paid on company stock in your account may be used to repay the ESOP loan. The ESOP trustee would exchange the dividends in your account for shares of stock with a fair market value that is at least equal to the cash dividends used to repay the ESOP loan. However, an ESOP loan may only be repaid with dividends paid on shares purchased with that loan.

**What compensation is used to determine my part of the ESOP contribution each year?**

Compensation is generally defined as your total compensation that is subject to income tax, that is, all of your compensation paid to you by us during a Plan Year. However, the following adjustments to Compensation will be made by:

- including your salary reduction contributions to any plan or arrangement maintained by your Employer;
- including wage continuation payments (referred to as differential pay) for qualified service in the military;
- excluding all Compensation paid after you terminate employment with the Employer, other than regular compensation for services, and effective as of January 1, 2022, unused leave, provided that such amounts would have been paid to you if you had continued employment and they are actually paid within the later of 2½ months after your termination or the end of the Plan Year in which you terminate;
- excluding bonuses and overtime;
- excluding, effective as of March 1, 2021, reimbursements or other expense allowances, fringe benefits (cash and noncash), moving expenses, deferred compensation, and welfare benefits;
- excluding post and cost of living allowances in accordance with Department of State standardized regulations
- excluding group term life insurance; and
- excluding, effective as of January 1, 2022, amounts paid to you or on your behalf to reduce or offset student loan repayment obligations.

**Is there a limit on the amount of eligible compensation which can be considered for my ESOP contribution?**

Yes. The IRS limits the amount of annual compensation that may be considered as eligible for determining pre-tax retirement contributions. The limit for 2021 is $290,000. Every year the IRS evaluates this limit and decides if a cost-of-living adjustment is warranted.

**Is there a limit on how much can be contributed to my ESOP account each year?**

Yes. There is a maximum limit on the amount of all pre-tax contributions you may receive in a Plan Year. This limit applies to all contributions Radiance makes on your behalf to the ESOP and to the 401(k) Plan, in addition to the amounts you defer pre-tax, to the 401(k) Plan. These limits do not include earnings on your accounts, catch-up contributions, or any transfers you make from one plan to another. For 2021, the limits are as follows:

- you may defer, pre-tax, up to $19,500 to the 401(k) Plan;
- if you are age 50 or older, you are allowed an additional $6,000 catch-up contribution; and
- the total amount you and Radiance may contribute to your accounts in the 401(k) Plan and ESOP is limited to the lesser of $58,000 or 100 percent of your annual compensation.

These limits may increase periodically for cost-of-living adjustments.

# ARTICLE IV
# PRIOR TRANSFERS UNDER THE TERMS OF THE 401(K) TRANSFER ELECTION

**What is the 401(k) Transfer Election?**

Radiance previously offered eligible employees a limited opportunity to elect to transfer all or a portion of their balances in the 401(k) Plan to the ESOP, subject to certain limitations. The amounts transferred pursuant to the 401(k) plan transfer election are subject to special rules, as described in this Article of the SPD.

**How is my Transfer Account be treated under the ESOP?**

The shares of Radiance stock purchased with funds transferred from the 401(k) Plan are held in your ESOP Transfer Account and will always be fully vested. The Transfer Account is subject to the provisions of the ESOP, except for several special provisions that will be explained in the next question of this SPD. Your current beneficiary designation for the ESOP applies to your Transfer Account.

**What special rules apply only to my Transfer Account in the ESOP?**

The special rules that apply only to your Transfer Account include two in-service withdrawal features, and a special diversification feature. A description of each of these features follows.

Hardship Withdrawal. You may request the cash value of up to 100 percent of your Transfer Account for the hardship purposes defined below. This hardship distribution will reduce the value of your ESOP account, will be taxable, and subject to early withdrawal penalties, if applicable.

A hardship is allowed only because an immediate and heavy financial need, in the event of one of the following reasons:

- expenses for medical care that would be tax-deductible (without regard to whether the expenses exceed the stated limit on adjusted gross income);

- costs directly related to the purchase of, eviction from, or to stop foreclosure on your primary residence, and expenses for the repair of damage to your primary residence attributed to a federally declared disaster area, that would be tax-deductible (without regard to whether the expenses exceed the stated limit on adjusted gross income);
- tuition, related educational fees, and room and board expenses for up to the next 12 months of post-secondary education for yourself, your spouse or your dependent (as defined in the 401(k) Plan);
- payments for burial or funeral expenses for your parent, spouse, children or other dependents (as defined in the 401(k) Plan; or
- other financial needs as determined by the IRS.

You must have exhausted all other options available to you (including taking a withdrawal from your 401(k) Plan balance) before applying for a hardship withdrawal from the ESOP.

At age $59^{1}/_{2}$. While still employed, at or after age $59^{1}/_{2}$, you may request a distribution of the value of the shares of company stock held in your Transfer Account. This distribution will be subject to taxes, and will reduce the value of your ESOP account.

Special Diversification. Beginning in 2024, you may have the right to diversify up to 10% of the shares of company stock held in your Transfer Account. See ARTICLE V, *Diversification* for more details about the special diversification feature.

## ARTICLE V
## DIVERSIFICATION

### When may I diversify my account balance?

During your employment with Radiance, there are two ways you may diversify the investment of your ESOP account out of shares of Company stock:

Legally Required Diversification. For five years following attainment of age 55 and 10 years of participation in the ESOP you may elect to diversify up to 25 percent of the shares of company stock in your ESOP account, provided that the fair market value of your ESOP account is at least $500. In the sixth and final year, you may elect up to 50 percent. If you make this election, the Administrator will either (i) offer alternative investment options in the ESOP in which you may invest cash you receive for your shares (ii) distribute cash to you equal to the value of your shares; (iii) distribute your shares to you subject to the immediate put requirement; or (iv) liquidate your shares and transfer the cash received to your 401(k) Plan account or another plan that accepts such transfers. The amount available for diversification is calculated on a cumulative basis and includes shares of company stock previously diversified. The election period begins immediately after the end of each Plan Year and ends 90 days after the value of company stock has been determined for that Plan Year. For an example of the cumulative calculation, see Example B.

### EXAMPLE B:

| YEAR ONE | |
|---|---|
| 2021 ESOP ending balance | 10,000 |
| Multiplied by 25 percent | x 25% |
| Eligible diversification in 2022 | 2,500 |
| You elect to diversify less than the full 25 percent | - 1,000 |

|  | 9,000 |
|---|---|
| **YEAR TWO** |  |
| 2022 ESOP ending balance (assumes 300 shares contributed) | 9,300 |
| Add back shares diversified in 2022 | + 1,000 |
| Total shares to compute diversification calculation | 10,300 |
| Multiplied by 25 percent | 2,575 |
| Less shares previously diversified | - 1,000 |
| Eligible diversification in 2023 | 1,575 |
| You elect to diversify | - 1575 |
|  | 7,725 |
| **YEAR THREE -** You would be able to diversify only 25 percent of shares contributed in 2023 | |

<u>Special Diversification Feature</u>. Beginning with the 2024 Plan Year, an election period will be announced during which you may elect to diversify up to 10% of your Transfer Account. If you have a Transfer Account balance, this special diversification is available to you, regardless of whether you are eligible for the legally required diversification described above. Your special diversification election, if made, will be effective by the end of the Plan Year and will be based on the most recent valuation period preceding the election period. Your election may be limited if the Company does not hold enough cash to satisfy all the elections or the elections are restricted by an arrangement with the Company's creditors. You may elect to receive a distribution of the amounts you diversify or have the amounts transferred to the 401(k) Plan. If you are eligible for both the legally required and the special diversification, you will be able to diversify the greater of the two amounts. You will receive diversification notices when you are eligible, to apprise you of the amounts you are eligible to diversify, and the dates of the election period.

## ARTICLE VI
## VOTING

### May I vote company stock held in my account?

You or your beneficiary have the right to direct the ESOP Trustee how to vote the shares of Radiance stock allocated to your ESOP account on all shareholder issues. The ESOP Trustee will generally follow your direction, except if doing so would cause it to violate its duties under ERISA. The ESOP Trustee will vote in its discretion any shares of company stock for which it does not receive direction in a timely manner.

## ARTICLE VII
## VESTING

### What is my vested interest in my ESOP account?

Vesting is based on your years of service with Radiance, and only applies to your account in certain circumstances. Following are the exceptions to the ESOP vesting schedule:

- The shares purchased with 401(k) transfers and held in the Transfer Account are always 100% vested;

7

- If you completed one Hour of Service on or before December 31, 2013, you are 100% vested in all the shares and cash held in your ESOP account;
- If you are age 65 or older (Normal Retirement Age), or if you die, or become permanently disabled while employed you are 100% vested in all shares and cash held in your ESOP account.
- In all other circumstances, your vested percentage in your account is determined under the following schedule(s) and is based on vesting that is determined by Years of Service. This means at the time your employment ends; your Company Contribution Account is multiplied by your vested percentage. The result is the value of your vested benefit, which is the value you will be paid from the ESOP. The vested percentage applicable to the Company Contribution Account is determined under the following schedule.

### Vesting Schedule for Company Contribution Account

| Years of Service | Percentage |
|---|---|
| 1 Year of Service | 30 % |
| 2 Years of Service | 60 % |
| 3 Years of Service | 100 % |

Your vested benefit will normally be distributed to you or your beneficiary upon your death, disability or retirement, or if your employment ends for any other reason.

## How do I determine my Years of Service for vesting purposes?

To earn a Year of Service, you must be credited with at least 1,000 Hours of Service during a Plan Year.

## Does all my service count for vesting purposes?

In calculating your vested percentage, all service is generally counted. However, there are some exceptions to this general rule.

Break in Service Rules. If your employment ends and you are rehired, you may lose credit for prior service under the ESOP's break in service rules.

Break in Service for Vesting Purposes. You have a break in service if you complete less than 501 Hours of Service during a Plan Year. You may be credited with 501 Hours of Service to prevent a break in service for approved leaves of absence.

## What happens to my unvested account balance if I take a distribution and am later rehired?

If you were partially vested in your account balance when you left, the unvested portion of your account balance will be forfeited on the earlier of: (i) the distribution of your entire vested account balance; or (ii) when you have incurred five consecutive 1-Year Breaks in Service.

If you had no vested percentage in your account balance when you left, your account balance was forfeited. However, if you return to service with us before incurring 5 consecutive 1-Year Breaks in Service, your account balance as of the date your employment ended will be restored, unadjusted for any gains or losses.

If you previously received a distribution of your entire vested account balance, and you are reemployed prior to incurring 5 consecutive 1-Year Breaks in Service, you may repay this distribution. If you repay the entire amount of the distribution, we will restore your account balance with your forfeited amount. You must repay this distribution within five years from your date of reemployment, or, if earlier, before you

incur 5 consecutive 1-Year Breaks in Service. If you were fully vested when you left, you do not have the opportunity to repay your distribution.

**What happens to the unvested amount of my ESOP balance when my employment ends and I take a distribution of my vested balance?**

Your unvested balance remains in the ESOP and is referred to as a forfeiture. Forfeitures may be used to reinstate previously forfeited amounts, to reduce company contributions (including corrective contributions), or to pay plan expenses. Any remaining Forfeitures are reallocated among the accounts of active participants in the ESOP in the same manner as company contributions are allocated.

**What happens if I am called to active military duty?**

If you are a veteran and are reemployed under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERAA), your qualified military service may be considered service with the Company. There may also be benefits for employees who die or become disabled while on active duty or who receive wage continuation payments while in the military.

## ARTICLE VIII
## DISABILITY AND DEATH BENEFITS

**How is disability defined?**

Under the terms of the ESOP, you will be considered disabled if you have a physical or mental condition resulting from bodily injury, disease, or mental disorder which renders you incapable of continuing any gainful occupation and which condition constitutes total disability under the federal Social Security Acts. You will also be considered disabled if you are determined by the insurance carrier for a long-term disability plan maintained by Radiance to be eligible for benefits under such plan.

**What happens if I become disabled while working for the Company?**

If you become disabled while working for Radiance, your ESOP account will become 100% vested, and you will be entitled to receive your pro rata share of the ESOP contribution for the year you are considered totally disabled. Your ESOP account balance will be paid to you as described in Article IX.

**What happens if I die while working for the Company?**

If you die while working for Radiance, your ESOP account will become 100% vested, and your account will be credited with the pro rata share of your ESOP contribution for the year in which you die. Your ESOP account balance will be paid to you as described in Article IX.

**What happens if I am a participant, terminate employment, and die before receiving my benefits?**

If you terminate employment with us and subsequently die, your beneficiary will be entitled to the vested percentage of your remaining account balance at the time of your death.

**Who is the beneficiary of my death benefit?**

You need to name the person who will receive any death benefit if you die before retirement. To name your ESOP beneficiary, login at www.myesopdashboard.com. Once logged in, you have 3 options to submit your beneficiary designation: Under the "Forms" tab 1) click on the Downloadable Form then print,

complete and upload it; 2) upload a pre-existing completed Beneficiary Form; or 3) click on the Online Form to complete and submit online.

If you are not married, you may designate any beneficiary you choose. If you are married, at the time of your death, your spouse will be the beneficiary of the death benefit, unless you made an election to change your beneficiary.

TO DESIGNATE A BENEFICIARY OTHER THAN YOUR SPOUSE, YOUR SPOUSE MUST IRREVOCABLY CONSENT TO WAIVE ANY RIGHT TO THE DEATH BENEFIT. YOUR SPOUSE'S CONSENT MUST BE IN WRITING, BE WITNESSED BY A NOTARY OR AN ESOP REPRESENTATIVE, ACKNOWLEDGING SPECIFICALLY THE NON-SPOUSE BENEFICIARY.

If at the time of your death, the beneficiary you designated is not alive, or you do not have a valid beneficiary designation on file, the entire value of your ESOP account will be paid to the following, in order of priority:

- your surviving spouse;
- your children, including adopted children, per stirpes;
- your surviving parents, in equal shares; or
- your estate.

# ARTICLE IX
# TIMING AND FORM OF DISTRIBUTION

## When and how will the value of my ESOP account be paid?

If your employment terminates because of your death, disability, or retirement, your vested ESOP account will begin to be paid in the Plan Year following the Plan Year in which you terminated. If your employment terminates for any other reason, your vested ESOP account will begin to be paid no later than the end of the fifth Plan Year following the Plan Year in which you terminated. Notwithstanding the foregoing, the ESOP distribution policy (as revised by Radiance) may provide for payments to begin earlier.

The value of your vested ESOP account will be paid in annual installment payments over a period not longer than the greater of 5 years, provided that if you have an account balance in excess of $1,165,000 (as adjusted), the period is 5 years plus 1 additional year (but not more than 5 additional years) for each $210,000 (as adjusted) or fraction thereof by which such balance exceeds $1,070,000 (as adjusted). Notwithstanding the foregoing, the ESOP distribution policy (as revised by Radiance) may provide for payments to be made over a shorter period, including as a lump sum, may set thresholds under which payments will be made in a lump sum, and may set minimum installment amounts.

As long as Radiance elects to be treated as an S corporation for tax purposes, the Company will determine if the vested value of the shares in your ESOP account will be distributed in cash or in the form of whole and fractional shares of company stock, provided that you will be required to immediately "put" or sell the shares to Radiance at the then-current fair market value. The vested value of any cash invested in your account will be distributed in the form of cash.

If the total value of your vested ESOP balance is greater than $1,000, you must consent to the distribution of your ESOP account. If the total value of your vested ESOP balance is less than or equal to $1,000, a distribution will automatically be made to you as soon as administratively feasible, regardless of whether you elect to receive it.

**May I delay taking a distribution of my ESOP account?**

If the vested value of your ESOP account is greater than $1,000, you are not required to take a distribution until you reach age 65, which is Normal Retirement Age, or retire, if later. Radiance no longer needs your consent to distribute to you the vested value of your ESOP account once you reach Normal Retirement Age.

Until that time, if you are no longer employed, and if the vested value of your ESOP account is greater than $1,000 and you do not request a distribution from the ESOP, the ESOP trustee may exchange the distributable shares of Radiance stock in your account for cash at the then-current fair market value (provided that Radiance does not first redeem your distributable shares), and transfer the cash to an account in your name in the Radiance 401(k) Plan, where you may direct the investment of the cash and take a distribution at any time. The transferred amounts will generally be treated as Discretionary Contributions under the Radiance 401(k) Plan and will be eligible for in-service withdrawals and loans. However, any transferred amounts that are unvested will continue to be subject to the ESOP's vesting schedule and may be forfeited.

In addition, if you are a five percent owner, you are required to begin taking a distribution of your account not later than the April 1st following the end of the year in which you reach age 72 (or 70½ if you reach age 70½ before January 1, 2020). If you are not a five percent owner, you are required to begin taking a distribution of your account not later than the April 1st in which you reach age 72 (or 70½ if you reach age 70½ before January 1, 2020) or retire, whichever is later.

# ARTICLE X
# TAX TREATMENT OF DISTRIBUTIONS

**What are my tax consequences when I receive a distribution from the ESOP?**

Unless you elect to roll over the amount of your ESOP distribution, generally the full amount will be included in your taxable income for the year in which you receive the distribution. The tax treatment may also depend on your age when you receive the distribution. If you are under age $59^{1}/_{2}$ at the time of the distribution, you may be subject to a 10-percent early withdrawal penalty.

**May I elect to reduce or defer tax on my distribution?**

You may reduce, or defer entirely, the tax due on your distribution through use of one of the following methods:

1. While making your distribution election, you have the option of requesting a direct rollover of all or a portion of your distribution to an IRA, annuity, or another tax-qualified retirement plan willing to accept the transfer. No tax will be due until you withdraw funds from your rollover account.
2. If you do not choose a direct rollover while making your distribution election, you have 60 days from the date that appears on the distribution check or wire to your account to roll the funds over to an IRA, annuity, or another tax-qualified retirement plan. You will not pay taxes on the amount rolled over until you begin withdrawing funds from your rollover account.

WHENEVER YOU RECEIVE A DISTRIBUTION, THE ESOP RECORD KEEPER WILL DELIVER TO YOU A MORE DETAILED EXPLANATION OF THESE OPTIONS. HOWEVER, THE RULES WHICH DETERMINE WHETHER YOU QUALIFY FOR FAVORABLE TAX TREATMENT ARE VERY COMPLEX. YOU SHOULD CONSULT WITH A QUALIFIED TAX ADVISOR BEFORE MAKING A CHOICE.

# ARTICLE XI
# TOP-HEAVY RULES

## What is a top-heavy ESOP?

Any retirement plan that primarily benefits key employees, who are certain owners or officers of the Company, is called a top-heavy ESOP. The ESOP will generally be considered top-heavy when more than 60 percent of the value of the ESOP is held by key employees. Each year, during the administration process, a test is performed to determine if the ESOP is top heavy.

## What happens if the ESOP becomes top-heavy?

If in any Plan Year, the ESOP is determined to be top-heavy, Radiance will be required to contribute to the non-key employees to provide them with at least the minimum benefit provided to key employees in that Plan Year.

# ARTICLE XII
# PROTECTED BENEFITS AND CLAIMS PROCEDURES

## Is my benefit protected?

As a rule, your vested and unvested interests in your account may not be sold, used as collateral for a loan, given away or otherwise transferred. In addition, your creditors may not attach, garnish or otherwise interfere with your account.

## Are there any exceptions to the general rule?

There are two exceptions to this general rule. The first exception is Radiance must honor a qualified domestic relations order, which is often referred to as a QDRO. A QDRO is a decree or order issued by a court that obligates you to pay child support or alimony, or otherwise allocates a portion of your assets in the ESOP to your spouse, former spouse, child or other dependent. Upon receipt of a QDRO, the Company will determine the validity of the order and determine if all or a portion of your benefits may be used to satisfy the obligation. You and your beneficiary may obtain from the Company, without charge, a copy of the Qualified Domestic Relations Order Procedure.

The second exception applies if you are involved with the administration of the ESOP. If you are found liable for any action that adversely affects the ESOP, the Company can offset your benefits by the amount you are ordered or required by a court to pay the Plan. All or a portion of your benefits may be used to satisfy any such obligation to the Plan.

## Can the ESOP be amended?

Yes. Radiance has the right to amend the ESOP at any time. In no event, however, will any amendment authorize or permit any part of the ESOP assets to be used for purposes other than the exclusive benefit of participants or their beneficiaries. Additionally, no amendment will cause any reduction in the amount credited to your account.

## What happens if the ESOP is discontinued or terminated?

Although the Company intends to maintain the ESOP indefinitely, Radiance reserves the right to terminate the ESOP at any time. Upon termination, no further contributions will be made to the ESOP and all amounts

credited to your accounts will become 100 percent vested. In the event of a termination, Radiance will direct the distribution of your accounts in a manner permitted according to the terms of the ESOP as soon as practicable. You will be notified of any modification or termination of the ESOP.

## How do I submit a claim for ESOP benefits?

Benefits will be paid to you and your beneficiary without the necessity of formal claims. However, if you think an error has been made in determining your benefits, you or your beneficiary may make a request for any ESOP benefits to which you believe you are entitled. Any such request should be in writing and should be made to Radiance, as Plan Administrator.

If the Company determines the claim is valid, you will receive a statement describing the amount of benefit, the method or methods of payment, the timing of distributions, and other information relevant to the payment of the benefit.

## What if my benefits are denied?

Your request for ESOP benefits will be considered a claim, and it will be subject to a full and fair review. If your claim is wholly or partially denied, the Company will provide you with a written or electronic notification of the Company's adverse determination. This written or electronic notification must be provided to you within a reasonable period, but not later than 90 days after the receipt of your claim, unless the Company determines special circumstances require an extension of time for processing your claim. If an extension of time for processing is required, written notice of the extension will be furnished to you prior to the termination of the initial 90-day period. In no event will an extension exceed 90 days from the end of the initial period. The extension notice will indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the benefit determination.

The Company's written or electronic notification of any adverse benefit determination must contain the following information:

- The specific reason or reasons for the adverse determination;
- Reference to the specific ESOP provisions on which the determination is based.
- A description of any additional material or information necessary for you to perfect the claim and an explanation of why such material or information is necessary.
- Appropriate information as to the steps to be taken if you or your beneficiary want to submit your claim for review.

If your claim has been denied, and you want to submit your claim for review, you must follow the Claims Review Procedure in the next question.

## What is the Claims Review Procedure?

Upon the denial of your claim for benefits, you may file your claim for review, in writing, with the Company. Following are the terms related to your filing:

- you must file the claim no later than 60 days after you have received written notification of the denial of your claim for benefits;
- you may submit written comments, documents, records, and other information relating to your claim for benefits;
- you may review all pertinent documents relating to the denial of your claim and submit any issues and comments, in writing, to the Company;
- upon request and free of charge, you must be provided reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits;

13

- full and fair review, considering all documents, records, and other information you submitted relating to your claim, must be considered, without regard to whether such information was submitted or considered in the initial benefit determination.

Radiance will provide you with written or electronic notification of the Plan's benefit determination on review. This notification of this denial must be provided 60 days after the Company receives your written claim, unless the Company determines that special circumstances require an extension of time for processing your claim; written notice of the extension will be furnished to you prior to the termination of the initial 60-day period. In no event will such extension exceed a period of 60 days from the end of the initial period. The extension notice will indicate the special circumstances requiring an extension of time and the date by which the Plan expects to render the determination on review. In the case of an adverse benefit determination, the notification will set forth:

- The specific reason or reasons for the adverse determination.
- Reference to the specific ESOP provisions on which the benefit determination is based.
- A statement that you are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your claim for benefits.

If you have a claim for benefits which is denied, you may file suit in a state or Federal court. However, to do so, you must file the suit no later than 180 days after the Company makes a final determination to deny your claim.

## What are my rights as an ESOP participant?

As a participant in the ESOP, you are entitled to certain rights and protections under ERISA. These rights include the following:

- To examine, without charge, at the Company's office and at other specified locations, all documents governing the ESOP, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the ESOP with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration;
- To obtain, upon written request to the Company, copies of documents governing the operation of the ESOP, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary ESOP description. The Company may make a reasonable charge for the copies;
- To receive a summary of the ESOP's annual financial report, which the Company is required by law to furnish to each participant; and
- To obtain a statement telling you whether you have a right to receive a pension at Normal Retirement Age and, if so, what your benefits would be at Normal Retirement Age if you stop working under the ESOP now. If you do not have a right to a pension benefit, the statement will tell you how many years you must work to get a right to a pension. THIS STATEMENT MUST BE REQUESTED IN WRITING AND IS NOT REQUIRED TO BE GIVEN MORE THAN ONCE EVERY TWELVE (12) MONTHS.

The Plan must provide this statement free of charge. In addition to creating rights for ESOP participants, ERISA imposes duties upon the people who are responsible for the operation of the ESOP. The people who operate your ESOP, called fiduciaries of the ESOP, have a duty to do so prudently and in the interest of you and other ESOP participants and beneficiary. No one, including your Company or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a pension benefit or exercising your rights under ERISA.

If your claim for a pension benefit is denied or ignored in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of ESOP documents or the latest annual report from the ESOP and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Administrator to provide the materials and pay you up to $110.00 a day until you receive the materials, unless the materials were not sent because of reasons beyond the Company's control.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the ESOP's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in Federal court. You and your beneficiary can obtain, without charge, a copy of the qualified domestic relations order ("QDRO") procedures from the Company.

If the ESOP's fiduciaries misuse the ESOP's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees if, for example, it finds your claim is frivolous.

### What can I do if I have questions or my rights are violated?

If you have any questions about the ESOP, you should contact Radiance, the Administrator of the Plan. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Company, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in the telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

<center>

**ARTICLE XIII**
**ESOP EXPENSES**

</center>

The ESOP permits the payment of ESOP expenses to be made from the ESOP's assets. In the event expenses are paid from the ESOP's assets, the expenses will generally be allocated among the accounts of all participants in the ESOP. These expenses will be allocated either proportionately based on the value of the account balances or as an equal dollar amount based on the number of participants in the ESOP. The method of allocating the expenses depends on the nature of the expense itself. For example, certain administrative (or recordkeeping) expenses would typically be allocated proportionately to each participant. If the ESOP pays $1,000 in expenses and there are 100 participants, your account balance would be charged $10 ($1,000/100) of the expense.

## ARTICLE XIV
## GENERAL INFORMATION ABOUT THE RADIANCE ESOP

There is certain general information that you may need to know about the ESOP. This information has been summarized for you below.

### General ESOP Information

The full name of the ESOP is the Radiance Technologies, Inc. Employee Stock Ownership Plan, and its assigned Plan Number is 003.

Contributions made to the ESOP will be held and invested by the ESOP Trustee.

The ESOP's records are maintained on a Plan Year that begins on January 1 and ends on December 31, however, for purposes of paying distributions, the stock held by the ESOP is valued on a semi-annual basis, as of June 30 and December 31 each year.

To the extent not governed by federal law, the Plan and Trust will be governed by the laws of Alabama.

Benefits provided by the ESOP are NOT insured by the Pension Benefit Guaranty Corporation under Title IV of ERISA, because the insurance provisions under ERISA are not applicable to ESOPs.

### Company Information

Your Company's name, address and identification number are:

> Radiance Technologies, Inc.
> 310 Bob Heath Drive
> Huntsville, Alabama 35806
> 63-1204084

The ESOP allows other companies to adopt its provisions. You or your beneficiary may examine or obtain a complete list of companies, if any, who have adopted the ESOP by making a written request to the Administrator.

### Administrator Information

The Company, as Administrator is responsible for the day-to-day administration and operation of the ESOP. For example, the Company maintains the records for the ESOP, including your account information, provides you with the forms you need to complete during your participation, and directs the payment of your account at the appropriate time.

If you have any questions about the ESOP and your participation in the Plan or wish to review the formal Plan document and certain other materials related to the ESOP you should contact Human Resources, who has been designated by the Company to perform some of the duties of Administrator.

The Company has the complete power, in its sole discretion, to determine all questions relating to the administration, interpretation, and application of the ESOP (and any related documents and underlying policies), and such determination is conclusive and binding upon all persons.

16

The name, address and business telephone number for contacting the Company as Administrator of the ESOP is below:

> Radiance Technologies, Inc.
> 310 Bob Heath Drive
> Huntsville, Alabama 35806
> 256-704-3400

## Trustee Information

All money that is contributed to the ESOP is held in a trust fund. The Trustee is responsible for the safekeeping of the trust fund. The assets of the trust will accumulate in the trust fund until distributed to you when eligible.

The name and address for the ESOP Trustee is:

> Argent Trust Company
> 1100 Abernathy Road
> 500 NorthPark, Suite 550
> Atlanta, GA 30328

## Service of Legal Process

Radiance is the ESOP's agent for service of legal process.

Service of legal process may also be made upon the Trustee.

# EXHIBIT 10

# RADIANCE TECHNOLOGIES, INC.
# EMPLOYEE STOCK OWNERSHIP TRUST

# TABLE OF CONTENTS

Page

ARTICLE I NAME.................................................................................................................... 1

ARTICLE II MANAGEMENT AND CONTROL OF TRUST ASSETS .................................. 2

    2.1    The Trust............................................................................................................. 2
    2.2    Responsibility of Trustee. ................................................................................. 2
    2.3    General Powers. ................................................................................................ 2
    2.4    Compensation and Expenses............................................................................. 6
    2.5    Exercise of Trustee Duties. .............................................................................. 6
    2.6    Plan Administration. ......................................................................................... 7
    2.7    Continuation of Powers upon Trust Termination. ........................................... 7

ARTICLE III PROVISIONS RELATED TO INVESTMENT IN COMPANY STOCK............ 7

    3.1    Investment of Cash. .......................................................................................... 7
    3.2    Stock Dividends, Splits and Other Capital Reorganizations. ......................... 8
    3.3    Voting of Shares and Tender or Exchange Offers. .......................................... 8
    3.4    Put Option. ........................................................................................................ 9

ARTICLE IV MISCELLANEOUS ........................................................................................... 10

    4.1    Disagreement as to Acts................................................................................... 10
    4.2    Persons Dealing with Trustee. ......................................................................... 10
    4.3    Benefits May Not Be Assigned or Alienated................................................... 10
    4.4    Evidence............................................................................................................ 10
    4.5    Waiver of Notice. ............................................................................................. 10
    4.6    Counterparts. .................................................................................................... 10
    4.7    Governing Laws and Severability.................................................................... 11
    4.8    Successors. ........................................................................................................ 11
    4.9    Action by the Administrator or the Company. ................................................ 11
    4.10   Action by Multiple Trustees. ........................................................................... 11
    4.11   Conformance with Plan.................................................................................... 11
    4.12   Headings; Gender and Number........................................................................ 12
    4.13   Written Directions. .......................................................................................... 12

ARTICLE V NO REVERSION TO COMPANY ..................................................................... 12

ARTICLE VI CHANGE OF TRUSTEE ................................................................................... 12

    6.1    Resignation. ...................................................................................................... 12
    6.2    Removal of the Trustee. ................................................................................... 13
    6.3    Duties of Resigning or Removed Trustee and of Successor Trustee................ 13
    6.4    Filling Trustee Vacancy. .................................................................................. 13

ARTICLE VII ADDITIONAL EMPLOYERS .......................................................................... 14

ARTICLE VIII AMENDMENT AND TERMINATION .......................................................... 14

    8.1    Amendment....................................................................................................... 14
    8.2    Termination....................................................................................................... 14

i

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE IX INDEMNIFICATION AND DEFENSE OF ACTIONS .......................................... 15

    9.1    Indemnification. ..................................................................................................... 15

    9.2    Notice and Assumption of Defense. ..................................................................... 16

    9.3    Reimbursement of Expenses. ................................................................................ 16

    9.4    Governmental Investigations. ............................................................................... 16

    9.5    Limitation. ............................................................................................................. 17

    9.6    Other Agreements. ................................................................................................ 17

ii

## RADIANCE TECHNOLOGIES, INC.
## EMPLOYEE STOCK OWNERSHIP TRUST

**THIS TRUST AGREEMENT** (the "Trust Agreement") is made and entered into as of September 5, 2017, by and between  Radiance Technologies, Inc., an Alabama corporation (the "Company"), and Argent Trust Company, as successor trustee (the "Trustee").

### WITNESSETH THAT:

**WHEREAS**, the Company has established the Radiance Technologies, Inc. Employee Stock Ownership Plan (the "Plan") and established the Radiance Technologies, Inc. Employee Stock Ownership Trust (the "Trust") to implement and form a part of the Plan;

**WHEREAS**, the Plan is a stock bonus plan qualified under section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code") which is designed to invest primarily in shares of common stock of the Company that constitute Qualifying Employer Securities as defined in Code section 409(l) ("Company Stock") and which meets the requirements of Code section 4975(e)(7) and section 407(d)(6) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), applicable to employee stock ownership plans;

**WHEREAS**, the Trust is designed to hold Company Stock, sums of money and other property contributed or transferred from time to time to the Trust, and all income thereon; and

**NOW, THEREFORE, IT IS AGREED**, by and between the parties hereto that the provisions contained herein shall constitute the agreement between the Company and the Trustee in connection with the Plan and Trust; that the Trustee shall hold the Trust assets without distinction between the principal and income thereof; and that the Trustee shall apply the Trust assets, after payment of all necessary expenses, for the exclusive benefit of Plan Participants and their Beneficiaries and in accordance with the provisions of this Trust Agreement;

**IT IS FURTHER AGREED**, that the Trustee hereby accepts appointment as the successor trustee of the Trust pursuant to the terms of this Trust Agreement and agrees to perform the obligations set forth in this Trust Agreement; and

**IT IS FURTHER AGREED,** that all capitalized terms used herein, which are not otherwise defined herein, shall have the meanings given to such terms in the Plan; and

**IT IS FURTHER AGREED**, by and between the parties hereto, as follows:

### ARTICLE I
### NAME

The Trust shall be known as the "Radiance Technologies, Inc. Employee Stock Ownership Trust."

1

## ARTICLE II
## MANAGEMENT AND CONTROL OF TRUST ASSETS

### 2.1    The Trust.

The Trust at any date shall include all property of every kind the Trustee holds hereunder. The Trustee shall administer and invest all contributions the Employers make under the Plan as one Trust. If it becomes necessary to determine the portion of the Trust allocable to each of the employees and former employees of any Employer as of any date, the Administrator shall specify such date as a Valuation Date.

### 2.2    Responsibility of Trustee.

The Trustee shall not be responsible for the adequacy of the Trust to satisfy any liabilities under the Plan or for the proper application of distributions made or other action taken upon the written direction of the Administrator. The duties and powers of the Trustee shall be limited to those set forth in this Trust Agreement, and nothing contained in the Plan, either expressly or by implication, shall be deemed to impose any additional duties on the Trustee.

### 2.3    General Powers.

Subject to the provisions of Sections 2.5 and 2.6 and Article III, the Trustee shall have the following duties, powers and rights, in addition to those provided elsewhere in this Trust Agreement or by law:

(a)    to receive and hold all contributions and distributions or dividends paid to the Trust under the Plan. The Trustee shall have no duty to determine that the contributions, distributions or dividends comply with the provisions of the Plan or with any resolution of the Board of Directors providing therefore;

(b)    as directed by the Administrator, to retain in cash (pending investment and reinvestment) such amount as the Administrator directs the Trustee to retain, and to invest such cash as provided in Section 3.1; provided, however, that pending receipt of directions from the Administrator, the Trustee may retain reasonable amounts of cash, in its discretion, without any liability for interest;

(c)    as directed by the Administrator, to make distributions from the Trust to such persons, in such forms (Company Stock, cash or a combination of both), in such manner and at such times, without inquiring as to whether a payee is entitled to the payment or as to whether a payment is proper, and without liability for a payment made in good faith without actual knowledge of the changed status of the payee. If any payment of benefits the Administrator directs to be made from the Trust is not claimed, the Trustee shall notify the Administrator of that fact within a reasonable period of time. The Trustee shall dispose of such payment as the Administrator shall direct. The Trustee shall have no obligation to ascertain the whereabouts of any payee of benefits from the Trust.

2

(d)     subject to the Plan, to vote any securities, including Company Stock, held in the Trust or otherwise consent to any action on the part of the issuer of such securities, in person, by proxy or power of attorney;

(e)     to contract or otherwise enter into transactions between the Trustee and the Company or any Company shareholder or any other entity or person with respect to the purchase or sale of Company Stock. In the event counsel for the Company determines that Company Stock to be disposed of requires registration under the Securities Act of 1933 and/or qualification of the securities under the Blue Sky laws of any state or states, then the Company, at its own expense, will take or cause to be taken any and all such actions as may be necessary to effect such registration and/or qualification.

(f)     to continue to hold any security including Company Stock;

(g)     to abandon, arbitrate, compromise, contest or settle claims and demands by or against the Trust;

(h)     to begin, defend or maintain any litigation necessary in connection with the administration, investment and reinvestment of the Trust, and, to the extent not paid from the Trust, the Company shall indemnify the Trustee against all expenses and liabilities the Trustee reasonably anticipates or sustains by reason thereof (including reasonable attorneys' fees);

(i)     to retain any funds or property subject to any dispute without liability for the payment of interest, or to decline to make delivery thereof or payment until a court of competent jurisdiction makes a final adjudication;

(j)     to report to the Administrator and the Company as of the last day of each Plan Year (which shall be the same as the Trust's fiscal year), as of any Valuation Date and at such other times as may be required under the Plan, (i) the then "Net Worth" of the Trust; for this purpose, "Net Worth" means the fair market value of all property held in the Trust, reduced by any liabilities of the Trust other than liabilities to Participants and their Beneficiaries, (ii) all investments and earnings and gains thereon, receipts, disbursements and other transactions of the Trust during such periods, and (iii) such other information as the Trustee may possess that the Company advises the Trustee in writing that it requires to comply with ERISA section 103;

(k)     to keep accurate accounts of all such investments and earnings and gains thereon, receipts, disbursements and other transactions and, except with respect to Participant voting records and valuation reports of the independent appraiser (as provided below) prepared for the Trustee in connection with any purchase or sale of Company Stock by the Trust, all such books and records related to such investments shall be open to inspection by any person the Administrator or the Company designates to the Trustee in writing. The Trustee shall keep all accounts of the Trust on an accrual basis. If the U.S. Department of Labor issues regulations under ERISA regarding the valuation of securities or other assets for purposes of the reports ERISA requires, the Trustee shall use such valuation methods for purposes of the accounts described by this subparagraph. The Administrator may approve the Trustee's accounting either by giving written notice of approval to the Trustee or by failing to express objection to such accounting in writing delivered to the Trustee within thirty (30) days after the date upon which

3

the accounting was delivered to the Administrator (the "Objection Period"). Upon receipt of the Administrator's written approval of the accounting, or upon the expiration of the Objection Period, such accounting shall be deemed approved, and the Trustee shall be discharged and released as to all items set forth in such accounting, as fully as if such accounting had been allowed and settled by decree of a court of competent jurisdiction in a proceeding in which the Administrator, the Company, the Trustee and all persons claiming to have any interest in the Trust or under the Plan were parties;

(l)    as directed by the Administrator, to pay any estate, income, inheritance or other assessment, charge or tax attributable to any benefit that a payee shall or may be required to pay out of such benefit, and to require before making any payment such release or other document from any taxing authority and such indemnity from the intended payee as the Trustee shall deem necessary for its protection;

(m)    to employ and to rely reasonably upon advice and information furnished by accountants, agents, attorneys or independent appraisers for such purposes as the Trustee considers reasonably necessary;

(n)    to presume, until advised to the contrary by the Administrator, the Company or the Internal Revenue Service that the Trust is a "qualified trust" entitled to tax exemption under Code section 501(a);

(o)    to invest and reinvest the assets of the Trust, such as cash that is not already invested in Company Stock, in personal property of any kind, including, but not limited to, bonds and debentures, closed-end or open-end mutual funds, certificates of deposit ("CDs"), collective investment funds or group trusts, equipment trust certificates, guaranteed investment contracts, investment trust certificates, mortgages, notes, common or preferred stock and savings accounts. With respect to an investment in collective investment funds or group trusts, the instrument creating such collective investment trusts or group trust together with any amendments or supplements, are made a part hereof as fully as if set forth herein in their entirety. The Trustee shall follow the directions of the Administrator, shall have no duty to review the assets from time to time so acquired, nor to make any recommendations with respect to the investment, reinvestment or retention thereof and shall have no liability for any losses arising from investments made in accordance with such directions or lack thereof;

(p)    to exercise any options, subscription rights and other privileges with respect to assets, subject to the provisions of Article III;

(q)    to register ownership of any securities or other property in the Trustee's name or in the name of a nominee, with or without the addition of words indicating that such securities are held in a fiduciary capacity, and to hold any securities in bearer form; provided, however, that the books and records of the Trustee shall at all times reflect that all such investments are part of the Trust;

(r)    to borrow such funds from time to time as the Trustee considers desirable or necessary and in the best interest of the Trust, including to finance the purchase of Company Stock, and to enter into such agreements as the Trustee determines necessary or appropriate to

4

accomplish such actions, and for that purpose to mortgage or pledge any part of the Trust (subject to the provisions of Code section 4975(c) and ERISA section 406 and the regulations issued thereunder).

(s)     if the Administrator or Company the shall advise the Trustee that any loan transaction the Trustee contemplates is with a disqualified person (within the meaning of Code section 4975) or that a disqualified person has or proposes to guarantee an Exempt Loan to the Trust, the following terms and conditions shall apply to such loan:

(i)     the Trustee will use the proceeds of such Exempt Loan within a reasonable time after receipt only for any of the following purposes: (A) to acquire Company Stock; (B) to repay such Exempt Loan; or (C) to repay a prior Exempt Loan. Except as permitted under the Code or ERISA or applicable regulations, no financed Company Stock may be subject to a put, call or other option, or buy-sell or similar arrangement while held by and when distributed from the Trust, whether or not the Plan is then an employee stock ownership plan;

(ii)    the interest rate of the Exempt Loan may not be more than a reasonable rate of interest;

(iii)   any collateral the Trust pledges to the lender must consist only of the assets the Trust purchased with the borrowed funds and those assets the Trust used as collateral on any prior Exempt Loan repaid with the proceeds of the current Exempt Loan;

(iv)    the lender may have no recourse against the Trust under such Exempt Loan except with respect to collateral given for the Exempt Loan, contributions (other than contributions of Company Stock) that the Company makes to the Trust to meet its obligations under the Exempt Loan and earnings attributable to such collateral and the investment of such contributions. As the Administrator or the Company determines and communicates to the Trustee, the payment made with respect to an Exempt Loan during a Plan Year must not exceed the sum of all contributions and earnings received during or prior to such Plan Year less any payments made in prior years.

(v)     in the event of default upon an Exempt Loan, the value of Trust assets transferred in satisfaction of the Exempt Loan must not exceed the amount of default, and the Exempt Loan shall provide for a transfer of Trust assets upon default only upon and to the extent of the failure of the Trust to meet the payment schedule of the Exempt Loan; and

5

(vi)    the Trustee shall maintain all assets acquired with the proceeds of an Exempt Loan in a suspense account within the Trust. In directing the Trustee to withdraw assets from the suspense account, the Administrator will apply the provisions of Treasury Regulations sections 54.4975-7(b)(8) and (15) as if all securities in the suspense account were encumbered. Upon the payment of any portion of the Exempt Loan, the Trustee will effect the release of assets in the suspense account from encumbrances in accordance with directions from the Administrator or the Company in accordance with the terms of the Plan;

(t)    to deposit securities with a clearing corporation as defined in the applicable Uniform Commercial Code. The certificates representing securities, including those in bearer form, may be held in bulk form with, and may be merged into, certificates of the same class of the same issuer that constitute assets of other accounts or owners, without certification as to the ownership attached. Utilization of a book-entry system may be made for the pledge or transfer of securities the Trustee holds or by a clearing corporation. The Trustee shall at all times, however, maintain a separate and distinct record of the securities the Trust owns;

(u)    to use the Federal Book-Entry Account System, a service the Federal Reserve Bank provides for its member banks for deposit of Treasury securities; and

(v)    to perform all other acts that are appropriate or necessary for the proper investment, management, and distribution of the Trust.

### 2.4  Compensation and Expenses.

The Trustee shall be entitled to reasonable compensation for its services, as agreed to between the Company and the Trustee from time to time in writing, and to reimbursement of all reasonable expenses the Trustee incurs in the administration of the Trust, as agreed to between the Company and the Trustee from time to time in writing. The Trustee is authorized to pay its compensation from the Trust as well as all such reasonable expenses the Trustee incurs, including compensation to any agents the Trustee employs and any reasonable accounting, legal and valuation expenses. The Company shall pay all such amounts, if they are not paid from the Trust. Any such payment the Company makes shall not be considered an Employer contribution to the Trust.

### 2.5  Exercise of Trustee Duties.

The Trustee shall discharge its duties hereunder solely in the interest of Participants and other persons entitled to benefits under the Plan and;

(a)    for the exclusive purposes of (i) providing benefits to Participants and other persons entitled to benefits under the Plan, and (ii) defraying reasonable expenses of administering the Plan;

6

(b)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(c)     in accordance with the documents and instruments governing the Plan unless, in the good faith judgment of the Trustee, the documents and instruments are not consistent with the provisions of ERISA or this Trust Agreement; and

(d)     in a manner that does not constitute a non-exempt prohibited transaction under Code section 4975(c) or ERISA sections 406 or 407.

**2.6     Plan Administration.**

The Administrator may authorize one or more individuals to communicate with the Trustee and shall at all times keep the Trustee advised of the individuals authorized to act on behalf of the Administrator. With the Trustee's prior written consent, the Administrator may authorize the Trustee to act, without specific directions or instructions from the Administrator, on any matter or class of matters with respect to which directions or instructions from the Administrator are otherwise required hereunder. The Trustee shall be fully protected in relying on any communication any authorized person sends and shall not be required to verify the accuracy or validity of any such communication. If the Trustee requests in writing any directions hereunder and does not receive them, the Trustee shall act or refrain from acting, as the Trustee may determine, with no liability for such action or inaction. The duties of the Trustee shall be limited to those set forth in this Trust Agreement, or as later agreed upon by the Trustee, Administrator and Company in writing, and nothing contained in the Plan, either expressly or by implication, shall be deemed to impose any additional duties on the Trustee.

**2.7     Continuation of Powers upon Trust Termination.**

Notwithstanding anything to the contrary in this Trust Agreement, upon termination of the Trust, the duties, powers and rights of the Trustee hereunder shall continue until all Trust assets have been liquidated.

<div align="center">

**ARTICLE III**
**PROVISIONS RELATED TO INVESTMENT IN COMPANY STOCK**

</div>

**3.1     Investment of Cash.**

If an Employer's contribution made pursuant to the Plan or any distribution or dividends paid to the Plan for any Plan Year are in cash, the Trustee shall use such cash to make any scheduled amortization payment on an Exempt Loan and, if any cash remains thereafter, as provided under Section 2.3(o). Subject to the preceding sentence, to the extent possible, the Trustee shall purchase Company Stock with the cash contained in the Participants' Other Investments Accounts, unless ERISA prohibits. All such purchases must be at a price that the Trustee determines does not exceed "adequate consideration," within the meaning of ERISA section 3(18) as of the date of purchase as the Trustee determines. In making its determination, the Trustee shall take into account the advice and opinion of an independent appraiser if such

<div align="center">7</div>

Company Stock is not publicly traded. Additionally, pending investment of cash in Company Stock, the Trustee shall invest such cash as provided in Section 2.3(o).

**3.2    Stock Dividends, Splits and Other Capital Reorganizations.**

Any Company Stock the Trust receives as a stock dividend or split shall be allocated as of each Valuation Date under the Plan in proportion to the Company Stock to which it is attributable.

**3.3    Voting of Shares and Tender or Exchange Offers.**

The Trustee shall exercise all exchange, tender, voting and other rights with respect to Company Stock held in the Trust as described as follows:

(a)    <u>Allocated Shares.</u>    Shares of Company Stock shall be deemed to be allocated to the Company Stock Account in an amount to be determined on the Valuation Date coincident with or immediately preceding the record date of any vote or tender offer.

(b)    <u>Voting of Company Stock.</u>    The Trustee shall vote all Company Stock held by it as part of the Plan assets; provided, however, that if any agreement entered into by the Trust provides for voting of any shares of Company Stock pledged as security for any obligation of the Plan, then such shares of Company Stock shall be voted in accordance with such agreement.

Notwithstanding the foregoing, each Participant or Beneficiary shall be entitled to direct the Trustee as to the manner in which the Company Stock which is entitled to vote and which is allocated to the Company Stock Account of such Participant or Beneficiary is to be voted. For purposes of the foregoing sentence, each Participant shall be a named fiduciary of the Plan as described in ERISA section 402(a)(2).

If the Employer does not have a registration-type class of securities and the by-laws of the Employer require the Plan to vote an issue in a manner that reflects a one-man, one-vote philosophy, each Participant or Beneficiary shall be entitled to cast one vote on an issue, and the Trustee shall vote the shares held by the Plan in proportion to the results of the votes cast on the issue by the Participants and Beneficiaries. For purposes of this Section the term "registration-type class of securities" means: (A) a class of securities required to be registered under Section 12 of the Securities Exchange Act of 1934; and (B) a class of securities which would be required to be so registered except for the exemption from registration provided in subsection (g)(2)(H) of such Section 12. If a Participant or Beneficiary is entitled to so direct the Trustee, all allocated Company Stock as to which the Trustee has timely received directions (which may include an instruction to abstain), the Trustee shall vote in accordance with such directions as provided in this paragraph, provided, that the Trustee may otherwise vote the shares as it determines is necessary to fulfill the Trustee's fiduciary duties under ERISA. The Trustee shall, in its discretion and subject to its fiduciary duties under ERISA, vote (i) any shares of Company Stock held in the unallocated Company Stock Account, and (ii) any allocated shares of Company Stock as to which the Trustee has received no voting directions.

8

Without limiting the foregoing, with respect to any (i) corporate matter that involves the voting of Company Stock that is a registration-type class of securities, or (ii) that involves the voting of Company Stock that is not a registration type class of securities with respect to the approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidation, dissolution, sale of substantially all of the assets of a trade or business or such other transactions that may be prescribed by regulation, each Participant shall be entitled to direct the Trustee as to the exercise of any shareholder voting rights attributable to shares of Company Stock then allocated to his Accounts to the extent required by Code sections 401(a)(22) and 409(e) and the Treasury Regulations thereunder. For purposes of the foregoing sentence, each Participant shall be a named fiduciary of the Plan as described in ERISA section 402(a)(2). With regard to the foregoing, the Company shall have the responsibility for determining when a corporate matter has arisen that involves the voting of Company Stock under this paragraph, and it shall notify the Trustee on a timely basis of its determination.

(c)     Tendering of Company Stock. In the event of a tender offer or other offer to purchase shares of Company Stock held by the Trust, the Trustee shall, in its discretion and subject to its fiduciary duties under ERISA and the requirements under this Section 3.3, tender and sell or not tender and sell such shares.

In carrying out its responsibilities under this Section 3.3, the Trustee may rely on information the Company furnishes to it, including the names and addresses of Participants, the number of shares of Company Stock allocated to their Company Stock Accounts and the number of shares of Company Stock the Trustee holds that have not yet been allocated.

**3.4     Put Option.**

If (i) the distribution of a Participant's Account is to be made in cash, (ii) a Participant exercises his or her rights to diversify his or her Company Stock Account under the Plan, or (iii) the Trustee expects to incur substantial expenses that the Employers will not pay directly, and as a result of the events described in clause (i), (ii), or (iii), the Trustee determines that the Trust has insufficient cash to make anticipated distributions or diversification transfers or to pay Trust expenses, the Trust shall have a "put option" on Company Stock it holds to require the Company to purchase such Company Stock, to the extent the Trustee reasonably believes it necessary to make such anticipated distributions and diversification transfers and to pay such expenses. The purchase price shall not be less than "adequate consideration" as defined in Section 3.1.

The implementation of such a put option shall be pursuant to one or more of the following arrangements as the Trustee shall determine:

(a)     The Trustee shall put Company Stock to the Company on a Valuation Date in an amount sufficient to provide an amount of cash the Trustee estimates in good faith to be sufficient;

(b)     If permitted under applicable law, rulings and regulations, and not a nonexempt prohibited transaction under Code section 4975(c) or ERISA section 406 or 407, the

Trustee, in its discretion, shall put Company Stock to the Company on a date other than a Valuation Date and shall be paid the cash therefor; or

(c)    If permitted under applicable law, rulings, or regulations, and not a nonexempt prohibited transaction under Code section 4975(c) or ERISA section 406 or 407, the Company shall make a short term, interest free loan to the Trustee. The Trustee shall repay such loan to the Company on the Valuation Date next following the date on which the Trustee exercises the put option.

## ARTICLE IV
## MISCELLANEOUS

### 4.1    Disagreement as to Acts.

If there is a disagreement between the Trustee and anyone as to any act or transaction reported in any accounting, the Trustee shall have the right to have its account settled by a court of competent jurisdiction.

### 4.2    Persons Dealing with Trustee.

No person dealing with the Trustee shall be required to see to the application of any money paid or property delivered to the Trustee, or to determine whether or not the Trustee is acting pursuant to any authority granted to it under this Trust Agreement or the Plan.

### 4.3    Benefits May Not Be Assigned or Alienated.

The interests under the Plan and this Trust Agreement of Participants and other persons entitled to benefits under the Plan are not subject to the claims of their creditors and may not be voluntarily or involuntarily alienated, assigned or encumbered, except to the extent that the Administrator directs the Trustee that any such interests are subject to a qualified domestic relations order (as defined in Code section 414(p)) as provided in the Plan, or as required under Code section 401(a)(13)(C).

### 4.4    Evidence.

Evidence required of anyone under this Trust Agreement may be by affidavit, certificate, document or other instrument that the person acting in reliance thereon considers pertinent and reliable, and which the proper party makes, presents or signs.

### 4.5    Waiver of Notice.

Any person entitled to notice under this Trust Agreement may waive such notice in writing.

### 4.6    Counterparts.

This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original and no other counterparts need be produced.

7/4062523.5
215556-301001

4.7     **Governing Laws and Severability.**

This Trust Agreement shall be construed and administered according to the laws of the State of Alabama to the extent that the laws of the United States of America do not preempt such laws. If any provision of this Trust Agreement is held illegal or invalid, the illegality or invalidity shall not affect the remaining provisions of the Trust Agreement, but shall be severable, and the Trust Agreement shall be construed and enforced as if the illegal or invalid provision had never been inserted herein.

4.8     **Successors.**

This Trust Agreement shall be binding on the Company, the Employers and any successors thereto by virtue of any consolidation, dissolution, merger, reorganization or sale, on the Trustee and the Trustee's successor, and on all persons entitled to benefits under the Plan and their respective heirs and legal representatives.

4.9     **Action by the Administrator or the Company.**

Any action the Company is permitted or required to take under this Trust Agreement shall be by resolution of its Board of Directors or by a person or persons authorized by resolution of its Board of Directors. Any action the Administrator is permitted or required to take shall be in writing. The Trustee shall not recognize or take notice of any appointment of any representative of the Administrator or the Company unless and until the Administrator or the Company shall have notified the Trustee in writing of such appointment and the extent of such representative's authority. The Trustee may assume that such appointment and authority continue in effect until it receives written notice to the contrary from the Company or the Administrator. Any action the Trustee takes or omits by authority of any representative of the Administrator or the Company within the scope of the Trustee's authority shall be as effective for all purposes hereof as if the Company or the Administrator had authorized such action or non-action.

4.10    **Action by Multiple Trustees.**

(a)     Trustee Decisions. If two or more persons act as Trustee, a unanimous decision of such persons shall be required with respect to any decision regarding the administration or the investment of the Trust or of any portion of the Trust with respect to which such persons act as Trustee. If there is more than one Trustee, the Trustees jointly will control and manage the assets of the Trust (or those Trust assets as to which they act as Trustee).

(b)     Allocation. Multiple Trustees may allocate among themselves specific duties or may authorize one or more of them, either individually or in concert, to exercise any or all of the powers granted to the Trustee, or to perform any or all of the duties assigned to the Trustee under this Trust Agreement.

(c)     Signature. The signature of each Trustee is necessary to effect any transaction on behalf of the Trust (or as to those Trust assets as to which the signatory acts as Trustee).

4.11    **Conformance with Plan.**

11

To the extent the provisions of the Plan and this Trust Agreement conflict, the Plan provisions shall govern; provided, however, that the Trustee's duties, powers and rights shall be determined solely under this Trust Agreement, and the Trustee shall not be bound by any Plan or Trust Agreement amendment until the Trustee has received a written copy of the amendment.

### 4.12    Headings; Gender and Number.

The headings used in this Trust Agreement are for convenience of reference only and shall have no substantive effect on the provisions of this Trust Agreement. Where the context in this Trust Agreement admits, words in the masculine gender include the feminine and neuter genders, the plural includes the singular, and the singular includes the plural.

### 4.13    Written Directions.

All directions from the Company and/or from the Administrator to the Trustee shall be in writing. E-mails and facsimiles shall be deemed to satisfy this requirement.

## ARTICLE V
## NO REVERSION TO COMPANY

No part of the corpus or income of the Trust shall revert to any Employer or be used for, or diverted to, purposes other than for the exclusive benefit of Participants and other persons entitled to benefits under the Plan, except as provided below:

(a)    If, upon termination of the Plan with respect to any Employer, any amounts are held in a suspense account that are attributable to the contributions of such Employer and such amounts may not be credited to any Participant's Account, such amounts, upon the written direction of the Administrator, will be returned to that Employer as soon as practicable after the termination of the Plan with respect to that Employer.

(b)    Employer contributions under the Plan are conditioned upon the deductibility thereof under Code section 404, and, to the extent any such deduction of an Employer is disallowed, the Trustee shall, upon the written direction of the Administrator, return the amount of the contribution (to the extent disallowed), reduced by the amount of any losses thereon, to the Employer within one year after the date the deduction is disallowed.

(c)    If an Employer makes a contribution or any portion thereof by a mistake of fact, the Trustee shall, upon written direction of the Administrator, return the amount of the contribution or such portion, reduced by the amount of any losses thereon, to the Employer within one year after the date of payment to the Trustee.

Notwithstanding the foregoing, the Trustee has no responsibility as to the sufficiency of the Trust to provide any distribution to an Employer under this Article V.

## ARTICLE VI
## CHANGE OF TRUSTEE

### 6.1    Resignation.

12

The Trustee may resign at any time by giving thirty (30) days' advance written notice to the Administrator and the Company and to any other Trustee(s) then acting, unless the Company waives such notice.

### 6.2    Removal of the Trustee.

The Company may remove the Trustee by giving thirty (30) days' advance written notice to the Trustee, subject to providing the removed Trustee with satisfactory written evidence of the appointment of a successor Trustee and of the successor Trustee's acceptance of the trusteeship.

### 6.3    Duties of Resigning or Removed Trustee and of Successor Trustee.

If the Trustee resigns or is removed, the Trustee shall promptly deliver and transfer the assets and written records of the Trust to the successor Trustee, and may reserve such reasonable amount as it deems necessary to provide for the payment of all fees, expenses and taxes then or thereafter chargeable against the Trust, unless the Company agrees to pay them. The Company shall be obligated to reimburse the Trust for any amount the Trustee reserves. Within sixty (60) days, the resigned or removed Trustee shall furnish to the Administrator and the Company and the successor Trustee the Company designates an account of the Trustee's administration of the Trust from the date of its last account. The Administrator and the Company the shall have one hundred twenty (120) days after the Trustee's mailing of such account within which to file with the Trustee written objections to such account. Except as otherwise required by law, including, but not limited to ERISA, upon the expiration of such period, the Trustee shall be forever discharged and released from all accountability and liability to the Administrator, the Company, Participants and the Trust with respect to the propriety of the Trustee's acts and transactions that are accurately and fully shown in such account except with respect to any such acts or transactions as to which a written objection has been filed within such one hundred twenty (120) day period with the Trustee. Each successor Trustee shall succeed to the title to Trust assets vested in its predecessor without the filing or signing of any further instrument, but any resigning or removed Trustee shall execute all documents and perform all acts necessary to vest such title in any successor Trustee.

If the Company does not designate a successor Trustee, or if a successor Trustee the Company designates has not accepted its appointment, within thirty (30) days after the Trustee gives notice of its resignation or receives notice of removal, the Trustee may, at the expense of the Trust, apply to a court of competent jurisdiction to appoint a successor Trustee. Until a successor Trustee is appointed, the Trustee shall be entitled to be compensated for its services.

Each successor Trustee shall have all the duties, powers and rights this Trust Agreement confers as if originally named Trustee. No predecessor Trustee shall be liable for any successor Trustee's act.

### 6.4    Filling Trustee Vacancy.

The Company shall fill a vacancy in the office of the Trustee as soon as practicable by a writing filed with the entity or person appointed to fill the vacancy.

7/4062523.5
215556-301001

## ARTICLE VII
## ADDITIONAL EMPLOYERS

Any Participating Employer may become a party to this Trust Agreement by

(a)    filing with the Company and the Trustee a certified copy of a resolution of its board of directors to that effect; and

(b)    filing with the Trustee a certified copy of a resolution of the Board of Directors of the Company consenting to such action.

## ARTICLE VIII
## AMENDMENT AND TERMINATION

### 8.1    Amendment.

While the Company expects and intends to continue the Trust, the Company reserves the right to amend the Trust Agreement at any time pursuant to an action of the Company's Board of Directors. No amendment shall change the duties, powers and rights of the Trustee under this Trust Agreement without the Trustee's prior written agreement, nor reduce a Participant's benefits to less than the amount such Participant would be entitled to receive if such Participant had resigned from the employ of his or her Employer on the date of the amendment. Amendments to the Trust Agreement shall be effective upon execution of such amendments by both the Company and the Trustee.

### 8.2    Termination.

The Trust may be terminated as to all Employees on any date the Company specifies. The Trust will terminate as to any Employer on the first to occur of the following:

(a)    the date that Employer terminates it;

(b)    the date such Employer's contributions to the Trust are completely discontinued;

(c)    the date such Employer is judicially declared bankrupt under Chapter 7 of the U.S. Bankruptcy Code; or

(d)    the consolidation, dissolution, merger or reorganization of that Employer, or the sale by that Employer of all or substantially all of its assets, except that, with the consent of the Company, such arrangements may be made whereby the Trust will be continued by any successor to that Employer or any purchaser of all or substantially all of that Employer's assets, in which case the successor or purchaser will be substituted for that Employer under the Trust; provided, however, that the foregoing shall not apply with respect to the proposed transaction contemplated in that certain engagement letter agreement by and between the Company and the Trustee dated September 5, 2017 (the "Engagement Agreement"), which shall include but not be limited to any transaction whereby the Plan becomes the sole owner of the Company.

14

The Trustee's powers upon termination will continue until liquidation of the Trust, or the portion thereof attributable to an Employer, as the case may be. Upon termination of this Trust, the Trustee shall first reserve such reasonable amounts as the Trustee may deem necessary to provide for the payment of any compensation, expenses, fees or taxes then or thereafter chargeable to the Trust. Subject to such reserve, the balance of the Trust shall be liquidated and distributed by the Trustee to or for the benefit of the Participants and their Beneficiaries, as directed by the Administrator accompanied by a certification from the Administrator that the disposition is in accordance with the terms of the Plan and applicable law, and the Trustee need not question the propriety of such certification. The Company shall have full responsibility to see that such distribution is legal and proper and within the terms of the Plan and this Trust Agreement.

### ARTICLE IX
### INDEMNIFICATION AND DEFENSE OF ACTIONS

**9.1    Indemnification.**

The term "Indemnitees" shall mean the Trustee and the Trustee's affiliates and their agents, directors, employees, officers and shareholders. Subject to the applicable provisions of ERISA, the Company and all Employers shall indemnify the Indemnitees for any cost, expense, loss or other damage, including reasonable attorney's fees, any of the Indemnitees suffer resulting from any legal proceedings related in any way to the performance of services by any one or more of the Indemnitees pursuant to the provisions of this Trust Agreement. The indemnification provided for in this Section 9.1 shall extend to (and not by way of limitation):

(a)    any action taken or not taken by any of the Indemnitees at the direction or request of the Administrator, the Company or any agent of the Administrator or the Company;

(b)    any action not taken by any of the Indemnitees in the absence of such direction or request if the Indemnitees are not required by law to act without the receipt of such direction or request; and

(c)    all reasonable costs and expenses the Indemnitees incur in enforcing the indemnification provisions of this Section 9.1, including reasonable attorneys' fees and court costs. However, these indemnification provisions shall not apply to the extent that any cost, damage, expense, or loss with respect to which any of the Indemnitees shall seek indemnification is held by a court of competent jurisdiction, in a final judgment from which no appeal is taken, to have resulted either from the gross negligence of one or more of the Indemnitees, from the willful misconduct of one or more of the Indemnitees or from the breach of any fiduciary duty imposed under ERISA by any one or more of the Indemnitees.

The foregoing right of indemnification shall be in addition to other rights to which the Trustee may be entitled by law, under the Articles of Incorporation or Bylaws of any Employer, or by reason of insurance coverage of any kind.

The Company may, at its own expense and with the prior written consent of the Trustee, which the Trustee shall be entitled to give or withhold at its discretion, settle any claim asserted

15

or proceeding brought against the Trustee when such settlement appears to be in the best interests of the Company, as the Company determines.

**9.2    Notice and Assumption of Defense.**

If one or more of the Indemnitees receive notice of any legal proceeding with respect to which indemnification may be sought against the Company pursuant to this Article IX (a "Proceeding"), such Indemnitees shall notify the Company of the Proceeding in writing within fifteen (15) days after the commencement of the Proceeding. However, the failure by any Indemnitee to notify the Company shall not relieve the Company from any liability, except to the extent that the failure to notify the Company shall actually have prejudiced the defense of any Proceeding.

**9.3    Reimbursement of Expenses.**

The Company shall reimburse the Indemnitees for all reasonable costs that they incur in connection with any Proceeding, as the Indemnitees incur them, including costs of investigation, of testifying in any hearing, of responding to discovery proceedings and of consulting with the Company or the attorneys for the Company. The Indemnitees shall have the right to employ their own counsel in any Proceeding, and the Company shall pay the reasonable fees and expenses of the Indemnitees' counsel as they are incurred, if any one or more of the following conditions are satisfied:

(a)    the Company shall authorize employment by the Indemnitees of their own counsel;

(b)    the Indemnitees' counsel advise them that there may be one or more legal defenses available to them that are different from or additional to defenses available to the Company (in which case the Company shall not have the right to assume the defense of the Proceeding on behalf of the Indemnitees);

(c)    the Company fails to assume the defense of the proceeding and to employ counsel reasonably satisfactory to the Indemnitees within ten (10) days after being notified of the commencement of the Proceeding;

(d)    the Indemnitees' counsel inform them that a conflict exists with the counsel the Company selects and the Company does not replace such counsel (in which case the Company shall not have the right to assume the defense of the Proceeding on behalf of the Indemnitees);

(e)    the Company and the Trustee have a conflict of interest (in which case the Company shall not have the right to assume the defense of the Proceeding on behalf of the Indemnitees); or

(f)    the allegation made against the Trustee is for its breach of fiduciary duty, gross negligence or willful misconduct.

**9.4    Governmental Investigations.**

16

The provisions of this Article IX shall also apply if any governmental or private commission or regulatory authority investigates any of the Indemnitees, or requires any of the Indemnitees to testify in any hearing in connection with any investigation, regarding the performance of services by the Indemnitees pursuant to this Trust Agreement. Investigations covered by this Article IX shall include, but shall not be limited to, investigations conducted by any agency of the United States or of any state, by any committee of the Congress of the United States or of the legislature of any state, or by a stock exchange or other entity having authority to investigate or regulate similar to that of a stock exchange. In the case of any such investigation, the Indemnitees shall have the right to employ separate counsel to represent them, and the Company shall pay the reasonable fees and expenses of the Indemnitees' counsel as they are incurred.

**9.5    Limitation.**

If a court of competent jurisdiction holds that any payment or award of indemnification pursuant to the terms of this Trust Agreement is unavailable to any one or more of the Indemnitees from the Company for any reason other than their gross negligence or willful misconduct or breach of fiduciary duty, the Company then shall nonetheless reimburse the affected Indemnitees, as required by Section 9.1, but taking into account the basis for the denial of full indemnification by the court.

**9.6    Other Agreements.**

The terms of this Article IX shall not apply with respect to the engagement of the Trustee under the terms of the Engagement Agreement; with respect to such Engagement Agreement, the terms of Section 6 the Engagement Agreement will apply. Notwithstanding the foregoing, the Company and the Trustee may enter into additional agreements further delineating the indemnification agreement in this Article IX, which agreements (whether executed prior to or subsequent to the date hereof) shall supersede this Article IX.

*-- Signature Page follows--*

7/4062523.5
215556-301001

**IN WITNESS WHEREOF,** the Company and the Trustee have caused these presents to be signed and their seals to be affixed hereunto and attested by their duly authorized officers all as of the day and year first written above.

<div style="margin-left:40%">

**RADIANCE TECHNOLOGIES, INC.**

By:_____

Name: William C Bailey, Jr.

Title: President


**ARGENT TRUST COMPANY**

By:_____

Name: Stephen A. Martin

Title: Senior Vice President, not in his individual capacity, but solely in his capacity as an authorized officer of Argent Trust Company

</div>

18

# EXHIBIT 11

FILED

2024 Jul-11  PM 02:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| RADIANCE TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 5:24-CV-00794-HNJ |
| | ) | |
| JADE BAKER, | ) | |
| | ) | |
| Defendant. | ) | |

## ANSWER TO COMPLAINT BY DEFENDANT JADE BAKER

For answer to the complaint of plaintiff Radiance Technologies, Inc. ("Radiance"), defendant Jade Baker ("Baker") states:

## **INTRODUCTION**

The paragraphs of the "Introduction" do not contain allegations of fact for which responsive pleading is required but are merely descriptive of the action filed by Radiance. To the extent that the allegations of paragraphs of the "Introduction" allege that Baker has liability to Radiance, that Radiance is entitled to recover in this action, or that the matters alleged in the complaint are true, Baker denies those allegations.

## THE PARTIES

1.      Upon information and belief, the allegations of paragraph 1 are admitted.

2.      The allegations of paragraph 2 are admitted.

## JURISDICTION AND VENUE

3.      Baker admits only that this Court has subject matter jurisdiction over this action. To the extent that the allegations of paragraph 3 allege that Baker has liability to Radiance, that Radiance is entitled to recover in this action, or that the matters alleged in the complaint are true, Baker denies those allegations.

4.      The allegations of paragraph 4 are admitted.

5.      Baker admits only that venue is appropriate in United States District Court for the Northern District of Alabama, Northeastern Division. To the extent that the allegations of paragraph 5 allege that Baker has liability to Radiance, that Radiance is entitled to recover in this action, or that the matters alleged in the complaint are true, Baker denies those allegations.

## FACTUAL ALLEGATIONS

6.      The allegations contained in paragraph 6 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 6 of the complaint, those allegations are denied.

2

7.      The first two sentences of paragraph 7 of the complaint are admitted. The remaining allegations are denied.

8.      The allegations contained in paragraph 8 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 8 of the complaint, those allegations are denied.

9.      The allegations contained in paragraph 9 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 9 of the complaint, those allegations are denied.

10.     The allegations contained in paragraph 10 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 10 of the complaint, those allegations are denied.

11.     Baker admits that he was involved in a Radiance project with Honeywell International. Baker admits that he was a part of the government funded research and planning team, Looking Glass 1A, to develop the technical approach for Looking Glass 1B. Baker admits that he was listed as key personnel for Looking Glass 1B. Baker is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 11 of the complaint.

12.     The allegations contained in paragraph 12 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 12 of the complaint, those allegations are denied.

13.     The allegations contained in paragraph 13 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 13 of the complaint, those allegations are denied.

14.     The allegations contained in paragraph 14 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 14 of the complaint, those allegations are denied.

15.     The allegations contained in paragraph 15 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 15 of the complaint, those allegations are denied.

16.     The allegations contained in paragraph 16 of the complaint are denied.

17.     The first three sentences of paragraph 17 of the complaint are admitted. The remaining allegations are denied.

18.     Denied. The emails referenced in paragraph 18 of the complaint speak for themselves. Baker denies any mischaracterization of those emails and further denies Radiance's interpretation of the language quoted in paragraph 18.

19.     The allegations contained in the first sentence of paragraph 19 of the complaint are denied. The remaining allegations contained in paragraph 19 are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the remaining allegations contained in paragraph 19 of the complaint, those allegations are denied.

20.     Denied.

21.     Denied as written. Baker admits that he accessed certain files on his Radiance issued laptop to perform his job duties at Radiance.

22.     Denied as written. Baker admits that he accessed certain files to his Radiance issued laptop to perform his job duties at Radiance.

23.     Baker is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of paragraph 23 of the complaint and therefore those allegations are denied. Baker denies the characterization of the Google search referenced in paragraph 23 of the complaint.

24.     Denied.

25.     Denied.

26.    The allegations contained in the first sentence of paragraph 26 of the complaint are denied. The message referenced in paragraph 26 of the complaint speak for themselves. Baker denies any mischaracterization of those emails and further denies Radiance's interpretation of the language quoted in paragraph 26.

27.    The allegations contained in the last sentence of paragraph 27 of the complaint are denied. The remaining allegations contained in paragraph 27 are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the remaining allegations contained in paragraph 27 of the complaint, those allegations are denied.

28.    Denied as written. Baker admits that he accessed certain files on his Radiance issued laptop to perform his job duties at Radiance.

29.    Denied as written. Baker admits that he accessed certain files on his Radiance issued laptop to perform his job duties at Radiance.

30.    The allegations contained in paragraph 30 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 30 of the complaint, those allegations are denied.

31.    The allegations contained in paragraph 31 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the

extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 31 of the complaint, those allegations are denied.

32.     Admitted.

33.     Denied. The emails referenced in paragraph 33 of the complaint speak for themselves. Baker denies any mischaracterization of those emails and further denies Radiance's interpretation of the language quoted in paragraph 33.

34.     Baker is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 34 of the complaint and therefore those allegations are denied.

35.     Baker admits that he resigned from Radiance. The remaining allegations of paragraph 35 are denied.

36.     The job application referenced in paragraph 36 of the complaint speaks for itself. Baker denies any mischaracterization of job application, denies Radiance's interpretation of the dates referenced in paragraph 36, and denies that he did anything to "create a false paper trail."

37.     Baker is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37 of the complaint and therefore those allegations are denied.

38.     Denied as written. Baker admits that he accessed certain files on his Radiance issued laptop to perform his job duties at Radiance.

39.     Baker is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39 of the complaint and therefore those allegations are denied. Baker admits that he routinely deleted spam emails and emptied the Deleted Items folder in his email account.

40.     Denied as written. Baker admits that he accessed certain files on his Radiance issued laptop to perform his job duties at Radiance.

41.     Denied.

42.     Baker admits that he is now employed by PeopleTec. The remaining allegations of paragraph 42 are denied.

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT 18 U.S.C § 1836

43.     Baker adopts and incorporates by reference its previous responses to the paragraphs above as if fully stated here.

44.     Denied.

45.     Denied.

46.     Denied.

47.     The allegations contained in paragraph 47 of the complaint are not directed at Baker. Therefore, no responsive pleading by Baker is required. To the extent that plaintiff intends to assert any claim against Baker arising out of the allegations contained in paragraph 47 of the complaint, those allegations are denied.

48.     The confidentiality provision of the Radiance Handbook referenced in paragraph 48 speaks for itself. Baker denies any mischaracterization of the confidentiality provision of the Radiance Handbook or the obligations of the parties thereunder. Baker specifically denies that violated any provision of the Radiance Handbook.

49.     Denied.

50.     Denied. The confidentiality provision of the Radiance Handbook referenced in paragraph 50 speaks for itself. Baker denies any mischaracterization of the confidentiality provision of the Radiance Handbook or the obligations of the parties thereunder. Baker specifically denies that violated any provision of the Radiance Handbook.

51.     Denied.

52.     Denied.

In response to the *ad damnum* clause following paragraph 52 of the complaint, Baker denies that Radiance is entitled to the requested relief or to any relief whatsoever.

## COUNT II –FIDUCIARY DUTY

53.     Baker adopts and incorporates by reference its previous responses to the paragraphs above as if fully stated here.

54.     Paragraph 54 consists of legal conclusions which do not require a response by Baker. To the extent Radiance intends to assert any claims against Baker arising out of the legal conclusions contained in paragraph 54 of the complaint, Baker denies the allegations.

55.     Denied.

56.     Denied.

In response to the *ad damnum* clause following paragraph 56 of the complaint, Baker denies that Radiance is entitled to the requested relief or to any relief whatsoever.

## COUNT III – CIVIL CONSPIRACY (All Defendants)

57.     Baker adopts and incorporates by reference its previous responses to the paragraphs above as if fully stated here.

58.     Denied.

59.     Denied.

In response to the *ad damnum* clause following paragraph 59 of the complaint, Baker denies that Radiance is entitled to the requested relief or to any relief whatsoever.

## COUNT IV – VIOLATION OF THE ALABAMA DIGITAL CRIME ACT ALA. CODE § 13A-8-110, *et seq.*

60.     Baker adopts and incorporates by reference its previous responses to the paragraphs above as if fully stated here.

61.     The allegations contained in the first sentence of paragraph 61 are admitted. The remaining allegations of paragraph 61 consist of legal conclusions which do not require a response by Baker. To the extent Radiance intends to assert any claims against Baker arising out of the legal conclusions contained in the second sentence of paragraph 61 of the complaint, Baker denies the allegations.

62.     Admitted.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

In response to the *ad damnum* clause following paragraph 66 of the complaint, Baker denies that Radiance is entitled to the requested relief or to any relief whatsoever.

## ADDITIONAL DEFENSES

### First Affirmative Defense

Some or all of Radiance's claims fail to state a claim against Baker upon which relief can be granted.

## Second Affirmative Defense

Radiance is not entitled to any judgment against Baker, and it is not entitled to recover any damages, interest, costs, attorney's fees, or any other relief whatsoever from Baker.

## Third Affirmative Defense

All of Baker's actions or omissions with respect to the matters at issue in this case were reasonable, necessary, legally protected, and justified under the circumstances. Therefore, Baker has no liability to Radiance.

## Fourth Affirmative Defense

Radiance's claims are barred, in whole or in part, because it has failed to mitigate, avoid, or otherwise reduce its damages or injuries, if any.

## Fifth Affirmative Defense

Radiance's claims are barred because Baker acted in good faith, with due care and without malice, and in conformity with all applicable rules, regulations, constitutional provisions, decisional authorities, procedures, statutes, and statutory interpretations.

## Sixth Affirmative Defense

Baker is immune from any liability to Radiance.

**Seventh Affirmative Defense**

Radiance has no maintainable claim against Baker under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

**Eighth Affirmative Defense**

Radiance has no maintainable claim against Baker under the Alabama Digital Crime Act, Ala. Code § 13A-8-110 *et seq.* (1975).

**Nineth Affirmative Defense**

Radiance has no maintainable claim against Baker for breach of fiduciary duty under Alabama law.

**Tenth Affirmative Defense**

Baker pleads the defense of justification.

**Eleventh Affirmative Defense**

Baker pleads immunity under 18 U.S.C. § 1833(b).

**Twelfth Affirmative Defense**

Radiance's conspiracy claims are barred because Baker, at all relevant times, acted separately and independently, and he did not conspire or federate with any person or entity to commit the unlawful acts alleged in the verified complaint.

**Thirteenth Affirmative Defense**

Radiance's conspiracy claims are barred because there is no underlying tort for which Baker is liable.

## Fourteenth Affirmative Defense

Baker denies engaging in any conduct entitling Radiance to recover punitive damages.

## Fifteenth Affirmative Defense

Some or all of Radiance's claims are without substantial justification, and are unwarranted by existing law or by a non-frivolous argument for changing existing law or establishing new law. Additionally, some or all of the factual contentions underlying Radiance's claims are without evidentiary support, and are unlikely to have evidentiary support even after a reasonable opportunity for further investigation or discovery.

Baker reserves the right to assert additional defenses as discovery progresses in this case. To the extent that any of the allegations in the verified complaint have not been expressly admitted or denied, they are denied and strict proof of each such allegation is demanded.

*S/L. Franklin Corley IV*
C. Gregory Burgess (ASB-1519-R79C)
L. Franklin Corley IV (ASB-7350-T73C)

**Attorneys for defendant Jade Baker**

14

**OF COUNSEL:**

**LANIER FORD SHAVER & PAYNE P.C.**
Post Office Box 2087 (35804)
2101 West Clinton Avenue, Suite 102
Huntsville, Alabama 35805
Telephone Number: (256) 535-1100
Facsimile Number: (256) 533-9322
Email: cgb@lanierford.com
      lfc@lanierford.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of July, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

W. BRAD ENGLISH
EMILY J. CHANCEY
ROBERT G. JONES
BENJAMIN L. MCARTHUR
LA KEISHA BUTLER
TAYLOR R. HOLT
**MAYNARD NEXSEN PC**
655 Gallatin Street
Huntsville, Alabama 35801
Telephone: (256) 512-5705
benglish@MaynardNexsen.com
echancey@MaynardNexsen.com
rjones@MaynardNexsen.com
bmcarthur@MaynardNexsen.com
lbutler@MaynardNexsen.com
taholt@MaynardNexsen.com

THOMAS J. BUTLER
STEPHEN C. JACKSON
**MAYNARD NEXSEN PC**
1901 Sixth Avenue North, Suite 1700
Birmingham, Alabama 35203
Telephone: (205) 254-1063
tbutler@MaynardNexsen.com
steve.jackson@MaynardNexsen.com

*S/L. Franklin Corley IV*
L. Franklin Corley IV

15