# EXHIBIT A

RADIANCE TECHNOLOGIES, INC.

EMPLOYEE STOCK OWNERSHIP PLAN

TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS

ARTICLE II
ADMINISTRATION

2.1    POWERS AND RESPONSIBILITIES OF THE EMPLOYER ................................... 14

2.2    DESIGNATION OF ADMINISTRATIVE AUTHORITY ......................................... 15

2.3    ALLOCATION AND DELEGATION OF RESPONSIBILITIES ............................ 15

2.4    POWERS AND DUTIES OF THE ADMINISTRATOR ............................................ 15

2.5    RECORDS AND REPORTS ..................................................................................... 17

2.6    APPOINTMENT OF ADVISERS ............................................................................. 17

2.7    PAYMENT OF EXPENSES ..................................................................................... 17

2.8    CLAIMS PROCEDURE ............................................................................................ 17

2.9    CLAIMS REVIEW PROCEDURE .......................................................................... 18

ARTICLE III
ELIGIBILITY

3.1    CONDITIONS OF ELIGIBILITY ............................................................................ 18

3.2    EFFECTIVE DATE OF PARTICIPATION ............................................................. 18

3.3    DETERMINATION OF ELIGIBILITY .................................................................... 19

3.4    TERMINATION OF ELIGIBILITY ......................................................................... 19

3.5    REHIRED EMPLOYEES AND BREAKS IN SERVICE .......................................... 19

3.6    ELECTION NOT TO PARTICIPATE ...................................................................... 20

ARTICLE IV
CONTRIBUTION AND ALLOCATION

4.1    FORMULA FOR DETERMINING EMPLOYER CONTRIBUTION ........................ 20

4.2    TIME OF PAYMENT OF EMPLOYER CONTRIBUTION ...................................... 21

i

4.3    ALLOCATION OF CONTRIBUTION, FORFEITURES AND EARNINGS ........... 21

4.4    MAXIMUM ANNUAL ADDITIONS ......................................................................... 26

4.5    DIVERSIFICATION .................................................................................................. 28

4.6    QUALIFIED MILITARY SERVICE ......................................................................... 30

4.7    PROHIBITED ALLOCATION OF COMPANY STOCK........................................... 30

ARTICLE V
FUNDING AND INVESTMENT POLICY

5.1    INVESTMENT POLICY................................................................................................ 35

5.2    APPLICATION OF CASH AND INACTIVE PARTICIPANTS................................ 35

5.3    TRANSACTIONS INVOLVING COMPANY STOCK.............................................. 36

5.4    LOANS TO THE TRUST ........................................................................................... 38

ARTICLE VI
VALUATIONS

6.1    VALUATION OF THE TRUST FUND......................................................................... 39

6.2    METHOD OF VALUATION ....................................................................................... 39

ARTICLE VII
DETERMINATION AND DISTRIBUTION OF BENEFITS

7.1    DETERMINATION OF BENEFITS UPON RETIREMENT ..................................... 39

7.2    DETERMINATION OF BENEFITS UPON DEATH ................................................ 40

7.3    DETERMINATION OF BENEFITS IN EVENT OF DISABILITY.......................... 41

7.4    DETERMINATION OF BENEFITS UPON TERMINATION ................................... 42

7.5    DISTRIBUTION OF BENEFITS................................................................................ 43

7.6    HOW AND WHEN PLAN BENEFITS WILL BE DISTRIBUTED.......................... 45

7.7    REQUIRED MINIMUM DISTRIBUTIONS ............................................................. 47

7.8    DISTRIBUTION FOR MINOR OR INCOMPETENT INDIVIDUAL..................... 52

7.9    LOCATION OF PARTICIPANT OR BENEFICIARY UNKNOWN ........................ 52

7.10   RIGHT OF FIRST REFUSALS ................................................................................. 52

7.11   STOCK CERTIFICATE LEGEND ............................................................................. 53

ii

7.12    PUT OPTION ........................................................................................ 54

7.13    NONTERMINABLE PROTECTIONS AND RIGHTS ............................................ 55

7.14    QUALIFIED DOMESTIC RELATIONS ORDER DISTRIBUTION ......................... 55

7.15    DIRECT ROLLOVER .............................................................................. 56

7.16    CORRECTIVE DISTRIBUTIONS ............................................................... 57

7.17    DIVERSIFICATION AND TRANSFER RIGHTS ............................................. 58

## ARTICLE VIII
## AMENDMENT, TERMINATION AND MERGERS

8.1    AMENDMENT ........................................................................................ 60

8.2    TERMINATION ...................................................................................... 60

8.3    MERGER, CONSOLIDATION OR TRANSFER OF ASSETS .............................. 61

## ARTICLE IX
## TOP HEAVY

9.1    TOP HEAVY PLAN REQUIREMENTS ......................................................... 61

9.2    DETERMINATION OF TOP HEAVY STATUS ............................................... 61

## ARTICLE X
## MISCELLANEOUS

10.1    PARTICIPANT'S RIGHTS ....................................................................... 64

10.2    ALIENATION ........................................................................................ 64

10.3    CONSTRUCTION OF PLAN ...................................................................... 65

10.4    GENDER AND NUMBER .......................................................................... 65

10.5    LEGAL ACTION .................................................................................... 65

10.6    PROHIBITION AGAINST DIVERSION OF FUNDS ......................................... 65

10.7    EMPLOYER'S AND TRUSTEE'S PROTECTIVE CLAUSE ................................ 66

10.8    RECEIPT AND RELEASE FOR PAYMENTS ................................................. 66

10.9    ACTION BY THE EMPLOYER ................................................................... 66

10.10    NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY .............. 66

10.11    HEADINGS .......................................................................................... 67

10.12   ELECTRONIC MEDIA ........................................................... 67

10.13   PLAN CORRECTION .............................................................. 67

10.14   APPROVAL BY INTERNAL REVENUE SERVICE............................................ 67

10.15   UNIFORMITY ....................................................................... 68

10.16   SECURITIES AND EXCHANGE COMMISSION APPROVAL ......................... 68

ARTICLE XI
PARTICIPATING EMPLOYERS

11.1   ADOPTION BY OTHER EMPLOYERS ................................................... 68

11.2   REQUIREMENTS OF PARTICIPATING EMPLOYERS......................................... 68

11.3   DESIGNATION OF AGENT .......................................................... 69

11.4   EMPLOYEE TRANSFERS ............................................................ 69

11.5   PARTICIPATING EMPLOYER CONTRIBUTION AND FORFEITURES.............. 69

11.6   AMENDMENT ...................................................................... 69

11.7   DISCONTINUANCE OF PARTICIPATION ............................................... 69

11.8   ADMINISTRATOR'S AUTHORITY ..................................................... 70

RADIANCE TECHNOLOGIES, INC. EMPLOYEE STOCK OWNERSHIP PLAN

The Radiance Technologies, Inc. Employee Stock Ownership Plan (herein referred to as the "Plan") is hereby amended and restated as of January 1, 2021 by Radiance Technologies, Inc. (herein referred to as the "Employer").

W I T N E S S E T H:

WHEREAS, the Employer heretofore established the Plan effective January 1, 2008, in recognition of the contribution made to its successful operation by its employees and for the exclusive benefit of its eligible employees and such Plan was amended and restated effective January 1, 2014, and January 1, 2015; and

WHEREAS, under the terms of the Plan, the Employer has reserved the right to amend the Plan; and

WHEREAS, contributions to the Plan will be made by the Employer and such contributions made to the Trust will be invested primarily in the capital stock of the Employer;

NOW, THEREFORE, effective January 1, 2021, except as otherwise provided, the Employer in accordance with the provisions of the Plan pertaining to amendments thereof, hereby amends the Plan in its entirety and restates the Plan to provide as follows:

ARTICLE I
DEFINITIONS

1.1     "Account" means the account established and maintained by the Administrator for each Participant with respect to such Participant's total interest in the Plan and Trust resulting from the Employer contributions, and, including but not limited to, such Participant's Transfer Account.

1.2     "Act" means the Employee Retirement Income Security Act of 1974, as it may be amended from time to time.

1.3     "Administrator" means the Employer unless another person or entity has been designated by the Employer pursuant to Section 2.2 to administer the Plan on behalf of the Employer.

1.4     "Affiliated Employer" means any corporation which is a member of a controlled group of corporations (as defined in Code Section 414(b)) which includes the Employer; any trade or business (whether or not incorporated) which is under common control (as defined in Code Section 414(c)) with the Employer; any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Code Section 414(m)) which includes the Employer; and any other entity required to be aggregated with the Employer pursuant to Regulations under Code Section 414(o).

1

1.5     "Aggregate Account" means, with respect to each Participant, the value of all accounts maintained on behalf of a Participant, whether attributable to Employer or Employee contributions, subject to the provisions of Section 9.2.

1.6     "Anniversary Date" means the last day of the Plan Year.

1.7     "Beneficiary" means the person (or entity) to whom the share of a deceased Participant's interest in the Plan is payable.

1.8     "Code" means the Internal Revenue Code of 1986, as amended or replaced from time to time.

1.9     "Company Stock" means common stock issued by the Employer (or by a corporation which is a member of the controlled group of corporations of which the Employer is a member) which is readily tradable on an established securities market. If there is no common stock which meets the foregoing requirement, the term "Company Stock" means common stock issued by the Employer (or by a corporation which is a member of the same controlled group) having a combination of voting power and dividend rights equal to or in excess of: (A) that class of common stock of the Employer (or of any other such corporation) having the greatest voting power, and (B) that class of common stock of the Employer (or of any other such corporation) having the greatest dividend rights. Noncallable preferred stock shall be deemed to be "Company Stock" if such stock is convertible at any time into stock which constitutes "Company Stock" hereunder and if such conversion is at a conversion price which (as of the date of the acquisition by the Trust) is reasonable. For purposes of the preceding sentence, pursuant to Regulations, preferred stock shall be treated as noncallable if after the call there will be a reasonable opportunity for a conversion which meets the requirements of the preceding sentence.

1.10     "Company Stock Account" means the account of a Participant which is credited with the shares of Company Stock purchased and paid for by the Trust Fund or contributed to the Trust Fund.

A separate accounting shall be maintained with respect to that portion of the Company Stock Account attributable to a Participant's or the Participant's Beneficiary's election pursuant to Section 7.5(c)(3) to reinvest cash dividends in Company Stock. Any such Company Stock allocated to the Company Stock Account shall be fully Vested at all times and shall not be subject to Forfeiture for any reason.

1.11     "Compensation" means, with respect to any Participant and except as otherwise provided herein, such Participant's wages for the Plan Year (the "determination period") within the meaning of Code Section 3401(a) (for the purposes of income tax withholding at the source) but determined without regard to any rules that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401(a)(2)) (wages subject to Federal income tax withholding).

Except as provided herein, Compensation for a specified period is the Compensation actually paid or made available (or if earlier, includible in gross income) during such period.

Compensation for a Plan Year shall also include Compensation paid by the later of $2\frac{1}{2}$ months after an Employee's severance from employment with the Employer maintaining the Plan or the end of the Plan Year that includes the date of the Employee's severance from employment with the Employer maintaining the Plan, if the payment is (i) regular Compensation for services during the Employee's regular working hours, or Compensation for services outside the Employee's regular working hours (such as shift differential), commissions, or other similar payments, and, absent a severance from employment, the payments would have been paid to the Employee while the Employee continued in employment with the Employer; (ii) effective as of January 1, 2022, for "unused leave" (i.e., unused accrued bona fide sick, vacation, or other leave, but only if the Employee would have been able to use the leave if employment had continued); or (iii), effective as of January 1, 2022, received by a Participant pursuant to a nonqualified unfunded deferred compensation plan, but only if the payment would have been paid to the Participant at the same time if the Participant had not severed employment and only to the extent that the payment is includible in the Participant's gross income.

Any payments not described above shall not be considered Compensation if paid after severance from employment, even if they are paid by the later of $2\frac{1}{2}$ months after the date of severance from employment or the end of the Plan Year that includes the dates of severance from employment. Additionally, any payments described above shall not be considered Compensation if subject to any other exclusion stated herein, such as the exclusions for overtime and bonuses.

Back pay, within the meaning of section 1.415(c)-2(g)(8) of the Regulations, shall be treated as Compensation for the Plan Year to which the back pay relates to the extent the back pay represents wages and compensation that would otherwise be included in this definition.

For purposes of this Section, the determination of Compensation shall be made by:

(a)     excluding bonuses, overtime, and post and cost of living allowances in accordance with Department of State standardized regulations;

(b)     excluding, effective as of March 1, 2021, reimbursements or other expense allowances, fringe benefits (cash and noncash), moving expenses, deferred compensation, and welfare benefits;

(c)     excluding, effective of as of January 1, 2022, amounts paid to, or on behalf of, the Employee to reduce or offset student loan repayment obligations;

(d)     excluding, for periods prior to January 1, 2022, group term life insurance and amounts realized from the exercise, sale, exchange, settlement or other disposition of any restricted stock, vested stock unit, stock option, or any "synthetic equity" (as such term is defined in Section 4.7(c)(5));

3

(e)    including amounts which are contributed by the Employer pursuant to a salary reduction agreement and which are not includible in the gross income of the Participant under Code Sections 125, 132(f)(4), 402(e)(3), 402(h)(1)(B), 403(b) or 457(b), and, effective as of January 1, 2022, Employee contributions described in Code Section 414(h)(2) that are treated as Employer contributions. For this purpose, effective as of January 1, 2022, amounts not includible in gross income under Code Section 125 shall be deemed to include any amounts not available to a Participant in cash in lieu of group health coverage because the Participant is unable to certify that the Participant has other health coverage, provided the Employer does not request or collect information regarding the Participant's other health coverage as part of the enrollment process for the health plan; and

(f)    including Military Differential Pay.

Compensation in excess of $200,000 (or such other amount provided in the Code) shall be disregarded. Such amount shall be adjusted for increases in the cost of living in accordance with Code Section 401(a)(17)(B), except that the dollar increase in effect on January 1 of any calendar year shall be effective for the Plan Year beginning with or within such calendar year. For any "determination period" of less than twelve (12) months, the Compensation limit shall be an amount equal to the Compensation limit for the calendar year in which the "determination period" begins multiplied by the ratio obtained by dividing the number of full months in the short "determination period" by twelve (12). A "determination period" is not less than twelve (12) months solely because a Participant's Compensation does not include Compensation paid during a determination period while the Participant was not a Participant in the Plan (or a component of the Plan).

If any Employees are excluded from the Plan (or from any component of the Plan), then Compensation for any such Employees who become eligible or cease to be eligible to participate in the Plan (or in the component of the Plan) during a Plan Year shall only include Compensation while such Employees are Eligible Employees of the Plan (or of such component of the Plan).

For purposes of this Section, if the Plan is a plan described in Code Section 413(c) or 414(f) (a plan maintained by more than one Employer), the limitation applies separately with respect to the Compensation of any Participant from each Employer maintaining the Plan.

If, in connection with the adoption of any amendment, the definition of Compensation has been modified, then, except as otherwise provided herein, for Plan Years prior to the Plan Year which includes the adoption date of such amendment, Compensation means compensation determined pursuant to the terms of the Plan then in effect.

1.12    "Contract" means any life insurance policy, retirement income policy or annuity policy (group or individual) issued pursuant to the terms of the Plan. In the event of any conflict between the terms of this Plan and the terms of any contract purchased hereunder, the Plan provisions shall control.

4

1.13    "Current Obligations" means Trust obligations arising from extension of credit to the Trust and payable in cash within (1) year from the date an Employer contribution is due.

1.14    "Eligible Employee" means any Employee, except as provided below. The following Employees shall not be eligible to participate in this Plan:

(a)    Employees of Affiliated Employers, unless such Affiliated Employers have specifically adopted this Plan in writing.

(b)    Individuals who are not reported on the payroll records of the Employer as common law employees. In particular, it is expressly intended that individuals who are not treated as common law employees by the Employer on its payroll records, or partners or other self-employed individuals who are treated as independent contractors, are not Eligible Employees and are excluded from Plan participation even if a court or administrative agency determines that such individuals are common law employees and not independent contractors.

(c)    Employees whose employment is governed by the terms of a collective bargaining agreement between Employee representatives (within the meaning of Code Section 7701(a)(46)) and the Employer under which retirement benefits were the subject of good faith bargaining between the parties, unless such agreement expressly provides for coverage in this Plan.

(d)    Employees who are nonresident aliens (within the meaning of Code Section 7701(b)(1)(B)) and who receive no earned income (within the meaning of Code Section 911(d)(2)) from the Employer which constitutes income from sources within the United States (within the meaning of Code Section 861(a)(3)).

(e)    Leased Employees.

1.15    "Employee" means any person who is employed by the Employer or Affiliated Employer. Employee shall include Leased Employees within the meaning of Code Sections 414(n)(2) and 414(o)(2) unless such Leased Employees are covered by a plan described in Code Section 414(n)(5) and such Leased Employees do not constitute more than 20% of the recipient's non-highly compensated work force.

1.16    "Employer" means Radiance Technologies, Inc., any successor that shall maintain this Plan, and any predecessor that has maintained this Plan. The Employer has elected "S" corporation status under Code Section 1362(a). In addition, where appropriate, the term Employer shall include any Participating Employer (as defined in Section 11.1) which shall adopt this Plan.

1.17    "ESOP" means an employee stock ownership plan that meets the requirements of Code Section 4975(e)(7) and Regulation 54.4975-11.

1.18    "Exempt Loan" means a loan made to the Plan by a disqualified person or a loan to the Plan which is guaranteed by a disqualified person and which satisfies the requirements of Section 5.4 hereof. Any Exempt Loan must be primarily for the benefit of the Participants.

1.19    "Fiduciary" means any person who (a) exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets, (b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan or has any authority or responsibility to do so, or (c) has any discretionary authority or discretionary responsibility in the administration of the Plan.

1.20    "Forfeiture" means that portion of a Participant's Account that is not Vested, and occurs on the earlier of:

(a)    the distribution of the entire Vested portion of the Participant's Account of a Former Participant who has severed employment with the Employer. For purposes of this provision, if the Former Participant has a Vested benefit of zero, then such Former Participant shall be deemed to have received a distribution of such Vested benefit as of the year in which the severance of employment occurs, or

(b)    the last day of the Plan Year in which a Former Participant who has severed employment with the Employer incurs five (5) consecutive 1-Year Breaks in Service.

Regardless of the preceding provisions, if a Former Participant is eligible to share in the allocation of Employer contributions or Forfeitures in the year in which the Forfeiture would otherwise occur, then the Forfeiture will not occur until the end of the first Plan Year for which the Former Participant is not eligible to share in the allocation of Employer contributions or Forfeitures. Furthermore, the term "Forfeiture" shall also include amounts deemed to be Forfeitures pursuant to any other provision of this Plan.

1.21    "Former Participant" means a person who has been a Participant, but who has ceased to be a Participant for any reason.

1.22    "415 Compensation" with respect to any Participant means such Participant's wages for the Plan Year within the meaning of Code Section 3401(a) (for the purposes of income tax withholding at the source) but determined without regard to any rules that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401(a)(2)), plus amounts that would have been treated as wages for withholding purposes but for an election under Code Section 125(a), 132(f)(4), 402(e)(3), 402(h)(1)(B), 402(k), or 457(b), plus Military Differential Pay.

Notwithstanding the above, the determination of 415 Compensation shall be made by:

(a)    including amounts not includible in gross income under Code Section 125 shall be deemed to include any amounts not available to a Participant in cash in lieu of group health coverage because the Participant is unable to certify that the Participant has other health coverage, provided the Employer does not request or collect information regarding the Participant's other health coverage as part of the enrollment process for the health plan.

6

(b)     effective for Limitation Years beginning on and after July 1, 2007, making the following adjustments for amounts that are paid after the Participant's severance from employment with the Employer. Any other payment of compensation paid after severance of employment that is not described in the following types of compensation is not considered compensation within the meaning of Code Section 415(c)(3), even if payment is made within the time period specified above.

(1)     415 Compensation shall include regular pay after severance of employment if:

(i)     The payment is regular compensation for services during the Participant's regular working hours, or compensation for services outside the Participant's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments; and

(ii)     The payment would have been paid to the Participant prior to a severance from employment if the Participant had continued in employment with the Employer, and

(iii)     The payment is made by the later of 2 1/2 months after a Participant's severance from employment with the Employer or the end of the Limitation Year that includes the date of the Participant's severance from employment with the Employer.

(2)     Leave cash-outs shall be included in 415 Compensation if those amounts would have been included in the definition of 415 Compensation if they were paid prior to the Participant's severance from employment with the Employer and the amounts are for unused accrued bona fide sick, vacation, or other leave, but only if the Participant would have been able to use the leave if employment had continued, and such amounts are paid by the later of 2 1/2 months after a Participant's severance from employment with the Employer or the end of the Limitation Year that includes the date of the Participant's severance from employment with the Employer, and represents.

(3)     Deferred compensation shall be included in 415 Compensation if those amounts would have been included in the definition of 415 Compensation if they were paid prior to the Participant's severance from employment with the Employer maintaining the Plan and the amounts are received pursuant to a nonqualified unfunded deferred compensation plan, but only if the payment would have been paid if the Participant had continued in employment with the Employer and only to the extent that the payment is includible in the Participant's gross income, and such payment is made by the later of 2 1/2 months after a Participant's severance from employment with the Employer or the end of the Limitation Year that includes the date of the Participant's severance from employment with the Employer.

Notwithstanding the above, amounts earned but not paid during a Limitation Year solely because of the timing of pay periods and pay dates, shall be included in 415 Compensation

7

for the Limitation Year in which such amounts were earned provided the amounts are paid during the first few weeks of the next Limitation Year, the amounts are included on a uniform and consistent basis with respect to all similarly situated Participants, and no Compensation is included in more than one Limitation Year.

1.23    "Highly Compensated Employee" means an Employee described in Code Section 414(q) and the Regulations thereunder, and generally means any Employee who:

(a)    was a "five percent owner" as defined in the definition for "Key Employee" at any time during the "determination year" or the "look-back year"; or

(b)    for the "look-back year" had "415 Compensation" from the Employer in excess of $80,000. The $80,000 amount is adjusted at the same time and in the same manner as under Code Section 415(d), except that the base period is the calendar quarter ending September 30, 1996.

The "determination year" means the Plan Year for which testing is being performed, and the "look-back year" means the immediately preceding twelve (12) month period.

A highly compensated former Employee is based on the rules applicable to determining Highly Compensated Employee status as in effect for the "determination year," in accordance with Regulation 1.414(q)-1T, A-4 and IRS Notice 97-45 (or any superseding guidance).

In determining who is a Highly Compensated Employee, Employees who are non-resident aliens and who received no earned income (within the meaning of Code Section 911(d)(2)) from the Employer constituting United States source income within the meaning of Code Section 861(a)(3) shall not be treated as Employees. If a nonresident alien Employee has U.S. source income, that Employee is treated as satisfying this definition if all of such Employee's U.S. source income from the Employer is exempt from U.S. income tax under an applicable income tax treaty. Additionally, all Affiliated Employers shall be taken into account as a single employer and Leased Employees within the meaning of Code Sections 414(n)(2) and 414(o)(2) shall be considered Employees unless such Leased Employees are covered by a plan described in Code Section 414(n)(5) and are not covered in any qualified plan maintained by the Employer. The exclusion of Leased Employees for this purpose shall be applied on a uniform and consistent basis for all of the Employer's retirement plans. Highly Compensated former Employees shall be treated as Highly Compensated Employees without regard to whether they performed services during the "determination year."

1.24    "Highly Compensated Participant" means any Highly Compensated Employee who is eligible to participate in the component of the Plan being tested.

1.25    "Hour of Service" means (1) each hour for which an Employee is directly or indirectly compensated or entitled to compensation by the Employer for the performance of duties (these hours will be credited to the Employee for the computation period in which the duties are performed); (2) each hour for which an Employee is directly or indirectly compensated or entitled to compensation by the Employer (irrespective of whether the employment relationship has

8

terminated) for reasons other than performance of duties (such as vacation, holidays, sickness, jury duty, disability, lay-off, military duty or leave of absence) during the applicable computation period (these hours will be calculated and credited pursuant to Department of Labor regulation 2530.200b-2 which is incorporated herein by reference); (3) each hour for which back pay is awarded or agreed to by the Employer without regard to mitigation of damages (these hours will be credited to the Employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made). The same Hours of Service shall not be credited both under (1) or (2), as the case may be, and under (3).

Notwithstanding (2) above, (i) no more than 501 Hours of Service are required to be credited to an Employee on account of any single continuous period during which the Employee performs no duties (whether or not such period occurs in a single computation period); (ii) an hour for which an Employee is directly or indirectly paid, or entitled to payment, on account of a period during which no duties are performed is not required to be credited to the Employee if such payment is made or due under a plan maintained solely for the purpose of complying with applicable worker's compensation, or unemployment compensation or disability insurance laws; and (iii) Hours of Service are not required to be credited for a payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee.

For purposes of (2) above, a payment shall be deemed to be made by or due from the Employer regardless of whether such payment is made by or due from the Employer directly, or indirectly through, among others, a trust fund, or insurer, to which the Employer contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurer, or other entity are for the benefit of particular Employees or are on behalf of a group of Employees in the aggregate.

For purposes of this Section, Hours of Service will be credited for employment with other Affiliated Employers. The provisions of Department of Labor regulations 2530.200b-2(b) and (c) are incorporated herein by reference.

1.26    "Investment Manager" means any Fiduciary described in Act Section 3(38).

1.27    "Key Employee" means an Employee as defined in Code Section 416(i) and the Regulations thereunder. Generally, any Employee or former Employee (as well as each of the Employee's or former Employee's Beneficiaries) is considered a Key Employee if the Employee's or former Employee's, at any time during the Plan Year that contains the "determination date" (within the meaning of Section 9.2) has been included in one of the following categories:

(a)    an officer of the Employer (as that term is defined within the meaning of the Regulations under Code Section 416) having annual "415 Compensation" greater than $130,000 (as adjusted under Code Section 416(i)(1)).

(b)      a "five percent owner" of the Employer. "Five percent owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than five percent (5%) of the outstanding stock of the Employer or stock possessing more than five percent (5%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business, any person who owns more than five percent (5%) of the capital or profits interest in the Employer.

(c)      a "one percent owner" of the Employer having an annual "415 Compensation" from the Employer of more than $150,000. "One percent owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than one percent (1%) of the outstanding stock of the Employer or stock possessing more than one percent (1%) of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business, any person who owns more than one percent (1%) of the capital or profits interest in the Employer.

For purposes of this Section, the determination of "415 Compensation" shall be made by including amounts which are contributed by the Employer pursuant to a salary reduction agreement and which are not includible in the gross income of the Participant under Code Sections 125, 132(f)(4), 402(e)(3), 402(h)(1)(B), 403(b) or 457(b), and Employee contributions described in Code Section 414(h)(2) that are treated as Employer contributions.

In determining percentage ownership hereunder, employers that would otherwise be aggregated under Code Sections 414(b), (c), (m) and (o) shall be treated as separate employers. In determining whether an individual has 415 Compensation of more than $150,000 or $130,000 as adjusted, 415 Compensation from each employer required to be aggregated under Code Sections 414(b), (c), (m) and (o) shall be taken into account.

1.28      "Late Retirement Date" means a Participant's actual Retirement Date after having reached Normal Retirement Date.

1.29      "Leased Employee" means any person (other than an Employee of the recipient Employer) who pursuant to an agreement between the recipient Employer and any other person or entity ("leasing organization") has performed services for the recipient (or for the recipient and related persons determined in accordance with Code Section 414(n)(6)) on a substantially full time basis for a period of at least one year, and such services are performed under primary direction or control by the recipient Employer. Contributions or benefits provided a Leased Employee by the leasing organization which are attributable to services performed for the recipient Employer shall be treated as provided by the recipient Employer. Furthermore, Compensation for a Leased Employee shall only include Compensation from the leasing organization that is attributable to services performed for the recipient Employer. A Leased Employee shall not be considered an Employee of the recipient Employer:

(a)      if such employee is covered by a money purchase pension plan providing:

10

(1)    a nonintegrated employer contribution rate of at least 10% of compensation, as defined in Code Section 415(c)(3);

(2)    immediate participation;

(3)    full and immediate vesting; and

(b)    if Leased Employees do not constitute more than 20% of the recipient Employer's nonhighly compensated work force.

1.30    "Limitation Year"  means the Plan Year.

1.31    "Military Differential Pay" means any differential wage payments made to an individual that represents an amount which, when added to the individual's military pay, approximates the amount of compensation that was paid to the individual while working for the Employer. An individual receiving a differential wage payment, as defined by Code Section 3401(h)(2), is treated as an Employee of the Employer making the payment, and the differential wage payment is treated as 415 Compensation.

The Plan is not treated as failing to meet the requirements of any provision described in Code Section 414(u)(1)(C) (or corresponding Plan provisions) by reason of any contribution or benefit which is based on the differential wage payment. The preceding sentence applies only if all Employees of the Employer performing service in the uniformed services described in Code Section 3401(h)(2)(A) are entitled to receive differential wage payments (as defined in Code Section 3401(h)(2)) on reasonably equivalent terms and, if eligible to participate in a retirement plan maintained by the Employer, to make contributions based on the payments on reasonably equivalent terms (taking into account Code Sections 410(b)(3), (4), and (5)).

1.32    "Non-Highly Compensated Participant" means any Participant who is not a Highly Compensated Employee.

A Participant is a Non-Highly Compensated Participant for a particular Plan Year if such Participant does not meet the definition of a Highly Compensated Employee in effect for that Plan Year.

1.33    "Non-Key Employee" means any Employee or former Employee (and such Employee's or former Employee's Beneficiaries) who is not a Key Employee.

1.34    "Normal Retirement Age" means the Participant's 65th birthday. A Participant shall become fully Vested in the Participant's Account upon attaining Normal Retirement Age (if the Participant is an Employee on or after such date).

1.35    "Normal Retirement Date" means the Participant's Normal Retirement Age.

1.36    "1-Year Break in Service" means the applicable computation period during which an Employee has not completed more than 500 Hours of Service with the Employer. Further, solely for the purpose of determining whether a Participant has incurred a 1-Year Break in Service, Hours of Service shall be recognized for "authorized leaves of absence" and "maternity and paternity leaves of absence." Years of Service and 1-Year Breaks in Service shall be measured on the same computation period.

"Authorized leave of absence" means an unpaid, temporary cessation from active employment with the Employer pursuant to an established nondiscriminatory policy, whether occasioned by illness, military service, or any other reason.

A "maternity or paternity leave of absence" means an absence from work for any period by reason of the Employee's pregnancy, birth of the Employee's child, placement of a child with the Employee in connection with the adoption of such child, or any absence for the purpose of caring for such child for a period immediately following such birth or placement. For this purpose, Hours of Service shall be credited for the computation period in which the absence from work begins, only if credit therefore is necessary to prevent the Employee from incurring a 1-Year Break in Service, or, in any other case, in the immediately following computation period. The Hours of Service credited for a "maternity or paternity leave of absence" shall be those which would normally have been credited but for such absence, or, in any case in which the Administrator is unable to determine such hours normally credited, eight (8) Hours of Service per day. The total Hours of Service required to be credited for a "maternity or paternity leave of absence" shall not exceed the number of Hours of Service needed to prevent the Employee from incurring a 1-Year Break in Service.

1.37    "Other Investments Account" means the account of a Participant which is credited with such Participant's share of the net gain (or loss) of the Plan and Employer contributions in other than Company Stock and which is debited with payments made to pay for Company Stock.

1.38    "Participant" means any Eligible Employee who participates in the Plan and has not for any reason become ineligible to participate further in the Plan.

1.39    "Plan" means this instrument, including all amendments thereto.

1.40    "Plan Year" means the Plan's accounting year of twelve (12) months commencing on January 1 of each year and ending the following December 31.

1.41    "Radiance 401(k) Plan" means the Radiance Technologies, Inc. 401(k) Profit Sharing Plan.

1.42    "Regulation" means the income tax regulations as promulgated by the Secretary of the Treasury or a delegate of the Secretary of the Treasury, and as amended from time to time.

1.43    "Retirement" means a Participant's separation from service on or after attaining Normal Retirement Age.

1.44    "Retirement Date" means the date as of which a Participant retires for reasons other than Total and Permanent Disability, whether such retirement occurs on a Participant's Normal Retirement Date or Late Retirement Date (see Section 7.1).

1.45    "Terminated Participant" means a person who has been a Participant, but whose employment has been terminated other than by death, Total and Permanent Disability or Retirement.

1.46    "Top Heavy Plan" means a plan described in Section 9.2(a).

1.47    "Top Heavy Plan Year" means a Plan Year during which the Plan is a Top Heavy Plan.

1.48    "Total and Permanent Disability" means a physical or mental condition of a Participant resulting from bodily injury, disease, or mental disorder which renders such Participant incapable of continuing any gainful occupation and which condition constitutes total disability under the federal Social Security Acts or the Participant being determined by the insurance carrier for a long-term disability plan maintained by the Employer to be eligible for benefits under such plan.

1.49    "Transfer Account" means the account established and maintained by the Administrator for each Participant with respect to the Participant's interest in the Plan resulting from amounts transferred to this Plan pursuant to the direct plan-to-plan transfer from the Radiance 401(k) Plan described in Section 7.17.

1.50    "Trust" means the trust created by the Trust Agreement.

1.51    "Trustee" means the person(s) or entity named as trustee herein or in any separate trust forming a part of this Plan, and any successors.

1.52    "Trust Agreement" means the agreement between the Employer and the Trustee or any successor Trustee establishing the Trust and specifying the duties of the Trustee.

1.53    "Trust Fund" means the assets of the Plan and Trust as the same shall exist from time to time.

1.54    "Unallocated Company Stock Suspense Account" means an account containing Company Stock acquired with the proceeds of an Exempt Loan and which has not been released from such account and allocated to the Participants' Company Stock Accounts.

1.55    "Valuation Date" means the Anniversary Date and may include any other date or dates deemed necessary or appropriate by the Administrator for the valuation of the Participant's Account during the Plan Year, which may include any day that the Trustee, any transfer agent appointed by the Trustee or the Employer or any stock exchange used by such agent, are open for business.

1.56    "Vested" means the nonforfeitable portion of any account maintained on behalf of a Participant.

1.57    "Year of Service" means the computation period of twelve (12) consecutive months, herein set forth, during which an Employee has at least 1000 Hours of Service.

For vesting purposes, the computation periods shall be the Plan Year, excluding periods prior to the effective date of the Plan.

The computation period for all other purposes shall be the Plan Year if not otherwise set forth herein.

Notwithstanding the foregoing, for any short Plan Year, the determination of whether an Employee has completed a Year of Service shall be made in accordance with Department of Labor regulation 2530.203-2(c). However, in determining whether an Employee has completed a Year of Service for benefit accrual purposes in the short Plan Year, the number of the Hours of Service required shall be proportionately reduced based on the number of full months in the short Plan Year.

Years of Service with any Affiliated Employer shall be recognized.

ARTICLE II
ADMINISTRATION

2.1    POWERS AND RESPONSIBILITIES OF THE EMPLOYER

(a)    In addition to the general powers and responsibilities otherwise provided for in this Plan, the Employer shall be empowered to appoint and remove the Trustee and the Administrator from time to time as it deems necessary for the proper administration of the Plan to ensure that the Plan is being operated for the exclusive benefit of the Participants and their Beneficiaries in accordance with the terms of the Plan, the Code, and the Act. The Employer may appoint counsel, specialists, advisers, agents (including any nonfiduciary agent) and other persons as the Employer deems necessary or desirable in connection with the exercise of its fiduciary duties under this Plan. The Employer may compensate such agents or advisers from the assets of the Plan as fiduciary expenses (but not including any business (settlor) expenses of the Employer), to the extent not paid by the Employer.

(b)    The Employer may, by written agreement or designation, appoint at its option an Investment Manager (qualified under the Investment Company Act of 1940 as amended), investment adviser, or other agent to provide direction to the Trustee with respect to any or all of the Plan assets. Such appointment shall be given by the Employer in writing in a form acceptable to the Trustee and shall specifically identify the Plan assets with respect to which the Investment Manager or other agent shall have authority to direct the investment.

(c)    The Employer shall establish a "funding policy and method," i.e., it shall determine

14

whether the Plan has a short run need for liquidity (e.g., to pay benefits) or whether liquidity is a long run goal and investment growth (and stability of same) is a more current need, or shall appoint a qualified person to do so. The Employer or its delegate shall communicate such needs and goals to the Trustee, who shall coordinate such Plan needs with its investment policy. The communication of such a "funding policy and method" shall not, however, constitute a directive to the Trustee as to the investment of the Trust Funds. Such "funding policy and method" shall be consistent with the objectives of this Plan and with the requirements of Title I of the Act.

(d)     The Employer shall periodically review the performance of any Fiduciary or other person to whom duties have been delegated or allocated by it under the provisions of this Plan or pursuant to procedures established hereunder. This requirement may be satisfied by formal periodic review by the Employer or by a qualified person specifically designated by the Employer, through day-to-day conduct and evaluation, or through other appropriate ways.

(e)     The Employer will furnish Fiduciaries and Participants with notices and information statements when voting rights must be exercised.

## 2.2    DESIGNATION OF ADMINISTRATIVE AUTHORITY

The Employer shall be the Administrator. The Employer may appoint any person, including, but not limited to, the Employees of the Employer, to perform the duties of the Administrator. Any person so appointed shall signify acceptance by filing written acceptance with the Employer. Upon the resignation or removal of any individual performing the duties of the Administrator, the Employer may designate a successor.

## 2.3    ALLOCATION AND DELEGATION OF RESPONSIBILITIES

If more than one person is appointed as Administrator, the responsibilities of each Administrator may be specified by the Employer and accepted in writing by each Administrator. In the event that no such delegation is made by the Employer, the Administrators may allocate the responsibilities among themselves, in which event the Administrators shall notify the Employer and the Trustee in writing of such action and specify the responsibilities of each Administrator. The Trustee thereafter shall accept and rely upon any documents executed by the appropriate Administrator until such time as the Employer or the Administrators file with the Trustee a written revocation of such designation.

## 2.4    POWERS AND DUTIES OF THE ADMINISTRATOR

The primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan. The Administrator shall administer the Plan in accordance with its terms and shall have the power and discretion to construe the terms of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan. Any such determination by the Administrator shall be conclusive and binding upon all persons. The Administrator may establish procedures, correct any defect, supply any information, or reconcile any inconsistency in such

manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Plan; provided, however, that any procedure, discretionary act, interpretation or construction shall be done in a nondiscriminatory manner based upon uniform principles consistently applied and shall be consistent with the intent that the Plan shall continue to be deemed a qualified plan under the terms of Code Section 401(a), and shall comply with the terms of the Act and all regulations issued pursuant thereto. The Administrator shall have all powers necessary or appropriate to accomplish the Administrator's duties under the Plan.

The Administrator shall be charged with the duties of the general administration of the Plan as set forth under the terms of the Plan, including, but not limited to, the following:

(a)     the discretion to determine all questions relating to the eligibility of Employees to participate or remain a Participant hereunder and to receive benefits under the Plan;

(b)     to compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any Participant shall be entitled hereunder;

(c)     to authorize and direct the Trustee with respect to all nondiscretionary or otherwise directed disbursements from the Trust;

(d)     to maintain all necessary records for the administration of the Plan;

(e)     to interpret the provisions of the Plan and to make and publish such rules for regulation of the Plan as are consistent with the terms hereof;

(f)     to determine the size and type of any Contract to be purchased from any insurer, and to designate the insurer from which such Contract shall be purchased;

(g)     to compute and certify to the Employer and to the Trustee from time to time the sums of money necessary or desirable to be contributed to the Plan;

(h)     to consult with the Employer and the Trustee regarding the short and long-term liquidity needs of the Plan in order that the Trustee can exercise any investment discretion in a manner designed to accomplish specific objectives;

(i)     to establish and communicate to Participants a procedure for satisfying the diversification requirements under Code Section 401(a)(28);

(j)     to establish and communicate to Participants a procedure and method to insure that each Participant will vote Company Stock allocated to such Participant's Company Stock Account pursuant;

(k)     to determine the validity of, and take appropriate action with respect to, any qualified domestic relations order received by it;

(l)    to assist any Participant regarding the Participant's rights, benefits, or elections available under the Plan; and

(m)    to establish and maintain a distribution policy to interpret the distribution provisions of the Plan and provide for methods for benefit distributions from the Plan.

2.5    RECORDS AND REPORTS

The Administrator shall keep a record of all actions taken and shall keep all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law.

2.6    APPOINTMENT OF ADVISERS

The Administrator, or the Trustee with the consent of the Administrator, may appoint counsel, specialists, advisers, agents (including nonfiduciary agents) and other persons as the Administrator or the Trustee deems necessary or desirable in connection with the administration of this Plan, including but not limited to agents and advisers to assist with the administration and management of the Plan, and thereby to provide, among such other duties as the Administrator may appoint, assistance with maintaining Plan records and the providing of investment information to the Plan's investment Fiduciaries and to Participants.

2.7    PAYMENT OF EXPENSES

All expenses of administration may be paid out of the Trust Fund unless paid by the Employer. Such expenses shall include any expenses incident to the functioning of the Administrator, or any person or persons retained or appointed by any named Fiduciary incident to the exercise of their duties under the Plan, including, but not limited to, fees of accountants, counsel, Investment Managers, agents (including nonfiduciary agents) appointed for the purpose of assisting the Administrator or the Trustee in carrying out the instructions of Participants as to the directed investment of their Accounts and other specialists and their agents, the costs of any bonds required pursuant to Act Section 412, and other costs of administering the Plan. Until paid, the expenses shall constitute a liability of the Trust Fund.

2.8    CLAIMS PROCEDURE

Claims for benefits under the Plan may be filed in writing with the Administrator. Written or electronic notice of the disposition of a claim shall be furnished to the claimant within 90 days after the application is filed, or such period as is required by applicable law or Department of Labor regulation. In the event the claim is denied, the reasons for the denial shall be specifically set forth in the notice in language calculated to be understood by the claimant, pertinent provisions of the Plan shall be cited, and, where appropriate, an explanation as to how the claimant can perfect the claim will be provided. In addition, the claimant shall be furnished with an explanation of the Plan's claims review procedure.

17

2.9     CLAIMS REVIEW PROCEDURE

Any Employee, former Employee, or Beneficiary of either, who has been denied a benefit by a decision of the Administrator pursuant to Section 2.8 shall be entitled to request the Administrator to give further consideration to a claim by filing with the Administrator a written request for a hearing. Such request, together with a written statement of the reasons why the claimant believes the claim should be allowed, shall be filed with the Administrator no later than 60 days after receipt of the written or electronic notification provided for in Section 2.8. The Administrator shall then conduct a hearing within the next 60 days, at which the claimant may be represented by an attorney or any other representative of such claimant's choosing and expense and at which the claimant shall have an opportunity to submit written and oral evidence and arguments in support of the claim. At the hearing the claimant or the claimant's representative shall have an opportunity to review all documents in the possession of the Administrator which are pertinent to the claim at issue and its disallowance. Either the claimant or the Administrator may cause a court reporter to attend the hearing and record the proceedings. In such event, a complete written transcript of the proceedings shall be furnished to both parties by the court reporter. The full expense of any such court reporter and such transcripts shall be borne by the party causing the court reporter to attend the hearing. A final decision as to the allowance of the claim shall be made by the Administrator within 60 days of receipt of the appeal (unless there has been an extension of 60 days due to special circumstances, provided the delay and the special circumstances occasioning it are communicated to the claimant within the 60 day period). Such communication shall be written in a manner calculated to be understood by the claimant and shall include specific reasons for the decision and specific references to the pertinent Plan provisions on which the decision is based.

ARTICLE III
ELIGIBILITY

3.1     CONDITIONS OF ELIGIBILITY

Any Eligible Employee who has attained age 21 shall be eligible to participate hereunder as of the date such Employee has satisfied such requirements, provided that no age requirement shall apply effective as of January 1, 2022. However, any Employee who was a Participant in the Plan prior to the effective date of this amendment and restatement shall continue to participate in the Plan, subject to the eligibility terms as amended from time to time.

3.2     EFFECTIVE DATE OF PARTICIPATION

An Eligible Employee shall become a Participant effective as of the date on which he satisfies the eligibility requirements of Section 3.1.

If an Employee, who has satisfied the Plan's eligibility requirements and would otherwise have become a Participant, shall go from a classification of a noneligible Employee to an Eligible Employee, such Employee shall become a Participant on the date such Employee becomes an

Eligible Employee or, if later, the date that the Employee would have otherwise entered the Plan had the Employee always been an Eligible Employee.

If an Employee, who has satisfied the Plan's eligibility requirements and would otherwise become a Participant, shall go from a classification of an Eligible Employee to a noneligible class of Employees, such Employee shall become a Participant in the Plan on the date such Employee again becomes an Eligible Employee, or, if later, the date that the Employee would have otherwise entered the Plan had the Employee always been an Eligible Employee. However, if such Employee incurs a 1-Year Break in Service, eligibility will be determined under the break in service rules set forth in Section 3.5.

### 3.3    DETERMINATION OF ELIGIBILITY

The Administrator shall determine the eligibility of each Employee for participation in the Plan based upon information furnished by the Employer. Such determination shall be conclusive and binding upon all persons, as long as the same is made pursuant to the Plan and the Act. Such determination shall be subject to review pursuant to Section 2.9.

### 3.4    TERMINATION OF ELIGIBILITY

In the event a Participant shall go from a classification of an Eligible Employee to an ineligible Employee, such Former Participant shall continue to vest in the Plan for each Year of Service completed while a noneligible Employee, until such time as the Participant's Account shall be forfeited or distributed pursuant to the terms of the Plan. Additionally, the Former Participant's interest in the Plan shall continue to share in the earnings of the Trust Fund.

### 3.5    REHIRED EMPLOYEES AND BREAKS IN SERVICE

(a)    If any Employee becomes a former Employee due to severance from employment with the Employer and is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service occur, then the former Employee's prior service shall count in the same manner as if severance from employment with the Employer had not occurred. If any Participant ceases to be a Participant due to severance from employment with the Employer and is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service occur, then the Participant shall resume participation (as if severance from employment with the Employer had not occurred) on the reemployment date.

(b)    After a Former Participant who has severed employment with the Employer incurs five (5) consecutive 1-Year Breaks in Service, the Vested portion of such Former Participant's Account attributable to pre-break service shall not be increased as a result of post-break service. In such case, separate accounts will be maintained as follows:

(1)    one account for nonforfeitable benefits attributable to pre-break service; and

(2)      one account representing the Participant's Employer derived account balance in the Plan attributable to post-break service.

(c)      If any Participant becomes a Former Participant due to severance of employment with the Employer and is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service, and such Former Participant had received a distribution of the entire Vested interest prior to reemployment, then the forfeited account shall be reinstated only if the Former Participant repays the full amount which had been distributed. Such repayment must be made before the earlier of five (5) years after the first date on which the Participant is subsequently reemployed by the Employer or the close of the first period of five (5) consecutive 1-Year Breaks in Service commencing after the distribution. If a distribution occurs for any reason other than a severance of employment, the time for repayment may not end earlier than five (5) years after the date of distribution. In the event the Former Participant does repay the full amount distributed, the undistributed forfeited portion of the Participant's Account must be restored in full, unadjusted by any gains or losses occurring subsequent to the Valuation Date preceding the distribution. The source for such reinstatement may be Forfeitures occurring during the Plan Year. If such source is insufficient, then the Employer will contribute an amount which is sufficient to restore any such forfeited Accounts; provided, however, that if a discretionary contribution is made for such year pursuant to Section 4.1, such contribution shall first be applied to restore any such Accounts and the remainder shall be allocated in accordance with Section 4.3.

If a non-Vested Former Participant was deemed to have received a distribution and such Former Participant is reemployed by the Employer before five (5) consecutive 1-Year Breaks in Service, then such Participant will be deemed to have repaid the deemed distribution as of the date of reemployment.

3.6      ELECTION NOT TO PARTICIPATE

An Employee may, subject to the approval of the Employer, elect voluntarily and irrevocably not to participate in the Plan. The election not to participate must be communicated to the Employer, in writing, within a reasonable period of time before the beginning of the first Plan Year to which such waiver shall apply.

ARTICLE IV
CONTRIBUTION AND ALLOCATION

4.1      FORMULA FOR DETERMINING EMPLOYER CONTRIBUTION

(a)      For each Plan Year, the Employer shall contribute to the Plan such amount as shall be determined by the Employer.

(b)      The Employer shall contribute to the Plan the amount necessary to provide the top heavy minimum contribution. All contributions by the Employer shall be made in cash or, if there is no prohibited transaction within the meaning of Labor regulation 2509.94-3, in such property as is acceptable to the Trustee.

20

4.2    TIME OF PAYMENT OF EMPLOYER CONTRIBUTION

The Employer may make its contribution to the Plan for a particular Plan Year at such time as the Employer, in its sole discretion, determines. If the Employer makes a contribution for a particular Plan Year after the close of that Plan Year, the Employer will designate to the Trustee the Plan Year for which the Employer is making its contribution.

4.3    ALLOCATION OF CONTRIBUTION, FORFEITURES AND EARNINGS

(a)    The Administrator shall establish and maintain an Account in the name of each Participant to which the Administrator shall credit as of each Anniversary Date, or other Valuation Date, all amounts allocated to each such Participant as set forth herein.

(b)    The Employer shall provide the Administrator with all information required by the Administrator to make a proper allocation of the Employer contribution for each Plan Year. Within a reasonable period of time after the date of receipt by the Administrator of such information, the Administrator shall allocate such contribution to each Participant's Account in accordance with written directions to the Trustee and such contributions shall be allocated to each Participant's Account in the same proportion that each such Participant's Compensation for the year bears to the total Compensation of all Participants for such year.

Only Participants who have completed a Year of Service during the Plan Year and are actively employed on the last day of the Plan Year shall be eligible to share in the discretionary contribution for the year.

(c)    The Company Stock Account of each Participant shall be credited as of each Anniversary Date with the Participant's allocable share of Company Stock (including fractional shares) purchased and paid for by the Plan or contributed in kind by the Employer. Stock dividends on Company Stock held in the Participant's Company Stock Account shall be credited to the Participant's Company Stock Account when paid to the Plan. Cash dividends on Company Stock held in the Participant's Company Stock Account shall, in the sole discretion of the Administrator, either be credited to the Participant's Other Investments Account when paid to the Plan or be used to repay an Exempt Loan; provided, however, that when cash dividends are used to repay an Exempt Loan, Company Stock shall be released from the Unallocated Company Stock Suspense Account and allocated to the Participant's Company Stock Account pursuant to Section 4.3(e) and, provided further, that Company Stock allocated to the Participant's Company Stock Account shall have a fair market value not less than the amount of cash dividends which would have been allocated to such Participant's Other Investments Account for the year.

Notwithstanding the above, if the Employer elected to be an S corporation under Code Section 1362(a) and a distribution under Code Section 1368(a) is made, then the Administrator shall direct that such distribution on S corporation Company Stock held in the Participant's Company Stock Account shall, in the sole discretion of the Administrator, either be credited to the Participant's Other Investment Account when paid to the Plan or be used to repay an Exempt Loan;

21

provided, however, that when such distribution is used to repay an Exempt Loan, Company Stock shall be released from the Unallocated Company Stock Suspense Account and allocated to the Participant's Company Stock Account pursuant to Section 4.3(e) and, provided further, that Company Stock allocated to the Participant's Company Stock Account shall have a fair market value not less than the amount of the distribution that would have been allocated to such Participant's Other Investment Account for the year.

Company Stock acquired by the Plan with the proceeds of an Exempt Loan shall only be allocated to each Participant's Company Stock Account upon release from the Unallocated Company Stock Suspense Account as provided in Section 4.3(e) herein. Company Stock acquired with the proceeds of an Exempt Loan shall be an asset of the Trust Fund and maintained in the Unallocated Company Stock Suspense Account.

(d)    Except as provided above with respect to stock dividends on Company Stock, as of each Valuation Date, after allocation of Employer contributions, any earnings or losses (net appreciation or net depreciation) of the Trust Fund shall be allocated in the same proportion that each Participant's and Former Participant's nonsegregated accounts (other than each Participant's Company Stock Account) bear to the total of all Participants' and Former Participants' nonsegregated accounts (other than each Participant's Company Stock Account) as of such date.

Earnings or losses do not include the interest paid under any installment contract for the purchase of Company Stock by the Trust Fund or on any loan used by the Trust Fund to purchase Company Stock, nor does it include income received by the Trust Fund with respect to Company Stock acquired with the proceeds of an Exempt Loan; all income received by the Trust Fund from Company Stock acquired with the proceeds of an Exempt Loan may, at the discretion of the Administrator, be used to repay such loan.

(e)    All Company Stock acquired by the Plan with the proceeds of an Exempt Loan must be added to and maintained in the Unallocated Company Stock Suspense Account. Such Company Stock shall be released and withdrawn from that account as if all Company Stock in that account were encumbered. For each Plan Year during the duration of the loan, the number of shares of Company Stock released shall equal the number of encumbered shares held immediately before release for the current Plan Year multiplied by a fraction, the numerator of which is the amount of principal and interest paid for the Plan Year and the denominator of which is the sum of the numerator plus the principal and interest to be paid for all future Plan Years; provided however, at the discretion of the Administrator, the number of shares of Company Stock released and withdrawn from the Unallocated Company Stock Suspense Account may be determined solely with reference to the principal payment of the Exempt Loan if the following three conditions are met: (i) the Exempt Loan provides for annual payments of principal and interest at a cumulative rate that is not less rapid at any time than level annual payments of such amounts for ten years; (ii) the interest portion of any payment is disregarded for purposes of determining the number of shares released only to the extent it would be treated as interest under standard loan amortization tables; and (iii) if the Exempt Loan is renewed, extended or refinanced, the sum of the expired duration of the Exempt Loan and the renewal period, the extension period or the duration of a new Exempt

22

Loan does not exceed ten years. As of each Anniversary Date, the Plan must consistently allocate to each Participant's Account, in the same manner as Employer discretionary contributions pursuant to Section 4.1(a) are allocated, non-monetary units (shares and fractional shares of Company Stock) representing each Participant's interest in Company Stock withdrawn from the Unallocated Company Stock Suspense Account. In addition, Company Stock released from the Unallocated Company Stock Suspense Account with cash dividends pursuant to Section 4.3(c) shall be allocated to each Participant's Company Stock Account in the same manner as Employer discretionary contributions pursuant to Section 4.1(a) are allocated. Income earned with respect to Company Stock in the Unallocated Company Stock Suspense Account shall be used, at the discretion of the Administrator, to repay the Exempt Loan used to purchase such Company Stock. Company Stock released from the Unallocated Company Stock Suspense Account with such income, and any income which is not so used, shall be allocated as of each Anniversary Date in the same proportion that each Participant's and Former Participant's nonsegregated accounts after the allocation of any earnings or losses pursuant to the Employer discretionary contribution described in Section 4.1(a) bear to the total of all Participants' and Former Participants' nonsegregated account after the allocation of any earnings or losses pursuant to Section 4.3(d).

Notwithstanding the above, if the Employer elected to be an S corporation under Code Section 1362(a), Company Stock released from the Unallocated Company Stock Suspense Account with a distribution under Code Section 1368(a) on S corporation Company Stock pursuant to Section 4.3(c) shall be allocated to each Participant's Company Stock Account in the same proportion that each Participant's number of shares of Company Stock sharing in such distribution bears to the total number of shares of all Participant's Company Stock sharing in such distribution.

It is intended that the provisions of this section be applied and construed in a manner consistent with the requirements and provisions of Treas. Reg. section 54.4975-7(b)(8) and any successor Regulations thereto.

(f)      On or before each Anniversary Date any amounts that became Forfeitures since the last Anniversary Date may be made available to reinstate previously forfeited account balances, if any, of Former Participants in accordance with Section 3.5, reduce any Employer contributions, satisfy any contributions that may be required pursuant to Section 7.9, and/or pay administrative expenses of the Plan. The remaining Forfeitures, if any, shall be allocated among the Participant's Account in the same manner as Employer discretionary contributions pursuant to Section 4.1(a) are allocated. Provided, however, that in the event the allocation of Forfeitures provided herein shall cause the "annual addition" (as defined in Section 4.4) to any Participant's Account to exceed the amount allowable by the Code, the excess shall be reallocated in accordance with Section 4.4.

(g)      For any Top Heavy Plan Year, Non-Key Employees not otherwise eligible to share in the allocation of contributions as provided above, shall receive the minimum allocation provided for in Section 4.3(i) if eligible pursuant to the provisions of Section 4.3(k).

(h)      Notwithstanding the foregoing, Participants who are not actively employed on the last day of the Plan Year due to Retirement, Total and Permanent Disability or death shall share in

the allocation of contributions for that Plan Year regardless of whether such Participants completed a Year of Service during such Plan Year.

(i)      Minimum Allocations Required for Top Heavy Plan Years: Notwithstanding the foregoing, for any Top Heavy Plan Year, the sum of the Employer contributions allocated to the Participant's Account of each Non-Key Employee shall be equal to at least three percent (3%) of such Non-Key Employee's "415 Compensation" (reduced by contributions and forfeitures, if any, allocated to each Non-Key Employee in any defined contribution plan included with this Plan in a Required Aggregation Group). However, if (1) the sum of the Employer contributions allocated to the Participant's Account of each Key Employee for such Top Heavy Plan Year is less than three percent (3%) of each Key Employee's "415 Compensation" and (2) this Plan is not required to be included in an Aggregation Group to enable a defined benefit plan to meet the requirements of Code Section 401(a)(4) or 410, then the sum of the Employer contributions allocated to the Participant's Account of each Non-Key Employee shall be equal to the largest percentage allocated to the Participant's Account of any Key Employee.

However, no such minimum allocation shall be required in this Plan for any Non-Key Employee who participates in another defined contribution plan subject to Code Section 412 included with this Plan in a Required Aggregation Group where the other plan provides the minimum allocation.

(j)      For purposes of the minimum allocations set forth above, the percentage allocated to the Participant's Account of any Key Employee shall be equal to the ratio of the sum of the Employer contributions allocated on behalf of such Key Employee divided by the "415 Compensation" for such Key Employee.

(k)      For any Top Heavy Plan Year, the minimum allocations set forth above shall be allocated to the Participant's Account of all Non-Key Employees who are Participants and who are employed by the Employer on the last day of the Plan Year, including Non-Key Employees who have (1) failed to complete a Year of Service; (2) failed to receive an allocation of Employer contributions merely because the Participant's Compensation was less than a stated amount, or (3) declined to make mandatory contributions (if required) to the Plan.

(l)      For the purposes of this Section, "415 Compensation" in excess of $150,000 (or such other amount provided in the Code) shall be disregarded. Such amount shall be adjusted for increases in the cost of living in accordance with Code Section 401(a)(17)(B), except that the dollar increase in effect on January 1 of any calendar year shall be effective for the Plan Year beginning with or within such calendar year. If "415 Compensation" for any prior determination period is taken into account in determining a Participant's minimum benefit for the current Plan Year, the "415 Compensation" for such determination period is subject to the applicable annual "415 Compensation" limit in effect for that prior period. For this purpose, in determining the minimum benefit in Plan Years beginning on or after January 1, 1989, the annual "415 Compensation" limit in effect for determination periods beginning before that date is $200,000 (or such other amount as adjusted for increases in the cost of living in accordance with Code Section 415(d) for

determination periods beginning on or after January 1, 1989, and in accordance with Code Section 401(a)(17)(B) for determination periods beginning on or after January 1, 1994). For determination periods beginning prior to January 1, 1989, the $200,000 limit shall apply only for Top Heavy Plan Years and shall not be adjusted. For any short Plan Year the "415 Compensation" limit shall be an amount equal to the "415 Compensation" limit for the calendar year in which the Plan Year begins multiplied by the ratio obtained by dividing the number of full months in the short Plan Year by twelve (12).

(m)     Notwithstanding anything in this Section to the contrary, all information necessary to properly reflect a given transaction may not be available until after the date specified herein for processing such transaction, in which case the transaction will be reflected when such information is received and processed. Subject to express limits that may be imposed under the Code, the processing of any contribution, distribution or other transaction may be delayed for any legitimate business reason (including, but not limited to, failure of systems or computer programs, failure of the means of the transmission of data, force majeure, the failure of a service provider to timely receive values or prices, and the correction for errors or omissions or the errors or omissions of any service provider). The processing date of a transaction will be binding for all purposes of the Plan.

(n)     410(b) ratio percentage fail-safe provisions. Notwithstanding anything in the Plan to the contrary, if the Plan would otherwise fail to meet the requirements of Code Section 410(b)(1)(B) and the Regulations thereunder because the Employer discretionary contributions described in Section 4.1(a) would not be allocated to a sufficient number or percentage of Participants for a Plan Year, then the following rules may apply as determined by the Administrator (except as otherwise provided for herein):

(1)     The group of Participants eligible to share in the Employer discretionary contributions for the Plan Year will be expanded to include the minimum number of Participants who would not otherwise be eligible as are necessary to satisfy the applicable test specified above. The specific Participants who become eligible under the terms of this paragraph will be those who have not separated from service prior to the last day of the Plan Year and have completed the greatest number of Hours of Service in the Plan Year. In the event that more Participants than the "minimum necessary" become entitled to an allocation because they all have the same number of Hours of Service (and at least one of that group is required to receive an allocation in order for the test to be satisfied), then all such Participants shall be deemed to constitute the minimum necessary to pass the test.

(2)     If after application of paragraph (1) above, the applicable test is still not satisfied, then the group of Participants eligible to share in the Employer discretionary contributions for the Plan Year shall be further expanded to include the minimum number of Participants who have separated from service prior to the last day of the Plan Year as are necessary to satisfy the applicable test. The specific Participants who become eligible to share shall be those Participants who have completed the greatest number of Hours of Service in the Plan Year before terminating employment. In the event that more Participants than the "minimum necessary"

become entitled to an allocation because they all have the same number of Hours of Service (and at least one of that group is required to receive an allocation in order for the test to be satisfied), then all such Participants shall be deemed to constitute the minimum necessary to pass the test.

(3)      Nothing in this Section 4.3(n)  will permit the reduction of a Participant's accrued benefit. Therefore, any amounts that have previously been allocated to Participants may not be reallocated to satisfy these requirements. In such event, the Employer shall make an additional contribution equal to the amount such affected Participants would have received had they been included in the allocations, even if it exceeds the amount that would be deductible under Code Section 404. Any adjustment to the allocations pursuant to this paragraph will be considered a retroactive amendment adopted by the last day of the Plan Year.

Notwithstanding the foregoing, if the Plan fails to meet the requirements of Code Section 410(b)(1)(B) and the Regulations thereunder because the Employer discretionary contributions would not be allocated to a sufficient number or percentage of Participants for a Plan Year, the Administrator may use any other correction method permitted under the Code and Regulations thereunder and the foregoing will not limit the right of the Employer to amend the Plan to address such failure in a manner consistent with the requirements of the Code and Regulations thereunder.

4.4      MAXIMUM ANNUAL ADDITIONS

(a)      Notwithstanding the foregoing, the maximum "annual additions" credited to a Participant's accounts for any "limitation year" shall equal the lesser of: (1) $40,000 adjusted annually as provided in Code Section 415(d) pursuant to the Regulations, or (2) one-hundred percent (100%) of the Participant's "415 Compensation" for such "limitation year." If the Employer contribution that would otherwise be contributed or allocated to the Participant's accounts would cause the "annual additions" for the "limitation year" to exceed the maximum "annual additions," the amount contributed or allocated will be reduced so that the "annual additions" for the "limitation year" will equal the maximum "annual additions," and any amount in excess of the maximum "annual additions," which would have been allocated to such Participant may be allocated to other Participants. For any short "limitation year," the dollar limitation in (1) above shall be reduced by a fraction, the numerator of which is the number of full months in the short "limitation year" and the denominator of which is twelve (12).

(b)      For purposes of applying the limitations of Code Section 415, "annual additions" means the sum credited to a Participant's accounts for any "limitation year" of (1) Employer contributions, (2) Employee contributions, (3) forfeitures, (4) amounts allocated, after March 31, 1984, to an individual medical account, as defined in Code Section 415(l)(2) which is part of a pension or annuity plan maintained by the Employer, (5) amounts derived from contributions paid or accrued after December 31, 1985, in taxable years ending after such date, which are attributable to post-retirement medical benefits allocated to the separate account of a key employee (as defined in Code Section 419A(d)(3)) under a welfare benefit plan (as defined in Code Section 419(e)) maintained by the Employer and (6) allocations under a simplified employee pension plan. Except,

however, the "415 Compensation" percentage limitation referred to in paragraph (a)(2) above shall not apply to: (A) any contribution for medical benefits after separation from service (within the meaning of Code Sections 401(h) or 419A(f)(2)) which is otherwise treated as an "annual addition," or (B) any amount otherwise treated as an "annual addition" under Code Section 415(l)(1). The annual additions under Section 4.4(b) with respect to Company Stock released from the Unallocated Company Stock Suspense Account (by reason of contributions used for payments on an Exempt Loan and allocated to Participants' Company Stock Accounts) shall be based upon the lesser of (Y) the amount of such contributions, or (Z) the fair market value of such Company Stock as of the allocation date. Annual additions shall not include any allocation attributable to proceeds from the sale of Company Stock by the Trust or to appreciation (realized or unrealized) in the fair market value of Company Stock.

(c)     For purposes of applying the limitations of Code Section 415, the following are not "annual additions": (1) the transfer of funds from one qualified plan to another and (2) provided the Employer has not elected to be an S corporation under Code Section 1362(a) and provided no more than one-third of the Employer contributions for the year are allocated to Highly Compensated Participants, Forfeitures of Company Stock purchased with the proceeds of an Exempt Loan and Employer contributions applied to the payment of interest on an Exempt Loan. In addition, the following are not Employee contributions for the purposes of Section 4.4(b): (A) rollover contributions (as defined in Code Sections 402(c), 403(a)(4), 403(b)(8), 408(d)(3) and 457(e)(16)); (B) repayments of loans made to a Participant from the Plan; (C) repayments of distributions received by an Employee pursuant to Code Section 411(a)(7)(B) (cash-outs); (D) repayments of distributions received by an Employee pursuant to Code Section 411(a)(3)(D) (mandatory contributions); and (E) Employee contributions to a simplified employee pension excludable from gross income under Code Section 408(k)(6).

(d)     For purposes of applying the limitations of Code Section 415, the "limitation year" shall be the Plan Year.

(e)     For the purpose of this Section, all qualified defined contribution plans (whether terminated or not) ever maintained by the Employer shall be treated as one defined contribution plan.

(f)     For the purpose of this Section, if the Employer is a member of a controlled group of corporations, trades or businesses under common control (as defined by Code Section 1563(a) or Code Section 414(b) and (c) as modified by Code Section 415(h)), is a member of an affiliated service group (as defined by Code Section 414(m)), or is a member of a group of entities required to be aggregated pursuant to Regulations under Code Section 414(o), all Employees of such Employers shall be considered to be employed by a single Employer.

(g)     If this is a plan described in Code Section 413(c) (other than a plan described in Code Section 414(f)), then all of the benefits or contributions attributable to a Participant from all of the Employers maintaining this Plan shall be taken into account in applying the limits of this Section with respect to such Participant. Furthermore, in applying the limitations of this Section

27

with respect to such a Participant, the total "415 Compensation" received by the Participant from all of the Employers maintaining the Plan shall be taken into account.

(h)     (1)     If a Participant participates in more than one defined contribution plan maintained by the Employer which have different Anniversary Dates, the maximum "annual additions" under this Plan shall equal the maximum "annual additions" for the "limitation year" minus any "annual additions" previously credited to such Participant's accounts during the "limitation year."

(2)     If a Participant participates in both a defined contribution plan subject to Code Section 412 and a defined contribution plan not subject to Code Section 412 maintained by the Employer which have the same Anniversary Date, "annual additions" will be credited to the Participant's accounts under the defined contribution plan subject to Code Section 412 prior to crediting "annual additions" to the Participant's accounts under the defined contribution plan not subject to Code Section 412.

(3)     If a Participant participates in more than one defined contribution plan not subject to Code Section 412 maintained by the Employer which have the same Anniversary Date, the maximum "annual additions" under this Plan shall equal the product of (A) the maximum "annual additions" for the "limitation year" minus any "annual additions" previously credited under subparagraphs (1) or (2) above, multiplied by (B) a fraction (i) the numerator of which is the "annual additions" which would be credited to such Participant's accounts under this Plan without regard to the limitations of Code Section 415 and (ii) the denominator of which is such "annual additions" for all plans described in this subparagraph.

(i)     Notwithstanding anything contained in this Section to the contrary, the limitations, adjustments and other requirements prescribed in this Section shall at all times comply with the provisions of Code Section 415 and the Regulations thereunder.

4.5     DIVERSIFICATION

(a)     During each Annual Election Period in the Qualified Election Period, a Qualified Participant may elect to direct the Plan as to the investment of up to 25 percent of the Qualified Participant's Company Stock Account in the Plan to the extent such portion exceeds the amount to which a prior election under this subsection applies. In the year in which the Qualified Participant can make his or her last election, "50 percent" is substituted for "25 percent" in the preceding sentence.

The Administrator shall offer at least three investment options to each Qualified Participant who makes an election under this subsection; each investment option will be diversified and have materially different risk and return characteristics. In lieu of offering such investment options, the Administrator may direct that all amounts subject to Participant elections under this subsection be (i) distributed to Qualified Participants in cash, (ii) distributed to Qualified Participants in Company Stock, subject to the immediate put obligation, or (iii) liquidated and transferred to the

28

Radiance 401(k) Plan or another qualified plan of the Employer that accepts such transfers, provided that such plan permits participant-directed investments, such plan offers at least three investment options (each of which must be diversified and have materially different risk and return characteristics), such plan does not invest in employer securities to a substantial degree, and the transfer complies with all applicable qualification requirements including Code Sections 414(l), 411(d)(6), and 401(a)(11). Such investment, distribution, or transfer shall be made within ninety (90) days after the close of the Annual Election Period.

Notwithstanding the foregoing, no diversification shall be permitted with respect to the Company Stock Accounts of Participants to which Company Stock with a fair market value of less than $500 has been allocated. For this purpose, fair market value is determined as of the Valuation Date immediately preceding the first day on which a Qualified Participant is eligible to make the diversification election under this Subsection.

(b)    Beginning with the 2024 Plan Year and for each Plan Year thereafter, a Participant, subject to any Participant direction procedures established by the Administrator, may elect within an election period determined annually by the Administrator and communicated to Participants to direct the Trustee to diversify a maximum of 10% of his or her Transfer Account (determined as of the most recent Valuation Date preceding the election period). If the Participant so elects, such direction to the Trustee shall be effective no later than the final day of the Plan Year in which the election is made and shall be based on the most recent Valuation Date preceding the election period. If the Employer does not hold sufficient cash as determined by the Board of Directors of the Employer to satisfy all pending diversifications requests or if such requests are restricted by the terms of a third-party loan agreement or other similar arrangement involving the Employer's creditors, the Administrator shall first reduce the elections made pursuant to this Section 4.5(b), beginning with highest percentage elections and continuing with the next highest percentage elections, as necessary to effect the same highest possible percentage election for all Participants. Next, the elections will be effected on a pro rata basis at such highest possible percentage election and will be effected fully at all lower percentage election levels. Amounts diversified pursuant to this Section 4.5(b) shall be (i) if elected by the Participants, distributed to Participants in cash or distributed to Participants in Company Stock, subject to the immediate put obligation, or (ii) liquidated and transferred to the Radiance 401(k) Plan. The diversification rights described in this Section 4.5(b) are available to all Participants with a Transfer Account balance and not just those Participants who are Qualified Participants.

(c)    If a Qualified Participant is entitled to diversify a portion of his Transfer Account in accordance with Section 4.5(b), such Qualified Participant may elect to diversify the greater of: (i) the amount described in Section 4.5(a) or (ii) the amount described in Section 4.5(b).

(d)    For the purposes of this Section the following definitions shall apply:

(1)    "Annual Election Period" means the period that begins the day after the end of each Plan Year in the Qualified Election Period and ends 90 days after the date that the value of the shares subject to the diversification election is provided to the Qualified Participant.

(2)    "Qualified Participant" means any Employee who has completed ten (10) Years of Service as a Participant and has attained age 55.

(3)    "Qualified Election Period" means the six (6) Plan Year period beginning with the first Plan Year in which the Participant first became a "Qualified Participant."

4.6    QUALIFIED MILITARY SERVICE

Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service will be provided in accordance with Code Section 414(u).

4.7    PROHIBITED ALLOCATION OF COMPANY STOCK

(a)    No portion of the Trust Fund attributable to (or allocable in lieu of) Company Stock in an S corporation may, during a "nonallocation year," accrue (or be allocated directly or indirectly under any plan maintained by the Employer meeting the requirements of Code Section 401(a)) for the benefit of any "disqualified person."

(b)    For purposes of this Section:

(1)    The term "nonallocation year" means any Plan Year if, at any time during such Plan Year,

(i)    the Plan holds Company Stock consisting of stock in an S corporation, and

(ii)    "disqualified persons" own at least fifty percent (50%) of the number of shares of stock in the S corporation.

(2)    Attribution rules. For purposes of subsection (b)(1),

(i)    the rules of Code Section 318(a) shall apply for purposes of determining ownership, except that:

(A)    in applying paragraph (1) thereof, the members of an individual's family shall include members of the family described in subsection (c)(4), and

(B)    paragraph (4) thereof shall not apply.

(ii)    Deemed-owned shares. Notwithstanding the employee trust exception in Code Section 318(a)(2)(B)(i), an individual shall be treated as owning "deemed-owned shares" of the individual.

Solely for purposes of applying subsection (c)(5), this subsection (b)(2) shall be applied after the attribution rules of subsection (c)(5) have been applied.

30

(c)    For purposes of this Section:

(1)    The term "disqualified person" means any person if,

(i)    the aggregate number of "deemed-owned shares" of such person and the members of such person's family is at least twenty percent (20%) of the number of "deemed-owned shares" of stock in the S corporation, or

(ii)    in the case of a person not described in subsection (c)(1)(i), the number of "deemed-owned shares" of such person is at least ten percent (10%) of the number of "deemed-owned shares" of stock in such corporation.

(2)    Treatment of family members. In the case of a "disqualified person" under subsection (c)(1)(i), any member of such person's family with "deemed-owned shares" shall be treated as a "disqualified person" if not otherwise treated as a "disqualified person" under subsection (c)(1).

(3)    Deemed-owned shares:

(i)    The term "deemed-owned shares" means, with respect to any person,

(A)    the stock in the S corporation constituting Company Stock which is allocated to such person, and

(B)    such person's share of the stock in such corporation which is held by the Plan but which is not allocated under the Plan to Participants.

(ii)    Person's share of unallocated stock. For purposes of subsection (c)(3)(i)(B), a person's share of unallocated S corporation stock held by the Plan is the amount of the unallocated stock which would be allocated to such person if the unallocated stock were allocated to all Participants in the same proportions as the shares released and allocated from a suspense account, as described in Treasury Regulations Section 54.4975-11(c), under the Plan for the most recently ended Plan Year for which there were shares released and allocated from such a suspense account, or if there has been no such prior release and allocation from such a suspense account, then determined in proportion to a reasonable estimate of the shares that would be released and allocated in the first year of a loan payment.

(4)    Member of family. For purposes of this subsection (c), the term member of the family means, with respect to any individual,

(i)    the spouse of the individual,

(ii)    an ancestor or lineal descendent of the individual or the individual's spouse,

31

(iii)    a brother or sister of the individual or the individual's spouse and any lineal descendent of the brother or sister, and

(iv)    the spouse of any individual described in subsection (c)(4)(ii) or (iii).

A spouse of an individual who is legally separated from such individual under a decree of divorce or separate maintenance shall not be treated as such individual's spouse for purposes of this subsection (c)(4).

(5)    Treatment of synthetic equity. For purposes of subsections (b) and (c), in the case of a person who owns "synthetic equity" in the S corporation, except to the extent provided in Regulations, the shares of stock in such corporation on which such "synthetic equity" is based shall be treated as outstanding stock in such corporation and "deemed-owned shares" of such person if such treatment of "synthetic equity" of one (1) or more such persons results in,

(i)    the treatment of any person as a "disqualified person," or

(ii)    the treatment of any year as a "nonallocation year."

For purposes of this subsection (c)(5), "synthetic equity" shall be treated as owned by a person in the same manner as stock is treated as owned by a person under the rules of paragraphs (2) and (3) of Code Section 318(a). If, without regard to this subsection (c)(5), a person is treated as a "disqualified person" or a year is treated as a "nonallocation year," this subsection (c)(5) shall not be construed to result in the person or year not being so treated. The term "synthetic equity" means, any stock option, warrant, restricted stock, deferred insurance stock right, nonqualified deferred compensation, or similar interest or right that gives the holder the right to acquire or receive stock of the S corporation in the future. Except to the extent provided in Regulations, "synthetic equity" also includes a stock appreciation right, phantom stock unit, or similar right to a future cash payment based on the value of such stock or appreciation in such value.

(d)    For purposes of this Section and Code Section 409(p) and the Regulations thereunder, a prohibited allocation means an "impermissible accrual" or an "impermissible allocation."

(1)    "Impermissible accrual" means the extent that employer securities consisting of stock in an S corporation owned by the Plan and any assets attributable thereto are held under the Plan for the benefit of a "disqualified person" during a "nonallocation year." For this purpose, assets attributable to stock in an S corporation owned by the Plan include any distributions, within the meaning of Code Section 1368, made on S corporation stock held in a "disqualified person's" account in the Plan (including earnings thereon), plus any proceeds from the sale of S corporation securities held for a "disqualified person's" account in the Plan (including any earnings thereon).

(2)    "Impermissible allocation" means with respect to a "nonallocation year," the extent that a contribution or other annual addition (within the meaning of Code Section 415(c)(2)) is made with respect to the account of a "disqualified person," or the "disqualified person" otherwise accrues additional benefits, directly or indirectly under the Plan or any other plan of the Employer qualified under Code Section 401(a) (including a release and allocation of assets from a suspense account, as described at Regulations Section 54.4975-11(c) and (d)) that, for the "nonallocation year," would have been added to the account of the "disqualified person" under the Plan and invested in Company Stock owned by the Plan but for a provision in the Plan that precludes such addition to the account of the "disqualified person," and investment in Company Stock during a "nonallocation year."

(e)    The Administrator may use the following provisions to effect Code Section 409(p) transfers.

(1)    <u>Non-ESOP Portion.</u> Assets held under the Plan in accordance with this Section are held under a portion of the Plan that is not an employee stock ownership plan (ESOP), within the meaning of Code Section 4975(e)(7). Amounts held in the portion of the Plan that is not an ESOP (the Non-ESOP portion) shall be held in accounts that are separate from the accounts for the amounts held in the remainder of the Plan (the ESOP portion). The statements provided to Participants and Beneficiaries to show their interest in the Plan shall separately identify the amounts held in each such portion. Except as specifically set forth in this Section, all of the terms of the Plan apply to any amount held under the Non-ESOP portion of the Plan in the same manner and to the same extent as to any other amount held under the Plan.

(2)    <u>Transfers from ESOP to Non-ESOP Portion of Plan.</u>

(i)    In the case of any event that the Administrator determines would cause a "nonallocation year" (referred herein as a "nonallocation event"), shares of Company Stock held under the Plan before the date of the "nonallocation event," shall be transferred from the ESOP portion of the Plan to the Non-ESOP portion of the Plan as provided in this subsection (2)(i). Actions that may cause a "nonallocation event," include, but are not limited to, a contribution to the Plan in the form of shares of Company Stock, a distribution from the Plan in the form of shares of Company Stock, a change of investment within a Plan account of a "disqualified person" that alters the number of shares of Company Stock held in the account of the "disqualified person," or the issuance by the Employer of "synthetic equity" as defined by Code Section 409(p)(6)(C) and Regulations Section 1.409(p)-1(f). A "nonallocation event" occurs only if (y) the total number of "deemed-owned" shares held by the ESOP account of those Participants who are or who would be "disqualified persons" after taking into account the Participant's "synthetic equity" and the "nonallocation event," exceeds (z) 50% of the total number of shares of Company Stock outstanding after taking the "nonallocation event" into account. No transfer under this Section shall be greater than the amount the Administrator reasonably determines or estimates to be the excess, if any, of (y) over (z). Before the "nonallocation event" occurs, the Administrator shall determine the extent to which a transfer is required to be made and shall take steps to ensure

that all action necessary to implement the transfer are taken before the "nonallocation event" occurs.

        (ii)      Except as provided for in subsection (2)(iii), at the date of the transfer, the total number of shares transferred, as provided for in subsection (2)(i), shall be charged against the accounts of Participants who are "disqualified persons" (y) by first reducing the ESOP account of the Participant who is a "disqualified person" whose account has the largest number of shares (with the addition of "synthetic equity" shares) and (z) thereafter by reducing the ESOP accounts of each succeeding Participant who is a "disqualified person" who has the largest number of shares in his or her their account (with the addition of "synthetic equity" shares). Immediately following the transfer, the number of transferred shares charged against any Participant's account in the ESOP portion of the Plan shall be credited to an account established for that Participant in the Non-ESOP portion of the Plan.

        (iii)     Notwithstanding subsection (2)(ii), the number of shares transferred shall be charged against the accounts of Participants who are "disqualified persons" by first reducing the account of the Participant with the fewest shares (including "synthetic equity") who is a "disqualified person" and who is a Highly Compensated Employee to cause the Participant not to be a "disqualified person," and thereafter reducing the account of each other Participant who is a "disqualified person" and a Highly Compensated Employee, in order of who has the fewest ESOP shares (including "synthetic equity"). A transfer under this subsection (2)(iii) only applies to the extent that the transfer results in fewer shares being transferred than in a transfer under (2)(ii).

        (iv)     For purposes of subsections (2)(ii) and (2)(iii), "disqualified person" includes any person who would become a "disqualified person" at the time of the "nonallocation event" if such transfer did not occur.

        (v)      If two or more Participants described in subsections (2)(ii) and (2)(iii) above have the same number of shares, the account of the Participant with the longest service shall be reduced first. Furthermore, Beneficiaries are treated as Participants for purposes of this Section.

        (3)     <u>Income Taxes.</u> If the Trust owes income taxes as a result of unrelated business taxable income under Code Section 512(e) with respect to shares of Company Stock held in the Non-ESOP portion of the Plan, the income tax payments made by the Trustee shall be charged against the accounts of each Participant or Beneficiary who has an account in the Non-ESOP portion of the Plan in proportion to the ratio of the shares of Company Stock in such Participant's or Beneficiary's account in the non-ESOP portion of the Plan to the total shares of Company Stock in the non-ESOP portion of the Plan. The Employer may purchase shares of Company Stock from the Trustee with cash (based on the fair market value of the shares so purchased) from each such account to the extent necessary for the Trustee to make the income tax payments.

ARTICLE V

FUNDING AND INVESTMENT POLICY

5.1     INVESTMENT POLICY

(a)     The Plan is designed to invest primarily in Company Stock.

(b)     With due regard to subparagraph (a) above, the Administrator may also direct the Trustee to invest funds under the Plan in other property described in the Trust or in life insurance policies to the extent permitted by subparagraph (c) below, or the Trustee may hold such funds in cash or cash equivalents.

(c)     With due regard to subparagraph (a) above, the Administrator may also direct the Trustee to invest funds under the Plan not attributable to proceeds from an Exempt Loan in insurance policies on the life of any "keyman" Employee. The proceeds of a "keyman" insurance policy may not be used for the repayment of any indebtedness owed by the Plan which is secured by Company Stock. In the event any "keyman" insurance is purchased by the Trustee, the premiums paid thereon during any Plan Year, net of any policy dividends and increases in cash surrender values, shall be treated as the cost of Plan investment and any death benefit or cash surrender value received shall be treated as proceeds from an investment of the Plan.

(d)     The Plan may not obligate itself to acquire Company Stock from a particular holder thereof at an indefinite time determined upon the happening of an event such as the death of the holder.

(e)     The Plan may not obligate itself to acquire Company Stock under a put option binding upon the Plan. However, at the time a put option is exercised, the Plan may be given an option to assume the rights and obligations of the Employer under a put option binding upon the Employer.

(f)     All purchases of Company Stock shall be made at a price which, in the judgment of the Administrator, does not exceed the fair market value thereof. All sales of Company Stock shall be made at a price which, in the judgment of the Administrator, is not less than the fair market value thereof. The valuation rules set forth in Article VI shall be applicable.

5.2     APPLICATION OF CASH AND INACTIVE PARTICIPANTS

(a)     Employer contributions in cash, and any earnings on such contributions, shall first be applied to pay any Current Obligations of the Trust Fund.

(b)     If a Participant (or Beneficiary) becomes entitled to a distribution from his or her Vested Account pursuant to Article VII and such Participant (or Beneficiary) does not apply to receive the distribution in accordance with Article VII, such Participant (or Beneficiary) will be considered an "inactive participant" and the Employer, on a uniform and nondiscriminatory basis, may elect to redeem all or a portion of the distributable shares of the Company Stock held in the inactive participant's Company Stock Account (Vested and unvested) based on the appraised fair

35

market value of such Company Stock on the date of the redemption. In the event the Employer does not elect to redeem such inactive participant's distributable Company Stock Account, then the Plan may, on a uniform and nondiscriminatory basis, purchase all or a portion of such shares of Company Stock based on the most recent appraised fair market value. The proceeds of the shares of Company Stock redeemed or purchased from an inactive participant's Company Stock Account shall be held in a special "liquidated company stock account" on behalf of the inactive participant and shall, as soon as administratively practicable thereafter, be transferred in a trustee-to-trustee transfer to the Radiance 401(k) Plan. In addition, simultaneous with the trustee-to-trustee transfer of the Participant's special "liquidated company stock account," the inactive participant's Other Investments Account (Vested and unvested) shall also be transferred in a trustee-to-trustee transfer to the Radiance 401(k) Plan. The trustee-to-trustee transfer described in this Section 5.2(b) shall be subject to the following terms and conditions:

(1)     Only those inactive participants whose Account balances exceed the threshold set forth in Section 7.5(b) shall have their distributable Account balances transferred.

(2)     Immediately after the transfer, such Participant shall have a balance in the Radiance 401(k) Plan equal to the amount of his Account balance transferred from this Plan.

(3)     Any such transferred amounts shall assume the same characteristics of a Discretionary Contribution (as defined in the Radiance 401(k) Plan) under the Radiance 401(k) Plan and shall be eligible for in-service withdrawals and loans according to the provisions of the Radiance 401(k) Plan; provided, however, that such transferred amounts shall continue to be subject to the vesting schedule described in Section 7.4(b).

(4)     Any such transferred amount shall be subject to the distribution provisions of the Radiance 401(k) Plan; provided, however, that such transfer shall not eliminate any benefits provided under this Plan which are protected by Section 411(d)(6) of the Code.

(5)     Such transferred amount shall be invested in the Radiance 401(k) Plan's investment options pursuant to the Participant's investment direction currently on file with the Radiance 401(k) Plan or in the then-current default investment option for the Radiance 401(k) Plan.

5.3     TRANSACTIONS INVOLVING COMPANY STOCK

(a)     No portion of the Trust Fund attributable to (or allocable in lieu of) Company Stock acquired by the Plan in a sale to which Code Section 1042 applies may accrue or be allocated directly or indirectly under any plan maintained by the Employer meeting the requirements of Code Section 401(a):

(1)     during the "Nonallocation Period," for the benefit of

(i)     any taxpayer who makes an election under Code Section 1042(a) with respect to Company Stock,

36

(ii)     any individual who is related to the taxpayer (within the meaning of Code Section 267(b)), or

(2)     for the benefit of any other person who owns (after application of Code Section 318(a) applied without regard to the employee trust exception in Code Section 318(a)(2)(B)(i)) more than 25 percent of

(i)     any class of outstanding stock of the Employer or Affiliated Employer which issued such Company Stock, or

(ii)     the total value of any class of outstanding stock of the Employer or Affiliated Employer.

(b)     Except, however, subparagraph (a)(1)(ii) above shall not apply to lineal descendants of the taxpayer, provided that the aggregate amount allocated to the benefit of all such lineal descendants during the "Nonallocation Period" does not exceed more than five (5) percent of the Company Stock (or amounts allocated in lieu thereof) held by the Plan which are attributable to a sale to the Plan by any person related to such descendants (within the meaning of Code Section 267(c)(4)) in a transaction to which Code Section 1042 is applied.

(c)     person shall be treated as failing to meet the stock ownership limitation under paragraph (a)(2) above if such person fails such limitation:

(1)     at any time during the one (1) year period ending on the date of sale of Company Stock to the Plan, or

(2)     on the date as of which Company Stock is allocated to Participants in the Plan.

(d)     For purposes of this Section, "Nonallocation Period" means the period beginning on the date of the sale of the Company Stock and ending on the later of:

(1)     the date which is ten (10) years after the date of sale, or

(2)     the date of the Plan allocation attributable to the final payment of the Exempt Loan incurred in connection with such sale.

(e)     Notwithstanding any provision of this Section to the contrary, a sale to which Code Section 1042 applies shall not be made during the period in which the Employer has elected to be an S corporation under Code Section 1362(a).

5.4    LOANS TO THE TRUST

(a)    The Plan may borrow money for any lawful purpose, provided the proceeds of an Exempt Loan are used within a reasonable time after receipt only for any or all of the following purposes:

(1)    To acquire Company Stock.

(2)    To repay such loan.

(3)    To repay a prior Exempt Loan.

(b)    All loans to the Trust which are made or guaranteed by a disqualified person must satisfy all requirements applicable to Exempt Loans including but not limited to the following:

(1)    The loan must be at a reasonable rate of interest;

(2)    The interest rate and price of the stock to be acquired with loan proceeds should not be such that the Plan assets may be drained off;

(3)    Any collateral pledged to the creditor by the Plan shall consist only of the Company Stock purchased with the borrowed funds;

(4)    Under the terms of the loan, any pledge of Company Stock shall provide for the release of shares so pledged on a pro-rata basis pursuant to Section 4.3(e);

(5)    Under the terms of the loan, the creditor shall have no recourse against the Plan except with respect to such collateral, earnings attributable to such collateral, Employer contributions (other than contributions of Company Stock) that are made to meet Current Obligations and earnings attributable to such contributions;

(6)    The loan must be for a specific term and may not be payable at the demand of any person, except in the case of default;

(7)    In the event of default upon an Exempt Loan, the value of the Trust Fund transferred in satisfaction of the Exempt Loan shall not exceed the amount of default. If the lender is a disqualified person, an Exempt Loan shall provide for a transfer of Trust Funds upon default only upon and to the extent of the failure of the Plan to meet the payment schedule of the Exempt Loan;

(8)    Exempt Loan payments during a Plan Year must not exceed an amount equal to: (A) the sum, overall Plan Years, of all contributions and cash dividends paid by the Employer to the Plan with respect to such Exempt Loan and earnings on such Employer contributions and cash dividends, less (B) the sum of the Exempt Loan payments in all preceding

Plan Years. A separate accounting shall be maintained for such Employer contributions, cash dividends and earnings until the Exempt Loan is repaid.

(c)    For purposes of this Section, the term "disqualified person" means a person who is a Fiduciary, a person providing services to the Plan, an Employer any of whose Employees are covered by the Plan, an employee organization any of whose members are covered by the Plan, an owner, direct or indirect, of 50% or more of the total combined voting power of all classes of voting stock or of the total value of all classes of the stock, or an officer, director, 10% or more shareholder, or a Highly Compensated Employee.

## ARTICLE VI
## VALUATIONS

### 6.1    VALUATION OF THE TRUST FUND

The Administrator shall direct the Trustee, as of each Valuation Date, to determine the net worth of the assets comprising the Trust Fund as it exists on the Valuation Date. In determining such net worth, the Trustee shall value the assets comprising the Trust Fund at their fair market (or their contractual value in the case of a Contract) value as of the Valuation Date and shall deduct all expenses for which the Trustee has not yet obtained reimbursement from the Employer or the Trust Fund.

### 6.2    METHOD OF VALUATION

Valuations must be made in good faith and based on all relevant factors for determining the fair market value of securities. In the case of a transaction between a Plan and a disqualified person, value must be determined as of the date of the transaction. For all other Plan purposes, value must be determined as of the most recent Valuation Date under the Plan. An independent appraisal will not in itself be a good faith determination of value in the case of a transaction between the Plan and a disqualified person. However, in other cases, a determination of fair market value based on at least an annual appraisal independently arrived at by a person who customarily makes such appraisals and who is independent of any party to the transaction will be deemed to be a good faith determination of value. Company Stock not readily tradeable on an established securities market shall be valued by an independent appraiser meeting requirements similar to the requirements of the Regulations prescribed under Code Section 170(a)(1).

## ARTICLE VII
## DETERMINATION AND DISTRIBUTION OF BENEFITS

### 7.1    DETERMINATION OF BENEFITS UPON RETIREMENT

Every Participant may terminate employment with the Employer and retire for the purposes hereof on the Participant's Normal Retirement Date. However, a Participant may postpone the termination of employment with the Employer to a later date, in which event the participation of such Participant in the Plan, including the right to receive allocations pursuant to Section 4.3, shall

continue until such Participant's Late Retirement Date. The Trustee shall distribute, at the election of the retired Participant, all amounts credited to such Participant's Account in accordance with Sections 7.5 and 7.6.

       7.2     DETERMINATION OF BENEFITS UPON DEATH

       (a)     Upon the death of a Participant before the Participant's Retirement Date or other termination of employment, all amounts credited to such Participant's Account shall become fully Vested. The Trustee shall distribute, at the election of the Beneficiary, all amounts credited to such deceased Participant's Account in accordance with Sections 7.5 and 7.6.

       (b)     Upon the death of a Former Participant, the Administrator shall direct the Trustee, in accordance with the provisions of Sections 7.5 and 7.6, to distribute any remaining Vested amounts credited to the accounts of a deceased Former Participant to such Former Participant's Beneficiary.

       (c)     The Administrator may require such proper proof of death and such evidence of the right of any person to receive payment of the value of the account of a deceased Participant or Former Participant as the Administrator may deem desirable. The Administrator's determination of death and of the right of any person to receive payment shall be conclusive.

       (d)     The Beneficiary of the death benefit payable pursuant to this Section shall be the Participant's spouse. Except, however, the Participant may designate a Beneficiary other than the spouse if:

            (1)     the spouse has waived the right to be the Participant's Beneficiary, or

            (2)     the Participant is legally separated or has been abandoned (within the meaning of local law) and the Participant has a court order to such effect (and there is no "qualified domestic relations order" as defined in Code Section 414(p) which provides otherwise), or

            (3)     the Participant has no spouse, or

            (4)     the spouse cannot be located.

       In such event, the designation of a Beneficiary shall be made on a form satisfactory to the Administrator. A Participant may at any time revoke a designation of a Beneficiary or change a Beneficiary by filing written (or in such other form as permitted by the Internal Revenue Service) notice of such revocation or change with the Administrator. However, the Participant's spouse must again consent in writing (or in such other form as permitted by the Internal Revenue Service) to any change in Beneficiary unless the original consent acknowledged that the spouse had the right to limit consent only to a specific Beneficiary and that the spouse voluntarily elected to relinquish such right.

(e)    In the event no valid designation of Beneficiary exists, or if the Beneficiary is not alive at the time of the Participant's death, the death benefit will be paid in the following order of priority to:

(1)    the Participant's surviving spouse;

(2)    the Participant's children, including adopted children, per stirpes;

(3)    the Participant's surviving parents in equal shares; or

(4)    the Participant's estate.

If the Beneficiary does not predecease the Participant, but dies prior to distribution of the death benefit, the death benefit will be paid to the Beneficiary's designated Beneficiary (or if there is no designated Beneficiary, to the Beneficiary's estate).

(f)    Notwithstanding anything in this Section to the contrary, if a Participant has designated the spouse as a Beneficiary, then a divorce decree or a legal separation that relates to such spouse shall revoke the Participant's designation of the spouse as a Beneficiary unless the decree or a qualified domestic relations order (within the meaning of Code Section 414(p)) provides otherwise.

(g)    Any consent by the Participant's spouse to waive any rights to the death benefit must be in writing (or in such other form as permitted by the Internal Revenue Service), must acknowledge the effect of such waiver, and be witnessed by a Plan representative or a notary public. Further, the spouse's consent must be irrevocable and must acknowledge the specific nonspouse Beneficiary.

(h)    If a Participant dies while performing qualified military service (as defined in Code Section 414(u)), the Participant's Beneficiary is entitled to any additional benefits (other than benefit accruals relating to the period of qualified military service) provided under the Plan as if the Participant had resumed employment and then terminated employment on account of death. Moreover, the Plan will credit the Participant's qualified military service as service for vesting purposes, as though the Participant had resumed employment under the Uniformed Services Employment and Reemployment Rights Act (USERRA) immediately prior to the Participant's death.

7.3    DETERMINATION OF BENEFITS IN EVENT OF DISABILITY

In the event of a Participant's Total and Permanent Disability prior to the Participant's Retirement Date or other termination of employment, all amounts credited to such Participant's Account shall become fully Vested. In the event of a Participant's Total and Permanent Disability, the Trustee shall distribute, in accordance with election of such Participant, all amounts credited to the Participant's Account in accordance with the provisions of Sections 7.5 and 7.6.

7.4    DETERMINATION OF BENEFITS UPON TERMINATION

(a)    If a Participant's employment with the Employer is terminated for any reason other than death, Total and Permanent Disability or Retirement, then such Participant shall be entitled to such benefits as are provided hereinafter pursuant to this Section 7.4.

If a portion of a Participant's Account is forfeited, Company Stock allocated to the Participant's Company Stock Account must be forfeited only after the Participant's Other Investments Account has been depleted. If interest in more than one class of Company Stock has been allocated to a Participant's Account, the Participant must be treated as forfeiting the same proportion of each such class.

For purposes of this Section 7.4, if the value of a Terminated Participant's Vested benefit is zero, the Terminated Participant shall be deemed to have received a distribution of such Vested benefit.

(b)    The Vested portion of the Participant's Account attributable to certain Employer contributions shall be a percentage of the total amount credited to the Participant's Account determined on the basis of the Participant's number of Years of Service.

The Vested portion of the Participant's Account attributable to Employer discretionary contributions made pursuant to Section 4.1(a) is determined according to the following schedule:

Vesting Schedule

Employer Discretionary Contributions

| Years of Service | Percentage |
|---|---|
| 1 Year of Service | 30 % |
| 2 Years of Service | 60 % |
| 3 Years of Service | 100 % |

Notwithstanding the foregoing, any Participant who first completes at least one Hour of Service on or before December 31, 2013, shall always be fully Vested in his Employer discretionary contributions.

(c)    Notwithstanding the above, Company Stock allocated to each Participant's Company Stock Account pursuant to Section 4.3(e) must be forfeited only after other assets.

(d)    Notwithstanding the vesting schedule above, the Vested percentage of a Participant's Account shall not be less than the Vested percentage attained as of the later of the effective date or adoption date of this amendment and restatement.

(e)    Notwithstanding the vesting schedule above, upon the complete discontinuance of the Employer contributions to the Plan or upon any full or partial termination of the Plan, all

amounts then credited to the account of any affected Participant shall become 100% Vested and shall not thereafter be subject to Forfeiture.

(f)    The computation of a Participant's nonforfeitable percentage of such Participant's interest in the Plan shall not be reduced as the result of any direct or indirect amendment to this Plan. In the event that the Plan is amended to change or modify any vesting schedule, or if the Plan is amended in any way that directly or indirectly affects the computation of the Participant's nonforfeitable percentage, or if the Plan is deemed amended by an automatic change to a top heavy vesting schedule, then each Participant with at least three (3) Years of Service as of the expiration date of the election period may elect to have such Participant's nonforfeitable percentage computed under the Plan without regard to such amendment or change. If a Participant fails to make such election, then such Participant shall be subject to the new vesting schedule. The Participant's election period shall commence on the adoption date of the amendment and shall end sixty (60) days after the latest of:

(1)    the adoption date of the amendment,

(2)    the effective date of the amendment, or

(3)    the date the Participant receives written notice of the amendment from the Employer or Administrator.

(g)    In determining Years of Service for purposes of vesting under the Plan, Years of Service prior to the effective date of the Plan shall be excluded.

7.5    DISTRIBUTION OF BENEFITS

(a)    The Administrator, pursuant to the election of the Participant, shall direct the Trustee to distribute to a Participant or such Participant's Beneficiary any amount to which the Participant is entitled under the Plan.

(b)    Any distribution to a Participant who has a benefit which exceeds $1,000, shall require such Participant's written (or in such other form as permitted by the Internal Revenue Service) consent if such distribution is to occur prior to the time the benefit is "immediately distributable." A benefit is "immediately distributable" if any part of the benefit could be distributed to the Participant (or surviving spouse) before the Participant attains (or would have attained if not deceased) the later of the Participant's Normal Retirement Age or age 62. With regard to this required consent:

(1)    The Participant must be informed of the right to defer receipt of the distribution and such notification must also include a description of how much larger benefits will be if the commencement of distributions is deferred. If a Participant fails to consent, it shall be deemed an election to defer the distribution of any benefit. However, any election to defer the receipt of benefits shall not apply with respect to distributions which are required under Section 7.7.

43

(2)     Notice of the rights specified under this paragraph shall be provided no less than thirty (30) days and no more than one hundred eighty (180) days before the date the distribution is made.

(3)     Written (or such other form as permitted by the Internal Revenue Service) consent of the Participant to the distribution must not be made before the Participant receives the notice and must not be made more than one hundred eighty (180) days before the date the distribution is made.

(4)     No consent shall be valid if a significant detriment is imposed under the Plan on any Participant who does not consent to the distribution.

Any such distribution may occur less than thirty (30) days after the notice required under Regulation 1.411(a)-11(c) is given, provided that: (1) the Administrator clearly informs the Participant that the Participant has a right to a period of at least thirty (30) days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and (2) the Participant, after receiving the notice, affirmatively elects a distribution.

(c)     Notwithstanding anything herein to the contrary, the Administrator may direct that cash dividends on shares of Company Stock allocable to Participants' Company Stock Accounts be:

(1)     Paid by the Employer directly in cash to the Participants in the Plan or their Beneficiaries.

(2)     Paid to the Plan and distributed in cash to Participants in the Plan or their Beneficiaries no later than ninety (90) days after the close of the Plan Year in which paid.

(3)     At the election of Participants or their Beneficiaries, paid in accordance with paragraph (1) or (2) above, or paid to the Plan and reinvested in Company Stock; provided, however, that if cash dividends are reinvested in Company Stock, then Company Stock allocated to the Participant's Company Stock Account shall have a fair market value not less than the amount of cash dividends which would have been allocated to such Participant's Other Investment Account for the year. This paragraph (3) shall not apply while the Employer elected to be an S corporation under Code Section 1362(a).

(4)     Used to make payments on an Exempt Loan the proceeds of which were used to acquire Company Stock (whether or not allocated to Participants' Company Stock Accounts) with respect to which the cash dividend is paid.

(5)     Allocated to Participants' Other Investment Accounts.

Provided, however, that during the time the Employer has elected to be an S corporation under Code Section 1362(a), all S corporation dividends (if any) will be allocated pro rata based on the Participant's Company Stock Account balance.

(d)    Any part of a Participant's benefit which is retained in the Plan after the Anniversary Date on which the Participant's participation ends will continue to be treated as a Company Stock Account or as an Other Investments Account (subject to Sections 5.2(b) and 7.4(a)) as provided in Article IV. However, neither account will be credited with any further Employer contributions.

(e)    Required minimum distributions (Code Section 401(a)(9)). Notwithstanding any provision in the Plan to the contrary, the distribution of a Participant's benefits shall be made in accordance with the requirements of Section 7.7.

(f)    Except as limited by Sections 7.5 and 7.6, whenever the Trustee is to make a distribution, the distribution may be made on such date or as soon thereafter as is practicable. However, unless a Former Participant elects in writing to defer the receipt of benefits (such election may not result in a death benefit that is more than incidental), the payment of benefits shall occur not later than the sixtieth (60th) day after the close of the Plan Year in which the latest of the following events occurs:

(1)    the date on which the Participant attains the earlier of age 65 or the Normal Retirement Age specified herein;

(2)    the tenth (10th) anniversary of the year in which the Participant commenced participation in the Plan; or

(3)    the date the Participant terminates his service with the Employer.

(g)    If a distribution is made to a Participant who has not severed employment and who is not fully Vested in the Participant's Account and the Participant may increase the Vested percentage in such account, then, at any relevant time the Participant's Vested portion of the account will be equal to an amount ("X") determined by the formula:

$$X \text{ equals } P(AB \text{ plus } D) - D$$

For purposes of applying the formula: P is the Vested percentage at the relevant time, AB is the account balance at the relevant time, and D is the amount of distribution.

7.6    HOW AND WHEN PLAN BENEFITS WILL BE DISTRIBUTED

(a)    <u>Form of Distributions</u>.

(1)    <u>Company Stock Account</u>. Subject to the conditions set forth below, distribution of a Participant's benefit in the Company Stock Account will be made in shares of

Company Stock. However, if the Employer's charter or by-laws restrict the ownership of substantially all outstanding Company Stock to employees and the Trust, or if the Employer has elected to be taxed as an "S corporation," then a Participant's Company Stock Account will be distributed, at the Employer's election, in either (i) cash, or (ii) shares of Company Stock, provided that any such distributed shares of Company Stock shall be immediately resold to the Employer (or the Trust). Any shares purchased by the Employer (or the Trust) pursuant to this subsection shall be purchased at their fair market value. For purposes of this subsection, fair market value shall be based upon the appraised fair market value determined in accordance with Section 6.2 as of the Valuation Date coinciding with or immediately preceding the date such shares are purchased. Notwithstanding the foregoing, all such purchases of Company Stock by the Trustee shall be made at prices which, in the judgment of the Trustee, do not exceed the fair market value of such shares as of the date of the transaction. Such shares shall be purchased by notifying the Participant (or Beneficiary) in writing. The terms of payment for a purchase of such shares of stock will be set forth in a written statement delivered to the Participant (or Beneficiary).

(2)      Other Investments Account. Distribution of a Participant's benefit in the Other Investments Account shall be made in cash.

(b)      Timing of Distributions. Death, Disability, or Retirement. In the event of death, Disability, or Retirement, subject to Section 7.5(b), distribution of a Participant's Vested Account shall commence during the following Plan Year. Except as otherwise provided in any Plan distribution policy, the distribution will be made in annual installment payments over a period not longer than the greater of (i) 5 years, or (ii) in the case of a Participant with an account balance in excess of $1,165,000 (as adjusted), 5 years plus 1 additional year (but not more than 5 additional years) for such $230,000 (as adjusted) or fraction thereof by which such balance exceeds $1,165,000 (as adjusted). In the event a Participant is eligible to receive a distribution and does not elect to take such distribution, the distributable shares of Company Stock may be liquidated and transferred to the Radiance 401(k) Plan in accordance with Section 5.2(b).

(2)      Other Termination of Employment. In the event a Participant's employment terminates for reasons other than death, Disability, or Retirement, subject to Section 7.5(b), the distribution of the Participant's Vested Account shall commence no later than one year after the close of the Plan Year that is the fifth Plan Year following the Plan Year in which the Participant terminates employment. Except as provided in any Plan distribution policy, the distribution will be made in annual installment payments over a period not longer than the greater of (i) 5 years, or (ii) in the case of a Participant with an account balance in excess of $1,165,000 (as adjusted), 5 years plus 1 additional year (but not more than 5 additional years) for such $230,000 (as adjusted) or fraction thereof by which such balance exceeds $1,165,000 (as adjusted). In the event a Participant is eligible to receive a distribution and does not elect to take such distribution, the distributable shares of Company Stock may be liquidated and transferred to the Radiance 401(k) Plan in accordance with Section 5.2(b).

(c)      The Trustee will make distributions from the Trust only on instructions from the Administrator.

7.7    REQUIRED MINIMUM DISTRIBUTIONS

(a)    General Rules

(1)    Precedence. The requirements of this Section will take precedence over any inconsistent provisions of the Plan.

(2)    Requirements of Treasury Regulations Incorporated. All distributions required under this Section will be determined and made in accordance with the Regulations under Code Section 401(a)(9) notwithstanding any terms of the Plan to the contrary.

(3)    Required Beginning Date. The Participant's entire interest will be distributed, or begin to be distributed, to the Participant no later than the Participant's required beginning date.

(4)    Forms of Distribution. Unless the Participant's interest is distributed in a single sum on or before the required beginning date, as of the first distribution calendar year, distributions will be made in accordance with this Section.

(5)    TEFRA Section 242(b)(2) Elections. Notwithstanding the other provisions of this Section and the Plan, distributions may be made under a designation made before January 1, 1984, in accordance with Section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act (TEFRA) and the provisions of the Plan that relate to Section 242(b)(2) of TEFRA.

(b)    Required Minimum Distributions During Participant's Lifetime

(1)    Amount of Required Minimum Distribution For Each Distribution Calendar Year. During the Participant's lifetime, the minimum amount that will be distributed for each distribution calendar year is the lesser of:

(i)    the quotient obtained by dividing the Participant's account balance by the distribution period in the Uniform Lifetime Table set forth in Regulation Section 1.401(a)(9)-9, Q&A-2, using the Participant's age as of the Participant's birthday in the distribution calendar year; or

(ii)    if the Participant's sole designated beneficiary for the distribution calendar year is the Participant's spouse, the quotient obtained by dividing the Participant's account balance by the number in the Joint and Last Survivor Table set forth in Regulation Section 1.401(a)(9)-9, Q&A-3, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the distribution calendar year.

(2)    Lifetime Required Minimum Distributions Continue Through Year of Participant's Death. Required minimum distributions will be determined under this Section 7.7(b) beginning with the first distribution calendar year and up to and including the distribution calendar year that includes the Participant's date of death.

(c)        Required minimum distributions after Participant's death occurring prior to January 1, 2020

(1)        Death On or After Date Distributions Begin.

(i)        Participant survived by designated beneficiary. If the Participant dies on or after the date distributions begin and there is a designated beneficiary, the minimum amount that will be distributed for each distribution calendar year beginning with the calendar year after the calendar year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the longer of the remaining life expectancy of the Participant or the remaining life expectancy of the Participant's designated beneficiary, determined as follows:

(A)        The Participant's remaining life expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(B)        If the Participant's surviving spouse is the Participant's sole designated beneficiary, the remaining life expectancy of the surviving spouse is calculated for each distribution calendar year after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year. For distribution calendar years after the year of the surviving spouse's death, the remaining life expectancy of the surviving spouse is calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death, reduced by one for each subsequent calendar year.

(C)        If the Participant's surviving spouse is not the Participant's sole designated beneficiary, the designated beneficiary's remaining life expectancy is calculated using the age of the beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

(ii)        No designated beneficiary. If the Participant dies on or after the date distributions begin and there is no designated beneficiary as of September 30th of the year after the year of the Participant's death, the minimum amount that will be distributed for each distribution calendar year after the year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the Participant's remaining life expectancy calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(2)        Death Before Date Distributions Begin.

(i)        Participant survived by designated beneficiary. If the Participant dies before the date distributions begin and there is a designated beneficiary, the minimum amount that will be distributed for each distribution calendar year beginning with the calendar year after the calendar year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the remaining life expectancy of the Participant's designated beneficiary, determined as provided in Section 7.7(c)(1)(i).

48

(ii)    No designated beneficiary. If the Participant dies before the date distributions begin and there is no designated beneficiary as of September 30th of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31st of the calendar year containing the fifth anniversary of the Participant's death.

(d)    Required minimum distributions after Participant's death occurring on or after January 1, 2020

(1)    Participant survived by eligible designated beneficiary.

(i)    Death Before Date Distributions Begin. If the Participant dies before the date distributions begin and there is an eligible designated beneficiary, the minimum amount that will be distributed for each distribution calendar year beginning with the calendar year after the calendar year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the remaining life expectancy of the Participant's eligible designated beneficiary, determined in the same manner as provided in Section 7.7(c)(1)(i).

(ii)    Death On or After Date Distributions Begin. If the Participant dies on or after the date distributions begin and there is an eligible designated beneficiary, the minimum amount that will be distributed for each distribution calendar year beginning with the calendar year after the Participant's death is the quotient obtained by dividing the Participant's account balance by the longer of the remaining life expectancy of the Participant or the remaining life expectancy of the Participant's eligible designated beneficiary, determined as follows:

49

(A)    The Participant's remaining life expectancy is calculated using the age of the Participant in the year of death, reduced by one for each subsequent year.

(B)    If the Participant's surviving spouse is the Participant's sole designated beneficiary, the remaining life expectancy of the surviving spouse is calculated for each distribution calendar year after the year of the Participant's death using the surviving spouse's age as of the spouse's birthday in that year.

(C)    If the Participant's surviving spouse is not the Participant's sole designated beneficiary, the designated beneficiary's remaining life expectancy is calculated using the age of the beneficiary in the year following the year of the Participant's death, reduced by one for each subsequent year.

If an eligible designated beneficiary dies before receiving distribution of the beneficiary's entire interest in the Participant's account balance, distribution of the remaining interest will be completed by December 31st of the calendar year containing the tenth anniversary of the eligible designated beneficiary's death.

Notwithstanding the above, when a child of the Participant who is an eligible designated beneficiary reaches the age of majority, distribution of the child's entire interest will be completed by December 31st of the calendar year containing the tenth anniversary of the year the child reaches the age of majority.

(2)    Participant survived by designated beneficiary but no eligible designated beneficiary. If the Participant dies and there is a designated beneficiary but no eligible designated beneficiary as of September 30th of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31st of the calendar year containing the tenth anniversary of the Participant's death.

(3)    No designated beneficiary. If the Participant dies and there is no designated beneficiary as of September 30th of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31st of the calendar year containing the fifth anniversary of the Participant's death.

(e)    Definitions. For purposes of this Section, the following definitions apply:

(1)    "Designated beneficiary" means the individual who is designated as the Beneficiary under the Plan and is the designated beneficiary under Code Section 401(a)(9) and Regulation Section 1.401(a)(9)-1, Q&A-4.

(2)    "Distribution calendar year" means a calendar year for which a minimum distribution is required. For distributions beginning before the Participant's death, the first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's "Required beginning date." For distributions beginning after the Participant's death, the first distribution calendar year is the calendar year in which distributions

50

are required to begin under Section 7.7(c) or (d). The required minimum distribution for the Participant's first distribution calendar year will be made on or before the Participant's "Required beginning date." The required minimum distribution for other distribution calendar years, including the required minimum distribution for the distribution calendar year in which the Participant's "Required beginning date" occurs, will be made on or before December 31st of that distribution calendar year.

(3)    "Eligible designated beneficiary" means Participant's designated beneficiary who qualifies as an eligible designated beneficiary under Code Section 401(a)(9)(E)(ii). Certain trusts may be treated as eligible designated beneficiaries pursuant to Code Section 401(a)(9)(H)(iv) and (v).

(4)    "Life expectancy" means the life expectancy as computed by use of the Single Life Table in Regulation Section 1.401(a)(9)-9.

(5)    "Participant's account balance" means the Participant's account balance as of the last valuation date in the calendar year immediately preceding the "Distribution calendar year" (valuation calendar year) increased by the amount of any contributions made and allocated or Forfeitures allocated to the account balance as of the dates in the valuation calendar year after the valuation date and decreased by distributions made in the valuation calendar year after the valuation date. The account balance for the valuation calendar year includes any amounts rolled over or transferred to the Plan either in the valuation calendar year or in the "Distribution calendar year" if distributed or transferred in the valuation calendar year.

(6)    "Required beginning date" means, with respect to a Participant who has attained age 70 1/2 before January 1, 2020, April 1st of the calendar year following the later of the calendar year in which the Participant attains age 70 1/2 or the calendar year in which the Participant retires, except that benefit distributions to a "5-percent owner" must commence by April 1st of the calendar year following the calendar year in which the Participant attains age 70 1/2. "Required beginning date" means, with respect to any other Participant, April 1st of the calendar year following the later of the calendar year in which the Participant attains age 72 or the calendar year in which the Participant retires, except that benefit distributions to a "5-percent owner" must commence by April 1st of the calendar year following the calendar year in which the Participant attains age 72.

(7)    "5-percent owner" means, with respect to a Participant who has attained age 70 1/2 before January 1, 2020, a Participant who is a 5-percent owner as defined in Code Section 416 at any time during the Plan Year ending with or within the calendar year in which such owner attains age 70 1/2. "5-percent owner" means, with respect to any other Participant, a Participant who is a 5-percent owner as defined in Code Section 416 at any time during the Plan Year ending with or within the calendar year in which such owner attains age 72. Once distributions have begun to a 5-percent owner under this Section they must continue to be distributed, even if the Participant ceases to be a 5-percent owner in a subsequent year.

7.8    DISTRIBUTION FOR MINOR OR INCOMPETENT INDIVIDUAL

In the event a distribution is to be made to a minor or incompetent individual, then the Administrator may direct that such distribution be paid to the court appointed legal guardian or any other person authorized under state law to receive such distribution, or if none, then in the case of a minor individual, to a parent of such individual, or to the custodian for such individual under the Uniform Gift to Minors Act or Gift to Minors Act, if such is permitted by the laws of the state in which said individual resides. Such a payment to the guardian, custodian or parent of a minor or incompetent individual shall fully discharge the Trustee (or insurer), Employer, and Plan from further liability on account thereof.

7.9    LOCATION OF PARTICIPANT OR BENEFICIARY UNKNOWN

In the event that all, or any portion, of the distribution payable to a Participant or Beneficiary hereunder shall, at the later of the Participant's attainment of age 62 or Normal Retirement Age, remain unpaid solely by reason of the inability of the Administrator, after sending a registered letter, return receipt requested, to the last known address, and after further diligent effort, to ascertain the whereabouts of such Participant or Beneficiary, the amount so distributable may either, at the discretion of the Administrator, be treated as a Forfeiture or paid directly to an individual retirement account described in Code Section 408(a) or individual retirement annuity described in Code Section 408(b) pursuant to the Plan. However, the foregoing shall also apply prior to the later of a Participant's attainment of age 62 or Normal Retirement Age if, pursuant to the terms of the Plan, a mandatory distribution may be made to the Participant without the Participant's consent and the amount of such distribution is not more than $1,000. In the event a Participant or Beneficiary is located subsequent to a Forfeiture, such benefit shall be restored, first from Forfeitures, if any, and then from an additional Employer contribution if necessary. However, regardless of the preceding, a benefit which is lost by reason of escheat under applicable state law is not treated as a Forfeiture for purposes of this Section nor as an impermissible forfeiture under the Code.

7.10    RIGHT OF FIRST REFUSALS

(a)    If any Participant, the Participant's Beneficiary or any other person to whom shares of Company Stock are distributed from the Plan (the "Selling Participant") shall, at any time, desire to sell some or all of such shares (the "Offered Shares") to a third party (the "Third Party"), the Selling Participant shall give written notice of such desire to the Employer and the Administrator, which notice shall contain the number of shares offered for sale, the proposed terms of the sale and the names and addresses of both the Selling Participant and Third Party. Both the Trust Fund and the Employer shall each have the right of first refusal for a period of fourteen (14) days from the date the Selling Participant gives such written notice to the Employer and the Administrator (such fourteen (14) day period to run concurrently against the Trust Fund and the Employer) to acquire the Offered Shares. As between the Trust Fund and the Employer, the Trust Fund shall have priority to acquire the shares pursuant to the right of first refusal. The selling price and terms shall be the same as offered by the Third Party.

(b)     If the Trust Fund and the Employer do not exercise their right of first refusal within the required fourteen (14) day period provided above, the

Selling Participant shall have the right, at any time following the expiration of such fourteen (14) day period, to dispose of the Offered Shares to the Third Party; provided, however, that (i) no disposition shall be made to the Third Party on terms more favorable to the Third Party than those set forth in the written notice delivered by the Selling Participant above, and (ii) if such disposition shall not be made to a third party on the terms offered to the Employer and the Trust Fund, the offered Shares shall again be subject to the right of first refusal set forth above.

(c)     The closing pursuant to the exercise of the right of first refusal under Section 7.10(a) above shall take place at such place agreed upon between the Administrator and the Selling Participant, but not later than ten (10) days after the Employer or the Trust Fund shall have notified the Selling Participant of the exercise of the right of first refusal. At such closing, the Selling Participant shall deliver certificates representing the Offered Shares duly endorsed in blank for transfer, or with stock powers attached duly executed in blank with all required transfer tax stamps attached or provided for, and the Employer or the Trust Fund shall deliver the purchase price, or an appropriate portion thereof, to the Selling Participant.

(d)     Except as provided in this paragraph (d), no Company Stock acquired with the proceeds of an Exempt Loan complying with the requirements of Section 5.4 hereof shall be subject to a right of first refusal. Company Stock acquired with the proceeds of an Exempt Loan, which is distributed to a Participant or Beneficiary, shall be subject to the right of first refusal provided for in paragraph (a) of this Section only so long as the Company Stock is not publicly traded. The term "publicly traded" refers to a securities exchange registered under Section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f) or that is quoted on a system sponsored by a national securities association registered under Section 15A(b) of the Securities Exchange Act (15 U.S.C. 780). In addition, in the case of Company Stock which was acquired with the proceeds of a loan described in Section 5.4, the selling price and other terms under the right must not be less favorable to the seller than the greater of the value of the security determined under Section 6.2, or the purchase price and other terms offered by a buyer (other than the Employer or the Trust Fund), making a good faith offer to purchase the security. The right of first refusal must lapse no later than fourteen (14) days after the security holder gives notice to the holder of the right that an offer by a third party to purchase the security has been made. The right of first refusal shall comply with the provisions of paragraphs (a), (b) and (c) of this Section, except to the extent those provisions may conflict with the provisions of this paragraph.

7.11    STOCK CERTIFICATE LEGEND

Certificates for shares distributed pursuant to the Plan shall contain the following legend:

"The shares represented by this certificate are transferable only upon compliance with the terms of Radiance Technologies, Inc. Employee Stock Ownership Plan, which grants to Radiance Technologies, Inc. a right of first refusal, a copy of said

Plan being on file in the office of the Company."

7.12    PUT OPTION

(a)    If Company Stock which was not acquired with the proceeds of an Exempt Loan is distributed to a Participant and such Company Stock is not readily tradeable on an established securities market (within the meaning of Code Section 409(h)(1)(B)), a Participant has a right to require the Employer to repurchase the Company Stock distributed to such Participant under a fair valuation formula. Such Company Stock shall be subject to the provisions of Section 7.12(c).

(b)    Company Stock which is acquired with the proceeds of an Exempt Loan and which is not publicly traded when distributed, or if it is subject to a trading limitation when distributed, must be subject to a put option. For purposes of this paragraph, a "trading limitation" on a Company Stock is a restriction under any Federal or State securities law or any regulation thereunder, or an agreement (not prohibited by Section 7.13) affecting the Company Stock which would make the Company Stock not as freely tradeable as stock not subject to such restriction.

(c)    The put option must be exercisable only by a Participant, by the Participant's donees, or by a person (including an estate or its distributee) to whom the Company Stock passes by reason of a Participant's death. (Under this paragraph Participant or Former Participant means a Participant or Former Participant and the Beneficiaries of the Participant or Former Participant under the Plan.) The put option must permit a Participant to put the Company Stock to the Employer. Under no circumstances may the put option bind the Plan. However, it shall grant the Plan an option to assume the rights and obligations of the Employer at the time that the put option is exercised. If it is known at the time a loan is made that Federal or State law will be violated by the Employer honoring such put option, the put option must permit the Company Stock to be put, in a manner consistent with such law, to a third party (e.g., an affiliate of the Employer or a shareholder other than the Plan) that has substantial net worth at the time the loan is made and whose net worth is reasonably expected to remain substantial.

The put option shall commence as of the day following the date the Company Stock is distributed to the Former Participant and end sixty (60) days thereafter and if not exercised within such sixty (60) day period, an additional sixty (60) day option shall commence on the first day of the fifth month of the Plan Year next following the date the stock was distributed to the Former Participant (or such other sixty (60) day period as provided in Regulations). However, in the case of Company Stock that is publicly traded without restrictions when distributed but ceases to be so traded within either of the sixty (60) day periods described herein after distribution, the Employer must notify each holder of such Company Stock in writing on or before the tenth day after the date the Company Stock ceases to be so traded that for the remainder of the applicable sixty (60) day period the Company Stock is subject to the put option. The number of days between the tenth day and the date on which notice is actually given, if later than the tenth day, must be added to the duration of the put option. The notice must inform distributees of the term of the put options that they are to hold. The terms must satisfy the requirements of this paragraph.

The put option is exercised by the holder notifying the Employer in writing that the put option is being exercised; the notice shall state the name and address of the holder and the number of shares to be sold. The period during which a put option is exercisable does not include any time when a distributee is unable to exercise it because the party bound by the put option is prohibited from honoring it by applicable Federal or State law. The price at which a put option must be exercisable is the value of the Company Stock determined in accordance with Section 6.2. Payment under the put option involving a "Total Distribution" shall be paid in substantially equal monthly, quarterly, semiannual or annual installments over a period certain beginning not later than thirty (30) days after the exercise of the put option and not extending beyond five (5) years. The deferral of payment is reasonable if adequate security and a reasonable interest rate on the unpaid amounts are provided. The amount to be paid under the put option involving installment distributions must be paid not later than thirty (30) days after the exercise of the put option. Payment under a put option must not be restricted by the provisions of a loan or any other arrangement, including the terms of the Employer articles of incorporation, unless so required by applicable state law.

For purposes of this Section, "Total Distribution" means a distribution to a Participant or the Participant's Beneficiary within one (1) taxable year of the entire Vested Account.

(d)    An arrangement involving the Plan that creates a put option must not provide for the issuance of put options other than as provided under this Section. The Plan (and the Trust Fund) must not otherwise obligate itself to acquire Company Stock from a particular holder thereof at an indefinite time determined upon the happening of an event such as the death of the holder.

### 7.13    NONTERMINABLE PROTECTIONS AND RIGHTS

No Company Stock, except as provided in Section 7.11 and Section 7.12(b), acquired with the proceeds of a loan described in Section 5.4 hereof may be subject to a put, call, or other option, or buy-sell or similar arrangement when held by and when distributed from the Trust Fund, whether or not the Plan is then an ESOP. The protections and rights granted in this Section are nonterminable, and such protections and rights shall continue to exist under the terms of this Plan so long as any Company Stock acquired with the proceeds of a loan described in Section 5.4 hereof is held by the Trust Fund or by any Participant or other person for whose benefit such protections and rights have been created, and neither the repayment of such loan nor the failure of the Plan to be an ESOP, nor an amendment of the Plan shall cause a termination of said protections and rights.

### 7.14    QUALIFIED DOMESTIC RELATIONS ORDER DISTRIBUTION

All rights and benefits, including elections, provided to a Participant in this Plan shall be subject to the rights afforded to any "alternate payee" under a "qualified domestic relations order." Furthermore, a distribution to an "alternate payee" shall be permitted if such distribution is authorized by a "qualified domestic relations order," even if the affected Participant has not separated from service and has not reached the "earliest retirement age" under the Plan. For the purposes of this Section, "alternate payee," "qualified domestic relations order" and "earliest retirement age" shall have the meaning set forth under Code Section 414(p).

A domestic relations order that otherwise satisfies the requirements for a qualified domestic relations order ("QDRO") will not fail to be a QDRO: (i) solely because the order is issued after, or revises, another domestic relations order or QDRO; or (ii) solely because of the time at which the order is issued, including issuance after the Participant's death. A domestic relations order described in this paragraph is subject to the same requirements and protections that apply to QDROs.

7.15    DIRECT ROLLOVER

(a)    Notwithstanding any provision of the Plan to the contrary that would otherwise limit a "distributee's" election under this Section, a "distributee" may elect, at the time and in the manner prescribed by the Administrator, to have any portion of an "eligible rollover distribution" that is equal to at least $500 paid directly to an "eligible retirement plan" specified by the "distributee" in a "direct rollover."

(b)    For purposes of this Section the following definitions shall apply:

(1)    An "eligible rollover distribution" means any distribution described in Code Section 402(c)(4) and generally includes any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the "distributee" or the joint lives (or joint life expectancies) of the "distributee" and the "distributee's" designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any other distribution(s) that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and any other distribution reasonably expected to total less than $200 during a year. Any amount that is distributed on account of hardship shall not be an eligible rollover distribution and the "distributee" may not elect to have any portion of such a distribution paid directly to an "eligible retirement plan."

(2)    An "eligible retirement plan" is an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b) (other than an endowment contract), a qualified trust (an employees' trust) described in Code Section 401(a) which is exempt from tax under Code Section 501(a) and which agrees to separately account for amounts transferred into such plan from this Plan, an annuity plan described in Code Section 403(a), an eligible deferred compensation plan described in Code Section 457(b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality thereof which agrees to separately account for amounts transferred into such plan from this Plan, and an annuity contract described in Code

Section 403(b) that accepts the distributee's eligible rollover distribution. However, in the case of an "eligible rollover" distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity. The definition of eligible retirement

56

plan shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relation order, as defined in Code Section 414(p).

In addition, a Participant may elect to directly roll over an "eligible rollover distribution" to a Roth IRA described in Code Section 408A(b).

(3)    A "distributee" includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code Section 414(p), are "distributees" with regard to the interest of the spouse or former spouse.

For distributions after December 31, 2009, a nonspouse beneficiary who is a "designated beneficiary" under Code Section 401(a)(9)(E) and the Regulations thereunder, by a direct trustee-to-trustee transfer ("direct rollover"), may roll over all or any portion of his or her distribution to an individual retirement account the beneficiary establishes for purposes of receiving the distribution. In order to be able to roll over the distribution, the distribution otherwise must be an "eligible rollover distribution." If the Participant's named beneficiary is a trust, the Plan may make a direct rollover to an individual retirement account on behalf of the trust, provided the trust satisfies the requirements to be a designated beneficiary within the meaning of Code Section 401(a)(9)(E). A nonspouse beneficiary may not roll over an amount which is a required minimum distribution, as determined under applicable Regulations and other Internal Revenue Service guidance. If the Participant dies before his or her required beginning date and the nonspouse Beneficiary rolls over to an IRA the maximum amount eligible for rollover, the beneficiary may elect to use either the 5-year rule or the life expectancy rule, pursuant to Regulations Section 1.401(a)(9)-3, A-4(c), in determining the required minimum distributions from the IRA that receives the non-spouse beneficiary's distribution.

(4)    A "direct rollover" is a payment by the Plan to the "eligible retirement plan" specified by the "distributee."

(c)    Participant Notice. A Participant entitled to an eligible rollover distribution must receive a written explanation of his/her right to a direct rollover, the tax consequences of not making a direct rollover, and, if applicable, any available special income tax elections. The notice must be provided within the same 30-to-180 day timeframe applicable to the Participant consent notice. The direct rollover notice must be provided to all Participants, unless the total amount the Participant will receive as a distribution during the calendar year is expected to be less than $200.

7.16    CORRECTIVE DISTRIBUTIONS

Nothing in this Article shall preclude the Administrator from making a distribution to a Participant to the extent such distribution is made to correct a qualification defect in accordance

with the correction procedures under the IRS's Employee Plans Compliance Resolution System or any other voluntary compliance programs.

### 7.17   DIVERSIFICATION AND TRANSFER RIGHTS

(a)     Subject to the provisions listed below in this Section and such other terms and conditions as the Trustee and Administrator may require, a Participant who is actively employed by Employer and who is a participant in the Radiance 401(k) Plan may, during a specified period (herein referred to as the "Election Period"), elect to transfer all or a portion of his Vested Account balance under the Radiance 401(k) Plan to this Plan.

(1)     The Administrator shall provide reasonable notice of the Election Period to such Participants, including the projected dates of the Election Period and the per share valuation of Company Stock that will be purchased with the amount transferred from the Radiance 401(k) Plan.

(2)     The Administrator shall maintain a Transfer Account in the name of each such Participant, to which such transferred amounts shall be credited. Each Participant's Transfer Account shall share in any earnings and losses (net appreciation or net depreciation) of the Trust Fund in the same manner provided in Section 4.3(d).

(b)     The Transfer Account shall be adjusted as of each Valuation Date in accordance with Section 4.3(d). The Participant's interest in his Transfer Account shall be fully Vested and nonforfeitable at all times.

(c)     Amounts in a Participant's Transfer Account shall be held by the Trustee pursuant to the provisions of this Plan and shall be subject to the distribution limitations provided for in Regulation 1.401(k)-1(d). Such amounts may not be withdrawn by, or distributed to the Participant, in whole or in part, except as provided in Section 7.14, Section 7.15, and paragraphs (d), (e), and (f) of this Section 7.17.

(d)     At Normal Retirement Date, or such other date when the Participant or the Participant's Beneficiary shall be entitled to receive benefits, the Participant's Transfer Account shall be used to provide additional benefits to the Participant or the Participant's Beneficiary. Any distributions of amounts held in a Participant's Transfer Account shall be made in a manner which is consistent with and satisfies the provisions of Section 7.5, including, but not limited to, all notice and consent requirements of Code Section 411(a)(11) and the Regulations thereunder.

(e)     At such time as a Participant shall have attained the age of $59^1/_2$, the Administrator, at the election of the Participant who has not severed employment with the Employer, may direct the Trustee to distribute all or a portion of the amount then credited to the Participant's Transfer Account maintained on behalf of the Participant. In the event that the Administrator makes such a distribution, the Participant shall continue to be eligible to participate in the Plan on the same basis as any other Employee. Any distribution made pursuant to this Section shall be made in a manner

consistent with Sections 7.5 and 7.6, including, but not limited to, all notice and consent requirements of Code Section 411(a)(11) and the Regulations thereunder.

Notwithstanding the above, pre-retirement distributions from a Participant's Transfer Account shall not be permitted prior to the Participant attaining age $59\frac{1}{2}$ except as otherwise permitted under the terms of the Plan.

(f)    The Administrator, at the election of the Participant, shall direct the Trustee to distribute to any Participant in any one Plan Year up to the lesser of 100% of the Participant's Transfer Account valued as of the last Valuation Date or the amount necessary to satisfy the immediate and heavy financial need of the Participant.

Withdrawal under this paragraph (f) shall be authorized if the distribution is on account of:

(1)    Expenses incurred or necessary for medical care that would be deductible under Code Section 213(a) (determined without regard to whether the expenses exceed the stated limit on adjusted gross income);

(2)    The purchase of (excluding mortgage payments) of a principal residence for the Participant;

(3)    Payment of tuition, related educational fees, and room and board expenses, for up to the next 12 months of post-secondary education for the Participant, his spouse, children, or dependents (as defined in Code Section 152 without regard to Code Sections 152(b)(1), (b)(2), and (d)(1)(B));

(4)    Payments necessary to prevent the eviction of the Participant from, or foreclosure on the mortgage of, the Participant's principal residence;

(5)    Payments for funeral or burial expenses for the Participant's deceased parent, spouse, child, or dependent (as defined in Code Section 152 without regard to Code Section 152(d)(1)(B));

(6)    Expenses to the repair damage to the Participant's principal residence that would qualify for a casualty loss deduction under Code Section 165 (determined without regard to whether the loss exceeds 10% of adjusted gross income); or

(7)    Any other distribution which is deemed by the Commissioner of Internal Revenue to be made on account of immediate and heavy financial need as provided in Regulations.

Notwithstanding the above, distributions from the Participant's Transfer Account pursuant to this paragraph (f) shall be limited solely to the Participant's Transfer Account as of the date of distribution, reduced by the amount of any previous distributions pursuant to this Section and Section 7.14 and shall only be made once the Administrator determines that the Participant has first received any available hardship distributions from the Radiance 401(k) Plan.

(g)     Notwithstanding the above, any sale of Company Stock held in the Participants' Transfer Accounts shall not occur unless such sale complies with or is otherwise exempt from federal or state securities law.

ARTICLE VIII
AMENDMENT, TERMINATION AND MERGERS

8.1    AMENDMENT

(a)     The Employer shall have the right at any time to amend this Plan subject to the limitations of this Section. However, any amendment that affects the rights, duties or responsibilities of the Administrator may only be made with the Administrator's written consent. Any such amendment shall become effective as provided therein upon its execution.

(b)     No amendment to the Plan shall be effective if it authorizes or permits any part of the Trust Fund (other than such part as is required to pay taxes and administration expenses) to be used for or diverted to any purpose other than for the exclusive benefit of the Participants or their Beneficiaries or estates; or causes any reduction in the amount credited to the account of any Participant; or causes or permits any portion of the Trust Fund to revert to or become property of the Employer.

(c)     Except as permitted by Regulations (including Regulation 1.411(d)-4) or other IRS guidance, no Plan amendment or transaction having the effect of a Plan amendment (such as a merger, plan transfer or similar transaction) shall be effective if it eliminates or reduces any "Section 411(d)(6) protected benefit" or adds or modifies conditions relating to "Section 411(d)(6) protected benefits" which results in a further restriction on such benefit unless such "Section 411(d)(6) protected benefits" are preserved with respect to benefits accrued as of the later of the adoption date or effective date of the amendment. "Section 411(d)(6) protected benefits" are benefits described in Code Section 411(d)(6)(A), early retirement benefits and retirement-type subsidies, and optional forms of benefit.

8.2    TERMINATION

(a)     The Employer shall have the right at any time to terminate the Plan by delivering to the Trustee and Administrator written notice of such termination. Upon any full or partial termination, all amounts credited to the affected Participants' Accounts shall become 100% Vested as provided in Section 7.4 and shall not thereafter be subject to forfeiture, and all unallocated amounts (other than the Unallocated Company Stock Suspense Account), including Forfeitures, shall be allocated to the accounts of all Participants in accordance with the provisions hereof.

(b)     Upon the full termination of the Plan, the Employer shall direct the distribution of the assets of the Trust Fund to Participants in a manner which is consistent with and satisfies the provisions of Sections 7.5 and 7.6. Except as permitted by Regulations, the termination of the Plan shall not result in the reduction of "Section 411(d)(6) protected benefits" in accordance with Section 8.1(c).

8.3    MERGER, CONSOLIDATION OR TRANSFER OF ASSETS

This Plan and Trust may be merged or consolidated with, or its assets and/or liabilities may be transferred to any other plan and trust only if the benefits which would be received by a Participant of this Plan, in the event of a termination of the Plan immediately after such transfer, merger or consolidation, are at least equal to the benefits the Participant would have received if the Plan had terminated immediately before the transfer, merger or consolidation, and such transfer, merger or consolidation does not otherwise result in the elimination or reduction of any "Section 411(d)(6) protected benefits" in accordance with Section 8.1(c).

ARTICLE IX
TOP HEAVY

9.1    TOP HEAVY PLAN REQUIREMENTS

For any Top Heavy Plan Year, the Plan shall provide the special vesting requirements of Code Section 416(b) pursuant to Section 7.4 of the Plan and the special minimum allocation requirements of Code Section 416(c) pursuant to Section 4.3 of the Plan.

9.2    DETERMINATION OF TOP HEAVY STATUS

(a)    This Plan shall be a Top Heavy Plan for any Plan Year in which, as of the "determination date," (1) the Present Value of Accrued Benefits of Key Employees and (2) the sum of the Aggregate Accounts of Key Employees under this Plan and all plans of an Aggregation Group, exceeds sixty percent (60%) of the Present Value of Accrued Benefits and the Aggregate Accounts of all Key Employees and Non-Key Employees under this Plan and all plans of an Aggregation Group.

If any Participant is a Non-Key Employee for any Plan Year, but such Participant was a Key Employee for any prior Plan Year, such Participant's Present Value of Accrued Benefit and/or Aggregate Account balance shall not be taken into account for purposes of determining whether this Plan is a Top Heavy Plan (or whether any Aggregation Group which includes this Plan is a Top Heavy Group). In addition, if a Participant or Former Participant has not performed any services for any Employer maintaining the Plan at any time during the one-year period ending on the "determination date," any accrued benefit for such Participant or Former Participant shall not be taken into account for the purposes of determining whether this Plan is a Top Heavy Plan.

(b)    Aggregate Account: A Participant's Aggregate Account as of the "determination date" is the sum of:

(1)    the Participant's Account balance as of the most recent valuation occurring within a twelve (12) month period ending on the "determination date." However, with respect to Employees not performing services for the Employer during the year ending on the "determination date," the Participant's Account balance as of the most recent valuation occurring within a twelve

61

(12) month period ending on the "determination date" shall not be taken into account for purposes of this Section.

(2)        an adjustment for any contributions due as of the "determination date." Such adjustment shall be the amount of any contributions actually made after the Valuation Date but due on or before the "determination date," except for the first Plan Year when such adjustment shall also reflect the amount of any contributions made after the "determination date" that are allocated as of a date in that first Plan Year.

(3)        any Plan distributions made within the Plan Year that includes the "determination date" or, with respect to distributions made for a reason other than severance from employment, disability or death, within the five (5) preceding Plan Years. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Code Section 416(g)(2)(A)(i). In the case of distributions made after the Valuation Date and prior to the "determination date," such distributions are not included as distributions for top heavy purposes to the extent that such distributions are already included in the Participant's Aggregate Account balance as of the Valuation Date.

(4)        any Employee contributions, whether voluntary or mandatory. However, amounts attributable to tax deductible qualified voluntary employee contributions shall not be considered to be a part of the Participant's Aggregate Account balance.

(5)        with respect to unrelated rollovers and plan-to-plan transfers (ones which are both initiated by the Employee and made from a plan maintained by one employer to a plan maintained by another employer), if this Plan provides the rollovers or plan-to-plan transfers, it shall always consider such rollovers or plan-to-plan transfers as a distribution for the purposes of this Section. If this Plan is the plan accepting such rollovers or plan-to-plan transfers, it shall not consider such rollovers or plan-to-plan transfers as part of the Participant's Aggregate Account balance.

(6)        with respect to related rollovers and plan-to-plan transfers (ones either not initiated by the Employee or made to a plan maintained by the same employer), if this Plan provides the rollover or plan-to-plan transfer, it shall not be counted as a distribution for purposes of this Section. If this Plan is the plan accepting such rollover or plan-to-plan transfer, it shall consider such rollover or plan-to-plan transfer as part of the Participant's Aggregate Account balance, irrespective of the date on which such rollover or plan-to-plan transfer is accepted.

(7)        For the purposes of determining whether two employers are to be treated as the same employer in (5) and (6) above, all employers aggregated under Code Sections 414(b), (c), (m) and (o) are treated as the same employer.

(c)        "Aggregation Group" means either a Required Aggregation Group or a Permissive Aggregation Group as hereinafter determined.

(1)    Required Aggregation Group: In determining a Required Aggregation Group hereunder, each plan of the Employer in which a Key Employee is a participant in the Plan Year containing the Determination Date or any of the four preceding Plan Years, and each other plan of the Employer which enables any plan in which a Key Employee participates to meet the requirements of Code Sections 401(a)(4) or 410, will be required to be aggregated. Such group shall be known as a Required Aggregation Group.

In the case of a Required Aggregation Group, each plan in the group will be considered a Top Heavy Plan if the Required Aggregation Group is a Top Heavy Group. No plan in the Required Aggregation Group will be considered a Top Heavy Plan if the Required Aggregation Group is not a Top Heavy Group.

(2)    Permissive Aggregation Group: The Employer may also include any other plan not required to be included in the Required Aggregation Group, provided the resulting group, taken as a whole, would continue to satisfy the provisions of Code Sections 401(a)(4) and 410. Such group shall be known as a Permissive Aggregation Group.

In the case of a Permissive Aggregation Group, only a plan that is part of the Required Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is a Top Heavy Group. No plan in the Permissive Aggregation Group will be considered a Top Heavy Plan if the Permissive Aggregation Group is not a Top Heavy Group.

(3)    Only those plans of the Employer in which the Determination Dates fall within the same calendar year shall be aggregated in order to determine whether such plans are Top Heavy Plans.

(4)    An Aggregation Group shall include any terminated plan of the Employer if it was maintained within the last five (5) years ending on the Determination Date.

(d)    "Determination date" means (a) the last day of the preceding Plan Year, or (b) in the case of the first Plan Year, the last day of such Plan Year.

(e)    Present Value of Accrued Benefit: In the case of a defined benefit plan, the Present Value of Accrued Benefit for a Participant other than a Key Employee, shall be as determined using the single accrual method used for all plans of the Employer and Affiliated Employers, or if no such single method exists, using a method which results in benefits accruing not more rapidly than the slowest accrual rate permitted under Code Section 411(b)(1)(C). The determination of the Present Value of Accrued Benefit shall be determined as of the most recent valuation date that falls within or ends with the 12-month period ending on the Determination Date except as provided in Code Section 416 and the Regulations thereunder for the first and second plan years of a defined benefit plan.

(f)    "Top Heavy Group" means an Aggregation Group in which, as of the Determination Date, the sum of:

63

(1)    the Present Value of Accrued Benefits of Key Employees under all defined benefit plans included in the group, and

(2)    the Aggregate Accounts of Key Employees under all defined contribution plans included in the group, exceeds sixty percent (60%) of a similar sum determined for all Participants.

ARTICLE X
MISCELLANEOUS

10.1    PARTICIPANT'S RIGHTS

This Plan shall not be deemed to constitute a contract between the Employer and any Participant or to be a consideration or an inducement for the employment of any Participant or Employee. Nothing contained in this Plan shall be deemed to give any Participant or Employee the right to be retained in the service of the Employer or to interfere with the right of the Employer to discharge any Participant or Employee at any time regardless of the effect which such discharge shall have upon the Employee as a Participant of this Plan.

10.2    ALIENATION

(a)    Subject to the exceptions provided below, and as otherwise permitted by the Code and Act, no benefit which shall be payable out of the Trust Fund to any person (including a Participant or the Participant's Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any such person, nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Trustee, except to such extent as may be required by law.

(b)    Subsection (a) shall not apply to a "qualified domestic relations order" defined in Code Section 414(p), and those other domestic relations orders permitted to be so treated by the Administrator under the provisions of the Retirement Equity Act of 1984. The Administrator shall establish a written procedure to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Further, to the extent provided under a "qualified domestic relations order," a former spouse of a Participant shall be treated as the spouse or surviving spouse for all purposes under the Plan.

(c)    Subsection (a) shall not apply to an offset to a Participant's accrued benefit against an amount that the Participant is ordered or required to pay the Plan with respect to a judgment, order, or decree issued, or a settlement entered into in accordance with Code Sections 401(a)(13)(C) and (D).

10.3    CONSTRUCTION OF PLAN

This Plan and Trust shall be construed and enforced according to the Code, the Act and the laws of the State of Alabama, other than its laws respecting choice of law, to the extent not preempted by the Act.

10.4    GENDER AND NUMBER

Wherever any words are used herein in the masculine, feminine or neuter gender, they shall be construed as though they were also used in another gender in all cases where they would so apply, and whenever any words are used herein in the singular or plural form, they shall be construed as though they were also used in the other form in all cases where they would so apply.

10.5    LEGAL ACTION

In the event any claim, suit, or proceeding is brought regarding the Trust and/or Plan established hereunder to which the Trustee, the Employer or the Administrator may be a party, and such claim, suit, or proceeding is resolved in favor of the Trustee, the Employer or the Administrator, they shall be entitled to be reimbursed from the Trust Fund for any and all costs, attorney's fees, and other expenses pertaining thereto incurred by them for which they shall have become liable provided there has been no breach of fiduciary duty by the party seeking reimbursement.

10.6    PROHIBITION AGAINST DIVERSION OF FUNDS

(a)    Except as provided below and otherwise specifically permitted by law, it shall be impossible by operation of the Plan or of the Trust, by termination of either, by power of revocation or amendment, by the happening of any contingency, by collateral arrangement or by any other means, for any part of the corpus or income of any Trust Fund maintained pursuant to the Plan or any funds contributed thereto to be used for, or diverted to, purposes other than the exclusive benefit of Participants, Former Participants, or their Beneficiaries.

(b)    In the event the Employer shall make an excessive contribution under a mistake of fact pursuant to Act Section 403(c)(2)(A), the Employer may demand repayment of such excessive contribution at any time within one (1) year following the time of payment and the Trustees shall return such amount to the Employer within the one (1) year period. Earnings of the Plan attributable to the contributions may not be returned to the Employer but any losses attributable thereto must reduce the amount so returned.

(c)    Except for Section 4.1(b), any contribution by the Employer to the Trust Fund is conditioned upon the deductibility of the contribution by the Employer under the Code and, to the extent any such deduction is disallowed, the Employer may, within one (1) year following the final determination of the disallowance, whether by agreement with the Internal Revenue Service or by final decision of a competent jurisdiction, demand repayment of such disallowed contribution and the Trustee shall return such contribution within one (1) year following the disallowance. Earnings

of the Plan attributable to the contribution may not be returned to the Employer, but any losses attributable thereto must reduce the amount so returned.

### 10.7    EMPLOYER'S AND TRUSTEE'S PROTECTIVE CLAUSE

The Employer, Administrator and Trustee, and their successors, shall not be responsible for the validity of any Contract issued hereunder or for the failure on the part of the insurer to make payments provided by any such Contract, or for the action of any person which may delay payment or render a Contract null and void or unenforceable in whole or in part.

### 10.8    RECEIPT AND RELEASE FOR PAYMENTS

Any payment to any Participant, the Participant's legal representative, Beneficiary, or to any guardian or committee appointed for such Participant or Beneficiary in accordance with the provisions of the Plan, shall, to the extent thereof, be in full satisfaction of all claims hereunder against the Trustee and the Employer, either of whom may require such Participant, legal representative, Beneficiary, guardian or committee, as a condition precedent to such payment, to execute a receipt and release thereof in such form as shall be determined by the Trustee or Employer.

### 10.9    ACTION BY THE EMPLOYER

Whenever the Employer under the terms of the Plan is permitted or required to do or perform any act or matter or thing, it shall be done and performed by a person duly authorized by its legally constituted authority.

### 10.10    NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY

The "named Fiduciaries" of this Plan are (1) the Employer, (2) the Administrator and (3) the Trustee, and (4) any Investment Manager appointed hereunder. The named Fiduciaries shall have only those specific powers, duties, responsibilities, and obligations as are specifically given them under the Plan including, but not limited to, any agreement allocating or delegating their responsibilities, the terms of which are incorporated herein by reference. In general, the Employer shall have the sole responsibility for making the contributions provided for under Section 4.1; and shall have the authority to appoint and remove the Trustee and the Administrator; to formulate the Plan's "funding policy and method;" and to amend or terminate, in whole or in part, the Plan. The Administrator shall have the sole responsibility for the administration of the Plan, including, but not limited to, the items specified in Article II of the Plan, as the same may be allocated or delegated thereunder. The Trustee shall have the sole responsibility of management of the assets held under the Trust, except to the extent directed pursuant to Article II or with respect to those assets, the management of which has been assigned to an Investment Manager, who shall be solely responsible for the management of the assets assigned to it, all as specifically provided in the Plan. Each named Fiduciary warrants that any directions given, information furnished, or action taken by it shall be in accordance with the provisions of the Plan, authorizing or providing for such direction, information or action. Furthermore, each named Fiduciary may rely upon any such

direction, information or action of another named Fiduciary as being proper under the Plan, and is not required under the Plan to inquire into the propriety of any such direction, information or action. It is intended under the Plan that each named Fiduciary shall be responsible for the proper exercise of its own powers, duties, responsibilities and obligations under the Plan as specified or allocated herein. No named Fiduciary shall guarantee the Trust Fund in any manner against investment loss or depreciation in asset value. Any person or group may serve in more than one Fiduciary capacity.

### 10.11   HEADINGS

The headings and subheadings of this Plan have been inserted for convenience of reference and are to be ignored in any construction of the provisions hereof.

### 10.12   ELECTRONIC MEDIA

The Administrator may use telephonic or electronic media to satisfy any notice requirements required by this Plan, to the extent permissible under regulations (or other generally applicable guidance). In addition, a Participant's consent to an immediate distribution may be provided through telephonic or electronic means, to the extent permissible under regulations (or other generally applicable guidance). The Administrator also may use telephonic or electronic media to conduct plan transactions such as enrolling participants, making (and changing) deferral elections, electing (and changing) investment allocations, applying for Plan loans, and other transactions, to the extent permissible under regulations (or other generally applicable guidance).

### 10.13   PLAN CORRECTION

The Administrator in conjunction with the Employer may undertake such correction of Plan errors as the Administrator deems necessary, including correction to preserve tax qualification of the Plan under Code Section 401(a) or to correct a fiduciary breach under the Act. Without limiting the Administrator's authority under the prior sentence, the Administrator, as it determines to be reasonable and appropriate, may undertake correction of Plan document, operational, demographic and employer eligibility failures under a method described in the Plan or under the IRS Employee Plans Compliance Resolution System ("EPCRS") or any successor program to EPCRS. The Administrator, as it determines to be reasonable and appropriate, also may undertake or assist the appropriate Fiduciary or plan official in undertaking correction of a fiduciary breach, including correction under the DOL Voluntary Fiduciary Correction Program ("VFC") or any successor program to VFC.

### 10.14   APPROVAL BY INTERNAL REVENUE SERVICE

Notwithstanding anything herein to the contrary, if, pursuant to an application for qualification filed by or on behalf of the Plan by the time prescribed by law for filing the Employer's return for the taxable year in which the Plan is adopted, or such later date that the Secretary of the Treasury may prescribe, the Commissioner of Internal Revenue Service or the Commissioner's delegate should determine that the Plan does not initially qualify as a tax-exempt

plan under Code Sections 401 and 501, and such determination is not contested, or if contested, is finally upheld, then if the Plan is a new plan, it shall be void ab initio and all amounts contributed to the Plan by the Employer, less expenses paid, shall be returned within one (1) year and the Plan shall terminate, and the Trustee shall be discharged from all further obligations. If the disqualification relates to an amended plan, then the Plan shall operate as if it had not been amended.

### 10.15   UNIFORMITY

All provisions of this Plan shall be interpreted and applied in a uniform, nondiscriminatory manner. In the event of any conflict between the terms of this Plan and any Contract purchased hereunder, the Plan provisions shall control.

### 10.16   SECURITIES AND EXCHANGE COMMISSION APPROVAL

The Employer may request an interpretative letter from the Securities and Exchange Commission stating that the transfers of Company Stock contemplated hereunder do not involve transactions requiring a registration of such Company Stock under the Securities Act of 1933. In the event that a favorable interpretative letter is not obtained, the Employer reserves the right to amend the Plan and Trust retroactively to their effective dates in order to obtain a favorable interpretative letter or to terminate the Plan.

## ARTICLE XI
## PARTICIPATING EMPLOYERS

### 11.1   ADOPTION BY OTHER EMPLOYERS

Notwithstanding anything herein to the contrary, with the consent of the Employer and Trustee, any other corporation or entity, whether an affiliate or subsidiary or not, may adopt this Plan and all of the provisions hereof, and participate herein and be known as a Participating Employer, by a properly executed document evidencing said intent and will of such Participating Employer.

### 11.2   REQUIREMENTS OF PARTICIPATING EMPLOYERS

(a)     Each such Participating Employer shall be required to use the same Trustee as provided in this Plan.

(b)     The Trustee may, but shall not be required to, commingle, hold and invest as one Trust Fund all contributions made by Participating Employers, as well as all increments thereof.

(c)     Any expenses of the Plan which are to be paid by the Employer or borne by the Trust Fund shall be paid by each Participating Employer in the same proportion that the total amount standing to the credit of all Participants employed by such Employer bears to the total standing to the credit of all Participants.

11.3    DESIGNATION OF AGENT

Each Participating Employer shall be deemed to be a party to this Plan; provided, however, that with respect to all of its relations with the Trustee and Administrator for the purpose of this Plan, each Participating Employer shall be deemed to have designated irrevocably the Employer as its agent. Unless the context of the Plan clearly indicates the contrary, the word "Employer" shall be deemed to include each Participating Employer as related to its adoption of the Plan.

11.4    EMPLOYEE TRANSFERS

In the event an Employee is transferred between Participating Employers, accumulated service and eligibility shall be carried with the Employee involved. No such transfer shall effect a termination of employment hereunder, and the Participating Employer to which the Employee is transferred shall thereupon become obligated hereunder with respect to such Employee in the same manner as was the Participating Employer from whom the Employee was transferred.

11.5    PARTICIPATING EMPLOYER CONTRIBUTION AND FORFEITURES

Any contribution or Forfeiture subject to allocation during each Plan Year shall be determined and allocated separately by each Participating Employer, and shall be allocated only among the Participants eligible to share of the Employer or Participating Employer making the contribution or by which the forfeiting Participant was employed. On the basis of the information furnished by the Administrator, the Trustee shall keep separate books and records concerning the affairs of each Participating Employer hereunder and as to the accounts and credits of the Employees of each Participating Employer. The Trustee may, but need not, register Contracts so as to evidence that a particular Participating Employer is the interested Employer hereunder, but in the event of an Employee transfer from one Participating Employer to another, the employing Employer shall immediately notify the Trustee thereof.

11.6    AMENDMENT

Any Participating Employer that is an Affiliated Employer hereby authorizes the Employer to make amendments on its behalf, unless otherwise agreed among all affected parties. If a Participating Employer is not an Affiliated Employer, then amendment of this Plan by the Employer at any time when there shall be a Participating Employer shall, unless otherwise agreed to by the affected parties, only be by the written action of each and every Participating Employer and with the consent of the Trustee where such consent is necessary in accordance with the terms of this Plan.

11.7    DISCONTINUANCE OF PARTICIPATION

Any Participating Employer shall be permitted to discontinue or revoke its participation in the Plan at any time. At the time of any such discontinuance or revocation, satisfactory evidence thereof and of any applicable conditions imposed shall be delivered to the Trustee. The Trustee shall thereafter transfer, deliver and assign Contracts and other Trust Fund assets allocable to the

Participants of such Participating Employer to such new trustee as shall have been designated by such Participating Employer, in the event that it has established a separate qualified retirement plan for its Employees provided, however, that no such transfer shall be made if the result is the elimination or reduction of any "Section 411(d)(6) protected benefits" as described in Section 8.1(c). If no successor is designated, the Trustee shall retain such assets for the Employees of said Participating Employer pursuant to the provisions of Article VII hereof. In no such event shall any part of the corpus or income of the Trust as it relates to such Participating Employer be used for or diverted for purposes other than for the exclusive benefit of the Employees of such Participating Employer.

### 11.8    ADMINISTRATOR'S AUTHORITY

The Administrator shall have authority to make any and all necessary rules or regulations, binding upon all Participating Employers and all Participants, to effectuate the purpose of this Article.

*[signature page follows]*

IN WITNESS WHEREOF, this Plan has been executed on the 22nd day of December, 2021, effective as provided herein.

**RADIANCE TECHNOLOGIES, INC.**

By _____

Its _____CFO_____

71